IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WALTER D. BALLA, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. CV81-1165-S-EJL |
| | ) | |
| vs. | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| IDAHO BOARD OF CORRECTION, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

A hearing was held in this case on June 8, 2005 before the Honorable James M.

Fitzgerald.  The class representatives for Plaintiffs were present in court with their

counsel, J. Walter Sinclair and Nicole C. Hancock of Stoel Rives LLP.  Defendants were

represented by Paul R. Panther, Deputy Attorney General for the State of Idaho.  Pending

before the Court were the following motions: (1) Defendants Motion to Terminate

Injunctive Relief (Docket No. 439); (2) Plaintiff's Motion for Attorney Fees and Costs

(Docket No. 550); and (3) Defendants' Motion to Strike Exhibits (Docket No. 573).

Having considered the record, briefs, and oral argument in support of the pending

motions, the Court has determined that Defendants' Motion to Terminate Injunctive

Relief will be denied.  Plaintiffs' Motion for Attorney Fees and Costs will be

conditionally granted, and Defendants' Motion to Strike Exhibits is considered moot.

**ORDER  1**

## I. BACKGROUND

Defendants filed a motion seeking to terminate the injunctive relief ordered in

*Balla v. Idaho State Board of Correction (Balla I)*, 595 F. Supp. 1558 (D. Idaho 1984),

and *Balla v. Idaho State Board of Correction (Balla II)*, 656 F. Supp. 1108 (D. Idaho

1987) ("*Balla* cases"). The motion was filed pursuant to the procedure set forth in the

Prison Litigation Reform Act (PLRA), 18 U.S.C.A. § 3626 (b)(1) and (2). The statute

authorizes Defendants to seek termination of injunctive orders within two years after the

PLRA's enactment date, which was in 1996.

### A. History of *Balla* Injunctive Orders

The *Balla* cases were filed as class action challenges to prison conditions at the

Idaho State Correctional Institution (ISCI). In *Balla I,* the Court ordered prison officials

to do the following: (1) adopt a special dietary program for medically infirm inmates;

(2) provide adequate clothing for inmates in protective custody; (3) create 24-hour

emergency medical care for inmates and hire a full-time physician; (4) provide a properly

staffed medical delivery system; (5) establish a psychiatric care program; (6) provide

adequate security staff for double-celled units; (7) report to the Court on the IDOC's

progress; (8) establish an inmate classification system to protect younger offenders; and

(9) implement a disciplinary procedure insuring due process protection. 595 F. Supp. at

1583.

On July 11, 1985, the Court approved the compliance plans submitted in response

**ORDER 2**

to the *Balla* I Order.  *See Notice re Orders of July 11, 1985 and August 18, 1986,* (Docket

No. 525), Exhibit A.  The Court adopted the following compliance plans: (1) a dietary

program; (2) a plan for adequate clothing for protective custody inmates; (3) a medical

delivery system plan; (4) a program for psychiatric treatment; (5) implementation of

security staffing for double-celled units; (6) a plan to reduce predatory attacks in

protective custody units; (7) a classification procedure to protect younger offenders; and

(8) a disciplinary offense procedure in compliance with due process standards.  *Id.,*

Exhibit A.  IDOC officials were ordered to fully implement the compliance plans by

October 1, 1985.

> At the compliance hearings in July of 1985, "the court became concerned and was

persuaded that a full determination needed to be made regarding the overall overcrowded

conditions at ISCI."  *Balla II,* 656 F. Supp. 1110.  "Of particular concern to [the] Court

was the historical failure in the operation of ISCI to meet constitutional minima in the

housing of high-security and close custody inmates."  *Id.* at 1109.

> On August 18, 1986, the Court clarified the remaining issues in the action:

> "The plaintiffs have not challenged . . . the implementation of any
> programs or policies ordered and adopted in the July 11, 1985 order,
> except the psychiatric care program.  Therefore, the court will herein
> order that all issues except the overcrowding issue have been raised,
> decided, ordered, remedied and the remedial measures completed,
> and therefore, closed in this action.  The only issue which remains to
> be decided and will hereafter be litigated in this action is the issue of
> overcrowding.
>
> . . . .

**ORDER  3**

> IT IS FURTHER ORDERED that all issues which have been heretofore
> raised in this action, except the issue of overcrowding, should be, and are
> hereby, closed and will not be re-litigated in this action." *Order of August
> 18, 1986,* (Docket No. 223), p. 6-7.

The Court conducted a hearing on the overcrowding issue on October 31, and

November 1, 1985. At the close of the hearing, both parties agreed to the appointment of

a court-appointed expert. Initially, the Court appointed Thomas Lonergan as the neutral

expert. After several months, the Court was forced to relieve Mr. Lonergan of his expert

duties due an extended period of illness. After considering the parties' respective

nominations for a new expert, the Court appointed W. Raymond Nelson. Mr. Nelson

toured ISCI in January of 1987, and submitted a report to the Court in February of 1987.

The Court and its staff also toured the ISCI facility in February of 1987.

Another hearing was held on February 13, 1987 at which the parties had an

opportunity to question Mr. Nelson about his report. After the hearing, the Court entered

injunctive relief for Plaintiffs, capping the population in certain units at ISCI. *See Balla

v. Board of Correction (Balla II)*, 656 F. Supp. 1108 (D. Idaho 1987), (Docket No. 243).

The injunctive relief was based on the Eighth Amendment standards as they pertained to

"specific conditions of confinement." *Id.* at 1111 (quoting *Wright v. Rushen*, 642 F.2d

1129, 1133 (9th Cir. 1981). The Court was aware that it could "not use the totality of all

conditions to justify federal intervention requiring remedies more extensive than are

required to correct Eighth Amendment violations." *Id.* (quoting *Wright v. Rushen*). The

Court indicated that the injunctive relief was based on the constitutional minima as set

**ORDER 4**

forth in the cases decided in the United States Supreme Court and the Ninth Circuit Court of Appeals. *Id.* at 1110-12.

The Court made extensive findings in support of the population cap order. The main theme of the findings was that housing inmates in an overcrowded condition "threatens the physical, mental and emotional health and certainly threatens their personal and property safety. Such conditions are dehumanizing, intolerable and certainly of no penological benefit." *Balla II*, 656 F. Supp. at 1114. In July of 1985, the Court had identified its concerns about the conditions arising from overcrowding, and as of March 1987, the Defendants had failed to adequately remedy the overcrowding. The Court also determined that the plumbing issues identified at least two years earlier had not been rectified within the two-year time period. Accordingly, the Court's extensive findings, placed within the framework of the constitutional minima, resulted in a permanent injunction being issued against the IDOC, consisting of a population cap in certain ISCI units and an order pertaining to plumbing repairs. *Id.* at 1119.

Therefore, the injunctive orders Defendants seek to set aside have been in place since 1987, approximately eighteen years.

**B. Procedural History for Motion to Terminate Injunctive Relief.**

After Defendants filed the Motion to Terminate Prospective Relief (Docket No. 439), the Court appointed the firm of Stoel Rives to represent the inmates for the limited purpose of preparing a response to the Motion to Terminate. *See* Docket No. 459.

**ORDER 5**

Plaintiffs' counsel worked diligently to become familiar with the facts of the lawsuit and immediately set about selecting new potential class representatives.

The Court requested that Plaintiffs' counsel designate new class representatives and provide a response to the Motion to Terminate Prospective Relief within a month of being appointed. Defendants filed numerous objections to the procedures set forth by the Court relating to new class representatives, and it became obvious that the selection of new class representatives, in addition to determining whether there were current and ongoing constitutional violations at the prison, would be a complicated endeavor.

The Court entered a stay of the prior injunctive orders until such time as Plaintiffs could designate new class representatives and there could be a determination about the existence of current and ongoing constitutional violations at ISCI. The Court also issued notice of its intent to appoint an expert pursuant to Federal Rule of Evidence 706, and the parties jointly nominated Chase Riveland to be the Court's expert.

The parties selected Mr. Riveland based on his extensive professional background in corrections management and administration, dating back almost forty years. Mr. Riveland has served as a Superintendent of a correctional institution in Wisconsin, the Deputy Director of the Wisconsin Division of Corrections, the Executive Director of the Colorado Department of Corrections, and the Secretary of the Washington Department of Corrections. Mr. Riveland also worked as a correctional officer and correctional facility social worker in the early part of his career. He has served as an expert in over thirty

**ORDER 6**

cases in state and Federal courts on the issues of prison conditions, and he is the author of numerous articles on corrections issues for the National Institute of Corrections. A copy of Mr. Riveland's work history and publications is attached to the Final Expert Report of Chase Riveland, attached as Appendix A, hereto.

The parties submitted a joint set of directives to guide Mr. Riveland's appointment as the Court's expert. He was requested to offer an opinion "as to the impact on Units 9, 10, 11 and 13, and on ISCI as a whole, of fully double-celling those units." Mr. Riveland was informed that Defendants' Motion sought "to fully double cell . . . Units 9, 10, 11 and 13 at ISCI [which] would result in a net increase of 159 inmates at ISCI." *Joint Response to Order of November 12, 2004 and Instructions to Rule 706 Expert (Instructions)*, Docket No. 549, p. 2. The parties' instructions included a set of applicable legal standards to guide Mr. Riveland's appointment. The legal standards are substantially the same as those set forth in *Balla II*, 656 F. Supp. 1110-12. *Instruction*s, p. 4-6.

Mr. Riveland prepared an initial report for the Court which preliminarily recommended that the *Balla II* injunctive orders from 1987 remain in place. The Court referred the case to a settlement conference with Judge David O. Carter of the Central District of California to provide an opportunity for the parties to explore a resolution based on the findings in Mr. Riveland's preliminary report. The parties were unable to resolve the injunctive orders issue, but they agreed to limit the evidence presented at a hearing on Defendants' Motion to Terminate the Injunctive Relief, and submit the matter

**ORDER 7**

on written briefs, the joint expert's report, oral argument, and affidavits.

The Court must now examine whether the evidence before it shows current and ongoing constitutional violations and whether the remedy is to preserve the *Balla II* injunctive orders.

## II. PLRA PROSPECTIVE RELIEF STANDARDS

Defendants' Motion to Terminate is brought pursuant to the Prison Litigation Reform Act (PLRA), 18 U.S.C.A § 3626. The PLRA was clearly designed to inhibit a federal court's intervention into the daily operations of prisons. For example, injunctive relief can only be ordered "with respect to prison conditions" if it extends "no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626 (a)(1). The Court must find that the "relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation." *Id.* Thus, all injunctive orders entered after the PLRA's enactment must meet this needs-narrowness-intrusiveness test.

The PLRA also outlines the method for terminating prospective relief that was ordered prior to its enactment. A party may move for termination of injunctive orders two years after they are entered. *Id.*, § 3626(b). The PLRA states that when Defendants have moved to terminate an injunction:

> "Prospective relief shall not be terminated if the court makes written findings based on the record that prospective relief remains necessary to

**ORDER 8**

correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3).

A defendant is entitled to immediate termination if the relief was granted without findings that meet the needs-narrowness-intrusiveness test. *Id.*, § 3626(b)(2). Thus, the Court must first determine "whether the existing relief (in whole or in part) exceeds the constitutional minimum." *Gilmore v. California,* 220 F.3d 987, 1007 (9th Cir. 2000). The Court must do more than "merely examine the record for 'findings'" that comply with the new PLRA standard. *Gilmore*, 220 F.3d at 1007-08 and n. 25 (explicit findings in accordance with the new standard are not required as long as the record, the court's decision and relevant caselaw show that the injunctive orders meet the PLRA standard). If the prior injunctive relief exceeds the constitutional minimum, then those portions must be severed. But if the Court finds current and ongoing constitutional violations, "it cannot terminate or refuse to grant prospective relief necessary to correct a current and ongoing violation, so long as the relief is tailored to the constitutional minimum." *Id.*; § 3626(b)(3).

After reviewing the Orders set forth in *Balla II*, which incorporated the findings, determinations, and legal standards from *Balla I*, the Court has determined that the injunctive orders at issue in the Defendants' Motion meet the narrow tailoring standard of § 3626(b)(2). The findings required by the PRLA are implicit in the Court's judgment in *Balla II*. Although the judgment did not expressly state that the relief was narrowly

**ORDER 9**

tailored and extended no further than necessary to correct the constitutional violations, an examination of the record shows that these elements are implicit in the injunctive Order. Accordingly, the Court "cannot terminate or refuse to grant prospective relief necessary to correct a current and ongoing violation, so long as the relief is tailored to the constitutional minimum." *Gilmore*, 220 F.3d at 1007-08. The Court is essentially determining whether to preserve the existing injunctive relief based on the conditions as they exist at the time of the Court's consideration of the Motion to Terminate.

### III. FINDINGS OF CURRENT AND ONGOING VIOLATIONS

The Court now turns to the issue of current and ongoing constitutional violations at ISCI. The Court incorporates by reference the findings set forth in *Balla II*. *Balla II*, 656 F. Supp. at 1112-15.

1. At the time the *Balla II* orders were made in 1987, ISCI housed a diverse inmate population. It incarcerated mentally ill inmates, geriatric and infirm inmates, protective custody inmates, female inmates at intake, inmates held under a sentence of death, administrative segregation inmates, close custody inmates, and medium custody inmates. *Final Expert Report of Chase Riveland (Riveland Report)*, p. 5.

2. The IDOC opened the Idaho Maximum Security Institution (IMSI) in 1989. IMSI is designed to hold 552 beds. IMSI incarcerates the inmates in protective custody, close custody, and administrative segregation. Seriously mentally ill inmates and those held under a sentence of death are also held at ISCI. Female inmates are no longer held

**ORDER 10**

for intake purposes at ISCI. *Id.*, p. 5.

3. The ISCI inmate population now includes geriatric and infirm inmates, a disciplinary segregation unit, medium custody, and some minimum custody inmates. ISCI also contains an inmate reception unit and a transition unit. *Id.*, p. 5.

4. In 1987 the inmate population was approximately 750 inmates. The population at ISCI is now approximately 1416. *Id.* The enhancements made to the ISCI facility after 1987 include (1) the opening of a new chapel; (2) an upgrade to the food services building; (3) an expansion of Unit 7 and the education building; (4) the addition of Units 15 and 16; (5) the addition of 19 beds in the medical facility; (6) the opening of a new laundry; (7) the addition of a new visiting center; and (8) changes to the inmate classification system. *Id.*, p. 5. These enhancements do not counterbalance the deleterious effects of the doubling of inmates at ISCI. *Id.* at 16-20.

5. The IDOC plans to double-cell Unit 9. The design capacity for Unit 9 is 78 inmates, and *Balla II* capped the inmate population at 78. As of the date Mr. Riveland's report was written, the population in Unit 9 was 117 inmates. The planned population increase is 156 inmates in Unit 9. *Id.*, p. 7.

6. The IDOC also plans to double-cell Unit 10. The design capacity for Unit 10 is 72 inmates, and *Balla II* capped the inmate population at 108. The planned increase for Unit 10 is 144 inmates. *Id.*, p. 7.

7. The IDOC also plans to double-cell Unit 11. The design capacity for Unit 11 is

**ORDER 11**

72 inmates, and *Balla II* capped the inmate population at 108. The planned increase for Unit 11 is 144 inmates. *Id.*

8. Finally, the IDOC plans to double-cell Unit 13. The design capacity for Unit 13 is 96 inmates, and *Balla II* capped the inmate population at 144. The current inmate population for Unit 13 is approximately 192 inmates, and this represents full double-celling of each cell in this Unit. *Id.* Housing inmates in the overcrowded conditions in Units 9, 10, 11, and 13 threatens the physical, mental and emotional health of the inmates at ISCI. The overcrowded conditions also threaten the inmates' personal safety and the integrity of their minimal personal property. The conditions arising from the overcrowding are dehumanizing and of no penological benefit.

9. The American Correctional Association (ACA) standard for day room space is now less than half the recommended amount per inmate in Units 9, 10, and 11. The day room space in Unit 13 is slightly higher than the recommended space per inmate. *Id.*, p. 7-8. The Court may consider, but cannot exclusively rely on the ACA standards in determining the constitutional minima. *Balla II*, 656 F. Supp. 1112 (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1249 (9th Cir. 1982).

10. Although the number of toilets and sinks appear to be adequate for Units 9, 10, 11, and 13, the toilets and sinks are not consistently in operating condition. There are lengthy delays associated with repairing the sinks and toilets. The number of showers is deficient in Units 9, 10, 11, and 13, and not all showerheads are in working order within

**ORDER 12**

the Units. The showers at ISCI are typically one long shower enclosing more than one shower head and one curtain covering the entire shower. Due to safety and security concerns, the IDOC limits the number of inmates who can occupy the showers at a given time, thereby further limiting the shower usage. The only substantive change in the plumbing facilities for these Units from the 1987 findings is that the plumbing fixtures and pipes are eighteen years older and in need of even more frequent repairs. *Id.*, p. 8.

11.  Over the last four years, the IDOC records show 190 inmate-on-inmate assaults between January of 2001 to November of 2004. Nineteen incidents of inmate assaults on the IDOC staff were recorded in IDOC records. The number of inmate grievances recorded in the IDOC records show that in 2003, approximately 292 grievances were filed during the entire year, while 253 grievances were filed in the first quarter of 2004. This is a substantial increase in grievances from prior years. *Id.*, p. 14.

12.  Opportunities for inmates to be engaged in activities outside of their cells has diminished through double-celling practices, and exceeding the inmate population caps for Units 9, 10, 11, and 13 places an increased demand on central services. For example, work opportunities have grown increasingly scarce at ISCI. Work opportunities mitigate tension, provide funds for commissary purchases, and generate additional out-of-cell time. Several hundred  inmates have no work opportunities at ISCI. Double-celling inmates in Units 9, 10, 11, and 13 will further exacerbate the lack of work opportunities at ISCI. *Id.*, p. 9.

**ORDER  13**

13. Programs that offer skill building, drug and alcohol treatment, and behavioral change have been reduced and typically include only those inmate who are within two years of their release dates. These programs provide constructive use of inmates' time and provide out-of-cell opportunities that mitigate tension. Double-celling inmates at ISCI will reduce the number of skill building and treatment opportunities offered to ISCI inmates. *Id.*, p. 9.

14. Educational and vocational programs include approximately 250 inmates at ISCI. Inmates who are within two years of release are eligible for placement in educational and vocational programs. Double-celling inmates in the affected Units will further diminish the educational and vocational programs, thereby creating tension and reduced opportunities for out-of-cell time. *Id.*, p. 9.

15. The double-celling of inmates in Unites 9, 10, 11, and 13, is pushing the capability of the food services at ISCI to the limit. Food served at meals has been reduced, and fewer options are available to inmates. Providing sufficient nutritious food in a timely manner is crucial to the safe operation of ISCI. *Id.*, p. 11.

16. ISCI has seven psychosocial rehabilitation specialists assigned to work with at least 200 inmates per specialist. The specialists assist the inmates with their custody, security, and protection needs while at ISCI. Many inmates are assigned to Unit sergeants or other correctional officers to manage their custody, security, and protection needs. The correctional officers do not have the specialized training that is given to the psychosocial

**ORDER 14**

rehabilitation specialists, nor do they have sufficient time to meet with the inmates assigned to them. Inmates have reported a wait time of several weeks when they request to meet with the either the rehabilitation specialists or the Unit sergeants to whom they are assigned. *Id.*, p. 12.

17. Medical, dental, and pharmaceutical services at ISCI appear to be severely strained. Inmates described standing in line for up to two hours to obtain prescription medication. In October of 2004, as many as 708 inmates were being administered prescribed medication, with 292 of those inmates prescribed psychotropic medications. *Id.*, p. 13. The Court is also acutely aware of the number of pending civil rights claims, alleging the failure to adequately provide medical care for serious medical, dental, and psychological conditions. The conditions arising from the double-celling of all Units at ISCI will seriously threaten the IDOC's ability to provide adequate care for inmates' medical, dental, and psychological conditions.

18. Inmates are now restricted to their own tiers and cells, and the music room was eliminated. Changes were also made to the way in which inmates can access the legal resource center at ISCI, thereby limiting inmates' ability to obtain legal information and forms. *Id.*, p. 15.

19. Unit security staff were added for Units 15 and 16, and one additional officer was added to shifts for Units 9, 10, 11, and 13. However, the added security staff has not kept pace with the almost fifty percent increase in inmate population at ISCI. Unit

**ORDER 15**

officers must double as movement staff when the inmates are allowed to move from their tiers and to the food services building. ISCI has not been provided with the enhanced resources proportionate to the large increase in inmate population. *Id.*, p. 15.

20. Mr. Riveland's report indicates that "[m]any of the factors affecting the Court's analysis in 1987 resulting in a finding that overcrowding at ISCI was unconstitutional remain unchanged or further exacerbated for medium custody inmates. . . The day rooms in Units 9, 10, 11, and 13 are too small to handle the existing population, let alone an increased population." *Id.*, p. 16-17.

21. "Over the past several years, Idaho's incarceration rate has generally been in the top ten in the country, often in the top five. Seldom have the resources maintained pace with the inmate population increases." *Id.*, p. 17-18. Projected growth in the inmate population over the next four years anticipates an additional 1,300 inmates system-wide. No funds have been allocated to mitigate the anticipated growth in the inmate population. Double-celling inmates in ISCI Units 9, 10, 11, and 13 cannot accommodate the anticipated growth in the Idaho prison population. *Id.*

22. The increased staffing does not alleviate the problems associated with overcrowding, inadequate and antiquated plumbing, and medical, dental and psychological care. *Id.*, p. 15-16.

### IV. EXISTENCE OF CURRENT VIOLATIONS

In *Balla II*, the Court determined in its conclusions of law that "the overcrowded

**ORDER 16**

condition at ISCI has reached the level of unconstitutional overcrowding which is the unnecessary and wanton infliction of pain." *Balla II*, 656 F. Supp. at 1116-17 (citing *Rhodes v. Chapman*, 452 U.S. 337 (1981)). The Court then proceeded to list the specific legal violations that supported the issuance of a permanent injunction. *Balla II*, 656 F. Supp. at 1115-19. The Court issued the permanent injunction in accordance with the present requirements of the PLRA. It ordered that Defendants were permanently enjoined from (1) double-celling . . . more than seventy-eight (78) inmates in Unit 9 at any time; (2) housing more than one hundred eight (108) inmates in Units 10 and/or 11 at any time; [and] (3) housing more than one hundred forty-four (144) inmates in A-Block [Unit 13] at any time. *Id.* at 1120. The Court further ordered that "no more than two (2) inmates be housed in any cell for any period of time at any time and that no inmates be housed at any time in day rooms or other non-designed cell areas or forced to sleep on mattresses on the floor." *Id.* Finally, the Court ordered that "defendants attend to all plumbing disorders in the housing units within twenty-four (24) hours of oral or written report to the [ISCI] staff and that those plumbing disorders be remedied within three (3) working days from such report." *Id.* These injunctive orders are narrowly drawn, extend no further than necessary to correct the constitutional violations, and were the least intrusive means necessary to correct the violation of the rights at issue. *See Gilmore v. California*, 220 F.3d 987, 1008, (9th Cir. 2000)(district court must determine whether the existing relief exceeds the constitutional minimum). Accordingly, the *Balla II* injunctive order provisions satisfy the

**ORDER 17**

tests set forth in § 3626(b)(2) and § 3626(b)(3)(setting forth the conditions under which injunctive orders can be terminated or remain in place).

Of particular importance to the Court in *Balla II*, was the length of time that IDOC officials were aware that both the overcrowding and plumbing issues had been at the level of a constitutional violation. It appears that the Court had given the IDOC at least two years to remediate the overcrowding and plumbing violations, but the violations were not corrected. Defendants were informed that "only through adequate structural change or redesign of the housing units may the population caps ordered herein be increased." *Balla II*, 656 F. Supp. at 1119; *see also Balla v. Idaho State Board of Corrections*, 869 F.2d 461, 472 (9th Cir. 1989)("Evidence of an historical failure to comply with constitutional standards is highly relevant in fashioning an effective remedy.")(citing *Hutto v. Finney*, 437 U.S. 678, 687 (1978)).

Seventeen years after the injunctive orders in *Balla II*, Defendants return to Court, requesting relief under conditions that are worse, both as to overall inmate population and plumbing problems, than when the original injunctive orders were put in place. The minimal substantive changes implemented at ISCI after *Balla II* have not ameliorated the unconstitutional overcrowding conditions. There have been no adequate structural or design changes made to Units 9, 10, 11, and 13, which was the Court's pre-condition to eliminating the injunctive orders. As the Ninth Circuit observed: "good faith efforts do not cure the constitutional violations occurring for years." *Balla v. Idaho State Board of*

**ORDER 18**

*Corrections*, 869 F.2d at 473. The IDOC's efforts thus far have not resolved the unconstitutional overcrowding conditions at ISCI.

The parties agreed to limit the record that would be created in support of and in opposition to the Motion to Terminate Injunctive Relief, and the record clearly shows current and ongoing constitutional violations. *Gilmore*, 220 F.3d at 1010 (the record referred to in § 3626(b)(3) means the record reflecting conditions as of the time termination is sought). The facts before the Court are *prima facie* evidence that the existing remedial scheme has not worked and that Defendants are ill-equipped to increase the existing population caps. *See Ruiz v. Johnson*, 154 F. Supp. 2d 975, 999-1000 (S.D. Tex. 2001)("the federal courts have the power, and the duty, to make their interventions effective:" ordering new remedial plans where existing orders had failed to correct the constitutional violations); *Morales Feliciano v. Calderon Serra*, 300 F. Supp. 2d 321, 335 (D. Puerto Rico 2004)(failure of earlier relief to resolve the constitutional violations, supports the extension of more intrusive relief).

The Court hereby incorporates the conclusions of law and injunctive orders set forth in *Balla II*. *Balla II*, 656 F. Supp. 1115-20.[1] The Court has determined that the

---

[1] The findings of fact and conclusions of law include Units 1,2,3,7, and 8. It also refers to close custody inmates as potential occupants of Unit 9. The Court presumes that the parties' agreement to limit briefing and argument to Units 9, 10, 11, and 13 means that the orders pertaining to Units 1, 2, 3, 7, and 8 are no longer at issue in this action. It also appears that the parties are in agreement that Unit 9 will be occupied by medium custody inmates in the future. Therefore, the Court omits the inclusion of findings of fact and conclusions of law as they more particularly relate to Units 1, 2, 3, 7, and 8 and the close custody inmates.

**ORDER 19**

prospective relief ordered in *Balla II* remains necessary to correct the current and ongoing Eighth Amendment violations at ISCI.[2]  Therefore, the Court will preserve the permanent injunctions relating (1) to population caps in Units 9, 10, 11, and 13; (2) to the prohibition of triple-celling and placing inmates on the floor at any time, and (3) to plumbing repairs.

The legal standard applicable to the Eighth Amendment violations are set forth in the parties' Joint Instructions to the Rule 706 Expert (Docket No. 549).  The Court incorporates the Eighth Amendment standards as set forth in the parties' joint submission. The Court notes that the joint submission is taken from the legal standards set forth in *Balla II*, 656 F. Supp. 1108, 1110-12.

## V. NARROWLY DRAWN AND LEAST INTRUSIVE REMEDY

Preserving the injunctive orders set forth in *Balla II*, extends no further than is necessary to correct the Eighth Amendment violations, is narrowly drawn, and is the least intrusive way to correct the violations.  The permanent injunction was narrowly drawn because it placed population caps on four units at ISCI, it limited the IDOC's ability to house inmates on the floor in areas other than cells, and it placed a time limit on plumbing repairs.  These intrusions into the housing of inmates at ISCI were and continue to be necessary to eliminate a serious and persistent Eighth Amendment violation at this

---

[2] Although the Riveland Report indicates that an exception could be made in the injunctive orders for double-celling in Unit 9, the Court is not convinced that the original order prohibiting double-celling should be set aside. Unit 9 still suffers from limited day room space, lack of showers, and available out-of-cell time.

**ORDER  20**

institution. *See Skinner v. Uphoff*, 234 F. Supp. 2d 1208, 1218 (D.Wyo. 2002)

(prophylactic measures may be ordered if necessary to correct the continuing

constitutional violations).

The intrusions are narrowly tailored to Units 9, 10, 11, and 13, and the Court does

not perceive the Eighth Amendment violations arising from the overcrowding in these

units to be appropriate for a case-by-case determination. The intrusions into the day-to-

day operations of ISCI are minimal because there is no continuous supervision from the

Court, and the IDOC has complete control over how it assigns inmates to the ISCI Units

and arranges for immediate plumbing repairs. *See Benjamin v. Fraser*, 343 F.3d 35, 53-

54 (2d Cir. 2003)(directing district court to examine the appropriateness of injunctive

relief that goes beyond named individuals where record shows violations in a jail

system's food services; upholding findings that comprehensive repair scheme is less

intrusive than having the court supervise the system-wide violations).

Defendants argue that "absent evidence of excessive violence or rioting, the Court

must defer to the discretion of prison administrators" on the issue of housing inmates at

ISCI. *Defendants' Initial Brief (Docket No. 568-1)*, p. 6. The Court disagrees with this

proposition. It is specifically within the Court's province to determine "when prison

conditions pass beyond legitimate punishment and become cruel and unusual." *Rhodes v.*

*Chapman*, 452 U.S. 337, 364 (1981). The Court must examine the effect upon inmates of

the physical facility, sanitation, safety, inmate needs and services, and staffing. "When

**ORDER 21**

'the cumulative impact of the conditions of incarceration threatens the physical, mental, and emotional health and well-being of the inmates and/or creates a probability of recidivism and future incarceration,' the court must conclude that the conditions violate the Constitution." *Id.* (quoting *Laaman v. Helgemoe*, 437 F. Supp. [269], 323 [D.N.H. 1977]); *see also Wilson v. State of Idaho*, 746 P.2d 1022, 1025-26 (Idaho Ct. App. 1988)(the Eighth Amendment protects inmates from unsanitary living conditions and unnecessary exposure to communicable diseases; judges must review conditions of confinement with concepts of dignity, civilized standards, humanity, and decency).

After reviewing the record in this case, the Court is convinced that the IDOC officials would prefer to incarcerate inmates within the parameters of Eighth Amendment standards, but it has continually been denied adequate funding for the tremendous growth in inmate population. The Court is hopeful that the preservation of the *Balla II* injunctive orders will result in funding that will allow for systemic changes at ISCI. Once the constitutional standards are met, the IDOC may request review of the permanent injunction.

Based on the foregoing, the Court will preserve the injunctive relief ordered in *Balla II*. The PLRA provides for an end to the automatic stay of the injunctive relief when the Court makes a final ruling on the necessity for continuing relief. *See* § 3626(e)(2)(B). The Court is aware that Defendants chose to double-cell Units 9, 10, 11, and 13 prior to a determination of the Motion to Terminate Injunctive Relief. Therefore,

**ORDER 22**

in order for the Defendants to fully comply with the injunctive orders, the effective date will be delayed until October 28, 2005.

## VI. ATTORNEY FEES MOTION

Plaintiffs' counsel filed a Motion for Attorney Fees for their work in representing the inmate class. Attorney fees may be recovered if they are "directly and reasonably incurred in proving an actual violation of the plaintiff's rights." 28 U.S.C. § 1988. Attorney fees can also be awarded in a class action where Plaintiffs defend against a motion to terminate an injunctive order. *Cody v. Hillard*, 304 F.3d 767, 776 (8th Cir. 2002).

The Ninth Circuit has ruled that the full amount of attorney fees incurred to obtain injunctive relief may be awarded to counsel for the Plaintiffs. *Dannenberg v. Valadez*, 338 F.3d 1070, 1075 (9th Cir. 2003). Thus it appears that Plaintiffs' counsel are entitled to the attorney fees and costs they are requesting.

The Court delayed the oral argument on the attorney fees issue, and, therefore, the Court will issue a tentative ruling on the attorney fees and cost request at this time. The Court tentatively rules that Plaintiffs' Motion for Attorney Fees and Costs is granted. To the extent costs have been paid to Plaintiffs' counsel through the Court's Pro Bono Program, the program will be reimbursed. Defendants may arrange to reimburse the Court's program directly, rather than pay the amount to Plaintiffs' counsel. In the event either side requests oral argument on the Motion, the Court's ruling will be suspended

**ORDER 23**

until after oral argument has taken place.  The parties shall notify the Court's Pro Se Unit at (208) 334-1172 within ten days of this ruling as to whether oral argument is requested on the attorney fees issue.

## VII.  MOTION TO STRIKE

Defendants also filed a motion to strike the exhibits attached to the Affidavit of Nicole Hancock.  The exhibits were grievance forms the inmates had submitted to the IDOC, relating to alleged constitutional violations arising from the overcrowding at the prison.  Defendants claim that the grievance forms were not authenticated.  After the grievance forms were filed, Plaintiffs' counsel obtained affidavits from the inmates, attempting to authenticate the grievance forms.

The parties agreed to limit the record the Court would consider on the Motion to Terminate Injunctive Relief.  At the hearing on the Motion, the Court expressed its concern about considering affidavits without the opportunity for the parties to cross-examine the affiants' testimony.  Accordingly, the Court informed the parties that it would not consider the inmate affidavits pertaining to the Motion to Terminate. Therefore, Defendants' Motion to Strike is moot.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Defendants' Motion to Terminate (Docket No. 439 and 568-1) is DENIED.  The following sections of the

**ORDER  24**

permanent injunction in *Balla II* remain in effect:

    1. Double-celling more than seventy-eight (78) inmates in Unit 9 at any time;

    2. Housing more than one hundred eight (108) inmates in Unit 10 at any time;

    3. Housing more than one hundred eight (108) inmates in Unit 11 at any time; and

    4. Housing more than one hundred forty-four (144) inmates in A-Block at any

time.

The effective date of the preservation of the previous injunctive orders is October 28,

2005.

IT IS FURTHER HEREBY ORDERED that no more than two (2) inmates be

housed in any cell for any period of time at any time and that no inmates be housed at any

time in day rooms or other non-designed cell areas or forced to sleep on mattresses on the

floor. This order shall take effect immediately.

IT IS FURTHER HEREBY ORDERED that Defendants attend to all plumbing

disorders in the housing units within twenty-four (24) hours of oral or written report to

the Idaho State Correctional Institution (ISCI) staff and that those plumbing disorders be

remedied within three (3) working days from such report.

IT IS FURTHER HEREBY ORDERED that Plaintiffs' Motion for Attorney Fees

and Costs (Docket No. 550) is tentatively GRANTED. In the event the parties request

oral argument on the Court's tentative ruling, the ruling will be suspended. The parties

shall notify the Court's Pro Se Unit of the request for oral argument within ten (10) days

**ORDER 25**

of this Order's date.  If no oral argument is requested, Plaintiffs' counsel shall prepare a proposed order to submit to the Court.

IT IS FURTHER HEREBY ORDERED that Defendants' Motion to Strike Affidavits in Opposition to Motion (Docket No. 573) is MOOT.

Dated this 22 day of September, 2005.

Judge James M. Fitzgerald
United States District Court

**ORDER  26**