IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

WALTER D. BALLA, et al.,

Plaintiffs,

v.

IDAHO STATE BOARD OF CORRECTION, et al.,

Defendants.

Case No. CV 81-1165-S-BLW

**MEMORANDUM DECISION AND ORDER**

**INTRODUCTION**

Pending before the Court is Plaintiffs' Motion for Order to Show Cause Why Defendants Should Not Be Held in Contempt of Court. (Docket No. 740.) Plaintiffs have requested that the Court hold Defendants in contempt for temporarily exceeding court-imposed population caps on Units 9, 10, 11, and 13 at Idaho State Correctional Institution (ISCI), and for transferring and double-celling inmates in administrative segregation units at the Idaho Maximum Security Institution (IMSI). (Docket Nos. 740, 751, 762.)

The Court held an evidentiary hearing on February 18 and 20, 2009, and the parties have since submitted post-hearing briefing. For the reasons set forth more

fully herein, the Court declines to hold the Defendants in contempt.[1]

## THE *BALLA II* AND *BALLA III* INJUNCTIVE ORDERS

In *Balla v. Idaho State Board of Corrections*, 656 F.Supp. 1108, 1109 (D. Idaho 1987) (*Balla II*), District Judge Harold Ryan granted injunctive relief to the prisoner Plaintiffs at ISCI by imposing population caps in certain housing units. In relevant part, the Court prohibited Defendants from:

> 1. Double-celling maximum custody inmates or housing more than seventy-eight (78) inmates in Unit 8 [the restrictive housing unit] at any time.
>
> 2. Double-celling close custody inmates or housing more than seventy-eight (78) inmates in Unit 9 at any time [later modified to no more than 117 inmates].
>
> 3. Housing more than one hundred eight (108) inmates in Units 10 and/or 11 at any time.
>
> 4. Housing more than one hundred forty-four (144) inmates in A-Block [Unit 13] at any time.

*Balla II*, 656 F. Supp. at 1119-20. The Court also enjoined Defendants from using "any other vehicle, scheme or mechanism designed to undermine the spirit and letter of this opinion and order." *Id*. at 1119.

---

[1] The parties have also submitted supplemental briefing addressing the Court's December 4, 2008 Notice of Tentative Ruling and Order, in which the Court ruled preliminarily that Plaintiffs are entitled to pursue contempt motions for Defendants' alleged failure to comply with remedial plans that were adopted in 1985. The Court will issue a separate opinion on that matter.

In 2003, Defendants filed a Motion to Terminate Prospective Relief, seeking an end to the population caps imposed on Units 9, 10, 11, and 13. When a stay of the injunction was briefly in place, Defendants prepared the units for double-celling by installing additional bunks (the "*Balla* beds"). On September 26, 2005, Judge James M. Fitzgerald denied Defendants' Motion. (Docket No. 585) (*Balla III*). Judge Fitzgerald reaffirmed and preserved the injunction "relating (1) to population caps in Units 9, 10, 11, and 13, (2) to the prohibition of triple-celling and placing inmates on the floor at any time, and (3) to plumbing repairs." *Id*. at 20.

After a riot in early January 2009, Defendants filled the extra beds in these units for about three and one-half weeks, exceeding the population caps during that time. Plaintiffs now seek an order holding Defendants in contempt for that violation. As a remedy, they ask for monetary sanctions in the amount of $5,000 for each day that the Defendants "have violated and continue to violate the *Balla* injunctions."[2] (Docket No. 751, p. 5.) They also request the Court to order Defendants to remove the additional *Balla* beds as a preventative measure to make it more difficult for the Defendants to repeat the violation. (Docket No. 740, p. 2.)

---

[2] In their original Motion, Plaintiffs also suggested deadlines for compliance. Defendants are no longer double-celling the *Balla* units, and those dates have since passed. Thus, that aspect of the Motion is moot.

Plaintiffs further claim that the Defendants decreased the population at ISCI only through a game of "musical cells," in part by moving administrative segregation inmates from Unit 8 at ISCI to IMSI and double-celling them there. (Docket No. 751, p. 4.) Plaintiffs assert that this violates *Balla II*'s injunction against double-celling in Unit 8 at ISCI and against "using any other vehicle, scheme, or mechanism designed to undermine the spirit and letter" of the injunction. (Docket No. 751, pp. 4-6.)

With this background in mind, and after considering all of the evidence presented, the Court makes the following findings of fact.

## FINDINGS OF FACT

### Bringing Inmates Back to Idaho

1. In 2008, as many as 650 Idaho prisoners were housed in facilities in Texas and Oklahoma due to a lack of sufficient bed space in Idaho prisons. (Evidentiary Hearing Transcript (Tr.), p. 31.) The Texas facility was operated by the GEO Group, a private corporation, which held a contract with the Idaho Department of Correction (IDOC) for managing the Idaho inmates. (Tr., pp. 31-32.)

2. In October 2008, IDOC officials decided to terminate the contract with the GEO Group and transfer the 300 Idaho inmates that remained in Texas.

(Tr., p. 51.) This decision was driven both by a concern about chronic staff shortages at that particular facility and by a desire to save IDOC money in an increasingly tight budgetary environment. (Tr., pp. 32, 51, 180, 197-98.)

3. On November 5, the Director of IDOC, Brent Reinke, notified GEO Group that IDOC intended to remove all of the Idaho inmates from the Texas facility by January 5, 2009. (Defendants' Exhibit 2001 ("Def. Ex."); Tr., p. 33.) At that time, IDOC officials were weighing various options for placing these inmates, including transferring them to the Oklahoma contract prison, but no plans had yet been finalized. (Tr., pp. 52-53, 198-99.)

4. By mid-November, Defendants had decided to bring these inmates back to Idaho for financial reasons. (Tr., pp. 54-55, 198-99.) Returning the inmates would save the IDOC over one million dollars during the fiscal year. (Tr., pp. 54, 198-99.)

5. In late November, approximately four to six weeks before the inmates were scheduled to arrive, Defendants resolved to convert a warehouse at ISCI that formerly contained an upholstery shop into a new housing unit--Unit 24. (Tr., pp. 133, 201.) ISCI was operating at full capacity, and without the new unit, the prison would lack sufficient space to handle the increase in population. (Tr., p. 133.)

6. The design for Unit 24 called for housing approximately 200 inmates

in two "tiers" of bunk beds in a dormitory setting, separated by a central walkway. The unit would include two furnished day rooms, an indoor bathroom with four toilets and three urinals, and two outdoor plumbing trailers containing additional bathroom facilities. (Tr., pp. 134-36.) The outdoor trailers each were designed for ten showers, eight toilets, and eight sinks. (Tr., pp. 134-35.) Once completed, Unit 24 would have twenty toilets, twenty showers, twenty sinks, and three urinals; that is, one toilet and one shower for about every ten inmates.

7. Defendants intended to open Unit 24 on or about January 1, 2009, just a few days before the out of state inmates would arrive. (Tr., p. 202.) Unit 24 would be populated mainly with parole violators awaiting a hearing before the Parole Commission. (Tr., p. 175.)

8. In late December, IDOC staff members arrived at the Texas facility to oversee the transfer of the inmates back to Idaho. (Tr., p. 88.) The facility was in the process of being shut down: files and boxes were packed, and GEO Group had notified staff that the institution would close immediately after the Idaho inmates departed. (Tr., pp. 89, 98.)

**Movement into Unit 24 and the Riot**

9. By Friday, January 2, Unit 24 was still under construction. (Tr., p. 203.) Sinks, toilets, and plumbing fixtures had been left out in one of the two day

rooms, which was marked with yellow "caution tape" and was off-limits to inmates. (Tr., pp. 135-36, 163-64, 245, 28-384.) Only one outdoor bathroom trailer was on-site, and it was not functioning. (Tr., pp. 163-64.)

10. As a result, the inmates would be required to use the indoor bathroom with a limited number of toilets and urinals until the outdoor trailers were finished. Although the on-site trailer was scheduled to be finished the following day, the second trailer would not be completed for at least another week or two. (Tr., pp. 164, 195.)

11. Despite this apparent lack of readiness, the warden or deputy warden at ISCI authorized the transfer of approximately 200 inmates into Unit 24 in the evening hours of January 2. (Tr., pp. 140, 203.)

12. The inmates had been notified only about 45 minutes in advance that they would be moved into a new unit. (Tr., p. 238.) Several had accumulated valuable electronic items that were confiscated by correctional officers for storage elsewhere. (Tr., pp. 138-39, 250.) The bunk beds, essentially two surplus army cots wielded together, were smaller and flimsier than the beds in the other units. (Tr., pp. 139, 236-36.) There was a shortage of plastic totes for inmates to store their belongings. (Tr., p. 139.) Many were upset about their new living conditions. (Tr., p. 250.)

13. A few minutes after the lights were turned down for the night, a small group of inmates started a disturbance. (Tr., p. 253.) The two correctional officers who were still present quickly lost control of the situation and retreated into an enclosed control room. (Tr., p. 253.) Rioting inmates converged on the room and attempted to break the plexiglass window. (Tr., p. 253.) The interior window shattered, but the plexiglass barrier held. (Tr., pp. 253-54.)

14. Undaunted, inmates climbed onto the roof of the room and began to stomp a hole through the plywood. (Tr., p. 254.) One of the officers grabbed a shovel and broke an exterior window, and both crawled to safety. (Tr., p. 254.)

15. Certain inmates“tore the place apart” and started a small fire in the control room. (Tr., p. 254.) The riot continued until the unlocked exterior doors were opened. (Tr., p. 255.) Inmates then rushed out of the building. (Tr., p. 255.)

16. IDOC officials soon learned that Unit 24 was in no shape to be used as a housing unit. (Tr., p. 231.)

**Filling and Emptying the *Balla* Beds**

17. The first group of Texas inmates was scheduled to arrive at 9:00 a.m. on Sunday, January 4, the day after the riot had been put down. (Def. Ex. 2004.)

18. With bed space no longer available in Unit 24, Defendants had to quickly consider their options for housing these inmates.

19. Holding the inmates at the Texas facility was not a realistic option. The facility was closing, and only a skeleton crew would remain to wind down operations after the inmates left. (Tr., pp. 98-99, 113.) The inmates' personal belongings had already been sent to Idaho. (Tr., p. 93.) The preparations for transport were well underway when the riot occurred. Buses and planes had been chartered, and the first group of inmates were scheduled to depart in the early morning hours of January 4. (Def. Ex. 2004.)

20. While the IDOC's other contract prison in Oklahoma had the infrastructure in place to handle an increase in population, housing units at that prison had been "mothballed," and the prison did not have sufficient staff to manage more inmates. (Tr., pp. 112-13, 219.) Moreover, placing inmates in a different state generally requires a contracting process that takes significant time to complete. (Tr., pp. 217-220.)

21. Some county jails in Idaho accept IDOC inmates when they have space, but Chief of Prisons Pam Sonnen was aware that the county jails were full the weekend of the riot. (Tr., pp. 171-72, 213.) Further, every inmate who came back to Idaho would need to be screened, processed, and assessed before being sent to a county jail. (Tr., p. 174.) This would also be true if the Governor had declared a state of emergency, which was a prerequisite to placing inmates in jails

and prisons in surrounding states. (Tr., pp. 190-92.)

22. Defendants had tents available to them, but Chief Sonnen and other prison officials determined that placing inmates in tents was not feasible in the middle of winter because of inadequate heating. (Tr., pp. 144, 212.)

23. Faced with these options, Defendants decided to place inmates in the *Balla* beds in Units 9, 10, 11, and 13. (Tr., p. 144.) By doing so, the Defendants exceeded the population caps set for these units in *Balla II* and reaffirmed in *Balla III*.

24. Defendants resolved to move inmates out of the *Balla* beds as quickly as possible. Their plan was to (a) "back up" the county jails by asking counties to retain prisoners that would otherwise be moved to IDOC facilities, (b) transfer inmates out of ISCI to other institutions when beds opened, and (c) release inmates through the ordinary process of parole and completion of sentences. (Tr., pp. 161, 182-83, 222-23.)

25. Using these methods, by January 29 Defendants were in back into compliance with the *Balla* injunctions relating to the population caps for Units 9, 10, 11, and 13. (Docket No. 748.)

**Transferring Administrative Segregation Inmates to IMSI**

26. In *Balla II*, the Court prohibited the double-celling of inmates in Unit

8. At that time, Unit 8 was a restrictive housing unit that contained all maximum custody inmates in the state prison, which included inmates under a sentence of death, inmates in punitive segregation, and inmates in other types of administrative segregation. *Balla II*, 656 F.Supp. at 1113.

27. When IMSI opened as in 1989, maximum custody inmates were placed in that institution. (Tr., pp. 184-85.) ISCI became a medium custody prison. (Tr., p. 22.)

28. Unit 8 at ISCI is still the restrictive housing unit, but inmates who are to be held in longer-term administrative segregation are generally transferred to IMSI, provided that space is available there. (Tr., pp. 184-85, 267-68, 275-77.)

29. Defendants have not double-celled inmates in Unit 8 at ISCI since the riot, but 50 inmates were transferred from ISCI to administrative segregation at IMSI immediately following the riot. (Tr., pp. 146-50.)

30. These transferred inmates were placed in administrative segregation either because they were being investigated for involvement in the riot, or because they were already slated to be housed in longer-term administrative segregation before January 2. (Tr., pp. 146, 149, 269-70, 275-77.)

31. The IDOC subsequently changed its policy to allow double-celling at IMSI and to permit more out of cell time for those inmates who were double-

celled. (Tr., pp. 270-71.)

32. Some of the inmates transferred from ISCI were double-celled at IMSI, though the precise number is unknown. (Tr., pp. 150-51, 269-70.)

## STANDARD OF LAW

A court may hold a party in contempt when the party disobeys a specific and definite order by failing to take all reasonable steps within its power to comply. *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993). In a civil contempt proceeding, the party alleging contempt must demonstrate that the alleged contemnor violated the court's order by clear and convincing evidence, not merely a preponderance of the evidence. *Id*.

After violation has been proven, the burden then shifts to the alleged contemnor to show that he or she was unable to comply with the order. *United States v. Rylander*, 460 U.S. 752, 757 (1983); *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 781 (9th Cir. 1983). The "[a]bility to comply is the crucial inquiry, and 'a court should weigh all the evidence properly before it determines whether or not there is actually a present ability to obey.' " *United States v. Drollinger*, 80 F.3d 389, 393 (9th Cir. 1996).

## DISCUSSION

**Units 9, 10, 11, and 13**

There is no dispute that Defendants were in violation of *Balla II* and *Balla III* orders setting the population caps for these units from January 4 through January 29. Defendants argue, however, that the riot created an emergency that forced them to double-cell inmates temporarily until the population could be reduced. They further contend that they should not be held in contempt or sanctioned because they are now back in compliance.

Plaintiffs counter that Defendants made a series of decisions that were driven primarily by a desire to save money. They assert that the IDOC's plan to use Unit 24 was flawed from its inception and that the new unit was not ready for habitation when it became apparent that 300 additional inmates would be returned from Texas. The Plaintiffs argue that Defendants should be held accountable for the foreseeable consequences of their faulty planning.

Initially, the Court agrees with Plaintiffs that Defendants' preparation for the influx of an additional 300 inmates into Idaho prisons was flawed. Director Reinke's letter to GEO Group created a self-imposed 60-day deadline with no firm plan in place to manage the 300 Texas inmates. The subsequent decision to convert a former upholstery shop into a housing unit was made just a little over a

month before the inmates were set to arrive. It is difficult to understand how Defendants believed they were going to retrofit a warehouse with the necessary facilities to contain a large group of prisoners in a little over four weeks.

Not surprisingly, the new unit was not ready. The only bathroom that was available contained four toilets and three urinals for 200 inmates. A second day room was inaccessible because uninstalled sinks, toilets, and plumbing materials were stored there, and only one non-functioning outdoor bathroom trailer was present. The inmates were moved hastily into the unit, where some personal items were confiscated apparently without notice or an explanation. At each step in this process, Defendants displayed a tendency to work exceptionally close to the margins.

On the other hand, there are appropriate and lawful means by which inmates can seek to vindicate their rights, and rioting is not one of them. Furthermore, while it is now obvious that Unit 24 was still under construction on January 2, it would have been much closer to completion, had the riot not occurred, within as little as twenty-four hours. The sinks, toilets, and fixtures stored in the second day room were scheduled to be installed in the bathroom trailer the next day, freeing much needed space. Showers were to be taken in the gym, and the second outdoor trailer with additional toilets and sinks was set to be completed within a week or

two. The Court concludes that the decision by a group of inmates to destroy Unit 24 hours after they moved into it created a true exigency in this case.

Defendants have further persuaded the Court that no good choices were open to them for managing the increased population in the immediate aftermath of the riot, short of using the *Balla* beds. The county jails were full that weekend. The Texas facility was being shut down, and the Oklahoma prison was not ready for a sudden increase in inmates. Chief Sonnen testified that all inmates must be processed and reviewed before other states will accept them, and there is no indication in this record that the transfer of inmates to other states would have prevented temporary filling of the *Balla* units during that processing period. Placing inmates on mattresses in the gym or in day rooms, an alternative to double-celling, would have likely violated other aspects of the *Balla* injunctions. Using large tents in the middle of winter, a theoretical possibility, would have been less humane than double-celling inmates in heated buildings for a short period of time.

Therefore, regardless of the obvious missteps that Defendants took in preparing Unit 24, the Court finds no evidence that they intended to exceed the population caps before the riot occurred or that they thereafter used that situation as a pretext for long-term double-celling. Instead, the Court finds that the riot led directly to a shortage of beds, and the Court concludes that Defendants have

demonstrated that they were temporarily unable to comply with the population caps. *See United States v. Rylander*, 460 U.S. 752, 757 (1983) (noting that the inability to comply is a defense to contempt).

In reaching this conclusion, it is of no small importance to the Court that the *Balla* beds were vacated in about three and one-half weeks. If Defendants had remained non-committal about setting a firm deadline for decreasing the population in the units while the period of non-compliance grew, the Plaintiffs' argument that Defendants were not acting quickly and in good faith would have had much more force.

For these reasons, the Court declines to hold Defendants in contempt or to impose sanctions for temporarily violating the *Balla II* and *III* population caps set for Units 9, 10, 11 and 13.[3]

---

[3] The Court notes that because the Defendants are presently in compliance, a question arises whether the requested monetary sanctions would be remedial or punitive in nature. Sanctions in a civil contempt proceeding are designed to coerce a recalcitrant party back into compliance or to compensate a party for a loss caused by the violation. *United States v. Rylander*, 714 F.2d 996, 1001 (9th Cir. 1983). When sanctions can instead be characterized as punishment for the alleged contemnor's past defiance of the court's authority, the proceeding implicates criminal, rather than civil, contempt. *Id*. Criminal contempt proceedings require a higher burden of proof in addition to other constitutional safeguards. *See Id*. at 1001, 1004-05 (requiring proof beyond a reasonable doubt, the right to counsel, the privilege against self-incrimination, and even jury trials in some cases).

The Court need not parse the distinctions between civil and criminal contempt too finely for purposes of the present action. For the reasons given, the Defendants will not be found in contempt or sanctioned under either standard.

**Unit 8 and Administrative Segregation**

In *Balla II*, Judge Ryan enjoined Defendants from double-celling maximum custody inmates in Unit 8 at any time. Judge Ryan also prohibited "any other vehicle, scheme or mechanism designed to undermine the spirit and letter of this opinion." 656 F.Supp. at 1117, 1119. Plaintiffs argue that Defendants should be held in contempt for transferring and double-celling inmates in administrative segregation units at IMSI.

Plaintiffs suggest that Defendants were playing a shell game with inmates, particularly by allegedly transferring some inmates to IMSI, with greater restrictions, in order to relieve pressure at ISCI. But the evidence is simply not compelling enough to support a contempt finding on that basis. While it is clear inmates *were* sent from ISCI to IMSI after the riot, the evidence before the Court shows that these inmates were either being investigated as participants in the riot or were destined for administrative segregation at IMSI for other reasons. The Court cannot say, then, that Defendants moved inmates solely as a contrivance to evade court-imposed restrictions at ISCI.

In addition, the scope of the injunctive relief in this case encompasses only ISCI, and the Court has declined previous invitations to find that *Balla* extended to other prisons within the IDOC system. (Docket No. 433.) The wisdom of that

view is illustrated again here; according to Chief Sonnen and Warden Johanna Smith, the circumstances under which inmates are held in administrative segregation at IMSI differ significantly from those in the restrictive housing unit at ISCI. (Tr., p. 184-86.) While some of the concerns that led to the prohibition on double-celling of administrative segregation inmates at ISCI may be applicable to the units at IMSI, others may not. The Court must leave for another day and a different case any overcrowding issues that may exist at IMSI.

**Conclusion**

Based on the foregoing, Plaintiffs' Motion shall be denied, and the Court will not impose sanctions on Defendants for the temporary violation of the injunctions.

**ORDER**

NOW THEREFORE IT IS HEREBY ORDERED that Plaintiffs' Motion for Order to Show Cause Why Defendants Should Not Be Held in Contempt (Docket No. 740) is DENIED.




DATED: **May 28, 2009**

Honorable B. Lynn Winmill
Chief U. S. District Judge