UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WALTER D. BALLA, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>IDAHO STATE BOARD OF CORRECTION, et al.,<br><br>　　　　　Defendants. | Case No. CV-81-1165-S-BLW<br><br>**ORDER GRANTING IN PART MOTION FOR SANCTIONS [956]** |

　　　　Before the Court is Plaintiffs' Motion for Sanctions or, in the Alternative, Contempt (Dkt. 956). At issue is whether Defendant, the Idaho State Board of Correction, should be sanctioned for destroying or altering documents or otherwise presenting misleading information to the Court's appointed special master Dr. Marc Stern when he visited the Idaho State Correctional Institution ("ISCI") in September 2011 and January 2012. The parties briefed the issues and an evidentiary hearing was held on July 22 and 23, 2015.

　　**I.　　Factual Findings**

　　　　Having considered the evidence presented to the Court, the Court finds the following facts have been established by clear and convincing evidence:

　　　　　**A.　Appointment of Dr. Marc Stern as Special Master**

　1.　This case was initially filed in 1981.

Order Granting in Part Motion for Sanctions - 1

2. On November 1, 1984, in *Balla v. Idaho State Bd. of Corr.*, 595 F. Supp. 1558, 1583 (D. Idaho 1984) ("*Balla I*"), Judge Ryan ordered Defendant to do the following: (1) adopt a special dietary program for medically infirm inmates; (2) provide adequate clothing for inmates in protective custody; (3) create 24-hour emergency medical care for inmates and hire a full-time physician; (4) provide a properly staffed medical delivery system; (5) establish a psychiatric care program; (6) provide adequate security staff for double-celled units; (7) report to the Court on Defendant's progress; (8) establish an inmate classification system to protect younger inmates; and (9) implement a disciplinary procedure ensuring due process protection.

3. On July 11, 1985, Judge Ryan approved certain compliance plans that Defendant submitted in response to the *Balla I* order.

4. On January 6, 2011, Judge Winmill issued an order stating his intent to appoint a special master in order to move the then-30-year-old case forward toward closure.

5. On June 1, 2011, Judge Winmill gave notice of his intent to appoint Dr. Marc Stern as special master.

6. On July 20, 2011, Judge Winmill appointed Dr. Stern as a special master to evaluate the medical and mental health care delivery system at ISCI and determine whether ISCI was in compliance with the 1985 *Balla I* compliance plans (if the plans were still workable) and whether ISCI inmates were being deprived of their Eighth Amendment rights through deliberate indifference to their medical needs.

7. The July 20, 2011 order stated: "[C]ounsel and the parties shall work with Dr. Stern to allow him reasonable access to all necessary materials, individuals, and facilities that will assist him in completing his duties."

8. On September 7, 8, and 9, 2011, Dr. Stern visited ISCI. He spoke to ISCI administrators, other staff, and inmates.

9. On September 30, 2011, Dr. Stern asked the Court to appoint psychiatrist Dr. Amanda Ruiz as a deputy special master to assist him in evaluating ISCI's mental health care delivery. Judge Winmill duly appointed Dr. Ruiz on October 17, 2011.

10. On January 2, 3, and 4, 2012, Dr. Stern visited ISCI again, this time with Dr. Ruiz. They spoke to ISCI administrators, other staff, and inmates.

11. On March 19, 2012, Dr. Stern filed his report (Dkt. 822). He stated in the executive summary of the report: "I found serious problems with the delivery of medical and mental health care. Many of these problems either have resulted or risk resulting in serious harm to inmates at ISCI. In multiple ways, these conditions violate the right of inmates at ISCI to be protected from cruel and unusual punishment. Since many of these problems are frequent, pervasive, long standing, and authorities are or should have been aware of them, it is my opinion that authorities are deliberately indifferent to the serious health care needs of their charges."

12. Following the issuance of Dr. Stern's report, the parties engaged in settlement negotiations. Using Dr. Stern's report as a guideline, the parties eventually reached an agreement whereby Defendant agreed to implement certain Modified Compliance Plans and to be subject to a two-year monitoring period during which the parties would meet every month to discuss the progress of the implementation and to address healthcare-related areas of concern raised by either party. *See* Stipulated Motion to Modify Injunctive Relief (Dkt. 842). The original monitoring period is set to end in June 2016.

    B. ISCI's "Preparations" for Dr. Stern's Visits

        1. Dry Cells

13. There are two cells each in Unit 15 and Unit 16 (also known as the Behavioral Health Unit, or BHU) at ISCI that are known as "holding cells" or "dry cells."

14. "Dry" cells are different from regular "wet" cells in that dry cells have no bed, no sink, and no toilet. There is a grate in the concrete floor where inmates can relieve themselves.

15. Inmates with mental health problems were held in the dry cells when they acted out against ISCI staff or other inmates or were a danger to themselves, for example, when they were having a psychotic episode or were on suicide watch.

16. Prior to Dr. Stern's visit, dry cells were used frequently. Former ISCI staff whose offices were located close to the dry cells testified that the dry cells were used daily.  Current ISCI employees admitted that the dry cells were used at least weekly.

17. Sometimes inmates were placed in the dry cell for short periods of time, ranging from a few minutes to a few hours.

18. Other times, however, inmates were placed in the dry cell for days.

19. Inmate Munk's housing record shows that he was in a dry cell between May 5 and 7 (three days), June 29 and July 2 (four days), July 26 and 30 (five days), October 21 and 24 (four days) and November 17 and 21 (five days) in 2011.

20. Inmate Brady's housing record shows that he was in a dry cell from June 30 to July 2 (three days) in 2011.

21. Inmate Wilson's housing record shows that he was in a dry cell from July 1 to 5 (five days) and July 28 to 30 (three days) in 2011.

22. Inmate Garner's housing record shows that he was in a dry cell between August 16 and 24 (nine days) and October 6 and 25 (twenty days) in 2011.

23. Inmate Hassan's housing record shows that he was in a dry cell from August 30 to September 6 (seven days) in 2011.

24. Inmate Ehrlick's housing record shows that he was in a dry cell from September 2 to September 4 (three days) in 2011.

25. Inmate Evans's housing record shows that he was in a dry cell between September 17 and 19 (three days) in 2011.

26. Inmate DeHart's housing record shows that he was in a dry cell from October 18 to 21 (four days) in 2011.

27. Inmate Robinson's housing record shows that he was in a dry cell between October 24 and 27 (four days) in 2011.

28. Inmate Hoskins's housing record shows that he was in a dry cell between November 13 and 15 (three days) and November 17 and 26 (ten days) in 2011.

29. Inmate Bright's housing record shows that he was in a dry cell between November 30 and December 3 (four days) and between December 14 and 16 (three days) in 2011.

30. Inmate Hays's housing record shows that he was in a dry cell between December 24 and 26 (three days) in 2011.

31. An inmate was once placed in a dry cell for 30 days.

32. Although, as one clinician put it, it is always possible to give some kind of clinical justification for multi-day stays, the reality was that the dry cells were sometimes used for punishment rather than therapeutic purposes. For instance, inmate Hochstetler's treatment plan provided that, if he acted out, he would be placed in a dry cell for a pre-ordained 3 days instead of being regularly monitored and being transferred to a regular cell if his behavior changed during those 3 days. In a departure from the normal practice, he was not provided a suicide watch companion to check on him while he was in the dry cell.

33. During the summer before Dr. Stern's visit, after ISCI was on notice that a special master would be visiting, ISCI clinicians were instructed to change the way that they used the dry cells, either by stopping their use altogether or by stopping their use for periods of longer than 24 hours.

34. Based on the records provided to the Court, up to the time of Dr. Stern's first set of visits, multiple dry cells were used almost daily. However, none of the dry cells were used during Dr. Stern's first set of visits on September 7, 8, and 9, 2011.

35. The dry cells were operational again after Dr. Stern's first set of visits and before Dr. Stern's second set of visits.

36. During Dr. Stern's second visit, this time with Dr. Ruiz, on January 2, 3, and 4, 2012, none of the dry cells were used on January 2 and 3.

37. Two of the dry cells were used on January 4. However, without information on what time of day inmates were placed in the dry cells, and given the pattern of frequent use before Dr. Stern's and Dr. Ruiz's visit, it appears that the dry cells were used on January 4 only after Dr. Stern and Dr. Ruiz left.

38. Dr. Ruiz saw the dry cells during her visit to ISCI in January 2012 and commented that the dry cells were "barbaric."

39. During her visit, she asked Shell Wamble-Fisher, then ISCI's clinical supervisor, for information about inmates who had been placed in the dry cells while on suicide watch or close observation between October 2011 and December 2011.

40. Ms. Wamble-Fisher provided Dr. Ruiz with an outline showing that, of 137 inmates who were on suicide watch or close observation during that time period, 45 were put in a dry cell. Of those, 16 stayed in the dry cell for over 24 hours. The longest stay she listed was inmate Sanford's stay in a dry cell between November 16 and December 2, 2011 (16 days).

41. Ms. Wamble-Fisher's outline misstated that inmate Garner was in a dry cell between October 6 and 16, 2011. His housing record shows that he was actually in dry cells between October 6 and 25, 2011 (19 days).

42. Dr. Stern's report identified a number of problems with mental health care at ISCI, including misusing segregation as a de facto punishment for behavior caused by mental illness and misusing segregation in dry cells as a method of providing mental health care to inmates having acute self-harm episodes.

43. The "most distressing" problem Dr. Stern identified with ISCI's way of handling patients at risk of self-harm was having patients with serious mental illnesses spend "far too much time in dry cells. In a three month period, eight individuals spent five or more days in a dry cell (six of these stays lasted 10 days or more, the longest of which was 16 days).

According to Dr. Ruiz, the use of these dry cells on a long-term basis can only be described as degrading and inhumane."

44. ISCI's response to Dr. Stern's findings, attached as Appendix A of Dr. Stern's report (Dkts. 822-1, 822-2), stated that, "effective January 9, 2012, prior to putting an inmate in a dry cell, security staff would contact the Idaho Department of Correction ("IDOC") clinical supervisor or chief psychologist for an initial mental health assessment and then conduct a telephonic follow-up every two hours until the inmate was moved to a less restrictive environment. The dry cells would only be used "in extreme situations for a short duration."

### 2. Suicide Watch Companion Training Logs

45. Brian Fariss was the psychiatric treatment coordinator at ISCI between September 2009 and October 2011. In that role, his responsibilities included serving as the liaison between the BHU and ISCI's medical service provider, chairing the multidisciplinary treatment team that reviewed the offender case plans and medical files, and supervising the suicide watch prevention program, which included training some inmates to be suicide watch companions.

46. From October 2011 until approximately October 2012, Mr. Fariss was a correctional program manager at ISCI. His responsibilities included supervising all case management and drug and alcohol rehabilitation functions.

47. Before Dr. Stern's visit, Shell Wamble-Fisher asked Mr. Fariss to create a log to show which inmates had been trained as suicide watch companions and when they had been trained.

48. Mr. Fariss told Ms. Wamble-Fisher that creating a log would be "disingenuous" because it would make it appear to the special master as if he had been keeping track of the training contemporaneously when he had not been doing so.

49. Ms. Wamble-Fisher instructed him to create the log anyway.

50. Mr. Fariss created the log. He estimated the dates of the training by counting 30 days back from the date of each suicide watch companion's first timesheet.

51. In April or May 2011, Mr. Fariss told Ms. Wamble-Fisher that he was preparing documents so that he could speak with the special master.

52. Ms. Wamble-Fisher told Mr. Fariss that the special master would not be speaking with him and that his information was not required for the special master.

53. Dr. Stern's report found that the suicide watch companion program had three serious flaws: (1) the companions were not adequately screened, with many of the companions themselves having serious mental illnesses which could put the inmates they worked with at risk; (2) rather than supplementing monitoring by ISCI staff, the companions were being used as substitutes for professional staff; and (3) there was no medical record documentation of the companions' clinical observations of other inmates during suicide watches and close observation.

54. The report did not comment directly on whether or how the companions were trained.

### 3.  "Auditing" Inmate Medical Records

55. Prior to Dr. Stern's visits, Shell Wamble-Fisher did non-routine audits of inmate medical records to get them "ready" for the special master's visit.

56. Regarding medical records, Dr. Stern's report stated in relevant part: "A well organized and complete medical record is a necessary element of a constitutionally adequate health care delivery system. In my opinion, medical records are currently well organized and complete, and all loose papers have been filed. However, this state of affairs is a recent development. According to staff, until May 2011, most medical records did not have clearly marked sections, were disorganized, and were missing many essential documents, such as lab and x-ray reports, which were in loose stacks waiting to be filed. If this is true, the medical record at that time would likely not have been able to support constitutionally adequate care."

57. ISCI's response to Dr. Stern's findings, attached as Appendix A of Dr. Stern's report, stated the following regarding medical records: "Staff is currently in place to ensure that filing is maintained" and "Since June 2011 staff has been in place and will continue to be maintained."

58. Regarding mental health records specifically, Dr. Stern found that ISCI did not maintain complete and accurate records of care provided during acute suicidal events and of treatment plans and group therapy treatment.

### 4.  Level of Staffing

59. Prior to Dr. Stern's visit, Shell Wamble-Fisher began meeting with inmates in the general compound for 10-15 minutes each so that she could create the impression in their medical records that inmates had recently met with a clinician when normally there were only two clinicians responsible for the yard, which made it very difficult for all of the inmates who needed mental health services to be seen regularly.

60. Regarding the number of trained mental health professionals per capita at ISCI, Dr. Stern found that there was an insufficient number of psychiatric and non-psychiatric mental health staff at ISCI, although the report cautioned that he could not state with a great level of certainty that the deficiencies in non-psychiatric mental health services that he observed were the result of insufficient staffing.

### 5.  Movement of Certain Inmates Out of the BHU

61. Some inmates were moved out of the BHU prior to Dr. Stern's visit.

62. Some former ISCI employees testified that the inmates who were moved out of the BHU were the ones who complained the most or had more serious mental health problems.

63. However, in some instances, the housing records of the inmates identified by these witnesses did not reflect those moves. In other instances, other legitimate reasons existed for moving them out.

### C. Other Instances of Documents Being Altered

#### 1. Gender Identity Disorder

64. In 2007, IDOC was a defendant in a federal lawsuit brought by two inmates with gender identity disorder who had castrated themselves. Dr. Richard Craig, IDOC's chief psychologist, participated in a Ninth Circuit mediation of that case in San Francisco that year.

65. In October or November 2007, Shell Wamble-Fisher instructed the clinicians at ISCI to not diagnose inmates with gender identity disorder and to remove references to gender identity disorder and references to inmates using feminine pronouns (e.g., "she," "her") from inmates' medical files so that ISCI would not have to pay for gender identity disorder treatment.

66. In subsequent conversations, Ms. Wamble-Fisher mentioned that the instructions were "per Dr. Craig."

67. Following those instructions, Armida Molina-Medina, then a clinician at ISCI, deleted a reference to gender identity disorder from an electronic record in inmate Jerry A. Romero's file. (Romero is now also known as Mona Lisa Romero.) Ms. Molina-Medina also removed the hard copy of that record from the inmate's file and put it in the shred bin, replacing it with a new version without references to gender identity disorder. When she re-signed the new version, she dated her signature with the current date, but she did not change the original date of the mental health assessment, which remained the date on which she had first seen the inmate.

68. Ms. Molina-Medina also changed a document in another inmate's file by deleting references to the inmate as "she" or "her."

69. From then on, if an inmate told her something about gender identity, such as a desire to start hormonal therapy treatment, she omitted such information from her notes.

### 2.  Primary Logs

70. A primary log is a document written by the on-call clinician recording his or her observations of inmates that he or she saw that day.

71. The primary log does not go into inmates' medical files. However, the primary log is an important tool that clinicians use on a daily basis to stay abreast of inmates' mental health condition from day to day.

72. At the end of each day, the clinician on duty emails his or her primary log to the other clinicians and also saves a copy of the primary log on the U drive, a shared drive.

73. All of the clinicians and clinical supervisors had access to the U drive, including Shell Wamble-Fisher.

74. On March 14, 2012, clinician Diana Canfield wrote a primary log in which she noted that Vicki Hansen, a clinician at the Idaho Maximum Security Institution ("IMSI"), had seen an inmate who was moved to IMSI. She sent out the primary log to the other clinicians via email and saved it in the shared drive.

75. The following day, Ms. Canfield and another clinician Jessie Bogley discovered that someone had changed the version in the shared drive so that the primary log stated that Ms. Canfield, rather than Ms. Hansen, had seen the inmate at IMSI.

76. Shell Wamble-Fisher sometimes "condensed" clinicians' primary logs by removing information that she thought should not be in the primary log. When doing so, she did not check the inmate's medical records to ensure that the deleted information was captured in some other way.

### 3.  SOAP Notes

77. Clinicians write a Subjective, Objective, Assessment, and Plan ("SOAP") note each time they have clinical contact with an inmate. Like primary logs, SOAP notes were sent to other clinicians by email at the end of each day and electronic versions of SOAP notes were also saved in the U drive.

78. Unlike primary logs, the clinicians also printed out paper copies of SOAP notes and put the paper copies in the bin for filing in the inmate's medical file.

79. Someone with access to the U drive deleted clinician Diana Canfield's SOAP notes for July 1, 2012 from the U drive.

80. Someone at ISCI also deliberately removed Ms. Canfield's SOAP notes from inmates' medical files, including one instance in which a month's worth of Ms. Canfield's SOAP notes, but not other clinicians' SOAP notes, were removed from inmate Bright's file.

81. During the Idaho Bureau of Occupational Licenses's (IBOL's) investigation of Ms. Canfield, IBOL investigator Cindy Stephenson requested from ISCI all of the SOAP notes for certain inmates during April 2012. Shell Wamble-Fisher pulled the files for ISCI. When Ms. Stephenson reviewed the documents, she found no documents signed by Ms. Canfield.

82. As part of the investigation, clinician Jessie Bogley conducted random checks on inmates' files and she also found that Ms. Canfield's documents were missing from the files, but not other clinicians' files.

### 4.  Suicide Risk Assessments

83. On March 22, 2012, clinician Diana Canfield personally evaluated a new inmate who had just been transferred to ISCI from another facility and decided that he should be put under close supervision, but not on suicide watch. She filled out a Suicide Risk Assessment (SRA) form to that effect.

84. After Ms. Canfield left work that day, her supervisor Shell Wamble-Fisher did not physically see the inmate. However, she overrode Ms. Canfield's decision after consulting with Dr. Craig and the inmate's treating psychologist from his former facility, and she put the inmate on suicide watch.

85. Ms. Wamble-Fisher filled out another Suicide Risk Assessment that identified Ms. Canfield as the one who had observed and spoken to the inmate, but also described Ms. Wamble-Fisher's subsequent consultations and decision.

86. As the clinical supervisor, Ms. Wamble-Fisher had the authority to override Ms. Canfield's decisions.

### D. Complaints and Investigations

#### 1. Dr. Stern

87. Although Dr. Stern testified that he felt he had unfettered access to ISCI during his visits, he also had the impression that Shell Wamble-Fisher generally was not being forthright in her eagerness to present a positive image of ISCI.

88. Dr. Stern shared his concern with Warden Smith at the end of his second visit in January 2012.

#### 2. Clinicians' Complaint

89. In March 2012, five clinicians supervised by Shell Wamble-Fisher met with then-Warden Johanna Smith and then-Deputy Warden Kevin Yordy to discuss their concerns about Shell Wamble-Fisher.

90. One of the complaints was that Ms. Wamble-Fisher changed Ms. Canfield's primary log.

91. Another was that, "When the special masters [sic] was here clinical staff was told to do multiple things differently, such as not use the back holding cells to make it look like we don't routinely use them."

#### 3. Cindy Stephenson

92. In August 2012, Dr. Craig made a complaint about clinician Diana Canfield to IBOL for allegedly documenting that she had seen two inmates in July 2012 when she had not actually seen them.

93. In investigating the complaint, IBOL investigator Cindy Stephenson interviewed 17 different individuals and requested documents from ISCI.

94. Based on her interviews and her review of the documents she received, she concluded that Ms. Canfield had not violated any ethical rules. Elaine Sullivan, a counselor who did professional reviews for IBOL, concurred with Ms. Stephenson that no ethical violation

had occurred. The Board itself also agreed, adopting Ms. Stephenson's report and taking no disciplinary action against Ms. Canfield.

95. Ms. Stephenson's report stated her conclusion that someone had altered, removed, or tampered with Ms. Canfield's notes, documents, and information on multiple occasions.

96. Ms. Stephenson's report also stated her conclusion, that, "From everything I have been told, it would appear there is an issue of some type with the supervisor, Ms. Wamble-Fisher." In reaching that conclusion, Ms. Stephenson considered that Ms. Wamble-Fisher had access to all computer records and all hard copy files and had reviewed medical files in advance of the special master's visit. Ms. Wamble-Fisher was also the one who pulled four inmate files that Ms. Stephenson had requested from ISCI, from which Ms. Canfield's notes were missing.

97. Although Ms. Stephenson did not have the power to open an investigation into Ms. Wamble-Fisher, she wanted to bring the potential issues with Ms. Wamble-Fisher to her supervisors' attention.

## II.     Legal Standard

### A.  The Court's Inherent Authority to Sanction

A federal district court has inherent authority to sanction parties when they act "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). Bad faith includes "delaying or disrupting the litigation or hampering enforcement of a court order." *Id.*

It also includes actions constituting a fraud upon the court. *Chambers*, 501 U.S. at 44. To prove fraud upon the court, Plaintiffs must demonstrate by clear and convincing evidence not that they suffered prejudice, but that Defendant harmed the integrity of the judicial process. As the Ninth Circuit has noted, "[m]ost fraud on the court cases involve a scheme by one party to hide a key fact from the court and the opposing party." *United States v. Estate of Stonehill*, 660 F.3d 415, 444 (9th Cir. 2011). The movant generally "must show more than perjury or

nondisclosure of evidence, unless that perjury or nondisclosure was so fundamental that it undermined the workings of the adversary process itself." *Id.* at 445.

In line with the fraud on the court cases, other cases have held that sanctions for bad faith conduct are appropriate "when a party acts *for an improper purpose*," even if the act involves reckless rather than willful misstatements of law and fact or, in some cases, even if the act consists of making a truthful statement or a non-frivolous argument or objection. *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) (citing *In re Itel Sec. Litig.*, 791 F.2d 672, 675 (9th Cir. 1986)).

### B. Spoliation of Evidence

"Spoliation of evidence is 'the destruction or significant alteration of evidence, or the failure to properly preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Lifetouch Nat'l Sch. Studios, Inc. v. Moss-Williams*, Case No. C10-05297 RMW (HRL), 2013 U.S. Dist. LEXIS 148360, at *7 (N.D. Cal. Oct. 15, 2013) (quoting *Zubulake v. UBS Warburg LLD*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). "A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).

Most courts use the three-part test set forth in *Zubulake v. UBS Warburg LLD*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003): "A party seeking sanctions for spoliation of evidence must prove the following elements: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to the claims or defenses of the party that sought the discovery of the spoliated evidence[.]" *Montoya v. Orange Cty. Sheriff's Dep't*, Case No. 11-cv-1922, 2013 U.S. Dist. LEXIS 180682, at *19-20 (C.D. Cal. Oct. 15, 2013) (internal quotation marks omitted).

If a party is found to have spoliated evidence, the court then determines whether and which sanctions are appropriate. Courts choose "the least onerous sanction corresponding to the

Order Granting in Part Motion for Sanctions - 15

willfulness of the destructive act and the prejudice suffered by the victim." *Apple Inc. v. Samsung Electronics Co.*, 888 F. Supp. 2d 976, 992 (N.D. Cal. 2012). "Ultimately, the choice of appropriate spoliation sanctions must be determined on a case-by-case basis, and should be commensurate to the spoliating party's motive or degree of fault in destroying the evidence" and the degree of prejudice suffered by the movant. *Id.* at 992-93. Prejudice can be hard to measure in the spoliation context, given that the documents that would show prejudice most clearly are, by definition, destroyed. However, once spoliation is shown, prejudice can be presumed, shifting the burden to the spoliator to show that the destruction of evidence did not prejudice the movant. *Id.* at 993.

### III.     Analysis

Based on the factual findings above, the Court finds that Defendant acted with improper purpose to keep the Court's special master from appreciating the true extent to which the dry cells were used and the true extent to which ISCI failed to keep adequate records related to mental health care. Specifically, taking into account the consistency and credibility of the witnesses and the totality of the evidence, the Court is troubled by the degree to which ISCI attempted to put forward its "best face" as opposed to sincerely trying to improve its delivery of mental health care over the long term. To some degree, a desire to put the prison's "best face" forward when an outsider comes to scrutinize the facility can lead to some improvements, which is better than an obstinate refusal to change. This is, after all, one of the reasons why Plaintiffs seek continued court involvement in ISCI's provision of medical and mental health care.

However, ISCI's pattern of allowing its employees to manipulate inmate medical files before, during, and after the special master's visit for inappropriate purposes crosses the line. As one witness stated, "audits and investigations . . . are actually how you grow." By keeping the dry cells empty during the days of Dr. Stern's and Dr. Ruiz's visits; discouraging Mr. Fariss, who ran the suicide watch companion program, from speaking with the special master; creating a "log" that would have misled the special master into thinking that training for suicide watch companions was tracked contemporaneously; and re-organizing and supplementing documents

Order Granting in Part Motion for Sanctions - 16

during an anticipatory "audit" of inmates' medical files, ISCI attempted to paper over and mislead the special master about the inadequacies of its mental health care system rather than risk a bad finding by the special master, which might have led to a court order to improve their system in a formal and long-standing way. [1] For instance, a conversation with Mr. Fariss could have led the special master to investigate the use of inmates of suicide watch companions further and come to a firmer conclusion regarding the lack of sufficient mental health staffing.

That said, the Court is cognizant, as are Plaintiffs, that ISCI has made progress since the special master's visits in 2011 and 2012. Under the terms of the parties' Stipulated Motion and Modified Compliance Plans, which were the product of intense settlement negotiations after the special master's report was issued, the parties are now approximately halfway through a two-year monitoring period that began on June 6, 2014. The parties have been meeting monthly to address healthcare-related problems at the prison as they arise and have been making progress toward the resolution of this case. The Court is also aware that, despite ISCI's attempt to make itself look better to the special master, the special master nevertheless saw through some of it and critiqued, for instance, ISCI's use of the dry cells to contain inmates with serious mental illnesses and ISCI's poor documentation of its mental health care delivery.

Ultimately, although Dr. Stern saw past the façade in some areas and the parties have made progress on providing better medical and mental health services for the inmates, the Court and its representatives expect and need forthright, honest, and transparent information in order to make just decisions. The breadth and depth of a problem cannot be obfuscated if it is to be properly remedied. Attempts to mislead the Court strike at the heart of the judicial process and

---

[1] Plaintiffs also raised the movement of certain problematic inmates out of the BHU and "alteration" of Ms. Canfield's SRA as evidence of IDOC's cover-up. The Court finds no fault with IDOC as to these two incidents in the context of this motion, as there was not sufficient evidence that the inmates moved out of the BHU were moved out for nefarious reasons as opposed to other, legitimate security reasons. As for the SRA, while Ms. Wamble-Fisher's decision to fill out an SRA form and order an inmate be placed on suicide watch without seeing the inmate may or may not have been the best practice from the perspective of providing mental health care or from the perspective of the clinicians' ethical code, Ms. Wamble-Fisher's new SRA was not misleading as it was clear from the document that she did not see the inmate and was relying on Ms. Canfield's observations in addition to her own consultation with the inmate's psychologist and Dr. Craig.

Order Granting in Part Motion for Sanctions - 17

cannot be ignored even if the parties have made progress since then. Thus, the Court finds it appropriate to issue sanctions.

## IV.     Remedies

In their Motion, Plaintiffs seek a number of different types of sanctions. After careful consideration of the degree of willfulness involved in ISCI's conduct and the level of harm to Plaintiffs and to the judicial process, the Court finds that the "least onerous sanction[s] corresponding to the willfulness of the destructive act and the prejudice suffered by the victim," *Apple*, 888 F. Supp. 2d at 992, are the following limited sanctions:

(1) The two-year compliance monitoring period set forth in the Stipulated Motion and Modified Compliance Plans shall restart as of September 1, 2015, to conclude on September 1, 2017.

(2) Sections 6.1 through 6.7 of the Stipulated Motion currently provide for the automatic termination of the Modified Compliance Plans and Orders 1, 3, 4, and 5 of *Balla I*, as well as the dismissal of the *Balla I* legal claims, upon Defendant demonstrating to the satisfaction of an auditor from the National Commission on Correctional Health Care (NCCHC) that Defendant is in compliance with certain standards. These sections of the Stipulated Motion shall remain in place, except for one change to Section 6.7: After the NCCHC certifies to the Court that Defendant is in compliance, Defendant shall file a motion to terminate the Modified Compliance Plans and of Orders 1, 3, 4, and 5 of the *Balla I* order and dismiss the *Balla I* legal claims. Defendant shall have the burden to prove that "there are no ongoing constitutional violations, that the relief ordered exceeds what is necessary to correct an ongoing constitutional violation, or both." *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010). Plaintiffs shall have an opportunity to present evidence to the contrary if they wish. Termination of the Modified Compliance Plans and of Orders 1, 3, 4, and 5 of the *Balla I* order and dismissal of the *Balla I* legal claims shall occur only with the Court's approval.

(3) Defendant shall pay reasonable attorney's fees and costs incurred by Plaintiffs in bringing this Motion for Sanctions.[2]

DATED: August 11, 2015.

*David O. Carter*

DAVID O. CARTER
United States District Judge
for the Central District of California
Sitting by Special Designation

---

[2] Plaintiffs also requested that the Court appoint a medical expert to provide Plaintiffs an independent review of IDOC's compliance with the Modified Compliance Plans and that the Court reopen negotiations on Addendum B of the Stipulated Motion to address issues pertaining to medical records and oversight of IDOC compliance with the Modified Compliance Plans. The Court finds these sanctions unnecessary as the NCCHC auditor will do an independent review of IDOC's compliance at the end of the monitoring period anyway and Plaintiffs will have an opportunity to raise any concerns about continuing Eighth Amendment violations at the end of the monitoring period.

Order Granting in Part Motion for Sanctions - 19