1    **UNITED STATES DISTRICT COURT**

2    **DISTRICT OF IDAHO**

3

WALTER D. BALLA, et al.,         )    CASE NO. 1:81-cv-1165-S-BLW
4                                  )
                 Plaintiffs,       )    **EVIDENTIARY HEARING DAY 1**
5                                  )    **(REDACTED)**
          vs.                      )
6                                  )
IDAHO STATE BOARD OF              )
7    CORRECTION, et al.,            )
                                   )
8                 Defendants.      )
     _____ )

9

10

11

12

13            **TRANSCRIPT OF PROCEEDINGS – VOLUME 1**
14             **BEFORE THE HONORABLE B. LYNN WINMILL**
               **MONDAY, FEBRUARY 3, 2020, 8:47 A.M.**
15                    **BOISE, IDAHO**

16

17

18

19

20

21
Proceedings recorded by mechanical stenography, transcript
22   produced by computer.
     _____

23

24            **TAMARA I. HOHENLEITNER, CSR 619, CRR**
               FEDERAL OFFICIAL COURT REPORTER
25        550 WEST FORT STREET, BOISE, IDAHO  83724

A P P E A R A N C E S

**FOR THE PLAINTIFFS**
      Wendy J. Olson
      Elijah M. Watkins
      Rollo M. Scott
      STOEL RIVES, LLP
      101 S. Capitol Blvd., Suite 1900
      Boise, ID 83702


**FOR DEFENDANTS**
      Mark A. Kubinski
      Lead Counsel, Corrections Section
      DEPUTY ATTORNEY GENERAL, IDAHO DEPARTMENT OF CORRECTION
      1299 N. Orchard St., Suite 110
      Boise, Idaho 83706

      Chris Kronberg
      Brian V. Church
      DEPUTY ATTORNEYS GENERAL, CIVIL LITIGATION DIVISION
      P.O. Box 83720
      Boise, Idaho 83720-0010

```
1                          I N D E X

2                  FEBRUARY 3, 2020 - VOLUME 1

3
   Date        Proceeding                                Page
4

5  2/3/20    Evidentiary Hearing Day 1                      1

6            Opening statement by Mr. Kronberg............... 7

7
```

**D E F E N D A N T S'   W I T N E S S E S**

**PAGE**

**AARON HOFER**
     Direct Examination By Mr. Kronberg.................... 12
     Cross-Examination By Ms. Olson........................ 38
     Redirect Examination By Mr. Kronberg................. 117
     Recross-Examination By Ms. Olson..................... 128

**REBEKAH HAGGARD, M.D.**
     Direct Examination By Mr. Kronberg................... 131
     Cross-Examination By Mr. Watkins..................... 157
     Redirect Examination By Mr. Kronberg................. 221
     Recross-Examination By Mr. Watkins................... 227

**RONA SIEGERT**
     Direct Examination By Mr. Kronberg................... 232


**P L A I N T I F F S'   E X H I B I T S**

**ADMITTED**                                              **PAGE**

**1007**     ............................................... 47
**1024**     ............................................... 80
**1025**     ............................................... 81
**1039**     ............................................... 89
**1052**     ............................................... 208
**1085**     ............................................... 72
**1088**     ............................................... 108
**1089**     ............................................... 108

1

## P L A I N T I F F S'  E X H I B I T S

2    ADMITTED                                                      PAGE

3    **1113**    ...................................................    52
     **1126**    ...................................................    54
4    **1129**    ...................................................    55
     **1132**    ...................................................    54
5    **1134**    ...................................................    54
     **1140**    ...................................................    54
6    **1152**    ...................................................    54
     **1158**    ...................................................    54
7    **1162**    ...................................................    219
     **1164**    ...................................................    220
8    **1168**    ...................................................    63
     **1171**    ...................................................    63
9    **1172**    ...................................................    63
     **1180**    ...................................................    54
10   **1186**    ...................................................    44
     **1239**    ...................................................    63
11   **1240**    ...................................................    63
     **1316**    ...................................................    103

12

13

14

## D E F E N D A N T S'  E X H I B I T S

15   ADMITTED                                                      PAGE

16   **1**      ...................................................    236
     **3**      ...................................................    251
17   **6**      ...................................................    16
     **7**      ...................................................    28
18   **86**     ...................................................    239
     **88**     ...................................................    250
19   **89**     ...................................................    252
     **184**    ...................................................    154
20   **185**    ...................................................    154
     **186**    ...................................................    154
21   **189**    ...................................................    33
     **191**    ...................................................    37
22   **262**    ...................................................    123
     **268**    ...................................................    123
23   **270**    ...................................................    180
     **273**    ...................................................    126
24   **277**    ...................................................    185
     **288**    ...................................................    126
25   **289**    ...................................................    127

1                        **D E F E N D A N T S' E X H I B I T S**

2    ADMITTED                                                          PAGE

3      **290**    ............................................... 127
       **291**    ............................................... 127
4      **292**    ............................................... 127
       **299**    ............................................... 127
5      **300**    ............................................... 127
       **305**    ............................................... 34
6      **306**    ............................................... 36

7


8                     **D E P O S I T I O N S   P U B L I S H E D**

9

10   **DATE**           **DEPONENT**                                   **PAGE**

11   4/11/2019    Rebekah Haggard ............................. 162

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

```
 1              P R O C E E D I N G S

 2              February 3, 2020

 3         THE CLERK:  The Court will now hear Civil Case

 4    81-1165, Balla vs. Idaho State Board of Correction, regarding

 5    defendants' motion to terminate prospective relief.

 6         THE COURT:  Good morning, Counsel.

 7              Counsel, before we start, let me apologize for

 8    starting late.  I was actually meeting in chambers with

 9    Mr. Metcalf and Ms. Davis just to run over a few things.

10              We are on the clock.  And when we start late, we will

11    try to make it up in various ways.  I think that I do have,

12    generally, matters in the afternoon after we get done at 2:30,

13    but we may try to -- the bottom line is you will get your time

14    one way or the other.  We'll make sure that happens.

15              I understand that the defense wishes to offer an

16    opening statement --

17         MR. KRONBERG:  Yes, Your Honor.

18         THE COURT:  -- and that the plaintiffs wish to

19    reserve.

20              Is that correct?

21         MR. WATKINS:  Correct, Your Honor.

22         THE COURT:  All right.  With that, then, let's go

23    ahead and proceed with the opening statements from --

24         Mr. Kronberg, you are going to argue?

25         MR. KRONBERG:  Yes.
```

1              THE COURT:  All right.

2              MR. KRONBERG:  Thanks, Your Honor.

3              Before I get started, I would like to point out that

4       the director of the Idaho Department of Corrections, Mr. --

5       Director Tewalt is present here today.

6              I would also like to put on the record that defendants

7       object to having the burden of proof in this termination

8       hearing.

9              THE COURT:  Well, Counsel, I understand.  It goes back

10      to Judge Carter's decision.

11             In a civil matter, I'm not sure how much -- I mean,

12      it's 51 percent.  So you either -- I'm not sure having the

13      burden of proof or not having the burden of proof in a civil

14      matter -- if it comes down to it's that close, you're probably

15      in a world of hurt anyway.  So -- but I understand.  The

16      objection is noted.

17             MR. KRONBERG:  Thank you.

18             So what this Court has indicated in relation to that

19      burden in its latest order, amended order on the motions in

20      limine, that defendants have the burden to show that inmates at

21      ISCI presently receive constitutionally adequate medical

22      treatment; they are not subject to unconstitutional conditions

23      resulting from overcrowding.

24             As the Court further indicated, that defendants can

25      meet this burden by demonstrating that they have complied with

8

1    the prospective relief; if they have, then the relief would no

2    longer be necessary to correct a current and ongoing violation

3    of the federal right.

4          Defendants believe that one way -- and certainly the

5    best way -- to demonstrate they have complied with the

6    prospective relief is to demonstrate they have complied with the

7    Modified Compliance Plans that were agreed to by the parties,

8    ordered by the Court, and designed to ensure compliance with the

9    prospective relief.

10         Now, there are about 39 audit tools that are relevant

11   with the Modified Compliance Plan.  Most of them are audited

12   monthly; 24 of those or so are reported out each month to the

13   plaintiffs in what is referred to generally as a Health Services

14   Report or report card.

15         THE COURT:  Help me out to make sure I understand this

16   correctly.

17         The Modified Compliance Plans were an outgrowth of the

18   settlement that was reached in this case; correct?

19         MR. KRONBERG:  That's my understanding.

20         THE COURT:  All right.  And the -- so what you're

21   suggesting is the Modified Compliance Plans are not the standard

22   because I have already ruled that the original settlement

23   agreements are no longer operative; they have essentially

24   expired.

25         But you are just indicating, as an evidentiary matter,

1     there is an indication that you are, in fact, in compliance with

2     the various requirements of *Balla I*, *II*, and *III*?

3          MR. KRONBERG:  Correct.

4          THE COURT:  Okay.  I just want to make sure I

5     understood that.

6          MR. KRONBERG:  So what we're going to do is bring in a

7     couple of the nurse monitors.  Rona Siegert is actually the

8     health services director of IDOC and Joni Lemons, and they are

9     going to explain to the Court how those audits are performed and

10    the fact that the audit results of the last two years have met

11    the 90 percent threshold required in the MCPs.

12          Those -- the Modified Compliance Plans and the audits

13    are heavily reliant on the NCCHC -- National Commission on

14    Correctional Health Care -- standards.

15          Additionally, we have the 2017 NCCHC audit the parties

16    agreed initially would serve as a basis to terminate the

17    prospective relief in this case.  Obviously, that's no longer

18    determinative.  But we believe that audit clearly demonstrates

19    that the IDOC has a well-run medical care system, and that

20    system meets constitutional standards in terms of medical care.

21          We have Aaron Hofer, the vice president of operations

22    for Corizon Health, here today.  He will talk about his

23    involvement with that audit and the fact that they did a lot of

24    work to correct whatever issues of noncompliance.

25          Now, it's true that there are things that remain out

1    of compliance.  But just because in every compliance factor, in

2    every NCCHC standard, every standard operating procedure of

3    ISCI, and every remaining compliance factor in the MCPs was

4    not -- did not reach the 90 percent threshold, we still think

5    it's pretty clear evidence of a constitutionally adequate health

6    care system.

7         And NCCHC returned to ISCI in 2019 to perform an

8    accreditation survey, using, obviously, its standards.

9    Mr. Hofer can talk about that survey and his response to it and

10   the fact that NCCHC did accredit ISCI.

11        We also have Tim Martin coming tomorrow morning by

12   video conference to talk about what NCCHC is, how these surveys

13   are done, and more about the results.

14        In addition, we are going to provide an overview of

15   the medical care system.  We're going to bring in Dr. Rebekah

16   Haggard to talk about the Infirmary and the Long Term Care

17   facility out at ISCI.  And she will also talk about the

18   additional health care she provides to inmates at ISCI.

19        We'll bring in Amanda Tillemans, who was the health

20   services administrator at ISCI at the time defendants filed

21   their motion for termination.  She will give an additional

22   overview of the health care system and the emergency response

23   system as well.

24        Now, in terms of mental health, we are going to bring

25   in Dr. Walter Campbell -- or "Wally Campbell," as he is known --

1       the chief psychologist at ISCI, along with a couple of mental

2       health clinicians, Laura Watson and Jeremy Clark, to talk about

3       the mental health care that's provided.

4            Jeremy Clark does the MCP audits in relation to mental

5       health, and he will testify and discuss how those audits have

6       demonstrated compliance with the Modified Compliance Plans.

7            Obviously, we are going to talk about -- have

8       witnesses come in and talk about the fact that, in relation to

9       the population caps and the security staffing and the relevant

10      housing units that were under the rubric of the prospective

11      relief, those caps and security staffing requirements of the

12      prospective relief have been met.  I don't think there is really

13      any issue about that in this case.

14           Lastly, I believe we're bring in Chuck Kinkead from

15      ISCI to talk about meeting the plumbing requirements under the

16      prospective relief.

17           So it's our position that given the fact that we have

18      met the requirements of the Modified Compliance Plans -- which

19      were put in place to ensure compliance with prospective

20      relief -- we have, ergo, met the requirements of the prospective

21      relief, and it's time to terminate.

22           Thanks.

23           THE COURT:  All right.  Thank you.

24           You may call your first witness.

25           MR. KRONBERG:  Aaron Hofer.

```
 1              THE COURT:  Counsel, did I understand you had
 2     agreed -- I think we covered this in the pretrial order that all
 3     witnesses will be excluded except while they are testifying, and
 4     they will be instructed not to discuss their testimony.  Is that
 5     correct?
 6              MR. KRONBERG:  That's my understanding.
 7              MR. WATKINS:  That's correct, Your Honor.
 8              THE COURT:  All right.  I just wanted to confirm that.
 9              Mr. Hofer, would you please come forward, step before
10     the clerk, and be sworn.
11               AARON HOFER, DEFENDANTS' WITNESS, SWORN
12              THE CLERK:  Please take a seat in the witness stand.
13              Please state your complete name, and spell your name
14     for the record.
15              THE WITNESS:  Yes.  Aaron Hofer.  A-A-R-O-N,
16     H-O-F-E-R.
17              THE COURT:  You may inquire.
18              MR. KRONBERG:  Thank you, Your Honor.
19                            DIRECT EXAMINATION
20     BY MR. KRONBERG:
21     Q.    Mr. Hofer, you work for Corizon Health; is that correct?
22     A.    I do.
23     Q.    What's your current position?
24     A.    Current position is vice president of operations.
25     Q.    Describe your duties and responsibilities in that position,
```

1    please.

2    A.   My job duties in the current position are, I guess,

3    accountable for all health care services for the State of Idaho.

4          THE COURT REPORTER:  Would you mind speaking a little

5    slower.

6          THE WITNESS:  Say that again.

7          THE COURT REPORTER:  Could you speak a little slower.

8          THE WITNESS:  Yeah.  Sorry.

9          Yeah.  I'm accountable for all the health care

10   services for the state of Idaho, support the staff, abide by the

11   contract, and work with the IDOC as a partner.

12   Q.   BY MR. KRONBERG:  How long have you been in that position?

13   A.   Since October of 2018.

14   Q.   What -- what position with Corizon did you have before

15   that?

16   A.   I was the health care administrator at ISCI.

17   Q.   Health services administrator?

18   A.   Yes.

19   Q.   And what were your duties in that position?

20   A.   Support the site staff; work with the client; and again,

21   make sure there are no barriers to care.

22   Q.   How long did you have that position?

23   A.   I had that from January of 2016 to October of 2018.

24   Q.   So in 2017, was it -- do you recall the National Commission

25   on Correctional Health Care audit that was performed in 2017?

1     A.    I do.

2     Q.    Was it part of your duties and responsibilities to review

3     and respond to that?

4     A.    Yes, it was.

5     Q.    Take a look at --

6           MR. KRONBERG:  Does he have the exhibits available up

7     there?

8           THE COURT:  Do you want -- Counsel, I prefer, if

9     possible, to use the evidence presenter; then I can see what the

10    witness is being shown as well.  But, you know, it's your time,

11    use it as you will.  But it can be a lot more efficient, though,

12    if we can just show it to the witness --

13          MR. KRONBERG:  Sure.

14          THE COURT:  -- using the evidence presenter.  But

15    we'll find a copy if you want to --

16          MR. KRONBERG:  That's okay.

17          THE COURT:  Do you want to use the court copies here?

18    Is that what you're --

19          MR. KRONBERG:  No.  I'll just use the presenter.

20          THE COURT:  All right.

21          MR. KRONBERG:  I just was concerned it's a lengthy

22    document and...

23          THE COURT:  Well, we can give him the original.  What

24    is the exhibit number?

25          MR. KRONBERG:  6.

```
 1                 THE COURT:  How are the -- I thought we covered this
 2        in the pretrial order.  Are these joint exhibits?
 3                 MR. KRONBERG:  No.
 4                 THE COURT:  So the defense's exhibits are numbered --
 5                 MR. KRONBERG:  Starting with 1.
 6                 THE COURT:  Going -- okay.  And the plaintiffs'
 7        exhibits?
 8                 MR. WATKINS:  1000, Your Honor.
 9                 THE COURT:  Okay.  As long as we have it so we're not
10        going to be stepping on each other.
11                 All right.  Do you have that in front of you now?
12                 THE WITNESS:  I do.
13                 THE COURT:  Go ahead, Mr. Kronberg.
14                 MR. KRONBERG:  Thanks, Judge.
15        Q.   BY MR. KRONBERG:  You can look at the monitor.  So is
16        that -- take a look at --
17                 THE COURT:  I'm not sure it's on yet.  Is there --
18        yeah, I think we now have it.
19                 MR. KRONBERG:  Thanks.
20        Q.   BY MR. KRONBERG:  So, Mr. Hofer, showing you what's been
21        marked Exhibit 6.
22                 Do you recognize that?
23        A.   I do.
24        Q.   Is that the NCCHC audit from 2017 that you reviewed and
25        responded to?
```

1    A.   Yes, it is.

2              MR. KRONBERG:  I'd move to admit Exhibit 6.

3              THE COURT:  Any objection?

4              MS. OLSON:  No objection, Your Honor.

5              THE COURT:  Exhibit 6 will be admitted.

6         (Defendants' Exhibit 6 admitted.)

7    Q.   BY MR. KRONBERG:  So let's take a look, if you will, at the

8    Executive Summary on page 3, if you will.

9              Mr. Hofer, I just want you to indicate -- to review,

10   if you will, what findings were made by the NCCHC as a result of

11   its audit in 2017.

12   A.   Okay.

13   Q.   What does it say there?

14   A.   Yeah.  So through their five-day audit of ISCI, the team

15   found that the prison was a well-run health care and mental

16   health care system.

17   Q.   What about the policies and procedures?

18   A.   The facility has put in several system checks in place to

19   identify the current problems, find a reason for the problem,

20   correct the problem, and continue monitoring to ensure that any

21   changes stay consistent.  And the policies reflect the national

22   standards of NCCHC, which will assist in identifying any problem

23   areas and provide consistent time frames and direction for all

24   staff.

25   Q.   Let's go back a second and just determine when this audit

```
 1       was performed.
 2               When was this audit performed?
 3       A.   It was May 8 through May 12, 2017.
 4       Q.   Let's take a look at some of the findings that are
 5       summarized starting on page 3.
 6               Do you see those?
 7       A.   I do.
 8       Q.   Okay.  Does it appear that most of these -- these are the
 9       ones that were found in noncompliance; correct?
10       A.   That is correct.
11       Q.   Okay.  It appears that a lot of these were NCCHC standards.
12       For example, we have NCCHC Standard P-E-07; is that correct?
13       A.   Correct.
14       Q.   And --
15               THE COURT:  Counsel, just so I'm clear:  So P-E-07 --
16       I assume the NCCHC have certain published standards, and this is
17       a reference to those published standards; correct?
18               MR. KRONBERG:  Correct.
19               THE COURT:  All right.  Go ahead.
20       Q.   BY MR. KRONBERG:  So in some of these standards that were
21       found to be noncompliant related to, for example, the same
22       issues, such as the Health Service Requests being handled in a
23       way that the NCCHC did not find in compliance.
24               For example, this first one, the NCCHC P-A-01, talks
25       about the access to care and the HSR issue.
```

1                    Do you see that?

2    A.   I do.

3    Q.   What was the issue with the HSR process there?

4    A.   A few of the auditors felt that the copay policy was a

5    barrier to care, which was later addressed.

6    Q.   And is that under the -- this is an IDOC standard operating

7    procedure; is that right?

8    A.   That is correct.

9    Q.   And does that also address access to care?

10   A.   It does.

11   Q.   And did that also address the issue of, for example, the

12   HSR problem you just indicated under the P-E-07?

13   A.   Yes, it did.

14   Q.   So let's take a look at some of the results that the NCCHC

15   found just on the compliance standards relating to the Modified

16   Compliance Plan.  So let's take a look at page 11, please.

17                    This is a compliance indicator for the MCP; is that

18   what that says?

19   A.   Yes.

20   Q.   And which compliance issue is indicated there at the top?

21   A.   Delays/lack of response to Health Services Requests.

22   Q.   In relation to the findings of the NCCHC on that compliance

23   indicator, what did they find, next page, page 12.

24   A.   Yeah.  They found that compliance was greater than 90

25   percent.

1    Q.   That met the threshold?

2    A.   It did.

3    Q.   Let's take a look at page 15.

4         And what's the MCP compliance indicator here?

5    A.   It is poor quality of nursing care when delivered in RDU.

6    Q.   And if we take a look at the following page, page 16, what

7    did the NCCHC find on this issue?

8    A.   They found that that was greater than 90 percent.

9    Q.   Met the threshold?

10   A.   It did.

11   Q.   Okay.  Let's take a look at page 22.

12        What's the MCP compliance indicator at issue here?

13   A.   Staff competency and systems for training qualified staff.

14   Q.   And if we look at the following page, page 23, what is the

15   findings of the NCCHC on that issue?

16   A.   They found that compliance was also greater than 90

17   percent.

18   Q.   Met the threshold?

19   A.   It did.

20   Q.   Let's take a look at page 28.

21        What's the MCP compliance indicator at issue there?

22   A.   Lack of confidentiality during sick call and pill call.

23   Q.   And what did the NCCHC find results -- find on that issue?

24   A.   Compliance greater than 90 percent.

25   Q.   So above the threshold requirement?

HOFER – Direct

```
1    A.   Yeah.

2    Q.   Let's take a look at page 30.

3         What's the MCP compliance indicator issue there?

4    A.   Poor quality of medical care when it is delivered; increase

5    availability of RNs to respond during emergency responses.

6    Q.   Thank you.

7         In terms of compliance, what did the NCCHC find on

8    that issue?

9    A.   They found that compliance was also greater than 90

10   percent.

11   Q.   Let's take a look at page 32.

12        What's the MCP compliance indicator at issue?

13   A.   Confirm continuity of care upon return from the hospital,

14   ER, or off-site care visit.

15   Q.   And what, on that particular issue, did the NCCHC audit

16   find?

17   A.   They also found that compliance was greater than 90

18   percent.

19   Q.   Above the threshold requirement?

20   A.   Yes, sir.

21   Q.   Let's take a look at page 38.

22        And what's the specific MCP compliance indicator at

23   issue here?

24   A.   Emergency response equipment not kept in order or not being

25   carefully tracked.
```

1    Q.   So what did the NCCHC find on this one?

2    A.   That compliance was actually less than 90 percent.

3    Q.   Can you tell what the issue was?  I believe there is a

4    recommendation.

5    A.   Yeah.  A lot them were the location of the bags, their

6    ability to audit those after emergency response; and then the

7    inventory being audited in an inappropriate time frame.

8    Q.   So this was in relation to the emergency response bags?

9    A.   Correct.

10   Q.   So these are the bags that emergency responders use when

11   they are responding to an emergency?

12   A.   You are correct.

13   Q.   Did you resolve -- do you know if this issue was resolved?

14   Were you involved in that?

15   A.   Yeah, I was involved.  Yes, that issue was resolved to make

16   sure that we have appropriate logs in place to address those

17   emergencies.

18   Q.   Let's take a look at page 39.

19        What's the MCP compliance indicator at issue there?

20   A.   Outpatient medical care to ensure adequate follow-up

21   related to outpatient care.

22   Q.   And what did the NCCHC find on that issue?

23   A.   They found that compliance was greater than 90 percent.

24   Q.   Above the threshold?

25   A.   Correct.

```
 1      Q.   Let's take a look at page 43.  This one is pretty easy.

 2           What's the issue with the compliance indicator for MCP

 3      on this one?

 4      A.   Elimination of the Life Transitions Program.

 5      Q.   And what does it indicate for compliance?

 6      A.   Greater that 90 percent.

 7      Q.   And what did the NCCHC auditors find in relation to the

 8      program?

 9      A.   That it no longer exists.

10      Q.   And was it replaced?

11      A.   Yes.  The Inmate Support Program.

12      Q.   Let's take a look at page 46.

13           What's the MCP indicator there?

14      A.   Poor documentation of medication delivery or

15      administration.

16      Q.   And if we look on the next page, page 47, what did the

17      NCCHC find?

18      A.   That the compliance was greater than 90 percent.

19      Q.   Meets the threshold for compliance?

20      A.   Yes, it does.

21      Q.   Let's take a look at page -- if I could read -- 52.

22           And what's the compliance indicator for MCP issue

23      there?

24      A.   Segregation/welfare check concerns.

25      Q.   And the results are on the next page.
```

1               What did the auditors find?

2    A.   That the compliance was greater than 90 percent.

3    Q.   Let's take a look at page 56.

4               And what's the MCP compliance indicator at issue

5    there?

6    A.   Offender medical records/mental health records.

7    Q.   And what was the result of the audit on that issue?

8    A.   Compliance was greater than 90 percent.

9    Q.   And just so we're clear:  The threshold requirement for

10   this audit was 90 percent; correct?

11   A.   Correct.

12   Q.   Let's take a look at page 60.

13              What's the MCP compliance indicator at issue there?

14   A.   Concerns related to death reviews.

15   Q.   And results of the audit?

16   A.   Compliance was greater than 90 percent.

17   Q.   Let's take a look at page 63.

18              What's the compliance indicator for MCP issue there?

19   A.   Requirement for a systemic program for screening and

20   evaluating offenders in need of mental health.

21   Q.   And I believe the results are on the next page.

22              What did the auditors find?

23   A.   Compliance greater than 90 percent.

24   Q.   Let's take a look at page 69.

25              What's the MCP indicator issue there?

**HOFER - Direct**

1    A.    A requirement for a treatment program that involves more

2    than segregation or close observation of mentally ill inmates.

3    Q.    I believe the results are on the following page, page --

4    actually, page 71.

5          What did the auditors find?

6    A.    Compliance greater than 90 percent.

7    Q.    And let's take a look at page 77.

8          What's the compliance indicator for MCP issue there?

9    A.    Increase employment of sufficient number of trained mental

10   health professionals.

11   Q.    And the compliance result?

12   A.    Was greater than 90 percent compliance.

13   Q.    Let's take a look at page 78.

14         What's the compliance indicator for MCP issue there?

15   A.    Administration of psychotropic medication only with

16   appropriate supervision and periodic evaluation.

17   Q.    And what did the auditors find?

18   A.    Compliance less than 90 percent.

19   Q.    And what appeared to have been the issue in terms of a

20   recommendation by the NCCHC?

21   A.    Their recommendation was a standard procedure for patients

22   to request mental health care should be put into place so

23   patients know that their requests are triaged and answered in a

24   timely manner.

25   Q.    Did -- was that resolved, to your knowledge?

1    A.    It was.

2    Q.    Do you know how it was resolved?

3    A.    I don't recall.

4    Q.    Let's take a look at page 81.

5          What's the compliance indicator for MCP at issue

6    there?

7    A.    Creating a basic program to identify, treat, and supervise

8    offenders at risk for suicide.

9    Q.    And I believe the compliance results are on the next page,

10   page 82.

11         What did the auditors find?

12   A.    That compliance was greater than 90 percent.

13   Q.    So out of all these -- now, just so we're clear:  There

14   were things found out of compliance in relation to some of the

15   NCCHC standards and the standard operating procedures of ISCI,

16   and we looked at those at the beginning; is that right?

17   A.    Correct.

18   Q.    So we have just been looking at the compliance indicators

19   for the MCP, and we found that only two out of all of them were

20   out of compliance; is that right?

21   A.    That is correct.

22   Q.    Let's take a look at page 87.

23         And what's this section of the audit?

24   A.    Patient chart review.

25   Q.    So have they set forth their review of, it looks to be,

1        19 -- 19 patient charts; is that correct?

2   A.   Correct.

3   Q.   Let's just take a look at the findings on each of these

4   charts.  Okay?

5            And if you take a look on this first one, what did the

6   auditors find?

7   A.   The ability to complete activities of daily living are not

8   compromised.  Neither the physical therapist nor the medical

9   provider felt referral to an orthopedic specialist for surgical

10  recommendations was medically necessary.  This was explained to

11  the patient.  And the physician auditor agrees with this

12  assessment and treatment.

13  Q.   Let's take a look at the next one.  And what I'm mainly

14  interested in is what the auditors found in relation to

15  reviewing that chart.

16  A.   Yeah.  The physician auditor agrees with the assessment and

17  the treatment.

18  Q.   For that patient?

19  A.   Correct.

20  Q.   Now, let's take a look at the next one.

21           What did the physician auditor state there?

22  A.   The physician auditor agrees with the current assessment

23  and treatment in that particular case.

24  Q.   And let's take one down here.

25           On P.C., what did the physician auditor state on that

**HOFER - Direct**

1    patient?

2    A.    The physician also agreed here that the current assessment

3    and treatment was appropriate.

4    Q.    Now, let's talk about what you did in response -- what ISCI

5    did in response to this audit.  Just give us an overview of what

6    happened.

7    A.    Okay.  Yeah.  So once we received the results of this

8    audit, we worked as a team, both Corizon and IDOC.  We met

9    weekly, oftentimes, I mean, maybe four or five times a month.

10   We went through and kind of built our own checklist.  And

11   basically, we hit all those areas to ensure we were compliant.

12            So both the mental health side and the medical side

13   worked together to make sure that we did everything we needed to

14   to put those fixes in place, which we did.

15   Q.    And did you -- what information did you provide, if any,

16   back to NCCHC before the follow-up audit?

17   A.    So we provided, basically, the fixes to be put in place.  I

18   guess, really, in essence, you're -- you're providing them an

19   outline of what you're doing to make sure that we're complying

20   with those standards.

21   Q.    And the NCCHC came back to do a follow-up audit; is that

22   correct?

23   A.    That is correct.

24   Q.    Let's take a look at Exhibit 7.

25            Is that the follow-up audit report?

```
 1        A.    That is, yes.

 2                    MR. KRONBERG:  Move to admit 7.

 3                    THE COURT:  Any objection?

 4                    MS. OLSON:  No, Your Honor.

 5                    THE COURT:  Audit 7 -- excuse me.  Exhibit 7 will be

 6        admitted.

 7              (Defendants' Exhibit 7 admitted.)

 8        Q.    BY MR. KRONBERG:  Once again, let's take a look at, I

 9        think, the Executive -- well, let's just get clear.  When --

10        excuse me.  I need better glasses.  Okay.  Here it is.

11              When did they come back to do this audit?  I'll get it

12        right here in a second.  It's on the screen if you look at it.

13        A.    Yeah.  September 25 through 28, 2017.

14        Q.    Thank you.

15        A.    You're welcome.

16        Q.    Let's take a look at the Executive Summary on the next

17        page, page 2.

18              What did the auditors find in general?

19        A.    The auditors found that ISCI has implemented many of the

20        recommendations from the original 2017 audit.  The health and

21        custody staff are guided by policy and procedures, standard

22        operating procedures, and accreditation standards.  They

23        observed up-to-date health services for inmates and attention to

24        emerging research concerning segregation and other advances in

25        correctional health care custody.
```

1          In addition, system checks are in place to identify

2     current problems, find the reason for the problem, correct the

3     problem, and continue monitoring to ensure that any changes stay

4     consistent.  The policies reflect NCCHC's national standards,

5     which provide consistent time frames and direction for all

6     staff.

7     Q.   So if we look at the findings -- essentially, on the next

8     page, there is a table of findings of compliance and

9     noncompliance.

10         It looks like you're still noncompliant with some of

11    the standards; is that correct?

12    A.   That is correct.

13    Q.   So in terms of responding to this audit and what was still

14    out of compliance, what did you do?

15    A.   You know, once again, sat down as a group, you know, as a

16    team, to go through all of those areas.  I can't remember the

17    exact number, but I know a lot of time was spent making sure

18    that we went through above and beyond, even went through the

19    recommendations.  So those were some of the things that the

20    auditors felt were important.

21         So we went through really as a team to ensure that we

22    were making those appropriate fixes and putting -- putting

23    ourselves in a good place going forward.

24    Q.   Now, I've got the table of -- Table 1 Findings of

25    Compliance back up on the screen in front of you.

```
 1              Does it appear that a lot of the things that were out

 2      of compliance are NCCHC standards?  For example, the first two I

 3      have highlighted.

 4      A.    Correct.

 5      Q.    Those are NCCHC standards?

 6      A.    That's correct.

 7      Q.    And there's also a couple of Idaho Department of

 8      Corrections standard operating procedures that were out of

 9      compliance as well?

10      A.    Correct.

11      Q.    Let's take a look at the -- well, let's take a look at

12      page 21.  I'll pull it up here in a second.

13              I've given you the wrong page.  That's okay.  Let's go

14      to page 34.

15              This is -- what's this section entitled?  You can just

16      look at the screen.

17      A.    Patient Chart Review.

18      Q.    Again, does it appear that the auditors looked at the

19      patient charts to determine compliance?

20      A.    They did, yes.

21      Q.    And let's talk about the first one, ███.  And I just want

22      you to indicate what the auditors found.

23      A.    Overall, the chart review of provider encounters, specialty

24      care, and diagnostics show appropriate clinical treatment.  The

25      patient's expectations, based on interview, were not consistent
```

1    with the care received.

2    Q.    Let's take a look at the next one entitled ████ patient.

3    And just let us know what the auditors found there.

4    A.    Overall, the chart review of special needs orders, provider

5    visits, and medications show appropriate clinical treatment, but

6    the patient seems to report different expectations.

7    Q.    And let's talk about what the auditors found in relation to

8    A.C., the next chart review.

9    A.    The facility reports much quicker turnaround times on this

10   type of item.  This, again, shows miscommunication between staff

11   and patients, leading to varied patient expectations.

12   Q.    Does it indicate whether the wait time for the medical

13   equipment was appropriate in terms of community standards of

14   care?

15   A.    Yes.

16   Q.    Let's take a look at the next and last two.

17            In relation to ████, what did the auditors find in

18   relation to the delivery of the diabetic shoes?

19   A.    A three-month wait for custom diabetic shoes is consistent

20   with community standards.  However, it appears in his chart that

21   the delay was secondary to facility health staff communication

22   and not the outside supplier.

23   Q.    And lastly, in relation to ████, what did the auditors

24   find?

25   A.    There is no medical indication for further referral to

1    oncology at this time.  Overall review of patient encounters,

2    medications, treatments administered, and referrals submitted

3    show appropriate clinical care.  The patient, again, reports

4    different understanding and communication resulting in different

5    expectations.

6    Q.   So what did you do in response to this audit?  Obviously,

7    there were some compliance issues remaining.

8    A.   Yeah.  Very similar to what we have done in the past,

9    obviously, we are going to address any sort of deficiency or

10   areas that need improvement.

11   Q.   Now, the NCCHC did not come back to do a second follow-up

12   in relation to this report; is that right?

13   A.   Correct.

14   Q.   Did they show up in 2019 to do an accreditation survey?

15   A.   Yes, they did.

16   Q.   Were you involved in reviewing and responding to that

17   survey?

18   A.   Yes.  I was familiar with that survey, yes.

19   Q.   Showing you what's been marked Exhibit 189.

20        Is that the report -- initial report on the

21   accreditation survey from 2019?

22   A.   That is.

23   Q.   And that's the one that you reviewed and responded to as

24   part of your duties and responsibilities as vice president of

25   operations?

1    A.   That's correct.

2            MR. KRONBERG:  I'd move to admit Exhibit 189.

3            THE COURT:  Any objection?

4            MS. OLSON:  Your Honor, I don't object to the exhibit

5    coming in.  But to the extent this witness just continues to

6    testify about something he's just read or did, we'd object

7    whether this witness has sufficient foundation to just read the

8    report into the record.

9            THE COURT:  Again, I'm going to let counsel use the

10   time as they will.  We will review each of these, of course,

11   before issuing a decision.

12           But Exhibit 189 will be admitted, but it probably

13   isn't necessary to have the witness go through and just

14   regurgitate what's in the written document.  But, again, it's

15   your time; use it as you will.

16       (Defendants' Exhibit 189 admitted.)

17   Q.   BY MR. KRONBERG:  As a result of that survey, did you take

18   some kind of corrective action?

19   A.   Yes.  So once we --

20           THE COURT:  Counsel, just a moment.  I see -- is it

21   Exhibit 190 or 189?

22           MR. KRONBERG:  It's 189.  Sorry, Judge.

23           THE COURT:  All right.

24   Q.   BY MR. KRONBERG:  Okay.  Just initially here, Mr. Hofer,

25   what did you do in response to -- to receiving this report?

1    A.    Yeah.  So in my position, I received this report via email.

2    And after receiving that, I sent it over to Warden Ramirez and

3    the medical and mental health team to ensure that obviously

4    these -- these areas were followed up on and, of course, fixed

5    and then sent in to NCCHC for review.

6    Q.    Okay.  Take a look at Exhibit 305, please.  It's right

7    there on the monitor.

8    A.    Okay.

9    Q.    And was that the response of the final report of NCCHC in

10   relation to the accreditation survey?

11   A.    Yes.

12              MR. KRONBERG:  Move to admit Exhibit 305.

13              THE COURT:  Any objection?

14              MS. OLSON:  No, Your Honor.

15              THE COURT:  Exhibit 305 will be admitted.

16        (Defendants' Exhibit 305 admitted.)

17   Q.    BY MR. KRONBERG:  I want to talk to you about one other

18   issue, Mr. Hofer.

19              Do you recall a change in the processing or the

20   process by which HSR, Health Service Requests, were made as a

21   result of the 2017 NCCHC audit?

22   A.    Yes, I do.

23   Q.    And what was the change?

24   A.    Yeah.  So in that 2017 audit, we had changed the copay

25   policy.  So it used to be $5 per visit and $3 for medications.

1    Q.    And how many Health Service Requests was an inmate allowed

2    to submit per day?

3    A.    At that particular time, just one per day.

4    Q.    And what changed in that respect after the audit in 2017?

5    A.    Yeah.  So after the audit, we changed the copay policy

6    where it is $2 per visit, zero dollars for medications, and a

7    patient can submit three HSRs per day.

8    Q.    And did that affect the number of HSRs that had to be

9    processed?

10   A.    Drastically, yes.

11   Q.    Increase?

12   A.    Increase, yes.

13   Q.    And what effect did -- when a Health Service Request is

14   submitted, is there a requirement that a provider see that

15   patient, if they are to see a provider, within 14 days?

16   A.    That's correct.

17   Q.    And so what happened to that requirement?

18   A.    For current time period, there was a backlog because of the

19   influx of HSRs coming through the system.

20   Q.    So what did you do about that?

21   A.    At that particular point, we worked with our -- with our

22   client to try to figure out the best way to staff that facility.

23   We did end up getting additional staff to accommodate that, and

24   we now have a plan in place, and we do not have a backlog at

25   ISCI.

1    Q.   Take a look at Exhibit 306.  It's on the screen.  Excuse

2    me.

3         What is Exhibit 306?

4    A.   So that is the Health Service Request for general

5    population.

6    Q.   And is this the health service report card for December of

7    2019?

8    A.   It is, yes.

9    Q.   And would it show the results of the effect of adding

10   provider hours on the 14-day issue?

11   A.   Correct.

12        MR. KRONBERG:  I'd move to admit Exhibit 306.

13        MS. OLSON:  No objection, Your Honor.

14        THE COURT:  All right.  Exhibit 306 will be admitted.

15        (Defendants' Exhibit 306 admitted.)

16   Q.   BY MR. KRONBERG:  So, for example -- so this is the page

17   that addresses the Health Service Request for the general

18   population; is that correct?

19   A.   That is correct.

20   Q.   So if we look at this particular chart, does that address

21   the visits completed within 14 days of submission of a Health

22   Service Request?

23   A.   It does, yes.

24   Q.   It indicates -- what does it indicate in terms of what

25   happened through the summer?

1    A.    Yeah.  So, I mean, looking at -- at those numbers, you can

2    see that there was a -- a backlog in place, and those numbers

3    were quite low.

4          And so what we did is we put in place -- we got

5    creative with staff, eventually got additional staff.  And you

6    start to kind of see those numbers get back up to where -- where

7    they should be.

8    Q.    So it's at -- was at 100 percent at the end of December?

9    A.    That is, yes.

10   Q.    And did you have to amend the contract with IDOC to get

11   that additional provider care?

12   A.    We did end up getting an amendment, yes.

13   Q.    Take a look at Exhibit 191.

14         Is that the contract amendment that allowed for the

15   staffing of additional provider hours at ISCI to handle the

16   14-day delay?

17   A.    That is the amendment, yes.

18             MR. KRONBERG:  Move to admit Exhibit 191.

19             THE COURT:  Any objection?

20             MS. OLSON:  No objection, Your Honor.

21             THE COURT:  191 will be admitted.

22         (Defendants' Exhibit 191 admitted.)

23             MR. KRONBERG:  I have no further questions.

24             THE COURT:  Cross.

25             MS. OLSON:  Yes, Your Honor.

1              And, Ms. Bracke, could we have the input switched over

2    to Ms. Franolich's computer, please.  Do you do that?

3              THE CLERK:  Yes.

4                         CROSS-EXAMINATION

5    BY MS. OLSON:

6    Q.   Good morning, Mr. Hofer.

7    A.   Good morning.

8    Q.   Mr. Hofer, you indicated that you're currently the vice

9    president of operations for Idaho; is that correct?

10   A.   That is correct.

11   Q.   And you succeeded Tom Dolan?

12   A.   I did, yes.

13   Q.   And as vice president -- I think you said it was vice

14   president of operations -- you're responsible for basically all

15   aspects of health care for the State of Idaho prison system; is

16   that right?

17   A.   Correct.

18   Q.   And you have to abide by the contract that Corizon has with

19   IDOC?

20   A.   Correct.

21   Q.   All aspects of that contract; is that right?

22   A.   Yes.

23   Q.   And you have to make sure that there are no barriers to

24   health care at IDOC; correct?

25   A.   That is correct.

1    Q.   Including at ISCI?

2    A.   Yes.

3    Q.   And having no barriers to health care would mean that it's

4    a constitutionally adequate system; is that correct?

5    A.   That is correct.

6    Q.   And if there are barriers to health care, it would not be a

7    constitutionally adequate system; is that right?

8    A.   Yes.  Can you rephrase that.

9    Q.   Sure.  If there were barriers to health care, it would not

10   be a constitutionally adequate system?

11   A.   Correct.

12   Q.   And that includes all parts of ISCI; is that right?

13   A.   Yes.

14   Q.   I think in response to some questions that Mr. Kronberg

15   asked you, there was specifically one of those NCCHC compliance

16   standards that applied to the RDU; is that right?

17   A.   Yes.

18   Q.   That's Unit -- is that Unit 14 within ISCI?

19   A.   No.

20   Q.   Which unit number is that?

21   A.   15.

22   Q.   15.  And so that would be the same thing; you would have to

23   provide constitutionally adequate care in Unit 16?

24   A.   Yes.

25   Q.   And Unit 14?

```
1        A.    Yes.

2        Q.    9?

3        A.    Yes.

4        Q.    10?

5        A.    Yes.

6        Q.    11?

7        A.    Yes.

8        Q.    13?

9        A.    Yes.

10       Q.    The Medical Annex?

11       A.    Yes.

12       Q.    Now, that NCCHC audit that Mr. Kronberg asked you a lot of

13       questions about that occurred in May of 2017, that's before you

14       became vice president of operations; right?

15       A.    That is correct.

16       Q.    You were the health services administrator for ISCI at the

17       time; is that correct?

18       A.    Correct.

19       Q.    And you did not actually participate in the audit; right?

20       A.    In the 2017 audit?

21       Q.    Correct.

22       A.    I did participate in the audit.

23       Q.    You weren't one of the auditors; correct?

24       A.    Oh.  Correct, no.

25       Q.    And are you familiar with what the auditor did who reviewed
```

1    the patient records?  Do you know how he performed that

2    function?

3    A.   I don't recall the exact, no.

4    Q.   All right.  Did you -- were you involved in anything with

5    respect to that review of the medical records?

6    A.   No.

7    Q.   And when you were working with -- I take it -- it sounds

8    like you worked with the auditors to a certain extent; correct?

9    A.   That is correct.

10   Q.   Did you take them to view the Medical Annex?

11   A.   I did not personally take them to view the Medical Annex,

12   no.

13   Q.   Do you know if they toured the Medical Annex?

14   A.   I do.

15   Q.   Do you know if they made any specific findings with respect

16   to the Medical Annex?

17   A.   I do not know the specific findings, no.

18   Q.   Have you read the entire NCCHC report?

19   A.   At one point, yes.

20   Q.   So this NCCHC audit which occurred in May of 2017, we're

21   closing in on three years ago; correct?

22   A.   That is correct.

23   Q.   If we could have Defense Exhibit 6 brought back up.  And if

24   you could turn to page 3.

25            And page 3 had those items that were noncompliant; is

1    that correct?  Page 3 in the lower right corner.

2    A.   I'm showing page 1 here.

3         THE COURT:  Did you want --

4         MS. OLSON:  Page 3.  I think --

5         THE COURT:  We only have page 1.  Now it's coming to

6    page 3.  There it is.

7    Q.   BY MS. OLSON:  And those first three standards that are on

8    there, NCCHC P-E-07 and on down, those are the ones where

9    initially ISCI was found not to be compliant; is that right?

10   A.   That is correct.

11   Q.   And then when we -- if you take a look at pages 11 and 12.

12   And those are the pages that dealt with delays and lack of

13   response to Health Services Requests; is that right?  I'm sorry.

14        Let me ask you this, Mr. Hofer:  Do you recall that

15   there was a problem that NCCHC identified with respect to

16   timely -- timely responding to Health Service Requests?

17   A.   I guess in what respect?

18   Q.   Well, you just read from the report.  Do you recall that

19   being one of the concerns that NCCHC had?

20   A.   Yes.

21   Q.   And there was also a concern with the limits on the number

22   of Health Service Requests that could be provided in a single

23   day; correct?

24   A.   That was a few of their opinions, yes.

25   Q.   Well, that's what they told you made you not in compliance;

1    correct?

2    A.   Correct.

3    Q.   All right.  And the Health Services Requests were also too

4    expensive at the time; is that correct?

5    A.   That's how some of them felt, yes.

6    Q.   Well, that was one of the findings; correct?

7    A.   Correct.

8    Q.   And so as the health services administrator and the vice

9    president of operations for Corizon, you were aware that this

10   was a specific barrier to care at the time of this NCCHC audit;

11   correct?

12   A.   Yes.  It was an issue that we addressed, yes.

13          THE COURT:  Counsel, just so I'm clear:  When you

14   refer to the Health Service Requests being too expensive, you

15   are referring to the copay?

16          MS. OLSON:  Correct, Your Honor.

17   Q.   BY MS. OLSON:  The -- the copay was too high; correct?

18   A.   Yes.

19   Q.   All right.  And that was one of the specific findings of

20   the audit; correct?

21   A.   That is correct.

22   Q.   And I think you indicated that you took steps to deal with

23   that, and we'll come back -- come back to that.

24          I think you indicated earlier that you're familiar

25   with a unit at ISCI known as the Medical Annex; correct?

1    A.   I am, yes.

2    Q.   If we could -- the witness could please be shown

3    Plaintiffs' or -- yeah, Plaintiffs' Exhibit 1186.

4         Mr. Hofer, do you recognize what's depicted in

5    Exhibit 1186?

6    A.   I do.

7    Q.   That's the Medical Annex?

8    A.   Yes, it is.

9         MS. OLSON:  Your Honor, we'd offer Plaintiffs'

10   Exhibit 1186.

11        THE COURT:  Any objection?

12        MR. KRONBERG:  No.

13        THE COURT:  1186 will be admitted.

14        (Plaintiffs' Exhibit 1186 admitted.)

15   Q.   BY MS. OLSON:  And, Mr. Hofer, inmates are assigned to live

16   in the Medical Annex if they have medical issues; correct?

17   A.   Some can have medical issues, yes.

18   Q.   Well, that's a primary reason people are assigned there,

19   right?

20   A.   Or to be closer to Pendyne, chapel, or medical, yes.

21   Q.   Well, how many have been assigned there, to your knowledge,

22   to be closer to Pendyne?

23   A.   I don't know the number.

24   Q.   And how many have been there to be closer to some facility

25   other than medical, say, chapel?

1    A.    I do not know that number.

2    Q.    How many have been assigned there to be closer to medical?

3    A.    I do not know that number.

4    Q.    In Corizon, the people you supervise sometimes make

5    requests for inmates to be assigned to the Medical Annex;

6    correct?

7    A.    That is correct.

8    Q.    And you're aware of that?

9    A.    I am.

10   Q.    You know Amanda Tillemans?

11   A.    Yes, I do.

12   Q.    Did she used to be Amanda Benton?

13   A.    She did.

14   Q.    If we could look at Exhibit 1007.

15         And, Mr. Hofer, do you recognize Exhibit 1007 as being

16   an email chain from March of 2018 on which you were copied?

17   A.    Yes.

18   Q.    And that Ms. Benton is also on there?

19   A.    That is correct, yes.

20         MS. OLSON:  Your Honor, at this time, I'd offer

21   Exhibit 1007.

22         THE COURT:  Any objection?

23         MR. KRONBERG:  It's not relevant and it's hearsay.  I

24   don't know what it's being offered for.

25         THE COURT:  Well, lay some further foundation,

1          Ms. Olson.

2                    MS. OLSON:  Very well, Your Honor.  I thought we had

3          agreement with counsel, but I'll -- I'll lay some additional

4          foundation.

5                    THE COURT:  Is there an agreement?  Let's --

6                    MR. KRONBERG:  No, there is no agreement to just admit

7          the exhibits.  There is an agreement that it is what it is,

8          but --

9                    THE COURT:  The agreement is to foundation?

10                   MS. OLSON:  Foundation and authenticity.  And the only

11         agreements *[sic]* were relevance, Your Honor.

12                   THE COURT:  The only objection is relevance?

13                   MS. OLSON:  Correct.

14                   MR. KRONBERG:  Relevance and hearsay.  I never waived

15         hearsay or relevance.  I mean, I don't know what -- why are we

16         looking at this document?  I don't know what the --

17                   THE COURT:  Well, go ahead, Ms. Olson.

18         Q.   BY MS. OLSON:  Mr. Hofer, you're copied on this document;

19         correct?

20         A.   Yes.

21         Q.   And it relates to assignment of an inmate to live in the

22         Medical Annex; correct?

23         A.   Yes.

24                   MS. OLSON:  Your Honor, I'd offer 1007.

25                   THE COURT:  I'm not absolutely clear where we're

1    going, but I'm going to give counsel some leeway.  We don't have

2    a jury here.  I'll certainly be able to sort this out.

3            Any objection to 1007 is overruled, and the exhibit

4    will be admitted.

5        (Plaintiffs' Exhibit 1007 admitted.)

6    Q.   BY MS. OLSON:  Mr. Hofer, on 1007 -- 1007, the email at the

7    bottom from Ms. Benton to Mr. Rufe on which you are copied,

8    refers to inmate being moved from IMSI -- that's max; correct?

9    A.   That is correct.

10   Q.   -- to the Medical Annex next bed available; correct?

11   A.   Yes.

12   Q.   And the purpose for that, according to this email, is so

13   that he has access to inhouse medical for the time being;

14   correct?

15   A.   Yes.

16   Q.   And, in fact, it's true that virtually all of the inmates

17   in the Medical Annex are there because they have more acute

18   medical issues than inmates in most of the other housing units;

19   correct?

20           MR. KRONBERG:  I'm going to object to the foundation

21   for this witness to answer that question.

22           THE COURT:  If you know.

23           THE WITNESS:  I'm not sure I know the exact number,

24   no.

25   Q.   BY MS. OLSON:  You've been to the Medical Annex?

1    A.    Many times.

2    Q.    You're familiar with what it looks like on the inside?

3    A.    I am.

4    Q.    You're familiar with the layout that's in there?

5    A.    Yes.

6    Q.    You're familiar with the general conditions of the inmates

7    housed there?

8    A.    Yes.

9    Q.    You're familiar with the specific contractual requirements

10    Corizon has for medical staffing of the Medical Annex; correct?

11    A.    I am.

12    Q.    And in fact, sometimes you've referred to the Medical Annex

13    as a circus tent; correct?

14    A.    Not that I'm aware of.

15    Q.    You've heard others refer to it as that?

16    A.    I have.

17    Q.    And that refers to the sort of circus tent of medical

18    issues for the inmates who are housed there; correct?

19    A.    I'm not sure I can answer that.  I don't know how it's

20    referred to.  I think it's the actual building itself.

21    Q.    Well, you have heard people refer to it as a circus tent;

22    correct?

23    A.    Correct.

24    Q.    And is it your testimony that you have no awareness that

25    that's because of the sort of circus of medical issues in that

1    tent?

2    A.   That's what I'm saying, yes.

3    Q.   And you're familiar with a woman named Kate Shelton?

4    A.   Yes, I am.

5    Q.   And in her presence, have you ever called the Medical Annex

6    a circus tent?

7    A.   Not that I'm aware of.

8    Q.   You're aware that the population of inmates housed in the

9    Medical Annex includes a variety of inmates with medical and

10   mobility problems; correct?

11   A.   Yes.

12   Q.   Inmates in wheelchairs?

13   A.   Yes.

14   Q.   Inmates with prosthetics?

15   A.   Yes.

16   Q.   Inmates that require oxygen?

17   A.   Yes.

18   Q.   Inmates that require chronic care?

19   A.   Yes.

20   Q.   They have a variety of medical aids?

21   A.   Yes.

22   Q.   And you would agree that the medical aids -- the walkers,

23   the wheelchairs -- are often needed to properly assist those

24   inmates with a medical condition?

25   A.   Yes.

1    Q.   That allows them to be or remain mobile?

2    A.   Yes.

3    Q.   Maintain their physical health?

4    A.   Yes.

5    Q.   Maintain their mental health?

6    A.   I'm not sure I can answer that.

7    Q.   If someone, for example, was paralyzed, didn't have proper

8    equipment or room for that equipment, they might be at risk of

9    falling; correct?

10   A.   Could be.

11   Q.   At risk of injury?

12   A.   Could.

13   Q.   And so the things like the mobility and the adequate space

14   are necessary for their proper medical care; correct?

15              MR. KRONBERG:  I'm going to object to the relevance.

16              THE COURT:  Well, I'm going to give counsel leeway.

17   The objection is overruled.

18              Go ahead.

19              THE WITNESS:  It might be a better question for a --

20   for a medical provider.

21   Q.   BY MS. OLSON:  You're responsible for the overall medical

22   care at ISCI; correct?

23   A.   Correct.

24   Q.   And you were the health services administrator there for a

25   time?

1     A.    Yes.

2     Q.    All right.  So if someone is paralyzed and, say, needs a

3     wheelchair and they didn't have proper equipment or room for

4     that equipment, they might be at risk of falling.  You agreed

5     with that; correct?

6     A.    Could be.

7     Q.    And so things are necessary for their proper medical care?

8     A.    Yes.

9     Q.    And a person with a mobility issue, say, someone who is

10    a -- has paralysis or is an amputee or multiple sclerosis, if

11    they do have a fall, they might need assistance in getting up;

12    correct?

13    A.    Could, yes.

14    Q.    And sometimes that takes trained medical personnel to do

15    that properly?

16    A.    Yes.

17    Q.    Are you familiar with what a Hoyer sling is?

18    A.    I am.

19    Q.    It assists in lifting and transferring people who are in

20    wheelchairs or have other kinds of medical conditions?

21    A.    Yes.

22    Q.    Limits falls?

23    A.    Yes.

24    Q.    And the Medical Annex has no Hoyer slings, does it?

25    A.    Not that I'm aware of.

1      Q.   I'm now going to show you some pictures that have been

2      marked for identification purposes as Plaintiffs' -- and we'll

3      go through the list of numbers, and then we'll put them up one

4      at a time -- 1113, 1126, 1129, 1132, 1134, 1140, 1152, 1158, and

5      1180.

6           And we'll start with 1113.  Do you recognize what's

7      depicted in that photo?

8      A.   I do.

9      Q.   That's the Medical Annex; correct?

10     A.   That is correct.

11     Q.   That's a pretty typical picture of how the Medical Annex

12     looks?

13     A.   The layout, yes.

14     Q.   And then if you'd look at Exhibit 1126.

15          Do you recognize what's depicted there?

16     A.   I do.

17          MS. OLSON:  Your Honor, I apologize.  I forgot to

18     offer Exhibit 1113.

19          THE COURT:  Any objection?

20          MR. KRONBERG:  No.

21          THE COURT:  1113 will be admitted.

22          (Plaintiffs' Exhibit 1113 admitted.)

23     Q.   BY MS. OLSON:  Do you recognize what's depicted in 1126?

24     A.   Yes.

25     Q.   Also the Medical Annex?

1    A.    Yes.

2    Q.    Also a pretty typical picture of how the Medical Annex

3    might look on any given day?

4    A.    Yes.

5    Q.    You can see people in wheelchairs?

6    A.    I do.

7    Q.    Somebody with a prosthetic leg?

8    A.    Yes.

9    Q.    Some oxygen machines there on the floor?

10   A.    Yes.

11   Q.    Look at Exhibit 1132.

12            THE COURT:  Do you wish to offer 1126?

13            MS. OLSON:  Yes.  Sorry, Your Honor.  I'd offer 1126.

14   Thank you.

15            THE COURT:  Any objection?

16            MR. KRONBERG:  No, Your Honor.

17            THE COURT:  Counsel, is there any objection to any of

18   these?

19            MR. KRONBERG:  I don't know what they -- I don't know

20   what they -- I don't know what they are yet.

21            MS. OLSON:  Well, Your Honor, they've got copies of

22   all of our exhibits.

23            THE COURT:  I know.  That's why I --

24            MR. KRONBERG:  Well, I don't have them memorized.  So

25   if they are just pictures of the annex --

```
 1              THE COURT:  Is that what they all are?

 2              MS. OLSON:  Yes, Your Honor.

 3              MR. KRONBERG:  That's fine.

 4              THE COURT:  All right.  Those exhibits -- 1113, 1126,

 5     1132, -40, -52, -58, and -80 -- will be admitted.

 6              Go ahead and proceed.

 7              MS. OLSON:  Thank you.

 8          (Plaintiffs' Exhibits 1126, 1132, 1134, 1140, 1152, 1158,

 9     and 1180 admitted.)

10     Q.   BY MS. OLSON:  I think we are looking at 1129.

11              That's a pretty typical picture of the Medical Annex;

12     correct?

13     A.   Correct.

14              MS. OLSON:  And can we go back to 1129.

15              MS. FRANOLICH:  That's what this one is.

16              MS. OLSON:  What was the one --

17              MS. FRANOLICH:  We skipped one.

18              THE COURT:  Counsel, I --

19              MS. OLSON:  So 11 -- just so we have a clear record,

20     can we have 1129 up.

21     Q.   BY MS. OLSON:  All right.  1129, also a pretty typical

22     picture of the annex?

23     A.   Yes.

24     Q.   And, Mr. Hofer, do you see where that wheelchair barely

25     fits between the lockers and the oxygen machine?
```

1    A.    I see the wheelchair and the oxygen machine, yes.

2    Q.    And no one is in that wheelchair; correct?

3    A.    No.

4    Q.    And typically someone in a wheelchair, if they were in it,

5    would need to be -- have their hands on the wheels to roll it if

6    they didn't have a pusher; correct?

7    A.    Correct.

8    Q.    And you see how that wheelchair barely fits between the

9    lockers and the oxygen machine?

10    A.    I can see that, yes.

11    Q.    All right.  Can we next look at Exhibit 1132.

12            Also a picture showing pretty typical --

13            THE COURT:  Counsel, just a moment.  I didn't have

14    1129.  You did offer 1129 as well?

15            MS. OLSON:  I did, Your Honor, yes.

16            THE COURT:  There was no objection, Mr. Kronberg?

17            MR. KRONBERG:  I thought that was part of the list,

18    but go ahead.

19            THE COURT:  I'm sorry?

20            MR. KRONBERG:  I thought that was part of the ones, so

21    I didn't object.

22            THE COURT:  Well, I may have skipped over it because I

23    was making notes.

24            In any event, 1129 is also admitted.

25            (Plaintiffs' Exhibit 1129 admitted.)

1              MS. OLSON:  I apologize, Your Honor.  I might have

2       done it a little quickly.

3       Q.    BY MS. OLSON:  So 1132, typical picture; correct?

4       A.    Correct.

5       Q.    And that's the -- sort of the aisle between the rows of

6       beds; correct -- end of one bed, head of another?

7       A.    Yes.

8       Q.    And do you know whether a wheelchair could fit between

9       those rows with that oxygen tank in there?

10      A.    No.

11      Q.    Have you ever checked?

12      A.    I personally have never checked, no.

13      Q.    Have you directed anyone to check?

14      A.    Not that I'm aware of, no.

15      Q.    All right.  Can we next look at Exhibit 1134.

16              Also a picture of the Medical Annex; correct?

17      A.    Yes.

18      Q.    Pretty typical of what the Medical Annex looks like on a

19      daily basis?

20      A.    Yes.

21      Q.    And the beds there, there are four sort of to a pod; right?

22      There are four that are connected?

23      A.    That's correct.

24      Q.    And have you ever measured the amount of space between the

25      two sets of beds?

1    A.    I have personally not measured those, no.

2    Q.    Have you ever directed anyone to do that?

3    A.    I have not.

4    Q.    Are you aware of whether a wheelchair can fit through all

5    of the alleyways in the Medical Annex?

6    A.    No.

7    Q.    And what, if any, procedures have you taken to ensure that

8    the people that are in their wheelchairs are able to get safely

9    in and out of their beds?

10   A.    I mean, I think this is another one of those where a

11   provider, if they felt that that was an issue, then they would

12   address that.

13   Q.    And are you aware of any provider addressing that?

14   A.    Not that I'm aware of, no.

15   Q.    And they certainly haven't reported it to you; is that

16   right?

17   A.    That is correct.

18   Q.    Let's look at Exhibit 1140.

19          And do you see -- do you recognize what is depicted in

20   1140?

21   A.    I do not.

22   Q.    You don't know what part -- whether that's part of the

23   annex or anything else?

24   A.    Yeah.  I don't know.  Yeah.  I'm not recognizing this

25   picture, no.

1    Q.   Let's look at 1152.

2         You recognize this as another sort of typical picture

3    of the Medical Annex?

4    A.   Yes.

5    Q.   And do you see the gentleman that's laying down in the

6    foreground there, on his bed?

7    A.   I do.

8    Q.   And do you see the wheelchair that's at the end of the bed?

9    A.   I do.

10   Q.   Do you know if there is any record that would show whether

11   that inmate is able to get up and move that wheelchair around

12   and get in and out of that bed?

13   A.   I don't.

14   Q.   Do you know if there is anyone who is assigned to assist

15   this individual getting in and out of that wheelchair?

16   A.   I don't.  I would assume the Medical Annex staff, if he

17   needed help, can certainly help him out, yes.

18   Q.   And by "Medical Annex staff," you mean the one nurse that's

19   assigned -- LPN that's assigned there during the day?

20   A.   No.

21   Q.   You mean an RN who is there during the day?

22   A.   No.

23   Q.   Who do you mean by "Medical Annex staff"?

24   A.   The one RN and the one LPN throughout the week.

25   Q.   The two of them?

1    A.    The two of them; correct.

2    Q.    What if this gentleman needs to get up in the middle of the

3    night?  Who helps him?

4    A.    I don't know.

5    Q.    There is no medical staff assigned to the Medical Annex at

6    night; correct?

7    A.    There are emergency responders that can assist in the

8    night, yes.

9    Q.    So that wasn't my question, Mr. Hofer.

10          There are no medical personnel assigned to the Medical

11    Annex at night; correct?

12    A.    Correct.

13    Q.    And that medical responder would have to -- the emergency

14    responder would come from the medical building; correct?

15    A.    That is correct.

16    Q.    Which is up some stairs from the Medical Annex?

17    A.    Correct.

18    Q.    Or up a long and steep ramp; correct?

19    A.    Correct.

20    Q.    Let's look at 1158.

21          That's another picture of the -- typical picture of

22    the Medical Annex; is that correct?

23    A.    That is correct.

24    Q.    And in looking at any of these pictures, Mr. Hofer, have

25    you seen anyone who is in there so they could be closer to

1      Pendyne?

2      A.   I'm not sure I can answer that question.

3              THE COURT:  Counsel, what is -- what is Pendyne?

4              MS. OLSON:  Yeah.  Sorry.

5      Q.   BY MS. OLSON:  Mr. Hofer, what is Pendyne?

6      A.   It's the cafeteria.

7              THE COURT REPORTER:  What?

8              THE WITNESS:  The cafeteria where they go to eat.

9              THE COURT:  So some people are housed there so they

10     are closer to where they go to eat?

11             THE WITNESS:  Well, some can be housed there because

12     they are closer to medical, chapel, rec.  Most of -- I believe

13     most of the meals are now inhouse, so...

14             THE COURT:  Well, I'm not sure I understand.  Is it

15     because of the combination of a mobility problem and the need to

16     be closer to the cafeteria?

17             THE WITNESS:  Well, several of these individuals may

18     have mobility problems; but this is a general population unit,

19     so not all of them do.

20             THE COURT:  Well, no.  I'm just trying to understand

21     why someone would be housed at this facility so they are closer

22     to the cafeteria.

23             THE WITNESS:  Well, the layout of ISCI, if you're in

24     Unit 14, you are probably walking -- I don't know, guessing --

25     maybe a quarter to a half mile to get to -- to Pendyne or to

1    medical.  So these people are closer to those facilities.

2              THE COURT:  Why are these individuals selected to be

3    closer than those who are otherwise at Unit 14?

4              THE WITNESS:  Because we have deemed them fit to be

5    closer, thought it would be better for them to be housed --

6              THE COURT:  So it's a medical or ambulation problem of

7    some kind?

8              THE WITNESS:  Could be.

9              THE COURT:  Okay.

10   Q.   BY MS. OLSON:  If you could look at Exhibit 1180.

11        Do you recognize this as another picture of the

12   Medical Annex?

13   A.   I do.

14   Q.   And there in the foreground sort of to the right of the

15   picture, there are a number of wheelchairs; is that correct?

16   A.   Yes.

17   Q.   And it's typical -- actually, even though you've testified

18   that they may need to be closer to Pendyne, it's typical to get

19   requests to put people in the Medical Annex because they have

20   medical needs; correct?

21   A.   Correct.

22   Q.   And in fact, there's no nurse or LPN stationed in any

23   other -- what you've referred to as a general housing unit;

24   correct?

25   A.   Correct.

1      Q.   And I take it, since you have been to the Medical Annex,

2      you are familiar with how you get in and out of the Medical

3      Annex, those doors?

4      A.   Yes.

5      Q.   Now I'll show you what's been marked an additional series

6      of photos as 1168, 1171, 1172, 1239, and 1240, all of which are

7      pictures of the doors into and out of the Medical Annex.

8           MS. OLSON:  I'll offer those.

9           MR. KRONBERG:  Just for the record, there is no

10     prospective relief that relates to this building, its doors or

11     anything else.  But I understand the Court's position on that.

12          THE COURT:  Well, I -- there is a requirement to

13     develop a system which allows unimpeded access to medical care.

14     I think that was Order 3 in *Balla I*.  I assume that's what this

15     addresses.

16          MS. OLSON:  Yes, Your Honor.  It's also the system has

17     to be constitutional throughout the facility, just as there were

18     provisions that related to what they were doing at RDU which

19     didn't exist in -- when Balla was first entered.  This is a part

20     of the facility.  So that's -- yes, that's definitely a part of

21     it, Your Honor.

22          THE COURT:  Well, we may need to have a further

23     discussion.  Because one of the things that strikes me is that

24     we're dealing really with compliance with the prior Balla

25     orders.  And that really is the focus of the hearing.

```
  1              If there are new violations, then those need to be

  2       subject to a different lawsuit.

  3              So -- all right.  I'm going to overrule the objection.

  4              Is that the only objection?

  5              MR. KRONBERG:  Sure, Judge.

  6              THE COURT:  All right.  The Exhibits 1168, 1171, 1172,

  7       1239, and 1240 will be admitted.

  8          (Plaintiffs' Exhibits 1168, 1171, 1172, 1239, and 1240

  9          admitted.)

 10              MS. OLSON:  Put up Exhibit 1168.

 11       Q.   BY MS. OLSON:  Do you recognize what's depicted in

 12       Exhibit 1168?

 13       A.   I do.

 14       Q.   Those are the doors into the Medical Annex; correct?

 15       A.   Correct.

 16       Q.   And in the middle there, right now, there's -- in this

 17       picture, 1168, there is no center bar there; correct?

 18       A.   Correct.

 19       Q.   And that was unusual?  There typically is a bar there;

 20       correct?

 21       A.   I'm not sure I can answer that.  I don't know.

 22       Q.   Well, you have been in and out of the doors to the Medical

 23       Annex; right?

 24       A.   I have.  It's been a while, so...

 25       Q.   When was the last time you were in the Medical Annex?
```

1    A.   The last time I was in the Medical Annex was when I was the

2    HSA at ISCI.

3    Q.   So sometime before October of 2018?

4    A.   Correct.

5    Q.   You went in and out of those doors; correct?

6    A.   I did.

7    Q.   And you don't recall whether there was a bar there?

8    A.   I don't.

9    Q.   All right.  If we could look at 1171.

10         Do you recognize this as the one of the doors open in

11   the Medical Annex?

12   A.   Yes.

13   Q.   And do you see those marks across the bottom of the door?

14   A.   Yes.

15   Q.   And are you aware that those are from wheelchairs hitting

16   the door on their way out?

17   A.   I'm not aware of that, no.

18   Q.   And there is no button to push to open those doors;

19   correct?

20   A.   Not that I'm aware of.

21   Q.   Have you ever seen anyone in a wheelchair try to leave that

22   facility?

23   A.   Not that I can recall.

24   Q.   Would you agree that if someone was in a wheelchair and

25   they had to push their way out, not with a button, that there

1    could be some risk of injury to that particular inmate?

2    A.   I'm not sure I can answer that, either.  Maybe risk to this

3    door, but I'm not sure of a risk to the patient.  So...

4    Q.   You think the door might be injured, but you're not sure if

5    the patient would be?

6    A.   I'm looking at the door.  I don't know if a patient would

7    be injured, no.

8    Q.   So we've talked a little bit about the staffing in the

9    Medical Annex.

10        And there is currently a medical -- there is an RN who

11   is stationed there; is that right?

12   A.   That is correct.

13   Q.   But there was a period of time, was there not, both while

14   you were the HSA and since you have become vice president of

15   operation, when there was no RN assigned to the Medical Annex;

16   correct?

17   A.   You are correct.

18   Q.   That was a contractual obligation that Corizon had that

19   just wasn't being followed; correct?

20   A.   Correct.

21   Q.   And you were aware during that time period that there was

22   no RN in the Medical Annex; correct?

23   A.   I was, yes.

24   Q.   In fact, you were informed that there was no RN there, and

25   you did not object?

1       A.   Correct.

2       Q.   So with respect to the medical staffing in the annex, there

3       is an LPN who is there; correct?

4       A.   There is.

5       Q.   During the day?

6       A.   Correct.

7       Q.   And an RN during the day?

8       A.   Yes.

9       Q.   And neither one of those individuals does rounds within the

10      facility; correct?  They don't wander through the annex and

11      check on those patients with serious medical needs?

12      A.   I'm not sure I can answer that.  I don't know what their

13      job duties are now or if they have changed.

14      Q.   Well, were you aware of what their job duties were at some

15      point?

16      A.   Yes.

17      Q.   And those job duties did not include doing rounds within

18      the Medical Annex; correct?

19      A.   Correct.

20      Q.   And there's no doctor who does rounds within the Medical

21      Annex; correct?

22      A.   That is correct.

23      Q.   And the Medical Annex is not staffed to provide regular

24      hands-on care; correct?

25      A.   Can you elaborate on "hands-on care"?

**HOFER - Cross**

1    Q.   They are not staffed to go out and treat patients while

2    they are there in the facility; correct -- on a regular basis?

3    A.   Well, they have sick call and pill call within the annex.

4    Q.   Sick call is when someone comes to the little window in the

5    back where the nurse is stationed; correct?

6    A.   Correct.

7    Q.   And pill call is when the inmates come to the back where

8    the nurses are stationed; correct?

9    A.   Correct.

10   Q.   So there is nobody in the facility whose job it is to go

11   into the unit and provide hands-on care; correct?

12   A.   Correct.

13   Q.   And the LPN and the RN are not both there at the same time

14   all the time; correct?

15   A.   Correct.

16   Q.   So is it either just the RN or the LPN?

17   A.   Yes.

18   Q.   So there is always just one nurse at the Medical Annex;

19   correct?

20   A.   Yes.

21   Q.   And the Medical Annex houses as many as -- has as many as

22   78 beds; is that right?

23   A.   That is correct.

24   Q.   And because that Medical Annex doesn't have any personnel

25   who go out and do rounds -- they do sick call and pill call --

1      it's not appropriate housing for inmates who are not

2      able-bodied; correct?

3      A.   Correct.

4      Q.   And you believe that everyone in the Medical Annex is

5      able-bodied; correct?

6      A.   To my knowledge, yes.

7      Q.   They should be able to complete their ADLs, or activities

8      of daily living?

9      A.   Yes.

10     Q.   Dress themselves?

11     A.   Yes.

12     Q.   Bathe themselves?

13     A.   I'm not sure I can answer that.

14     Q.   You don't know whether they can bathe themselves or not?

15     A.   I know that some Medical Annex staff *[sic]* will go down to

16     Long Term Care on -- and on their bathing schedule.  So I don't

17     know the specifics on that.

18     Q.   So there are at least some --

19     A.   Most, yes.

20     Q.   There are at least some inmates in the Medical Annex who

21     are not able to bathe themselves?

22     A.   To my knowledge, yes.

23     Q.   And that's actually an activity of daily living, isn't it?

24     A.   Correct.

25     Q.   And inmates in the Medical Annex should be able to toilet

```
 1     themselves, correct?

 2     A.   Yes.

 3     Q.   And an inmate who uses a wheelchair and in order to be in

 4     the Medical Annex should be able to transfer back and forth

 5     between his chair and his bed without any assistance from

 6     anybody else; correct?

 7     A.   Yes.

 8     Q.   And you're not aware of any inmates in the Medical Annex

 9     who use wheelchairs and are not able to perform the activities

10     of daily living on their own?

11     A.   Not that I'm aware of, no.

12     Q.   Or have difficulty changing their clothes on their own?

13     A.   Not that I'm aware of.

14     Q.   And are you aware of any inmates in the Medical Annex that

15     need assistance changing their beds?

16     A.   Not that I'm aware of.

17     Q.   And are you aware of any inmates in the Medical Annex who

18     need assistance getting in and out of them?

19     A.   Not that I'm aware of.

20     Q.   If there is an inmate in the Medical Annex who needs help

21     with any of those activities, who helps them?

22     A.   The nursing staff in the Medical Annex would help them.

23     Q.   Who would help them at night?

24     A.   Well, it could be an emergency responder.

25     Q.   And that emergency responder would have to come from some
```

1    other location; correct?

2    A.    Correct.

3    Q.    Are you aware, Mr. Hofer, of any instances between March

4    1st of 2018 and the present when an inmate who needed a higher

5    level of medical care was housed in the Medical Annex because

6    there wasn't any room either in Long Term Care or the Infirmary?

7    A.    I do not recall, no.

8    Q.    As part of your duties, do you attend regular -- excuse me.

9    As part of your duties, do you regularly attend the Monthly

10   Healthcare Contract Meetings?

11   A.    I do, yes.

12   Q.    What are those?

13   A.    Those are monthly meetings with Corizon and IDOC staff.

14   Q.    And who typically attends those meetings?

15   A.    Usually the VPO, the RMD, the RDON, contract team, Rona

16   Siegert.

17   Q.    So let me stop there for a minute.

18            So the VPO is you, the vice president of operations;

19   correct?

20   A.    Correct.

21   Q.    Or at least you after October of 2018.

22            And I think you said the NDO?

23   A.    So RMD, regional medical director.

24   Q.    Okay.  And --

25   A.    And then the regional nursing director.

1    Q.    Okay.  And then staff from IDOC, including Rona Siegert;

2    correct?

3    A.    Correct.

4    Q.    What is Ms. Siegert's function?

5    A.    She is the health services director.

6    Q.    And that's an IDOC position; correct?

7    A.    That is correct.

8    Q.    You were present on May 10 of 2018 at that Monthly

9    Healthcare Contract Meeting; correct?

10   A.    I'm not sure if I was present at that meeting.

11   Q.    All right.  Could we look at Exhibit 1085.

12           THE COURT:  Counsel, while you bring that up, just so

13   I understand.  I think you testified to this, but I was making

14   notes.

15           So there is a monthly contract meeting between IDOC

16   and Corizon to go over compliance with the Corizon contract?

17           THE WITNESS:  It can, yeah.

18           THE COURT:  Well, not "can."  What is its function?

19   What are you -- what are the meetings for?

20           THE WITNESS:  Well, so we have -- it's medical issues,

21   so we go through any medical issues, and we have a contract

22   meeting that follows for any contract-related items.

23           THE COURT:  And those are all done during a monthly

24   meeting?

25           THE WITNESS:  That is correct.  Yes, sir.

```
 1              THE COURT:  All right.  Go ahead, Ms. Olson.

 2              MS. OLSON:  Thank you.

 3    Q.   BY MS. OLSON:  You know a person named Connie Smock?

 4    A.   I do.

 5    Q.   All right.  In May of 2018, what was her position?

 6    A.   She was the regional nursing director for Corizon Health.

 7    Q.   All right.  And up on the screen now, do you recognize this

 8    document, the Monthly Healthcare Contract Meeting minutes from

 9    May 10 of 2018?

10    A.   Obviously, I attended the meeting.  I mean, obviously, I

11    would have to read through it, so I'm not recognizing,

12    obviously, all the items depicted in this.  So...

13              THE COURT:  Counsel, there is no question about

14    authenticity or foundation; correct?

15              MR. KRONBERG:  No.

16              MS. OLSON:  I'll offer 1085, then.

17              THE COURT:  Any objection?

18              MR. KRONBERG:  No.

19              THE COURT:  Exhibit 1085 will be admitted.

20         (Plaintiffs' Exhibit 1085 admitted.)

21    Q.   BY MS. OLSON:  Mr. Hofer, do you see there is a bullet

22    under "Risk report, Connie Smock," the second one from the

23    bottom, where it says "Medical Annex"?  Do you see this?

24    A.   Yes.

25    Q.   And do you see where it says, "Corizon discussed staffing
```

1      issues in the Medical Annex"?

2      A.   I do.

3      Q.   Do you recall that?

4      A.   I do recall this conversation, yes.

5      Q.   And Ms. Smock said:  "Patients who really should be in Long

6      Term Care are being placed in the Medical Annex because Long

7      Term Care is full."

8                Do you recall that?

9      A.   No.

10     Q.   You don't recall that?

11     A.   That was not Connie Smock, no.

12     Q.   Who said that?

13     A.   That was Dr. Menard.

14     Q.   Do you know why, then, it's under "Risk report, Connie

15     Smock"?

16     A.   I don't know that, no.

17     Q.   But it's your recollection at this meeting that Dr. Menard

18     was there -- or he said that; is that correct?

19     A.   That is correct.

20     Q.   And at the time, Dr. Menard was the regional medical

21     director; correct?

22     A.   That is correct.

23     Q.   So he was the highest-ranking medical provider for Corizon

24     for IDOC; correct?

25     A.   Correct.

1    Q.    And then he said:  "Extra staffing was discussed due to the

2    annex being more like a skilled nursing facility"; correct?

3    A.    Correct.

4    Q.    And was that Dr. Menard as well?

5    A.    That is correct.

6    Q.    What steps did Corizon take with respect to this report

7    from Dr. Menard that people were being placed in the Medical

8    Annex who should be in Long Term Care?

9    A.    I don't recall the exact steps.  I know we had

10   conversations after.  I remember speaking to Dr. Menard about

11   those, but I can't tell you the exact conversations.

12   Q.    And it continues to be the case that inmates who should be

13   in Long Term Care are assigned to the Medical Annex for a long

14   period of time; correct?

15   A.    That was his thought.

16   Q.    Now I'm asking you now.

17           You are now the vice president of operations; correct,

18   Mr. Hofer?

19   A.    Yes, I am.

20   Q.    In charge of all healthcare provided to IDOC?

21   A.    Correct.

22   Q.    And at ISCI; correct?

23   A.    Correct.

24   Q.    So is it the case, Mr. Hofer, that there are still inmates

25   who should be in Long Term Care who end up being assigned to the

1    Medical Annex?

2    A.   I think if they need to be in the Medical Annex or in Long

3    Term Care, they will be in Long Term Care.

4    Q.   I'm not sure I understand the answer to your [sic]

5    question.

6            So my question is:  Is it still the case as when

7    Dr. Menard made this report in May of 2018 that there are

8    inmates who should be in Long Term Care for adequate medical

9    care who were assigned to the Medical Annex for a period of

10   time?

11           MR. KRONBERG:  I'm going to object to the form of the

12   question, assuming facts not in evidence.

13           THE COURT:  Well, the witness has indicated he doesn't

14   agree, apparently, with Dr. Menard's assessment.  The question,

15   I guess, could be asked is whether there has been any change in

16   the circumstances without the predicate that there, in fact, has

17   been an improper placement of inmates at the Medical Annex.

18   That would be a fair question.  Otherwise, it does assume facts

19   not evidence.

20           Do you understand, Ms. Olson, what I'm saying?

21           MS. OLSON:  I think so, Your Honor.

22           THE COURT:  All right.

23   Q.   BY MS. OLSON:  So, Mr. Hofer, since May of 2018, has there

24   been any change in the processes that Corizon uses for assigning

25   inmates to the Medical Annex?

1    A.   Yeah.  You can be assigned from -- if a provider feels that

2    someone needs to be housed in the Medical Annex, then that

3    person will be assigned to the Medical Annex.

4         THE COURT:  No.  The question was:  Has there been a

5    change in the processes or procedures used by Corizon with

6    regard to the assignment of inmates to the annex, to Long Term

7    Care, or the Infirmary?

8         THE WITNESS:  No.  The policy has not changed.

9    Q.   BY MS. OLSON:  Not since 2018; correct?

10   A.   That I'm aware of, yes; correct.

11   Q.   And have you had any medical provider do any sort of an

12   audit to assess whether inmates in the Medical Annex should

13   instead be in Long Term Care given the medical complications

14   that they have?

15   A.   I am not aware of any audit, no.

16   Q.   If we could look at -- on that same document, Exhibit 1085,

17   the sixth bullet point down, where it starts "New HSR policy."

18   A.   Yes.

19   Q.   Do you see that?  It says also May of 2018?

20   A.   I do.

21   Q.   And it said there was a new HSR policy.

22        And this is still under Connie's risk report; correct?

23   A.   I'm not sure if Connie is the one that said this.  But,

24   yes, that came up, evidently, under that session, yes.

25   Q.   Okay.  Do you see where it says, "Connie distributed a

1    graph showing the increase in HSRs since the new policy"?

2    A.   Yes.

3    Q.   "Corizon will have the pricing regarding the HSR increase

4    to Pat by Friday"?

5    A.   Yes.

6    Q.   So in May of 2018, Ms. Smock showed a graph on the

7    increased number of Health Service Requests; correct?

8    A.   It appears so, yes.

9    Q.   Well, do you recall that?  Do you recall this graph?

10   A.   I don't recall the exact graph, no.

11   Q.   All right.  And at the time, you were just vice president

12   of -- excuse me -- you were just the HSA for ISCI; is that

13   correct?

14   A.   That is correct.

15   Q.   What steps did you take at that time to do anything about

16   the fact that there was this increase in HSRs?

17   A.   So as a site leader, and this was statewide, we provided

18   the data.  That was our job to provide to the regional office,

19   and then it was tracking and trending.  So I'm assuming that was

20   the information that was provided.  I don't know the exact, but,

21   yes, we compiled the data.

22   Q.   And it took, is it correct, from May of 2018 until the end

23   of December of 2019 before Corizon got on top of this new HSR --

24   this influx of HSRs?

25   A.   That is incorrect.

1    Q.   Well, it was a problem in May of 2018; right?

2    A.   Correct.

3    Q.   And you knew the number of HSRs was going up; correct?

4    A.   Correct.

5    Q.   And by the middle of 2019, as few as 22 percent of people

6    who submitted HSRs were being seen within 14 days; is that

7    right?

8    A.   I don't know.  Is that what the number was, 22 percent?

9    Q.   Do you recall?

10   A.   I don't recall the exact number, no.

11   Q.   You don't recall what the lowest number of -- lowest

12   percentage of inmates being seen within 14 days after submitting

13   an HSR request was?

14   A.   I don't recall the exact number, no.

15   Q.   But you don't dispute that it was 22 percent?

16   A.   I am not disputing that, no.

17   Q.   And it took them from May of 2018 -- I think you testified

18   on direct that it was the end of 2019 before you got on top of

19   that large number of HSRs; correct?

20   A.   Correct.

21   Q.   And I'll come back to that in a minute.

22            So let's look at Exhibit 1024.

23            And do you recognize Exhibit 1024 as an email that you

24   sent to Amanda Benton on May the 18th of 2018?

25   A.   I'm looking at it now.  I don't recall this email, but...

1    Q.   And you were responding to an email from Lisa Hayes to

2    Amanda Benton.  It looks like it must have been passed on to you

3    in some fashion.

4    A.   Correct.

5    Q.   And Ms. Hayes was an RN who worked in the Medical Annex

6    back in 2018 sometime?

7    A.   Correct.

8    Q.   And here, Ms. Hayes is reporting this patient couldn't use

9    the toilet and wasn't safe or physically possible because the

10   toilets down here in the annex are a problem; is that right?

11   A.   It appears so, yes.

12   Q.   And would need a different type of toilet or some type of

13   extensions built on the toilet to make it accessible; correct?

14   A.   Yes.

15   Q.   And if a person couldn't use the toilet properly, I think

16   we have already discussed that that would be a safety problem

17   and a risk -- a fall risk for that patient; correct?

18   A.   Yes.

19   Q.   So in this situation, there was someone who couldn't be in

20   the Medical Annex and had to be transferred to a higher level of

21   care; is that right?

22   A.   Yes.

23   Q.   And then it says, "Move back to LTC" --

24            THE COURT:  Counsel, this has not been admitted yet.

25            Is there any objection --

1            MR. KRONBERG:  No, Your Honor.

2            THE COURT:  -- Mr. Kronberg?

3            All right.  Exhibit 1024 will be admitted.

4            MS. OLSON:  Sorry about that, Your Honor.

5            THE COURT:  Go ahead.

6            MS. OLSON:  I'll get back to that in a minute.

7            (Plaintiffs' Exhibit 1024 admitted.)

8    Q.    BY MS. OLSON:  So the "LTC" in the second-to-last line in

9    the bottom, that refers to Long Term Care; is that right?

10   A.    That is correct.

11   Q.    And isn't it true that Long Term Care was often full?

12   A.    It can be, yes.

13   Q.    In fact, it was usually full; correct?

14   A.    It has a lot of patients, yes.

15   Q.    And -- and what are number of beds in Long Term Care?

16   A.    There are 16 beds in Long Term Care.

17   Q.    So substantially fewer, obviously, than the Medical Annex;

18   correct?

19   A.    Correct.

20   Q.    And Long Term Care is for those inmates who need assistance

21   with their activities of daily living?

22   A.    Yes.

23   Q.    And are you consulted -- if Long Term Care is full and

24   there is someone who, because of their medical needs, needs to

25   be in Long Term Care and needs that higher level of care, are

1      you consulted with respect to that?

2      A.   Yes, I am.

3      Q.   And there are times when you have to say:  "Sorry.  We

4      don't have a bed in Long Term Care.  Keep them in the Medical

5      Annex"; correct?

6      A.   No.

7      Q.   You have -- you have never turned down a request to move a

8      patient from the Medical Annex to Long Term Care?

9      A.   Not that I'm aware of, no.

10     Q.   Put up Exhibit 1025.

11          Mr. Hofer, do you recognize Exhibit 1025 as a series

12     of emails on which you are copied, at least the bottom two?

13     A.   Yes.  I'm looking at it now.

14          MS. OLSON:  Your Honor, I'd offer Exhibit 1025.

15          THE COURT:  Any objection?

16          MR. KRONBERG:  No, Your Honor.

17          THE COURT:  Exhibit 1025 will be admitted.

18     (Plaintiffs' Exhibit 1025 admitted.)

19     Q.   BY MS. OLSON:  And incidentally, this is also from May 18,

20     2018.

21          Do you know if this is also in relation to the last

22     email, Exhibit 1024, and the potential move of an inmate that

23     was discussed in 1024?

24     A.   I don't, no.  I don't know if that's the same patient.

25     Q.   And do you see at the bottom there, the email from Samuel

1      Erbe, E-R-B-E, to a number of others and you are copied?

2      A.   Yes.

3      Q.   Do you see that?

4                 And it says:

5                 "To all who all wanted this move, I believe we can put

6                 additional effort into accessibility, i.e., bathroom.

7                 We may be able to make this work.  This was our

8                 largest hang up.  The toilet just sits too far away

9                 from the wall.  Even with the safety bars, I really do

10                not think it would have worked."

11               And then:

12                "I had Lisa Hayes review the issue and she was in

13                agreement as well.  If we want to move" -- and there

14                is the person's name -- "to the annex, I would welcome

15                you to come to the annex and we can walk through some

16                of the issues we observed.  I believed with some work

17                and planning, this is something may be a capability if

18                this is what is needed.  Let me know if I can be of

19                assistance."

20               Do you see that?

21      A.   I do.

22      Q.   Did you ever take Sergeant Erbe up on his offer to come

23      down to the Medical Annex and check it out and see what the

24      issues are with respect to someone like this one inmate who

25      couldn't use the toilet?

1    A.   I'm not sure with Sam.  I know, obviously, Dutoit was a

2    part of that and Amanda.

3         I remember this case itself.  But as far as the

4    outcome and resolution, I don't remember what was done.

5    Q.   Okay.  Well, that wasn't quite my question, Mr. Hofer.

6         So my question was:  Did you ever go down -- did you

7    take Mr. Erbe up on his invitation, and did you ever go down to

8    see what the issues were that he could walk you through to do

9    any work and planning to make that a capability?  Did you go

10   down in response to that?

11   A.   I did not.

12   Q.   Do you know if anyone else did?

13   A.   I believe Amanda Benton went down.

14        MS. OLSON:  Your Honor, I'm not sure what time you

15   want to take the break, but --

16        THE COURT:  I was just going to suggest that.

17        MS. OLSON:  -- this would be a good breaking point.

18        THE COURT:  All right.  We'll take a 15-minute recess.

19   Counsel, I keep wanting to remind the jury not to discuss the

20   case among themselves, but I suspect that the class

21   representatives don't need to be told that.

22        We will be in recess for 15 minutes.

23        (Recess at 10:27 a.m. until 10:48 a.m.)

24        THE COURT:  I'll -- for the record, I'll simply remind

25   the witness that he is still under oath.

1          Ms. Olson, you may resume your cross.

2          MS. OLSON:  Thank you, Your Honor.

3     Q.   BY MS. OLSON:  Mr. Hofer, you're also familiar with the

4     unit at ISCI the Restrictive Housing Unit?

5     A.   I am.

6     Q.   That's Unit 8?

7     A.   Correct.

8     Q.   And it's, of course, also Corizon's responsibility to

9     provide medical care to inmates in Unit 8; correct?

10    A.   That is correct.

11    Q.   And there is also that obligation -- well, let me ask you

12    this first:  So restrictive housing, that's the most secure part

13    of ISCI, to your knowledge; correct?

14    A.   To my knowledge, yes.

15    Q.   And inmates there basically can't leave; they are

16    restricted to their housing unit; correct?

17    A.   I'm not sure of their exact restrictions, no.

18    Q.   Do you -- it's more restrictive, to your understanding,

19    than other parts of this facility?

20    A.   Yes.

21    Q.   And in fact, Corizon separately tracks whether or not

22    inmates there see a health care provider within 14 days; is that

23    right?

24    A.   That is correct.

25    Q.   So I'm going to have you take another look at Exhibit 306,

1    which is one of the exhibits that Mr. Kronberg had you look at.

2    And if you would look at page 14 of that.

3              And that also tracks in this period of time the number

4    of inmates who were seen within 14 days; is that right?

5    A.   That is correct.

6    Q.   And if we -- this is the December 2019 results.  But at the

7    bottom right corner, there is a graph from the prior months;

8    correct?

9    A.   Correct.

10   Q.   If you could pull up that graph.

11             And do you see that in August of 2019, 22 percent of

12   the visits were completed within 14 days; is that right?

13   A.   Yes.

14   Q.   So for the RDU, the threshold of 90 percent was not met in

15   July, August, September, October, or November?

16   A.   That is correct.

17   Q.   Look back at I think it's page 2 of Exhibit 306.  This is

18   the one that Mr. Kronberg looked at with you.  This is just so

19   our record is clear.  And again, the graph in the lower right

20   corner of page 2.

21             And that's the visits within 14 days for the rest of

22   the facility; is that correct?

23   A.   Yes.

24   Q.   And that shows that from July to November of 2019, Corizon

25   did not meet that threshold of 90 percent; correct?

1       A.   That is correct.

2       Q.   Was it a particular focus of Corizon to attempt to meet

3       that threshold in the month prior to the termination hearing?

4       A.   It was a focus for us the whole time.

5       Q.   Was it a particular focus in the month prior to the

6       termination hearing?

7       A.   No more than anything else.

8       Q.   In fact, Corizon, on two different occasions at least,

9       essentially surged providers to ISCI so you could see all of

10      those inmates who had not been seen within 14 days; is that

11      right?

12      A.   Can you please clarify?

13      Q.   Sure.  Providers from outside of ISCI were brought to the

14      facility on at least one Saturday in November?

15      A.   Yes; correct.

16      Q.   And again this last Saturday, there were providers who were

17      brought in essentially to surge to meet the needs; is that

18      correct?

19      A.   Correct.

20      Q.   And Corizon routinely pulls providers from other facilities

21      in order to meet the HSR level at ISCI; is that right?

22           MR. KRONBERG:  Object to the relevance.

23           THE COURT:  Overruled.

24           THE WITNESS:  They can at times, sure.

25      Q.   BY MS. OLSON:  And they have?

```
1    A.    Correct.

2    Q.    So, Mr. Hofer, I want to ask you some questions about some

3    specific inmates who are housed in the Medical Annex.

4          Are you familiar with an inmate named ███████████?

5    A.    I am not, no.

6    Q.    And so you don't know anything about what his level of care

7    is?

8    A.    I don't, no.

9    Q.    How about ██████████?

10   A.    The name sounds familiar, but I don't know the patient.

11   Q.    How about ████████?

12   A.    Once again, the name sounds familiar, but I don't know the

13   patient.

14   Q.    If we could look at Exhibit 1039.

15         And, Mr. Hofer, you recognize Exhibit 1039 as an email

16   string on which you are copied related to an inmate whose number

17   is 122571 and the last name of ██████?

18   A.    I'm seeing an email.  I don't recall this email, no.

19   Q.    But you see that it was sent to you, and you are copied on

20   this string; is that right?

21   A.    Yes, ma'am.

22         MS. OLSON:  Your Honor, I would offer Exhibit 1039.

23         THE COURT:  Any objection?

24         MR. KRONBERG:  I don't know what the relevance is at

25   this point, but I don't -- I won't object.
```

1          THE COURT:  Could you just briefly -- I mean, again,

2     there is no jury present.  Just give me your synopsis as to why

3     this is relevant and what it's relevant --

4          MS. OLSON:  Your Honor, it's relevant to the medical

5     care that's -- the adequacy of care that's provided to a

6     particular inmate who is going to be testifying later in the

7     hearing, Your Honor, and how he was moved about and where he is

8     now and whether he's --

9          THE COURT:  All right.

10          MS. OLSON:  -- as a reflection of the general broader

11     care within the Medical Annex and Long Term Care.

12          MR. KRONBERG:  I guess my problem is, Your Honor,

13     this -- this witness isn't a provider.  Unless he has some

14     foundation to talk about this particular patient --

15          THE COURT:  Well, I --

16          MR. KRONBERG:  -- I don't know why we're --

17          THE COURT:  Ms. Olson, I tend to agree.  If he doesn't

18     really know the details, why can't we just wait and deal with

19     this with the inmate?

20          Well, if you have some questions that are pertinent to

21     this, but -- I'll admit the exhibit because if this witness is

22     going to testify, then, presumably, it has some relevance to

23     that issue.

24          But as far as spending time with this witness, I'm not

25     sure how much profit there is in that.  But go ahead and

1      proceed.

2                  MS. OLSON:  Thank you, Your Honor.

3             (Plaintiffs' Exhibit 1039 admitted.)

4      Q.    BY MS. OLSON:  And if you would look at the second page,

5      which is the earliest email.  This is a request from Gen Brewer,

6      and she is one of the directors of nursing for Corizon at the

7      time; is that correct?

8      A.    Yes.

9      Q.    And to Christopher Rufe and yourself and others; correct?

10     A.    That is correct.

11     Q.    And Christopher Rufe is the IDOC person who was in charge

12     of inmate moves, essentially; correct?

13     A.    He was at that point, yes.

14     Q.    And it also was common for Corizon to make specific

15     requests for inmate moves; correct?

16     A.    Correct.

17     Q.    And you would often be copied on those, as we have seen in

18     some of these exhibits today; correct?

19     A.    That is correct.

20     Q.    And on this one, it makes a request to move ████████ to the

21     Medical Annex as soon as possible because his medical concerns

22     have increased; correct?

23     A.    According to the email, yes.

24     Q.    And so according to Corizon, then, at this time,

25     Mr. ███████ needed to be in the Medical Annex because of his

1    heightened medical needs; right?

2    A.   That's what it appears in this email, yes.

3    Q.   And you would often be informed of those sorts of -- the

4    need for those sorts of moves; correct?

5    A.   I could be, yes.

6    Q.   Are you familiar with an individual named ███████████?

7    A.   I am.

8    Q.   And in fact, there is a separate lawsuit by ██████████

9    against yourself and others in connection with his medical care;

10   isn't that right?

11   A.   No.

12   Q.   Has that lawsuit been resolved, or have you been dismissed?

13   A.   I don't believe I was ever named in that lawsuit.

14   Q.   Okay.  Have you looked at the July 11th, 2019, order

15   entered by Judge Nye?

16   A.   I have not.

17            MR. KRONBERG:  Object to the relevance, Your Honor.

18            MS. OLSON:  Your Honor, he is on the caption.  But if

19   he doesn't remember this, then I'll keep asking him questions.

20   That's fine.

21            THE WITNESS:  I don't remember.

22   Q.   BY MS. OLSON:  You know who Mr. ████████ is, though;

23   correct?

24   A.   I know him, yes.

25   Q.   And in fact, if we go back and look at Exhibit 6 at

1      page 87.  In the lower right-hand corner, it's page 87.

2              And do you see there at the very bottom where it says,

3      "Patient ███ identified complaint"?  Do you see that?

4      A.   I do.

5      Q.   Do you know if that's Mr. ████████?

6      A.   I don't, no.

7      Q.   Are you familiar with Mr. █████████ medical problems?

8      A.   Not entirely, no.

9      Q.   But you're aware of some of them; correct?

10     A.   Correct.

11     Q.   And from reading the medical information that's described

12     here on page 87 of Exhibit 6, are you able to tell if this is

13     ████████?

14     A.   I am not, no.  Sorry.

15     Q.   All right.  You know Mr. ███████, though; correct?

16     A.   That is correct.

17     Q.   And at the bottom here -- actually, if we go to page 88,

18     and at the top of that page.

19              And here it says:

20              "The physician auditor agrees with the current

21              assessment and treatment."

22              And that's with respect to that last patient, ████;

23     correct.

24     A.   I'm not sure I can answer that, no.

25     Q.   All right.  Do you have the whole exhibit in front of you?

1    A.   I'm looking at it right now.

2    Q.   But can you look -- so this is the next page, 88.  I'm just

3    trying to -- that goes on for two pages.  So if we go to the

4    bottom of 87 --

5             THE COURT:  Well, this is simple.  I mean, it is a

6    continuation of what is at the bottom of 87.

7             So you don't dispute that, do you?

8             THE WITNESS:  Correct.  No.

9             THE COURT:  No.  Let's --

10   Q.   BY MS. OLSON:  Well, let's go to the bottom of 88.

11            THE COURT:  Top of 88.

12            MS. OLSON:  Sorry.  Thank you, Your Honor.

13            THE COURT:  Actually, there we see both.

14   Q.   BY MS. OLSON:  Do you see that the physician auditor agreed

15   with the current assessment and treatment of this patient, █████;

16   correct?

17   A.   Correct.

18   Q.   And you're aware that there is an inmate named ████

19   █████████ who has since sued the Department of Correction and

20   others to obtain medical treatment; correct?

21   A.   Correct.

22   Q.   And some of that medical treatment is a particular kind of

23   physical therapy; correct?

24   A.   That is correct.

25   Q.   And in fact, he was receiving therapy in a place called

**HOFER – Cross**

1    Liberty STARS; correct?

2    A.   I can't recall the name, no.

3    Q.   You've been to that facility; correct?

4    A.   I have.

5    Q.   In fact, you went there at one point with others and asked

6    them to stop working on Mr. –– on Mr. ███████; is that

7    correct?

8    A.   That is not correct.

9    Q.   You went there to terminate his treatment; isn't that

10    right?

11    A.   No.

12    Q.   You went there while he was being treated?

13    A.   Yes.

14    Q.   And you had a discussion with the providers?

15    A.   Yes.

16    Q.   And Mr. ████████ treatment ended after that point;

17    correct?

18    A.   Not because of our discussion, no.

19    Q.   That wasn't my question.

20           Mr. ████████ treatment ended after that time; is

21    that correct?

22    A.   I don't recall when his treatment ended.

23    Q.   And those are expensive sessions; is that right?

24           MR. KRONBERG:  I'm going to object to the relevance.

25           THE WITNESS:  I do not know the cost of the session.

1              MR. KRONBERG:  Your Honor, I don't see what the

2      relevance of this is.

3              MS. OLSON:  Well, Your Honor, Mr. ████████ is going

4      to testify --

5              THE COURT:  The witness has said he doesn't know -- he

6      doesn't know the cost.  So we know that Mr. ████████ was

7      receiving treatment.  There was a discussion, and the treatment

8      stopped after that.  And he does not know what the cost is.  And

9      so I don't know what more we can do with this.

10             MS. OLSON:  That was the last question I was going to

11     ask on that point, Your Honor.

12     Q.    BY MS. OLSON:  So I think, Mr. Hofer, on direct

13     examination, you indicated that the contract between Corizon and

14     IDOC governed the staffing levels at ISCA -- at ISCI; is that

15     correct?

16     A.    That is correct.

17     Q.    And there is even a thing called "the staffing matrix"?

18     A.    Correct.

19     Q.    And the staffing matrix was part of one of the MCPs; is

20     that right?

21     A.    Yes.

22     Q.    So it was very important for Corizon to meet that staffing

23     matrix; is that right?

24     A.    Yes.

25     Q.    And Corizon has an obligation to meet the baseline there,

1      but they can always exceed the staffing level; is that right?

2      A.   Yes.

3      Q.   And Corizon is compensated on a per diem basis; correct?

4      A.   You're correct.

5      Q.   Do you know what the current per diem rate is?

6      A.   I do.

7      Q.   What is it?

8      A.   $18.02.

9           THE COURT:  I assume that's per patient?

10          THE WITNESS:  Per inmate per day.

11          THE COURT:  Per inmate per day, the entire facility?

12          THE WITNESS:  Correct.

13          THE COURT:  All right.

14     Q.   BY MS. OLSON:  And with respect to -- so one of the audits

15     that was done is to make sure you have the -- sufficient staff;

16     is that correct?

17     A.   Yes.

18     Q.   And there are other audits -- some actually do pertain to

19     the Medical Annex; right?

20     A.   I guess I don't recall the audit itself.

21     Q.   But there are audits that pertain to the Medical Annex?

22     A.   I guess I would have to see them.  I'm not entirely sure

23     which audit you're referring to.

24     Q.   We'll come back to that, then.

25          But off the top of your head, you're aware at least

1    that there are audits that are conducted in the Medical Annex?

2            I'm sorry.  Did you answer?  I didn't hear you?

3    A.   Sorry.  I guess I'd have to see the audit.  I'm not

4    entirely sure which one you're referring to.

5    Q.   I'm just asking if there are --

6    A.   I don't know.

7    Q.   -- audits that are done in the Medical Annex.

8            So is there -- the Medicaid [sic] Administration audit

9    compared -- related to pill call that was done in the Medical

10   Annex; correct?

11   A.   That's correct.

12   Q.   And they have sick call audits that are done; correct?

13   A.   Correct.

14   Q.   All right.  So there are Balla audits that pertain to the

15   Medical Annex?

16   A.   Yes.

17   Q.   I think I was asking you some questions about the contract.

18   And under the contract, I think you may have indicated earlier

19   that Corizon views its responsibility as providing -- as needing

20   to provide constitutionally adequate medical care; correct?

21   A.   Correct.

22   Q.   And the way that Corizon does that is by looking at the

23   results of these multiple audits; correct?

24   A.   Yes.

25   Q.   And when you audit things like response times or follow-up

1    times or complaints, those are things that are recorded on paper

2    about whether something was done or done within a specific time

3    frame; is that right?

4    A.    Correct.

5    Q.    And it doesn't actually track quality of care or patient

6    outcomes; correct?

7    A.    I guess, can you rephrase that.  Sorry.

8    Q.    Sure.  The Balla audits don't actually track quality of

9    care; correct?

10   A.    I guess that's a little bit subjective.  I guess I'm not

11   sure how to answer that.

12   Q.    So you know what quality of care is; correct?

13   A.    I do.

14   Q.    And it's whether you got appropriate medical care; correct?

15   A.    Correct.

16   Q.    Necessary medical care; correct?

17   A.    Correct.

18   Q.    Hoping for outcomes that are positive for the patient;

19   correct?

20   A.    Correct.

21   Q.    Are there any Balla audits that track those things?

22   A.    Yes.

23   Q.    Which audits are they?

24   A.    I don't know all of the audits.

25   Q.    Well, which ones can you think of that would track quality

**HOFER - Cross**                                                    98

1      of care?

2      A.    Reviewing emergency responses.

3      Q.    And how does that track -- how does that audit track

4      quality of care?

5      A.    Well, they are reviewed by the medical director to ensure

6      that the quality of care is provided.

7      Q.    And so that would be -- right now would be Ms. Haggard --

8      or Dr. Haggard; is that correct?

9      A.    That was be Dr. Dawson.

10     Q.    How long has Dr. Dawson been there?

11     A.    Just shy of a year.

12     Q.    And prior to that, it was Dr. Haggard?

13     A.    Yes.

14     Q.    And prior to that, Dr. Menard?

15     A.    Yes.

16     Q.    And are there any Balla audits that track patient outcomes?

17     A.    Not that I can recall off the top of my head.

18     Q.    Do you know Kate Shelton?

19     A.    I do.

20     Q.    Kate Shelton was the HSA for the South Boise Women's

21     Correctional, the East Boise Correctional Reentry Center, and

22     the Correctional Alternative Placement Program for about 3-1/2

23     years, from September of 2015 until February 26 of 2019?

24     A.    I do know Kate.  I don't think she managed all of those

25     facilities in that time frame, no.

1    Q.   Right.  She was at least the HSA for the South Boise

2    Women's Correctional Center?

3    A.   She was.

4    Q.   And over that period of time from September of 2015 until

5    February 26 of 2019?

6    A.   I don't know the exact end date.  Sorry.  But, yes.

7    Q.   And you interacted with her on a daily basis during her

8    time at Corizon?

9    A.   I would say HSA to HSA, yeah, we spoke often.

10   Q.   And she sometimes would come over, actually, to ISCI to

11   assist there; is that right?

12   A.   No.

13   Q.   She never came to ISCI?

14   A.   You said "to assist."  I don't know what she would be

15   assisting ISCI with.

16   Q.   She frequently came to ISCI; correct?

17   A.   I don't know how frequently.  I mean, I have seen her at

18   ISCI before, yes.

19   Q.   And do you recall Ms. Shelton ever sending you emails

20   raising concerns with respect to the medical administration

21   audits at ISCI?

22   A.   Not that I can recall.

23   Q.   Do you recall that Ms. Shelton expressed concern that the

24   audits showed gaps in the documentation for the administration

25   of medications?

HOFER – Cross

1    A.    Not that I can recall.

2    Q.    And do you recall her suggesting or telling you that these

3    gaps suggested either that the inmates were not receiving the

4    medications or that the dispensation of those medications was

5    not being documented?

6    A.    Not that I can recall.

7    Q.    Do you recall whether anybody else brought those issues to

8    your attention?

9    A.    I can't, no.

10   Q.    So I think you indicated earlier that there were times when

11   ISCI would pull providers from other facilities to cover

12   staffing shortages; correct?

13   A.    It could happen, yes.

14   Q.    Well, as HSA, you actually directed that at times; correct?

15   A.    I could have, yeah.

16   Q.    So you keep saying, "I could have."

17         Is this a -- when you were an HSA, did you ever do

18   that, bring medical providers from other facilities to assist at

19   ISCI when there were shortages?

20   A.    As an HSA, most of the time it was handled at the regional

21   office when they did scheduling.  So, no, I did not do a ton of

22   moving providers, as that was really not my job at that point.

23   I would vocalize and, obviously, they would make that decision.

24   Q.    And were there times when you vocalized when you were HSA

25   that you were short providers at ISCI, and you needed more

1    staff?

2    A.   I guess that question is -- it's a little different.  I

3    guess it's -- can you, I guess, kind of clarify what you mean by

4    that.

5    Q.   So I think a moment ago, you testified that, as HSA, you

6    would make a request to regional for more providers; is that

7    correct?  That that's how the process would work?

8    A.   Yeah.  Maybe for extra assistance that day, sure.

9    Q.   Yeah.  And so my question was:  Were there times, as HSA,

10   that you did that?  That there was a staff shortage at ISCI, so

11   you requested through regional to bring people over to ISCI from

12   other facilities?

13   A.   Yes.

14   Q.   And how many times did you do that?

15   A.   I do not recall the number.

16   Q.   Since you have become vice president of operations, are you

17   aware of the HSA bringing in outside medical providers because

18   of shortages at ISCI?

19   A.   We hired additional providers.

20   Q.   All right.  Well, that wasn't my question.

21        My question was:  Since you have been vice president

22   of operation, are you aware of there being a request or need at

23   ISCI to bring staff members from other facilities because of

24   shortages at ISCI?

25   A.   Yes.

1    Q.   And how many times has that happened?

2    A.   I do not know the number.

3    Q.   And did anyone ever tell you, Mr. Hofer, that Corizon

4    administration for ISCI -- well, strike that.

5              Did anyone in Corizon administration ever say to you

6    or in your presence that ISCI should pass Balla audits at all

7    costs?

8    A.   No.

9    Q.   And did anyone ever say to you that you should avoid

10   sending inmates to the emergency room in order to avoid the

11   costs associated with emergency room visits?

12   A.   No.

13   Q.   So I think you indicated earlier, when we looked at the

14   Monthly Healthcare Contract Meeting minutes from May of 2018,

15   you attended those when you were the HSA; correct?

16   A.   I attended a few of them.

17   Q.   And you continue to attend them as vice president of

18   operations; correct?

19   A.   That is correct.

20   Q.   And we talked a little bit about the problem with staffing

21   and the 14-day delay.  And that was actually the topic of

22   conversation in some of the Monthly Health Care Contract

23   Meetings; is that correct?

24   A.   That is correct.

25   Q.   If we could look at Exhibit 1316.

```
 1              Mr. Hofer, do you recognize Exhibit 1316 as the
 2    Monthly Healthcare Contract Meeting minutes from October 3,
 3    2019, at which you were present?
 4    A.   Yes.
 5              MS. OLSON:  And, Your Honor, I'd offer 1316.
 6              THE COURT:  Any objection?
 7              MR. KRONBERG:  No.
 8              THE COURT:  1316 will be admitted.
 9         (Plaintiffs' Exhibit 1316 admitted.)
10    Q.   BY MS. OLSON:  And a person named Sam Pierson was also
11    there; is that right?
12    A.   Yes.
13    Q.   Who is Sam Pierson?
14    A.   Sam is the regional nursing director for Corizon Health.
15    Q.   And so as the regional nursing director, would Sam Pierson
16    cover all of the IDOC facilities, not just ISCI?
17    A.   That is correct.
18    Q.   All right.  If you look there where it says -- there's the
19    first bullet under additional staffing.  Do you see that?
20    A.   I do.
21    Q.   And do you see where it says:
22              "S. Pierson indicated increasing the number of HSRs
23              submitted per day (3, up from 1) without increased
24              staffing to review and triage may be creating a
25              barrier to care"?
```

HOFER - Cross

1    A.    I do see that.

2    Q.    And you agreed with that?

3    A.    I'm not sure I agreed with that.  That was his statement,

4    so...

5    Q.    Well, and Mr. Pierson was a provider supervisor; correct?

6    A.    He is not a provider, no.

7    Q.    No.  I said a provider supervisor.  Correct?

8    A.    He is the regional nursing director.

9    Q.    And so he has -- his job is more related to the actual

10   medical care than yours; correct?

11   A.    That is correct.

12   Q.    And so Mr. Pierson's view, at least in October of 2019, was

13   that if you didn't increase staffing to review and triage the

14   HSRs, you could be creating a barrier to care; correct?

15   A.    That's what he said, yes.

16   Q.    And you agreed with him?

17   A.    I mean, I don't know.  Obviously, looking at this, I can't

18   say that I agreed with him or not.  So...

19   Q.    In this period of time, October of 2019, that's at the tail

20   end of that period when people weren't being seen very often

21   within 14 days; correct?

22   A.    That is correct.

23   Q.    And would you agree at that time that the staffing

24   shortages and the increase in HSRs meant that there was a

25   barrier to care?

```
 1              MR. KRONBERG:  Your Honor, I'm going to object.  This

 2    is not about ISCI.  It's a different facility.

 3              THE COURT:  Counsel?

 4              MS. OLSON:  I don't think it is, Your Honor.  He is

 5    referring generally to the number of HSRs having gone up.

 6              THE COURT:  Well, the reference is to ISCC.  I assume

 7    that's the entire complex.

 8              MS. OLSON:  No.  That's a --

 9              MR. KRONBERG:  It's a whole different facility.

10              MS. OLSON:  -- different facility, Your Honor.

11              THE COURT:  So it's just a different facility?

12              MS. OLSON:  That first -- that first line is a

13    different facility, Your Honor.  I don't think this one is.

14              THE COURT:  Well, let's clarify.  If the witness can

15    confirm that, fine; if not, it's not relevant, and we need to

16    move on.

17              THE WITNESS:  Yeah.  This appears to be, by the

18    information I'm receiving, ISCC specific.

19    Q.   BY MS. OLSON:  So are you saying you don't recall

20    specifically?

21    A.   I do not recall the exact information here, no.

22    Q.   So there was -- okay.  So setting aside -- so we have

23    talked about ISCI and the low number of staff when there was an

24    increase in HSRs; correct?

25    A.   We did talk about staffing at ISCI.
```

1    Q.    Yeah.  So even if this was ISCC, it was a similar problem

2    at ISCC, then; is that right?

3    A.    The HSRs increased everywhere, yes.

4    Q.    Yeah.  So coming back to -- to ISCI, it was the same

5    problem; right?  In October of 2019, because of the number of

6    HSRs, people weren't getting seen quickly enough; correct?

7    A.    Correct.

8    Q.    And if that's the same problem at ISCI as it was at ISCC,

9    there would also be a barrier to care at ISCC -- or excuse me --

10   at ISCI; correct?

11   A.    Yes.

12   Q.    So let's look at Exhibit 1088.

13          And, Mr. Hofer, do you recognize Exhibit 1088 as

14   December 2018 Monthly Healthcare Contract Meeting minutes?

15   A.    I'm looking at them now.  Yeah.

16   Q.    And you were present at that meeting; correct?

17   A.    Yes, I was.

18   Q.    As vice president of operations; correct?

19   A.    Correct.

20   Q.    And let's look on the second page of the exhibit, item

21   No. 6 at the bottom.  That bullet starts out, "Rona

22   discussed..."

23          That would be Rona Siegert; correct?

24   A.    That is correct.

25   Q.    All right.  At the bottom, it says:

1              "Everything flying at us and struggling to stay

2              afloat.  People are drowning with the number of

3              inmates seen in the morning.  Afternoon appointments;

4              still not documenting."

5          Do you recall that?

6     A.    Yes, I do.

7     Q.    So in December of 2018, there was a similar problem in

8     terms of making sure there were adequate staff to see inmates at

9     ISCI?

10    A.    Correct.

11    Q.    And then not documenting what happened at the appointment;

12    correct?

13    A.    I'm not sure.  Obviously, I see that here.  I'm not sure

14    that it was a documentation problem.

15    Q.    And are you -- do you know which audits would reflect the

16    things that Ms. Siegert is showing here; that is, that people

17    are drowning with the number of inmates seen in the morning,

18    afternoon appointments still not documenting?

19          And I apologize.  I may have misread that.  There is

20    actually a semicolon "afternoon appointments" and "still not

21    documenting."

22          But are you familiar with what audits would address

23    that?

24    A.    Not the exact audits, no.

25    Q.    And this applies to all ISCI inmates; correct?

```
 1      A.   It appears so.

 2      Q.   If we can look at Exhibit 1089.

 3               THE COURT:  Counsel, did you intend to offer 1088?

 4               MS. OLSON:  Yeah.  I apologize, Your Honor.  I do

 5      offer Exhibit 1088.

 6               THE COURT:  Any objection?

 7               MR. KRONBERG:  No.

 8               THE COURT:  1088 will be admitted.

 9          (Plaintiffs' Exhibit 1088 admitted.)

10      Q.   BY MS. OLSON:  Mr. Hofer, do you see Exhibit 1089 in front

11      of you?

12      A.   Yes.

13      Q.   And you recognize that as the Monthly Healthcare Contract

14      Meeting minutes from February of 2019, February 14 of 2019?

15      A.   Yes.

16      Q.   And you were present?

17      A.   I was.

18               MS. OLSON:  Your Honor, at this time, I would offer

19      Exhibit 1089.

20               THE COURT:  Any objection?

21               MR. KRONBERG:  No, Your Honor.

22               THE COURT:  1089 will be admitted.

23          (Plaintiffs' Exhibit 1089 admitted.)

24      Q.   BY MS. OLSON:  And with respect to Exhibit 1089, if you

25      would look at page 2.
```

1              And do you see there on page 2, under item 9 -- excuse

2    me -- item No. 3, where it says "Correctional medical

3    specialists"?

4    A.   Yes, I do.

5    Q.   And it says:

6              "Terminating all of CMS advanced skills.  There are

7              too many CMS's doing things beyond their scope of

8              skills."

9              Do you see where it says that.

10   A.   I do.

11   Q.   Do you recall who brought this item up at the February 2019

12   Monthly Healthcare Contract Meeting?

13   A.   I don't know exactly who brought that up.

14   Q.   Do you recall that it was part of the discussion?

15   A.   I do.

16   Q.   And, Mr. Hofer, the correctional medical specialists,

17   that's kind of the lowest level of medical care within ISCI; is

18   that right?

19   A.   That is not true, no.

20   Q.   What is the lowest level of care?

21   A.   I mean, I guess the lowest level of care would be probably

22   pharm tech or CNA.  The CMSs are the equivalent of an LPN, so...

23   Q.   Well, what does this mean, though, that the CMSs are doing

24   things beyond their scope of skills?

25   A.   Well, the CMSs don't have licenses.  So they act under the

1    license of the site medical director.

2    Q.   What do you mean by the second-level director?

3    A.   The site medical director.

4    Q.   Okay.

5    A.   Yeah.  So their scope is dictated by what that site medical

6    director allows them to do.

7    Q.   So, for example, if there were standing orders for them to

8    dispense certain kinds of medication, that would be something

9    they would be able to do?

10   A.   Yeah.

11   Q.   And if they were doing things that were beyond their scope

12   of skills, would you agree that there were then things that

13   required a higher level of care than the CMS was able to

14   provide?

15   A.   Could be.

16   Q.   And I think you said they were equivalent to LPNs, but they

17   don't have licenses like LPNs; correct?

18   A.   You are correct.

19   Q.   So, in fact, they can't do the things that LPNs can do?

20   A.   Correct.

21   Q.   And at that Monthly Healthcare Contract Meeting where you

22   saw this item about the correctional medical specialists are

23   acting above their scope of skills, what action, if any, did you

24   take to make sure that adequate care was taken in the places

25   where the CMSs were exercising medical care above their scope of

1    skills?

2    A.    This was really conversation with the providers, you know,

3    with the site medical directors, to ensure that they educated

4    the CMS staff and created a -- I guess kind of a very

5    black-and-white version of what their scope is and to follow

6    that.

7           So that was really directed at a physician level.

8    Q.    And do you know why these CMSs were using -- engaging in

9    things that were beyond their scope?

10   A.    I do not know why, no.

11   Q.    So the contract between Corizon and IDOC includes two

12   provisions under which IDOC can withhold a portion of the

13   payments if Corizon fails to meet the contractual -- contractual

14   staffing levels; is that correct?

15   A.    That is correct.

16   Q.    And the first ground is IDOC can withhold is if a position

17   on the contract staffing plan is vacant for more than 60 days;

18   correct?

19   A.    That is correct.

20   Q.    And that staffing plan is the lowest level needed; correct?

21   A.    Yes.  That would be the contracted staffing, yes.

22   Q.    And between March 1st of 2018 and April 22nd of 2019, there

23   was a withholding in every month; correct?

24   A.    That is correct.

25   Q.    And since April of 2019 until today, has there ever been a

1    month in which IDOC did not impose the withholding?

2    A.    Not that I'm aware of, no.

3    Q.    And some of the vacant positions in that time period

4    related to those withholdings were for ISCI; correct?

5    A.    They could be.

6    Q.    You don't know?

7    A.    I don't know right off the top of my head, no.

8    Q.    And the second ground for which IDOC can withhold is when

9    Corizon fails to meet the minimum manpower requirements laid out

10   in the contract; correct?

11   A.    That is correct.

12   Q.    And that withholding, too, was imposed between March 1st --

13   each month between March 1 of 2018 and April 22 of 2019; is that

14   right?

15   A.    That is correct.

16   Q.    And how about since April 22 of 2019 through now, the end

17   of January up to February 3rd of 2020, has there ever been a

18   month when that withholding was not imposed?

19   A.    Not that I'm aware of, no.

20   Q.    So that hasn't been a problem since -- when was the last

21   time that withholding was imposed?

22   A.    Last month.

23   Q.    All right.  So it was imposed last month?

24   A.    Well, I mean, it's monthly.

25   Q.    Okay.

1    A.    Sorry.

2    Q.    I misunderstood.  It's been imposed each month since March

3    of 2018; is that correct?

4    A.    Correct.

5    Q.    All right.  And is the failure to have the minimum manpower

6    reflected in the audits anywhere?

7    A.    Not that I'm aware of.

8    Q.    And is the failure to have certain staff positions filled

9    within 60 days reflected in any of the audits that you

10   discussed?

11   A.    Not that I'm aware of, no.

12   Q.    And I think you testified that there was a survey done by

13   NCCHC in June of last year; is that right?

14   A.    Yes.

15   Q.    And then you got the report a few months later?

16   Mr. Kronberg looked at that with you?

17   A.    Yes.

18   Q.    In that time period, did you ever reach out to NCCHC or the

19   auditors or surveyors and say, "Hey, we, in fact, have had a

20   problem.  In July, August, September, October, we haven't been

21   able to see inmates within 14 days"?  Did you relay that

22   information to them?

23   A.    No.

24   Q.    And did you relay to them any of the issues you had with

25   complying with the contract in terms of meeting the minimum

```
 1    staffing requirements or not having sufficient manpower?  Did

 2    you report that to them?

 3    A.    I don't see how that's relevant to their audit.  And at

 4    that point, we were fully staffed, so that wouldn't be

 5    applicable.

 6    Q.    So the answer is no?

 7    A.    The answer is no.

 8    Q.    And did you report to them at all that there was that

 9    period of time from at least March of 2018 until sometime after

10    that where there was not an RN in the Medical Annex?

11    A.    I did not, no.

12    Q.    If we could have you look at -- well, let me ask you this:

13    So the contract between Corizon and IDOC is related only to

14    medical care; correct?

15    A.    That is correct.

16    Q.    And so the services that IDOC contracted for with Corizon

17    are for medical services; correct?

18    A.    I guess we do -- sorry.  Excuse me.  We do have medical and

19    mental health services, as well, at some sites.

20    Q.    All right.  So medical and mental.

21          At ISCI, it's just medical; correct?

22    A.    You are correct.

23    Q.    And that's what Corizon agreed to provide?

24    A.    Correct.

25    Q.    Are you aware that one provision of the contract between
```

1          Corizon and IDOC requires that Corizon provide reasonable

2     accommodations for offenders with physical and/or developmental

3     disabilities as required by the Americans with Disabilities Act?

4     A.   Yes.

5     Q.   And Corizon, in its response to that proposal, agreed to

6     that; right?

7     A.   Yes.

8     Q.   And so as part of its obligations to provide adequate

9     medical care under the contract with IDOC, Corizon knows it's

10    important to also comply with the Americans with Disabilities

11    Act; correct?

12             MR. KRONBERG:  Your Honor, I'm going to object to the

13    relevance.  It's not part of any of the orders that are in play

14    in this case.  None of the prospective relief deals with the

15    ADA.

16             MS. OLSON:  I think, Your Honor, it goes to the

17    adequacy of the medical care, which is why it's in the contract.

18    And we're not -- we're not making any argument that there are

19    violations of the ADA.  It's all related to the adequacy of the

20    medical care.

21             THE COURT:  Well, again, I mean, I tend to agree.  I

22    think Mr. Kronberg is correct that failure to comply with the

23    ADA does not constitute failure to comply with the Eighth

24    Amendment, two very different standards.

25             If you're using that a failure to comply with the

1    contract as an indication of a failure to generally provide

2    health care, I suppose it's somehow relevant.  But one does not

3    necessarily lead to the other.  But I'll give you some leeway.

4            Just to remind counsel, you are both on the clock, so

5    if you --

6            MS. OLSON:  Absolutely understand, Your Honor.  We're

7    not -- and we're not -- again, we are not arguing that at issue

8    here is whether -- is the fact that IDOC has failed to comply

9    with the ADA.

10           THE COURT:  All right.

11   Q.   BY MS. OLSON:  So we've talked a fair amount about the

12   Medical Annex, Mr. Hofer.  I just want to ask you a couple last

13   questions about that.

14           So you have only been with Corizon since about 2015;

15   correct?

16   A.   That is correct.

17   Q.   And at any time, whether as the HSA for ISCI or the vice

18   president of operations, have you gone back and looked at some

19   of the historical documents related to the Balla lawsuit?

20           MR. KRONBERG:  Object to the relevance, Your Honor.

21           THE COURT:  Overruled.

22           THE WITNESS:  I have seen them.  Do I have them

23   memorized?  No.

24   Q.   BY MS. OLSON:  Yeah.  Well, have you looked at any of the

25   pleadings that the state filed in approximately 2005 when the

1      Medical Annex was being built?

2      A.    I have not, no.

3      Q.    And are you aware from any source of whether the state

4      represented to the Court that the Medical Annex was being built

5      to house inmates with medical problems?

6      A.    You're referring to in 2005?

7      Q.    Correct.  Are you aware that that was a representation that

8      was being made?

9      A.    No.

10            MS. OLSON:  I think that's all the questions I have

11     for Mr. Hofer.  Thank you.

12            THE COURT:  Redirect, Mr. Kronberg.

13                        REDIRECT EXAMINATION

14     BY MR. KRONBERG:

15     Q.    Mr. Hofer, you were asked a series of questions about

16     withholding of payments under the contract.

17            Do you recall that?

18     A.    I do.

19     Q.    And that's -- that's not ISCI specific, is it?

20     A.    That is correct.

21     Q.    That's statewide?

22     A.    Yes.

23     Q.    And are you aware of any correlation between those

24     withholdings and the provision of medical care at ISCI in terms

25     of whether it was adequate or not?

1    A.    No.

2    Q.    Have you seen any evidence that the medical care provided

3    at ISCI somehow suffered because there were withholdings of

4    payments to Corizon Health under the contract?

5          MS. OLSON:  Objection, Your Honor.  Speculation as to

6    this witness's response, lack of foundation.

7          MR. KRONBERG:  I asked him whether he has seen any

8    evidence.

9          THE COURT:  Overruled.

10         THE WITNESS:  I did not, no.

11   Q.    BY MR. KRONBERG:  So if you have staffing problems in terms

12   of a vacancy for a period of time at ISCI, you already testified

13   that you would pull in staff from other facilities.

14         Is that something that you could have done?

15   A.    Yes.

16   Q.    And did, in fact, you make sure that those vacancies were

17   somehow covered?

18         MS. OLSON:  Objection.  Leading.

19         THE COURT:  It is.  Sustained.  Rephrase.

20   Q.    BY MR. KRONBERG:  Did you provide coverage for the hours

21   for the position that was vacant?

22   A.    Yes.

23   Q.    How did you do that?

24   A.    In two ways.  We obviously had an amendment that increased

25   the provider hours, and so that increased 1.26 providers to

1    ISCI.

2              In addition to that, as a company, we ended up hiring

3    two additional providers to meet the demand that we were seeing

4    to make sure that we were in compliance, which we are.

5    Q.    You were asked a question about -- well, there is an issue

6    here about this 14-day delay period.  And I just -- are you

7    aware of whether the NCCHC standards provide for a 14-day period

8    between the HSR request being submitted and seeing a provider?

9    A.    No, they do not.

10   Q.    Let's talk about --

11             THE COURT:  Counsel, just so we're clear on that

12   point:  The 14-day standard did come from the Modified -- what's

13   the term -- Modified Compliance.

14             MS. OLSON:  Plan, MCP.

15             MR. KRONBERG:  Well, there is a standard operating

16   procedure.

17             THE COURT:  No.  I'm referring to the essentially the

18   settlement agreement and the standards that were established.

19             MR. KRONBERG:  My understanding is that the MCP refers

20   to a standard operating procedure of ISCI which does have a

21   14-day limit.

22             THE COURT:  All right.

23             MR. KRONBERG:  The NCCHC standard does not.

24             THE COURT:  No.  I understand that.  That point has

25   been made.  I just wanted to make sure I understood where that

1      14-day standard came from.

2              And you're saying it's part of IDOC's standard

3      operating procedures?

4              MR. KRONBERG:  Correct.

5              THE COURT:  And was then picked up as part of the

6      Modified Compliance Plan?

7              MR. KRONBERG:  Right.

8              THE COURT:  All right.

9      Q.   BY MR. KRONBERG:  Take a look at Exhibit 6, please.  I

10     guess I'll put that in front of you here in a second.  So I'm

11     going to -- sorry -- show you what's on page 21.

12             You were asked some questions about an RN being in the

13     Medical Annex.

14             Do you recall that?

15     A.   I do.

16     Q.   I'm sorry.  I can see it.

17             So the issue on page 21 -- and this is the 2017 audit

18     by NCCHC -- is compliance with the Idaho Nurse Practice Act.

19             Do you see that?

20     A.   I do.

21     Q.   And what did the NCCHC conclude in relation to whether ISCI

22     was in compliance with the Idaho Nurse Practice Act?

23     A.   Yeah.  They said that we were greater than 90 percent.

24     Q.   And is it clear, based on the audit, who was performing the

25     sick calls at ISCI at that time?

HOFER - Redirect                                              121

1    A.    Yes.

2    Q.    And who was doing that?

3    A.    A mixture of LPNs.

4    Q.    Well, what does it say there?  It says, Note, sick call is

5    being staffed by what?

6    A.    An LPN.

7    Q.    So sick call was not being staffed in the Medical Annex or

8    anywhere else at ISCI by an RN at that time; is that correct?

9    A.    That is not correct.

10   Q.    Where was it being staffed by an RN?

11   A.    General population.

12   Q.    Do you know whether it was being staffed in the Medical

13   Annex by an LPN at that time?

14   A.    I do not know at that time.  Wait.  This is 2019?

15   Q.    This is --

16   A.    Yes, at that time.

17   Q.    -- 2017.

18   A.    Oh, 2017?  I do not recall exactly which licensure.

19   Q.    Let's take a look at -- you were asked some questions about

20   the increase in the HSR, the Health Service Requests, becoming a

21   problem in May of 2018.

22          Do you recall that?

23   A.    Yes.

24   Q.    So let's take a look and see if they actually were a

25   problem in May of 2018.

1          Showing you the -- well, do you recognize what this

2     document is?

3     A.   I do.

4     Q.   What is it?

5     A.   That is the continuity of care from unscheduled off-site ER

6     hospital visits.

7     Q.   Well, let's go to -- showing you what's been marked as

8     Exhibit 262.

9          Do you recognize it?

10    A.   I do.

11    Q.   What is it?

12    A.   That's the medical diets.

13    Q.   Well, let's talk about the entire document.

14         What is it?

15    A.   The HSR for the audit results for June 3 through June 30 of

16    2018.

17    Q.   So if we go to the Audit Tool 02, that shows the HSR

18    requests for the general population; is that true?

19    A.   Correct.

20    Q.   So we can look at that same graph that you were asked about

21    on cross, provider visits in 14 days.

22         From January through June, all the way through May,

23    when you supposedly had a problem, are you above the 90 percent

24    threshold?

25    A.   Well above, yes.

1          THE COURT:  Counsel, are you offering the exhibit?

2          MR. KRONBERG:  Sure.

3          THE COURT:  Any objection?

4          MS. OLSON:  No, Your Honor.

5          THE COURT:  262 will be admitted.

6          (Defendants' Exhibit 262 admitted.)

7    Q.   BY MR. KRONBERG:  Showing you what's been marked

8    Exhibit 268.

9          What is Exhibit 268?

10   A.   That is the same HSR audit period, 12/2 through 12/29.

11   Q.   And if we look at the 14-day provider visits under Balla

12   Audit Tool 02, does it look like you're in trouble with the

13   14-day period?

14   A.   No, it does not.

15   Q.   What does it show?

16   A.   95 to 100 percent for three months, and 96 percent, and 96

17   percent.

18   Q.   Let's take a look --

19          MR. KRONBERG:  And I'll move to admit Exhibit 268.

20          THE COURT:  Any objection?

21          MS. OLSON:  No, Your Honor.

22          THE COURT:  268 will be admitted.

23          (Defendants' Exhibit 268 admitted.)

24   Q.   BY MR. KRONBERG:  Let's take a look at Exhibit 273.

25          What is that document, Mr. Hofer?

**HOFER - Redirect**

1    A.    That is the audit period through June 2nd through June

2    29th.

3    Q.    2019?

4    A.    Correct.

5    Q.    So if we look at -- is that the Balla Audit Tool 02?

6    A.    That is.

7    Q.    And if we look at that same graph -- sorry -- for provider

8    visits within 14 days, when does it first appear to start being

9    a problem based on the actual audits?

10   A.    It looks like we saw a dip in April at 88 percent; and in

11   June, obviously down to 68 percent.

12   Q.    And when did you start determining that you needed to amend

13   the contract to add additional provider help to deal with this

14   problem?

15   A.    That was right around October of 2018, I had some of those

16   conversations.

17   Q.    You were shown a series of photos, and I'm not going to

18   pull them all up.

19         Do you remember the photos of the door going into the

20   Medical Annex that had the door mark -- had marks on the door?

21   A.    I do.

22   Q.    Do you know -- do you know if those were from a laundry

23   cart?

24   A.    Very well could be.

25   Q.    Do you know if they're from a food cart?

**HOFER - Redirect**

1    A.   Very well could be.

2    Q.   You were shown Exhibits 1024 and I think 1025.  And I'm not

3    going to pull them up, but that was the discussion about the

4    Inmate ███████ coming down to the Medical Annex to try the

5    toilet.

6              Do you recall that?

7    A.   I do.

8    Q.   Do you know how that came about?

9    A.   Just briefly, through kind of some of the nursing

10   directors, was to see if he'd be a good fit down in the annex.

11   So they brought him down and wanted him to see if it's

12   potentially a place he could be housed.

13             It was pretty short-lived, and we decided that it was

14   not going to work, and that gentleman was brought back to Long

15   Term Care.

16   Q.   So he started out at Long Term Care and went down to try

17   the toilet in the Medical Annex?

18   A.   Correct.

19   Q.   And then it didn't work out, and he was sent back to Long

20   Term Care?

21   A.   That is what I'm aware of, yes.

22   Q.   You were asked about some meeting minutes and you --

23   whether the Medical Annex is a skilled nursing facility, and you

24   attributed those comments to Dr. Menard.

25             Do you recall that?

**HOFER − Redirect**

1    A.    I do.

2    Q.    Was that -- was everyone in agreement with Dr. Menard on

3    that comment?

4    A.    No, we were not.

5    Q.    Let's take a look at some photos of the Medical Annex.

6          Showing you what's been marked Exhibit 288, you have

7    already testified you are familiar with the Medical Annex in

8    relation to photos showed to you by the plaintiffs.

9          Does Exhibit 288 seem like a typical scene from the

10   Medical Annex to you?

11   A.    It does, yes.

12          MR. KRONBERG:  Move to admit Exhibit 288.

13          THE COURT:  Counsel, did you -- I think you referenced

14   273 as well.  Did you intend to offer both?

15          MR. KRONBERG:  Yes.  Thank you.

16          THE COURT:  Any objection to either?

17          MS. OLSON:  No, Your Honor.

18          THE COURT:  Exhibits 273 and 288 will both be

19   admitted.

20          (Defendants' Exhibits 273 and 288 admitted.)

21   Q.    BY MR. KRONBERG:  Showing you what's been marked 289.

22          Mr. Hofer, does that appear to be a typical scene in

23   the Medical Annex?

24   A.    Yes, it does.

25          MR. KRONBERG:  Move to admit 289.

**HOFER - Redirect**

```
1              MS. OLSON:  No objection, Your Honor.

2              THE COURT:  289 will be admitted.

3         (Defendants' Exhibit 289 admitted.)

4    Q.  BY MR. KRONBERG:  Showing you what's been marked

5    Exhibit 290, Mr. Hofer.

6              Does that appear to be a typical scene in the Medical

7    Annex?

8    A.   Yes, it does.

9              MR. KRONBERG:  Move to admit 290.

10             THE COURT:  Any objection?

11             MS. OLSON:  No, Your Honor.

12             THE COURT:  Counsel, is there a series here?  Could we

13   just offer them --

14             MR. KRONBERG:  291, 292, 299, 300.

15             THE COURT:  Any objection to any of those?

16             MS. OLSON:  No, Your Honor.

17             THE COURT:  Those exhibits will all be admitted.

18   That's 291, 292, 299, and 300.

19        (Defendants' Exhibits 290, 291, 292, 299, and 300

20   admitted.)

21   Q.   BY MR. KRONBERG:  Is it your understanding that the folks

22   that are housed in the Medical Annex have to be able to perform

23   their activities of daily living?

24   A.   Yes.

25   Q.   Are there some exceptions to that in terms of bathing?
```

**HOFER - Redirect/Recross**

1    A.   Yes.

2              MR. KRONBERG:  Nothing further, Your Honor.

3              THE COURT:  Any recross?

4              MS. OLSON:  Yes, just briefly, Your Honor.

5                        RECROSS-EXAMINATION

6    BY MS. OLSON:

7    Q.   Mr. Hofer, your undergraduate degree is in political

8    science?

9    A.   Yes, it is.

10   Q.   Your graduate degree is in business administration?

11   A.   Yes.

12   Q.   You have no formal medical training?

13   A.   I do not, no.

14   Q.   You have never worked in a skilled nursing facility?

15   A.   I have not.

16   Q.   And so when you indicated you didn't agree with Dr. Menard,

17   that certainly wasn't based on any medical knowledge of your

18   part; correct?

19   A.   That is correct.

20   Q.   And with respect to -- if we could bring up Exhibit 290

21   again.  I think that's one of those ones that Mr. Kronberg just

22   showed you.  Those are the series of the pictures of the Medical

23   Annex that Mr. Kronberg showed you, 290.

24              In that 290, that's that picture of the same alleyway

25   between the lockers and that outside row of beds that I showed

**HOFER − Recross**

1    you in one of the pictures that I showed you; is that correct?

2    A.   It appears so.

3    Q.   And you recall in the picture I showed you, there was a

4    gentleman who had a prosthetic leg ███████████████████

5    ██?

6    A.   I don't know what the leg said, no.

7    Q.   Well, do you recall there was an individual with a

8    prosthetic leg?

9    A.   Correct.

10   Q.   And there were oxygen tanks in the way?

11   A.   I did see one oxygen tank, yes.

12   Q.   And there were inmates in their wheelchairs in that

13   alleyway; correct?

14   A.   There were, yes.

15   Q.   And does it -- would you agree that it appears that

16   alleyway has been cleaned up for this picture?

17   A.   I can't say it's been cleaned up for this picture.  I don't

18   know if this is how it normally was.  I don't know.

19   Q.   Because you haven't been to the Medical Annex since 2018?

20   A.   It's been a while since I have been in there, yes.

21   Q.   Since you were the HSA; correct?

22   A.   Yes.

23   Q.   And do you know who took these pictures?

24   A.   I do not.

25   Q.   Do you know if an order was given to clean up the alleyways

```
1        before the picture was taken?

2        A.   I have no idea.

3        Q.   Have you ever seen emergency responders try to get a gurney

4        into the middle area?

5        A.   I have not personally seen that.

6                MR. KRONBERG:  Outside the scope.  We are getting

7        outside the scope of redirect, Your Honor.

8                THE COURT:  Ms. Olson.

9                MS. OLSON:  That's as far as I was going, Your Honor.

10       And I did not make similar objections to Mr. Kronberg.

11               THE COURT:  Two wrongs do not make a right.

12               MS. OLSON:  I know.  Very well, Your Honor.

13               That's all the questions I have.  Thank you, Your

14       Honor.

15               THE COURT:  Mr. Kronberg, I assume you have nothing

16       else.

17               MR. KRONBERG:  No, Your Honor.

18               THE COURT:  All right.  You may step down.  Thank you,

19       Mr. Hofer.

20               Call your next witness.

21               MR. KRONBERG:  Dr. Rebekah Haggard.

22               THE COURT:  Dr. Haggard, would you come before the

23       clerk and be sworn.  Ms. Gearhart will place you under oath and

24       then direct you from there.

25               REBEKAH HAGGARD, M.D., DEFENDANTS' WITNESS, SWORN
```

```
 1            THE CLERK:  Please take a seat in the witness stand.
 2            Please state your complete name, and spell your name
 3       for the record.
 4            THE WITNESS:  Rebekah, R-E-B-E-K-A-H, Haggard,
 5       H-A-G-G-A-R-D.
 6            THE COURT:  You may inquire of the witness.
 7            MR. KRONBERG:  Thank you, Your Honor.
 8                         DIRECT EXAMINATION
 9       BY MR. KRONBERG:
10       Q.   Dr. Haggard, you are a physician; is that correct?
11       A.   Yes.
12       Q.   Are you board certified?
13       A.   Yes.
14       Q.   In what?
15       A.   I'm certified by the American Board of Family Medicine, the
16       American Board of Quality Assurance and Utilization Review, and
17       I'm a Certified Correctional Health Professional.
18       Q.   Explain a little bit about that Quality Assurance board
19       certification.  What does that mean?
20       A.   Sure.  So, practically, it means that I have an eye toward
21       quality improvement, and that I have the knowledge and skills to
22       decrease medical errors, improve patient safety, and apply the
23       six goals of the Institute of Medicine for quality care, which
24       includes care that's safe, effective, efficient, timely,
25       patient-centered, and equitable.
```

```
1     Q.   Are you employed by Corizon Health?

2     A.   Yes.

3     Q.   And where are you employed by Corizon Health?

4     A.   I'm currently the site medical director for Idaho State

5     Correctional Institution.

6     Q.   Could you give a brief overview of your educational

7     background.

8     A.   I attended Eastern Nazarene College in Quincy,

9     Massachusetts, for my undergrad and then on to Penn State

10    University College of Medicine in Hershey, Pennsylvania.

11    Q.   Could you give us a brief overview of your employment

12    history.

13    A.   Yes.  I completed residency after medical school at

14    Crozer-Keystone Family practice residency outside of

15    Philadelphia, and then I joined a private family practice group

16    in the same area after residency.

17    Q.   So you worked in a skilled nursing facility as part of

18    that?

19    A.   Yes, I did.

20    Q.   How long did you do that?

21    A.   For four years.

22    Q.   And when did you get into correctional health care?

23    A.   So I was in private practice in Pennsylvania for those four

24    years, and then I moved to Boise, Idaho, to be near family.  And

25    I continued to work in private family practice with Primary
```

1    Health.  And it was after that that I joined what was at the

2    time Prison Health Services.

3    Q.    What year, just roughly, was that?

4    A.    2004.

5    Q.    What did you do for Prison Health Services?

6    A.    I started as the regional medical director here in Idaho.

7    Q.    What were your duties as regional medical director?

8    A.    At that time, it was oversight of the medical care across

9    the state, completing peer reviews on all the providers,

10   attending MAC meetings and QI meetings as possible.

11          I was also responsible for direct patient care at max

12   and ISCI and traveling to the outlying sites quarterly to at

13   least twice a year.

14   Q.    So let's just go back.  You mentioned MAC meetings.

15          What are those?

16   A.    A Medical Audit Committee meeting.  And that is a meeting

17   with multiple disciplines, including the DOC, mental

18   health, dental, medical, regional, and site leadership to go

19   over statistics, review sick call encounters, chronic care

20   encounters, Infirmary, and ensure that there aren't any major

21   changes or trends month to month.

22   Q.    And you also mentioned CQI, I believe, in there somewhere.

23          What's that?

24   A.    Yeah.  So the MAC meetings kind of go along with the

25   monthly CQI meeting.  And as site medical director at ISCI, I

HAGGARD - Direct

1    chair that committee.

2          And again, we are looking at quality improvement

3    trends and looking at infection logs and injuries and staff

4    safety and those sorts of things.

5    Q.   I may have led you a little bit astray.  I was talking

6    about your work with PHS.

7          But I think you just described actually what you're

8    doing today in terms of the MAC meetings and CQI?

9    A.   Yes.

10   Q.   What did you -- we're back to 2004.  Just proceed forward

11   with a brief overview of your employment history in correctional

12   health care as of 2004.

13         What happens next?

14   A.   So I started as a regional medical director here in Idaho,

15   and I stayed until the contract changed to a different

16   correctional health care company.  And I stayed with Prison

17   Health Services and went to Wyoming as their regional medical

18   director.  And I did that for approximately a year and then

19   relocated to one of our county jails in Reno, Nevada.  And I did

20   that for three years.

21   Q.   What were you -- what was your position at the county jail?

22   A.   Site medical director.  And I continued to help with some

23   of the utilization management issues in Wyoming.

24   Q.   For?

25   A.   About six months, roughly.  That was a while ago.  Don't

HAGGARD – Direct

1    quote me on that.

2    Q.    I mean for the prison system in Wyoming?

3    A.    Yes.  Yes.

4    Q.    Okay.  What happened next?

5    A.    Then in 2009, I went to the Prison Health Services

6    corporate office in Brentwood, Tennessee, as the patient safety

7    officer.

8    Q.    What were your duties?

9    A.    My role was to oversee the corporate patient safety

10   program, which was review of sentinel events, mortalities, and

11   tracking those and looking for any trends; traveling to the

12   sites to help with any corrective actions that needed to occur;

13   looking for opportunities for improvement; and then providing

14   training and education to all of our sites and employees on how

15   they can improve quality and safety.

16   Q.    And what did you do after that position?

17   A.    So that position went on for seven years.  It evolved over

18   time from patient safety officer to chief quality officer.  I

19   also worked on our current quality improvement manual, which was

20   drafted and then it's still in place today.

21         Again, we did training and education for all the sites

22   on how to utilize those tools and implement that and roll it

23   out.

24         And then in 2016, the regional medical director

25   position opened up here in Idaho again, and I still have family

1    here, and so I chose to relocate again.

2    Q.   And just wanted to touch bases with you on this quality

3    improvement manual.

4          Just what does that deal with?

5    A.   So we combine the patient safety program and quality

6    improvement into one program, quality improvement and patient

7    safety.  And so that manual included all of the processes for

8    how the sites review sentinel events and mortalities and what

9    they should be looking for, how to develop a corrective action

10   plan.

11         And then that ties into the continuous quality

12   improvement process to do plan studies and act -- studies to

13   look at that and make sure that the actions they put in place

14   were effective.

15   Q.   I interrupted you, and I apologize.  You were, I think --

16   what was the next thing you did after the job in the corporate

17   offices?  You moved back to Idaho?

18   A.   I'm sorry.  Can you say that again.

19   Q.   What was the next position you held after the corporate

20   position of chief quality officer?

21   A.   Yes.  That was when I came back to Idaho in August of 2016.

22   Q.   And what position did you obtain at that time?

23   A.   Regional medical director for Idaho.

24   Q.   Similar duties to what you described before or something

25   different?

1      A.    Pretty -- pretty much the same, yeah.

2      Q.    And how long were you regional medical director?

3      A.    I was regional medical director from August of 2016 through

4      August of 2017, at which time I also assumed the

5      responsibilities for site medical director at ISCI.

6      Q.    And I -- so you were regional medical director for Corizon

7      as of August 2016?

8      A.    Correct.

9      Q.    Site medical director at ISCI in August of 2017, what were

10     your duties in that position?

11     A.    My primary duties are patient care in our Infirmary and

12     Long Term Care units.  I'm also a resource for our other

13     providers -- other providers for them to, you know, answer

14     questions, present cases, and help in clinics as needed.

15     Q.    You are a full-time physician today at ISCI; correct?

16     A.    Yes.

17     Q.    So August 7, 2017, you're SMD.

18           What -- do you acquire a different position after that

19     or what happens?

20     A.    So in August of 2017, I transitioned to the site but

21     continued to perform the critical duties of the regional medical

22     director while they recruited for a new medical director.

23     Q.    How long did that go on for?  When did a new regional

24     medical director show up?

25     A.    Dr. Menard was hired in January of 2018.

HAGGARD - Direct

1    Q.   And what happened to your duties when he became the
2    regional medical director?
3    A.   I was able to focus solely on ISCI and not perform those
4    other RMD duties.
5    Q.   And by the "other RMD duties," you mean responsibility for
6    other facilities in the prison system?
7    A.   Yes and no.  So primarily a lot of the critical role of the
8    regional medical director was related to the Balla audits.  So
9    performing those chart audits and off-site reviews, utilization
10   management, and nonformulary requests, those come from all over
11   the state.
12   Q.   How long did you -- were you able to just focus on the site
13   medical director position without having to worry about the RMD
14   role?
15   A.   Dr. Menard was in his position for one year.
16   Q.   What happened after he left?
17   A.   So when he left in January of 2019, I assumed those duties
18   again to ensure that the Balla audits were completed, the
19   quarterly peer reviews.  And sort of -- I don't want to say less
20   important, but other things such as meetings and travel across
21   the state, those things could not obviously be done and do both
22   jobs at the same time.
23   Q.   How long did you cover both roles as site medical director
24   and regional medical director?
25   A.   So Dr. Dawson came on in May of 2019.

1  Q.   And what happened then in terms of regional medical

2  director roles?

3  A.   She assumed all the responsibilities.  But in a pretty

4  short time, the medical director at max and one of the other

5  sites -- I'm blanking at the moment -- but she had to assume

6  some direct patient care at sites that really was not

7  anticipated.  And so I -- I've been helping her to some degree

8  with some of the utilization review again and nonformulary

9  review.

10  Q.   That's the RMD role?

11  A.   Part of it, yes.

12  Q.   Part of it?

13  A.   Yes.

14  Q.   So where are we at today in terms of your role as site

15  medical director and who is performing the regional medical

16  director roles?

17  A.   So as of December 1st of 2019, Dr. Dawson decided to take

18  the site medical director position at ISCC.  And so she was no

19  longer the full-time RMD, either.  And so we both have continued

20  to share the critical roles and will continue to do that until

21  they recruit a new full-time RMD.

22  Q.   Let's talk about your duties --

23  A.   Okay.

24  Q.   -- and responsibilities in relation to your position as

25  full-time physician and the site medical director at ISCI.

HAGGARD - Direct

1         What's your primary focus in that position?

2    A.    So patient care comes first.  And again, my role is in the

3    Infirmary and the Long Term Care Unit first and foremost.

4    Q.    And where are the Long Term Care and Infirmary located?  In

5    a particular building?

6    A.    They are both in the Medical Building.

7    Q.    Is the Medical Building next to the Medical Annex?

8    A.    It is situated next door, yes.

9    Q.    Why don't you give a brief description of what facilities

10   are located in the Medical Building 20.

11   A.    So just as you sort of first come in the building, there is

12   a waiting area for the patients.  And to the right of that is

13   the Pharmacy Unit, and the hall on that side is administration.

14         If you go on the left side, that's where they do the

15   patient triage, nurse sick call.  There is a -- there are two

16   offices for Outpatient Clinic, and then there is the Dental Unit

17   and then the chronic care takes place sort of at the end of that

18   hall, with a nurse -- chronic care nurse and a provider's

19   office.

20         And then around the corner is Optometry.  Straight

21   ahead is the Emergency Room.  You keep working your way back,

22   Hemodialysis Unit is on the corner.  And then down a long hall,

23   we have a couple offices, I think -- yeah, a couple offices

24   there that have Mental Health Clinics.  Not every day of the

25   week, but I see mental health providers in there.

HAGGARD - Direct

1            And then the Infirmary is in the back, and the Long

2     Term Care Unit is below that.

3     Q.    On the floor below?

4     A.    Yes.

5     Q.    Let's talk about what you do in the Infirmary.  Why don't

6     you go through a typical day, perhaps, of what you do in the

7     Infirmary.

8     A.    I try to arrive between 6:30 and 7:00 in the morning so

9     that I can, you know, get a little bit of work done.  And then I

10    go back and meet with the night shift nurses in the Infirmary

11    and the day shift, as well, and we obtain shift report.

12            That basically reviews every patient that's there and

13    goes over any problems that they had overnight, any issues that

14    they might have.

15            And then once we have received report, then I go

16    examine each of the patients --

17    Q.    Let me stop -- let me stop you there.

18            How many beds are in the Infirmary?

19    A.    The Infirmary has 12 beds, 13 if you count the seg or the

20    mental health cell.

21    Q.    And who determines who is admitted into the Infirmary?

22    A.    That's by provider order.

23    Q.    So --

24    A.    Any provider.

25    Q.    It could be a nurse practitioner or a PA, physicians

1    assistant --

2    A.   Yes.

3    Q.   -- as well as yourself?

4    A.   Yes.

5    Q.   So I interrupted you again.

6         What -- what do you do after you have this meeting

7    with the nurses and get the report?

8    A.   So I go see the patients, address any of the problems that

9    they might have brought up for me.  And then I really start

10   writing the notes and the treatment plan and the orders.

11        So I order any medications they might need.  If there

12   is a patient who needs to go off site for a test or procedure, I

13   go to our schedule order and start to work on that.

14   Q.   Let me interrupt you there.  I apologize.

15        So these rounds, would they be called working rounds?

16   A.   Yes.

17   Q.   And are they daily?

18   A.   Yes.

19   Q.   What's a working round?

20   A.   Well, for me, that means doing the actual work: ordering

21   medicines, renewing medicines, making sure that the plan of care

22   is in place, that the nurses know what they're going to do for

23   the patient for the day, if they need IV fluids or if they need

24   to start -- get up and walk three times a day, whatever is in

25   the patient's care plan, that that's on the treatment so that it

1    gets done.

2    Q.   Where is the plaintiff's [*sic*] care plan maintained?

3    A.   Patient's?  Patient's care plan?

4    Q.   Patient's care plan, if I wanted to go take a look at it,

5    where would I look?

6    A.   That would be in the daily provider SOP note in the plans

7    section.

8    Q.   So is that an electronic medical record?

9    A.   Yes.

10   Q.   And you have -- is there something out there called the

11   eOMIS?

12   A.   Yes.

13   Q.   Is that the electronic medical records system?

14   A.   Yes.

15   Q.   So would the plan of care be found in the eOMIS?

16   A.   Yes.

17   Q.   And again I interrupted you.

18        You were talking about your -- well, let me ask this:

19   When you're doing your rounds, do you actually physically check

20   on the patients and see how they're doing?

21   A.   Yes.

22   Q.   And you were talking about your notes and orders and plans.

23   If you have anything to add to that, go ahead.

24        What do you do after that?

25   A.   So the notes, orders, and plans, and then start reviewing

1          other issues for the day.  So lab tests that might have come

2          in -- any patients at ISCI, not necessarily just the Infirmary.

3                   By then, patients are usually coming back from

4          off-site appointments.  Those patients go to the Infirmary

5          nurses, so the nurses might track me down for a verbal order.  I

6          might need to go see one of those patients.  Sometimes they get

7          admitted after they come back from a surgery or a procedure.

8          The shared duties for the regional medical director work.

9                   So just start chipping away at what has to be done for

10         the day.

11         Q.   Are there any particular criteria for someone to be

12         admitted into the Infirmary?

13         A.   Really, any Infirmary admission would assume that they need

14         skilled nursing care to some degree; or in the Long Term Care

15         Unit, it might mean they need assistance with activities of

16         daily living.

17         Q.   And let's segue into the Long Term Care facility located in

18         Building 20.

19                   What are your -- what do you do with Long Term Care?

20         A.   So Long Term Care is more akin to a nursing home than a

21         medical unit or a step-down, skilled nursing unit, like the

22         Infirmary.

23                   But the Long Term Care is similar in that I go

24         weekly -- not daily, but weekly.  I talk with the nurses and get

25         the report on each of the patients and go around and examine

1          them and see how they are doing.

2                  And again, it's working rounds on a weekly basis to

3          make sure that any medicines that need to be refilled or renewed

4          get done, lab tests that need ordered, address any problems that

5          the nurses brought up, those sorts of things.

6          Q.   And again, are the -- any treatment plans for the patients

7          in the Long Term Care, is all that information entered into the

8          electronic med -- electronic medical record?

9          A.   Yes.  And it would be similar to the plan of care for an

10         Infirmary patient, as well, in the plans section of the note.

11         Q.   You mentioned Balla duties in relation to the regional

12         medical director.  What duties does the regional medical

13         director have in relation to Long Term Care?

14         A.   The regional medical director does rounds, as well, weekly.

15         Those are more geared toward looking toward appropriateness of

16         care and ensuring that the care is being given and being done as

17         opposed to what I call "working rounds" of actually doing it.

18         So making sure it's appropriate and that it's been done.

19         Q.   So now are you -- when you round in the Long Term Care

20         facility, are you rounding with Dr. Dawson, or how does that

21         work?

22         A.   Yes.  So she comes around and does her rounds with me.

23         Q.   Is that once a week on Tuesday?

24         A.   Yes.

25         Q.   So who decides whether someone is admitted to Long Term

1    Care?

2    A.    Again, that would be a provider order based on need for

3    skilled nursing assistance or assistance with activities of

4    daily living.

5    Q.    Are there any particular criteria other than activities of

6    daily living, or is that the main one?

7    A.    Needing skilled nursing care or assistance with medications

8    in their day-to-day care would be the main ones.

9    Q.    So Long Term Care patients, do they come from all over

10    ISCI, any of the housing units?

11    A.    You mean patients that we admit into Long Term Care?

12    Q.    Yes.

13    A.    Yes, they could.  They could even come from other

14    facilities.

15    Q.    Sorry.  I asked a poor question.

16    A.    That's okay.

17    Q.    How unusual of me.

18         So if there is someone, let's say -- the Medical Annex

19    has come up.  If there is someone in the Medical Annex who

20    cannot transfer themselves from their bed to their wheelchair,

21    for example, would that mean that they should be in a facility

22    like the Long Term Care?

23    A.    Yes.

24    Q.    And in fact, if there are folks, inmates in the Medical

25    Annex who cannot perform the activities of daily living, what

1    happens?

2    A.   They should be admitted to the Infirmary or the Long Term

3    Care Unit.

4    Q.   Is that, in fact, what happens?

5    A.   As soon as we're made aware of it, yes.

6    Q.   Are there some folks in the Medical Annex that need help

7    with bathing?

8    A.   Yes.  And we do have quite a list of patients who are

9    scheduled to come down to the Long Term Care Unit to use the

10   shower there.

11   Q.   Why don't you just stick those folks into Long Term Care if

12   they need to have assistance with bathing?

13   A.   They are otherwise functionally independent and able to go

14   about their daily tasks, and we want those individuals to stay

15   as independent as possible as long as they can.

16           So we help them what they need help with and then

17   encourage them to continue to be independent otherwise.

18   Q.   Are you aware of why folks get housed in the Medical Annex?

19   A.   The annex is a general population unit.  We do ask

20   occasionally for patients to be placed -- placed there because

21   of the proximity to the medical building.

22   Q.   Is that because of mobility issues?

23   A.   They may have mobility issues.  It may also be to be closer

24   to Pendyne and close to the medical unit because they are going

25   to be coming for, you know, wound care or chronic care visits or

HAGGARD - Direct

1    sick call, and it's closer.

2    Q.    Let's talk about some of the other things you do.

3          Do you also provide care in the Outpatient Clinic?

4    A.    I do when the other providers need help with a particular

5    case or if we just are extra busy.  So I'll help there as needed

6    in the clinics.

7    Q.    I think you started to talk about this before.  But --

8    excuse me -- do you review lab results as part of your work?

9    A.    Yes.  So we try to maintain review of all labs that come in

10   within 72 hours.  And that's all of the labs.  So RDU intake

11   labs, any labs that providers order, we want to stay on top of

12   those in case there is something that needs to be addressed.

13   Q.    And RDU is Receiving and Diagnostic Unit?

14   A.    Yes.

15   Q.    And is there a time limit that you try to meet when

16   reviewing those lab results?

17   A.    Within 72 hours.  So that's why I try to help when I can,

18   because the -- you know, the other providers are equally busy.

19   Sometimes they take time off.

20         Sometimes we have labs that are ordered on the weekend

21   by an on-call provider who may not even be at the facility again

22   for another month or however long they are between their

23   on-call.  And so those labs still have to be reviewed by someone

24   who can take action on site.

25   Q.    So in order to review lab results, do you go -- do you use

HAGGARD - Direct

1    the electronic medical record, eOMIS?

2    A.    Yes.

3    Q.    Does it -- does that sort of time-stamp your work in

4    looking at lab results?

5    A.    Yes.

6    Q.    Do you work with the -- was there a Chronic Care Clinic --

7    A.    Yes.

8    Q.    -- in Building 20?

9          What is the Chronic Care Clinic?

10   A.    So those are defined by NCCHC, for one, and then just by

11   need of the patient and by our DOC contract.  They are primarily

12   conditions such as hypertension, diabetes, asthma, seizures,

13   hepatitis C, HIV, and special needs.

14   Q.    So do Chronic -- Chronic Care Clinic patients, do they come

15   from all of the housing units, or are they specific to one area?

16   A.    No.  Any housing unit.

17   Q.    And what happens at the Chronic Care Clinic?

18   A.    It's similar to an outpatient visit, only it's focused on

19   those particular disease entities.  So where a sick call might

20   be I twisted my ankle playing basketball, this we focus on their

21   diabetes or their hypertension.

22   Q.    How often do folks show up at the Chronic Care Clinic?

23   A.    We see them at least every 90 days, more frequently if

24   needed.  And I know that our nurse practitioner that does

25   chronic care is very careful about follow-up, and she will see

HAGGARD - Direct

1    people daily or weekly if she needs to to ensure that their

2    disease process is under good control.

3    Q.    Who is that provider?

4    A.    Nurse Practitioner Summer Eldredge.

5    Q.    Do you have any involvement in dealing with infectious

6    diseases?

7    A.    Yes.

8    Q.    And is there a -- do you have any examples of infectious

9    diseases that you folks deal with?

10   A.    So we have patients pretty regularly in the Infirmary with

11   cellulitis or a wound that they may need either short-term

12   antibiotics or even long-term antibiotics through PICC lines.

13   So we manage that in the Infirmary.

14          We have other, you know, concerns with flu season, if

15   you will.  And if patients are presenting with flu symptoms, we

16   might put them in respiratory isolation until we get their flu

17   swab back.

18          So, yes, a lot of infectious disease.

19   Q.    Do you have any negative air pressure cells?

20   A.    Yes, we have two.

21   Q.    In Building 20?

22   A.    Yes, in the Infirmary.

23   Q.    Let's talk about some other duties you have.

24          Do you assist with emergencies when you are on site?

25   A.    Yes, if need be.

151

1    Q.   What about following up with patients who may be in a

2    hospital off site?

3    A.   Yes, quite a bit.  Because they often will come back to the

4    Infirmary, and we'll at least put them on 23-hour observation to

5    make sure that they are stable.  Sometimes they just need a

6    direct admission into the Infirmary, and I'll do that as well.

7    Q.   Is there a blood thinning clinic that you're involved with?

8    And I'm not going to try to pronounce the name of the drug.  So

9    go ahead and tell us what that is.

10   A.   Yes.  I think of that as part of the Chronic Care Clinic.

11   And that's for Coumadin or warfarin.

12        And I do try to manage that clinic because the

13   medication has a tight therapeutic window, and it helps to have

14   one provider kind of track that and follow through and make

15   adjustments so that the patients are followed properly.

16   Q.   I think you have -- do you have additional duties as a

17   regional medical director.  Do you do peer review, or is that

18   a -- something Dr. Dawson handles?

19   A.   The way that it's divided right now, Dr. Dawson is doing

20   that.  But when I was full-time RMD, that was part of the role.

21   Q.   And did you consider that an important part of your duties?

22   A.   Yes.

23   Q.   Showing you what's been marked Exhibit 184.

24        Do you recognize what that is?  It's on the screen.

25   It should be on the screen.  Oh, is it there?

1   A.   No.  It's black.  Oh, there it is.

2   Q.   Thank you.

3        Do you recognize Exhibit 184, Dr. Haggard?

4   A.   Yes.  That's one of the peer review forms focused on the

5   Infirmary.  And then we -- we have forms also for sick call and

6   chronic care.

7   Q.   So what do you -- what do you do with this document in

8   terms of peer review?

9   A.   So there is a place along the left-hand column to identify

10  the patient chart number, and then you review that actual record

11  and answer the questions yes or no.

12  Q.   So in other words, if this is -- you're talking about these

13  are the patients?

14  A.   Yes.

15  Q.   And so are you going into the actual medical records to

16  review in relation to those patients?

17  A.   Yes.

18  Q.   And then you're answering the questions at the top of the

19  chart?

20  A.   Correct.

21  Q.   I believe there are an entire series of questions, some

22  more on the next page; is that correct?

23  A.   Yes.

24  Q.   Then a third page, more questions; is that correct?

25  A.   I don't know how many pages you turned, but --

1    Q.    Well, we can go back.  That's the first page.

2    A.    Yes.  Okay.  So three pages.

3    Q.    Okay.  That's the third page?

4    A.    Yes.

5    Q.    And what's the next step?

6    A.    After you have answered those questions, if you're doing

7    this on your computer, it automatically tabulates.  That's the

8    last page for comments, but then it automatically tabulates the

9    score on this.  And the provider will get a graph showing at the

10    bottom the evaluation of the questions.

11    Q.    So is that Exhibit 185?

12    A.    Yes.

13    Q.    So I think what you're talking about -- is that what's

14    automatically tabulated?

15    A.    So that's the summary of it, and it shows you each question

16    with a yes-no answer and then the percentage.  And the score

17    will show at the bottom, and that populates the graph that we

18    looked at on Exhibit 185.

19    Q.    And let's just go back to the 185.

20          And this is the graph you're talking about?

21    A.    Yes.

22          MR. KRONBERG:  I'm going to move 184, 185, and 186.

23          THE COURT:  Any objection?

24          MR. WATKINS:  No objection, Your Honor.

25          THE COURT:  184, 185, and 186 will be admitted.

HAGGARD – Direct

```
 1              (Defendants' Exhibits 184, 185, 186 admitted.)

 2      Q.   BY MR. KRONBERG:  And 186 is what, Dr. Haggard?  What's

 3      document 186?

 4      A.   I'm sorry.  That's the final page of the entire peer review

 5      document.  And that's just a place to type in any comments,

 6      issues identified, recommendations for improvement, and what

 7      we're going to do next time to look at that.

 8      Q.   So in terms of midlevel providers, how often does this

 9      process occur?

10      A.   Currently quarterly.

11      Q.   How about peer -- how about the other physicians?  How

12      often -- like, if you were there with Dr. Menard, he is regional

13      medical director and you're site medical director, how often

14      does this process occur?

15      A.   Annually.

16      Q.   Do you have any CQI duties, or does the RMD have any CQI

17      duties at ISCI?  In other words, is there a -- you review

18      documents, emergency responses, things like that?

19      A.   Yes.  So part of the requirements were for the regional

20      medical director to review 100 percent of the man-down emergency

21      responses at ISCI.

22      Q.   And what does that involve?

23      A.   So there is a log kept by the QI nurse, and the nurse

24      provides that log on a monthly basis to the regional medical

25      director.
```

HAGGARD - Direct

1    And it involves, similar to peer review, going into
2    each of those records and looking at the noted man-down event,
3    reviewing the note to make sure that care was appropriate and
4    timely, and that the plan of care was followed; and if a
5    provider needed to be contacted, that that was done.
6    Q.   And if you found something wrong or something didn't seem
7    right, what would you do?
8    A.   Note that right on that audit tool and then pass that along
9    to either the director of nursing, or the site administrator
10   sometimes will review that at a staff meeting.  Sometimes it was
11   more individual coaching or counseling.  But we spoke with the
12   people involved as needed.
13   Q.   Did you also review patients who are returning or were
14   returning from off-site specialty visits?
15   A.   Yes.  So the requirement was 100 percent of the man-down
16   and then 10 percent of off-site services and 10 percent of
17   hospital and emergency department visits.
18   Q.   So what did you do in that review process?
19   A.   So again, the QI nurse would keep the log, and then she
20   would randomly select I believe every fourth patient.  And that
21   would come out to be about 10 percent of the cases for that
22   month.
23        And then she would provide those chart numbers.  Just
24   like the man-down, and go into the electronic record and review
25   those.

HAGGARD – Direct

1    Q.   Would you review those for appropriate care, or what were

2    you looking for?

3    A.   There was a specific audit tool that would ask questions,

4    again, similar to the man-down review, but ask questions related

5    to those offsites.  Was the treatment plan done?  Was there an

6    alternative treatment?  Was the care followed through?  Those

7    sorts of things.

8    Q.   Did you also, as regional medical director, have a duty to

9    review sentinel events?

10   A.   Yes.

11   Q.   What's a sentinel event?

12   A.   A sentinel event for Corizon Health is any mortality.  And

13   then they have identified a handful of other events, such as

14   diabetic ketoacidosis, you know, serious hospitalizations, those

15   sorts of things.

16   Q.   And what's the purpose of the review?

17   A.   The sole purpose is to look for opportunities for

18   improvement and to provide any corrective actions that need to

19   be done and to improve care.

20   Q.   So give me an example of what kind of corrective action

21   might be taken as a result of a sentinel review.

22   A.   So one example might be noticing that -- I'm trying to

23   think of an example.  I'm trying to think of a specific example,

24   and I'm not able to at the moment.  I'm sorry.

25   Q.   If you found something that might need improvement, who

1    would you go to to talk to?

2    A.   It would depend on the issue.  So if it's more of a, you

3    know, individual person, an error that happened that we needed

4    to speak with one person, or if it's more of a pervasive

5    problem.  Let's say such as sick calls not being done timely;

6    that's more of a process issue that we need to put a plan in

7    place to correct as opposed to speaking to one person, if that

8    makes sense.

9            MR. KRONBERG:  I have nothing further.  Thank you.

10           THE COURT:  Cross.

11           MR. WATKINS:  Yes, Your Honor.

12           THE COURT:  Mr. Watkins, we will take a break in about

13   15 minutes.  So around then, you can pick your spot as to when

14   you want to take a recess.

15           MR. WATKINS:  Thank you, Your Honor.

16                          CROSS-EXAMINATION

17   BY MR. WATKINS:

18   Q.   Dr. Haggard, good afternoon.

19   A.    Hello.

20   Q.   Going over your history, you were the -- you stopped being

21   the regional medical director in or around January of 2018, when

22   Dr. Menard was hired?

23   A.   Yes.

24   Q.   And that was Dr. Steven Menard; correct?

25   A.   Yes.

1    Q.   You don't believe that Dr. Steven Menard was anything less

2    than a good doctor; right?

3    A.   Dr. Menard was a good physician, yes.

4    Q.   And you believe he is a competent medical professional; is

5    that correct?

6    A.   Yes.

7    Q.   You testified that you are currently the site medical

8    director at ISCI?

9    A.   Yes.

10   Q.   And at the same time, you are sharing work as also the

11   regional medical director for the entire state of Idaho; is that

12   correct?

13   A.   Yes.

14   Q.   And you share that work with Dr. Dawson?

15   A.   Yes.

16   Q.   I want to make sure that I have your chronology correct

17   while working at Corizon or one of Corizon's predecessors.

18          You became the regional medical director at one of

19   Corizon's predecessors for the state of Idaho in or around 2004?

20   A.   Yes.

21   Q.   And at that time, you were just the regional medical

22   director; right?

23   A.   Yes.

24   Q.   So you focused on all the regional medical director work;

25   correct?

HAGGARD - Cross

1    A.    Yes.  And at that time, it also included site care at IMSI

2    and ISCI.

3    Q.    Okay.  So you were sharing work between being a -- were you

4    the actual site medical director, or you were just assisting

5    there?

6    A.    No.  Site medical director.

7    Q.    So in 2004, you were the site medical director for IMSI as

8    well as the regional medical director for the state?

9    A.    That was part of the regional medical director role, was

10   covering those sites as well.

11   Q.    Okay.  And when you came back to Corizon -- you came back

12   to Corizon in or around 2016; is that right?

13   A.    I have been with the same company for 16 years.

14   Q.    You came back as the regional medical director to the state

15   of Idaho for Corizon in or around 2016; is that correct?

16   A.    Yes.

17   Q.    And when you came back, you were not the site medical

18   director; right?

19   A.    Correct.

20   Q.    You didn't have any hands-on patient-type responsibilities

21   in any specific site; right?

22   A.    Correct.

23   Q.    And then in 2017, you became not just the regional medical

24   director, but you were also the site medical director for ISCI;

25   correct?

1    A.    Yes, August of 2017.

2    Q.    So in or around August of 2017, you were doing the role of

3    two doctors?

4    A.    Yes.

5    Q.    You are only one person; right, Doctor?

6    A.    Yes, sir.

7    Q.    Okay.  In January of 2019 -- strike that.

8          In 2018, Dr. Steven Menard began working as the

9    regional medical director?

10   A.    January of 2018, yes.

11   Q.    So in January of 2018, you were once again able to focus on

12   just being the site medical director, and Dr. Menard focused on

13   just being the regional medical director; correct?

14   A.    Yes.

15   Q.    But then Dr. Menard left in around January of 2019?

16   A.    Yes.

17   Q.    And at that time, you resumed being both the regional

18   medical director and the site medical director for ISCI?

19   A.    Just to clarify:  The essential roles of the regional

20   medical director, I was not able to perform all the duties when

21   doing both jobs.

22   Q.    Okay.  So you were not able to do the full work as a

23   regional medical director at the same time that you were the

24   site medical director; correct?

25   A.    That's correct.

HAGGARD - Cross

1    Q.   Something had to give?

2    A.   Yes.

3    Q.   And as of today, you're currently the site medical director

4    for ISCI, but you also do regional medical director work;

5    correct?

6    A.   Some, yes.

7    Q.   And due to having these dual roles, you are doing less

8    clinical hours; is that right?

9    A.   No.  I would have to say that I put patient care first, and

10   the other administrative-type duties come later.

11   Q.   So it's your testimony today on the stand that you are not

12   doing less clinical work because you're having to fill two

13   roles?

14   A.   I am careful each day to ensure all of my clinical role

15   come first.

16   Q.   You took a deposition in this case?

17   A.   Yes.

18   Q.   You were under oath during that deposition?

19   A.   Yes.

20   Q.   You told the truth in that deposition?

21   A.   Yes.

22        MR. WATKINS:  I would like to hand the witness a copy

23   of her deposition.

24        THE COURT:  Counsel, do you have the original?

25        MR. WATKINS:  We do, Your Honor.

1          THE COURT:  Hand that to Ms. Gearhart and have her

2    publish it.

3          THE CLERK:  The deposition of Rebekah Haggard taken

4    April 11, 2019, is published.

5    Q.   BY MR. WATKINS:  Ms. Haggard, you have just been handed a

6    copy of your deposition.

7          Did you have a chance to review your deposition prior

8    to testifying in court today?

9    A.   Yes.

10   Q.   And did it appear to you to be -- to accurately reflect the

11   answers to the questions that you responded to during your

12   deposition?

13   A.   Yes.

14   Q.   Go ahead and turn to page 36 of your deposition.

15   A.   Where are the page numbers?

16   Q.   The page numbers are in the upper right-hand corner, ma'am.

17   A.   Okay.  Page 36.  So the actual deposition, not this

18   booklet?

19   Q.   Yes, ma'am, of the actual deposition, page 36.

20   A.   Okay.

21   Q.   And do you see line 21 there at the bottom, there is a "Q,"

22   representing a question that was posed to you?

23   A.   Yes.

24   Q.   Ms. Franolich, can you please put the deposition up on the

25   screen.

1              I'm going to go ahead and read, and please follow

2       along as I read.

3              THE COURT:  Wait.  You need the input changed.

4              MR. WATKINS:  Can we change the system back over to

5       Ms. Franolich's?

6              THE CLERK:  I did.

7       Q.   BY MR. WATKINS:  I'm going to be reading on page 36, moving

8       on to page 37.  You were asked this question and you gave this

9       answer:

10             "Q.  Now, starting in January of 2019 to present, are

11             you doing less clinic or more clinic or the same

12             amount of clinic that you were doing last time that

13             you were the site medical director?

14             "A.  Less clinic."

15             Page 37, please, at the top of the page:

16             "Q.  And that is because you are doing regional

17             medical director time during the clinic time?

18             "A.  Correct."

19             Did I read that correctly?

20      A.   You read it correctly; however, you misrepresented the

21      question --

22      Q.   Okay.  The --

23      A.   -- the first time.

24             THE COURT:  Just a moment.  I'm going to allow the

25      witness -- what was the clarification you wanted to make?

HAGGARD - Cross

1           THE WITNESS:  Thank you, Your Honor.

2           The clarification is that I may be performing

3      administrative duties that encroaches on clinic time, but I make

4      sure the clinic time gets done first.

5           And by "clinic time," I don't mean just Outpatient

6      Clinic or Chronic Care.  I mean providing medical care in

7      whatever setting that is.  And that that takes priority, and I

8      get the other work done after the fact.

9      Q.   BY MR. WATKINS:  Can you point to me in your deposition,

10     where you were under oath, where you said that in response to

11     the question that you were asked?

12     A.   I'm simply clarifying now what I meant.

13     Q.   And you received a copy of your deposition prior to your

14     testimony today; correct?

15     A.   I did.

16     Q.   And you had an opportunity to clarify it, correct?

17     A.   I didn't have an opportunity to add questions or flavor to

18     the answers that were given.

19     Q.   But at least with respect to the deposition when you were

20     under oath, you testified that you now give less clinical care

21     because -- you do less clinical hours because of your work that

22     you're sharing as a regional medical director; right?

23     A.   That does not equal to less care --

24           MR. KRONBERG:  Objection.  Object --

25           THE COURT:  Let's point out the exact question that

1    was asked and what her response was.  That will stand, and let's

2    move on.

3    Q.   BY MR. WATKINS:  Focused on page 36, lines 21 through 25,

4    ma'am.

5             "Q.  Now, starting in January of 2019 to present, are

6             you doing less clinic or more clinic or the same

7             amount of clinic that you were doing the last time

8             that you were the site medical director?

9             "A.  Less clinic hours."

10            And then if you continue on to page 37, lines 1

11            through 3:

12            "And that is because you are doing regional medical

13            director time during the clinic time?

14            "A.  Correct."

15            Did I read that correctly, ma'am?

16   A.   You read it correctly.

17   Q.   Thank you.

18            I'm going to talk a little bit about the inmates that

19   are housed at ISCI.

20            Corizon can make recommendations about keeping inmates

21   in Boise for medical reasons; is that right?

22   A.   Yes.

23   Q.   It's called a medical hold?

24   A.   Yes.

25   Q.   ISCI is the most acute facility in the state of Idaho; is

1    that correct?

2    A.   That's the place where we do intake and have the Infirmary

3    care.

4    Q.   Is that a yes to my question?

5             THE COURT:   The question is whether that is the most

6    acute facility in the state of Idaho.

7             THE WITNESS:   Yes.

8    Q.   BY MR. WATKINS:   ISCI gets patients from county jails on a

9    regular basis who are quite sick; correct?

10   A.   Yes.

11   Q.   It's fair to say that ISCI is the sicker facility; right?

12   A.   Yes.

13   Q.   ISCI has the majority of cancer patients?

14   A.   Yes.

15   Q.   And the majority of elderly patients?

16   A.   Yes.

17   Q.   ISCI has the majority of patients with comorbidities?

18   A.   A lot of sites have patients with multiple comorbidities,

19   so that may or may not be true.

20   Q.   So the question that I asked is:  ISCI has the majority of

21   patients with comorbidities?

22   A.   By percentage of the patient population, I would have to

23   look at that.

24   Q.   Do you still have your deposition in front of you, ma'am?

25   A.   I do.

HAGGARD - Cross

1    Q.   Can you please turn to page 26.

2    A.   (Witness complied.)

3    Q.   Do you have page 26 in front of you?

4    A.   I do.

5    Q.   Go ahead and look at lines 12 through 25 and follow along

6    as I read.

7              "Q.  BY MR. WATKINS:  What types of patients, talking

8              about illnesses, are at ISCI compared to other

9              facilities?"

10             At which point, Mr. Kubinski asserted an objection.

11             Line 16:  "That IDOC operates?"

12             Another objection.

13             Line 18:  "THE WITNESS:  Generally speaking, we have a

14             majority of the cancer patients, elderly patients,

15             patients with comorbidities.  We already talked about

16             that earlier.  Patients with five and six chronic

17             diseases.  They might have diabetes, hypertension,

18             COPD, oxygen-dependent; maybe they lost a limb due to

19             their diabetes, and they are an amputee in a

20             wheelchair.  So patients like that."

21             Did I read that correctly?

22   A.   Yes.

23   Q.   Fair to say these are high-needs patients?

24   A.   Yes.

25   Q.   And there are more wheelchair-bound patients at ISCI

HAGGARD – Cross

1    compared to other facilities generally; right?

2    A.    Generally speaking, you might be able to say that.

3    Q.    And ISCI houses a higher number of patients with cognitive

4    issues compared to other facilities?

5    A.    I'm not sure that that's the case.  Not necessarily.

6    Q.    You are the site medical director for ISCI?

7    A.    Yes.

8    Q.    And at various times, you have also served as the regional

9    medical director for the entire state?

10    A.    Yes.

11    Q.    And as you sit here today, you are not aware that ISCI

12    houses a higher number of patients with cognitive issues

13    compared to other facilities?

14    A.    IMSI has its own behavioral/mental health unit.  Those

15    patients likely have cognitive issues as well.

16    Q.    Go ahead and jump to page 29 of your deposition, please.

17    A.    Yep.

18    Q.    I'm focused on lines 16 through 25 -- strike that -- lines

19    18 through 25.

20            "Q.  Are there a higher number of or greater number of

21            patients with cognitive issues at ISCI compared to

22            other facilities?"

23            Two objections were lodged, and then you respond on

24    line 23:

25            "Given the older population, it stands to reason that,

HAGGARD – Cross

1               yes, some of them probably have some mild dementia."

2               Did I read that correctly?

3      A.   Yes.

4      Q.   And with respect to mild dementia, some also have

5      Alzheimer's?

6      A.   Yes.

7      Q.   And ISCI houses the majority of the older patients in the

8      state?

9      A.   That may be the case, yes.

10     Q.   Well, you're the site medical director; correct?

11     A.   Yes.

12     Q.   As the site medical director, have you done anything to

13     determine whether or not ISCI generally houses the higher number

14     of elderly patients in the state?

15     A.   I know that we have a large population of elderly patients.

16     I don't know how many are at Orofino or how many are at ISCC.

17     Q.   Did you know that when you were the regional medical

18     director?

19     A.   I did not track those numbers directly, no.

20     Q.   Did you instruct anyone else to track those numbers

21     directly?

22     A.   No.

23     Q.   You would agree that, generally speaking, elderly patients

24     might have more age-related illnesses or health concerns than

25     another younger person in the population?

1    A.   Not necessarily.

2            MR. WATKINS:  I think now is a good time to break,

3    Your Honor.

4            THE COURT:  Okay.  Counsel, let's take a 15-minute

5    recess.  We'll probably go just a few minutes beyond 2:30 to try

6    to catch up some of the time resulting from our starting late.

7    But at this point, we will take the second break of the day for

8    15 minutes.

9            We will be in recess.

10        (Recess at 12:36 p.m. until 1:01 p.m.)

11           THE COURT:  For the record, I'll note that Dr. Haggard

12   has retaken the witness stand.

13           I'll remind you you are still under oath.

14           You may continue your cross-examination, Mr. Watkins.

15           MR. WATKINS:  Thank you, Your Honor.

16   Q.   BY MR. WATKINS:  Dr. Haggard, you are aware of the MCPs, or

17   the Modified Compliance Plans?

18   A.   Yes.

19   Q.   You understand that the under the MCPs, there are specific

20   tasks that just the site medical director is supposed to do?

21   A.   Yes.

22   Q.   And you understand that under the MCPs, there are specific

23   tasks that the regional medical director is supposed to do;

24   correct?

25   A.   Yes.

HAGGARD - Cross

1    Q.    I think you testified earlier that you put clinical care

2    first; right?

3    A.    Yes.

4    Q.    And as a result of that, sometimes you don't do or aren't

5    able to accomplish some of the regional medical director tasks;

6    right?

7    A.    That is not entirely what I said.

8    Q.    Just to the new question:  Because of your focus on

9    clinical care, you are not always able to complete 100 percent

10   of the regional medical director tasks; right?

11   A.    With regard to the MCP, those duties were done.

12   Q.    So my question was:  You are not always able to complete

13   100 percent of the regional medical director tasks; right?

14   A.    Correct.

15   Q.    Isn't it true that, generally speaking, if you're an older

16   patient that is not well functioning, you are more likely than

17   not to be housed at ISCI than at any other facility?

18   A.    Generally speaking.

19   Q.    On an average, there is a higher mortality rate at ISCI

20   because of the types of patients there; correct?

21   A.    Yes.

22   Q.    So there are more deaths at ISCI?

23   A.    That's where the majority of the patients are sick; and so,

24   yes, there is a higher mortality rate.

25   Q.    And that's compared to all the other facilities in the

HAGGARD - Cross

1    state of Idaho?

2    A.    Yes.

3    Q.    On the -- your schedule, your day ends around 5:30, 6:00?

4    A.    Roughly, on average.

5    Q.    You leave ISCI around 5:30 or 6:00?

6    A.    I may leave before then and do some work at home.

7    Q.    But you're not at ISCI at night?

8    A.    Not typically.

9    Q.    And you don't have another doctor replace you when you're

10   not at site at ISCI; correct?

11   A.    There is always a provider on call.

12   Q.    So my question was -- strike that.

13        Is there a doctor physically on site at ISCI at night?

14   A.    If they are called in, yes.

15   Q.    As a general matter, is there a doctor assigned to work

16   physically at ISCI at night?

17   A.    No.  The on-call provider covers the site during the night.

18   Q.    So there is no medical doctor physically on site from

19   approximately 5:30 or 6:00, when you leave, until when you get

20   there in the morning unless they are called in?

21   A.    Correct.

22   Q.    And what time do you get there in the morning?

23   A.    Between 6:30 and 7:00.

24   Q.    So for approximately 12 hours a day, there is no doctor on

25   site physically at ISCI unless they are called in?

1    A.    Generally speaking.

2    Q.    And there is no other physician other than yourself that is

3    assigned to physically be at ISCI?

4    A.    Well, Dr. Dawson, the regional medical director, is

5    assigned to do Long Term Care rounds on a weekly basis and also

6    spend a percentage of her time on site as well.

7    Q.    Do you have a scheduler that handles your calendar?

8    A.    No.

9    Q.    Does anyone do anything to protect your calendar such that

10   you're able to maximize your contact with patients?

11   A.    I'm not sure I understand what you mean.

12   Q.    Does anyone keep you from needing to go to meetings or

13   schedule -- take things off your calendar such that you're able,

14   as a physician, to actually provide medical care to patients to

15   the maximum extent possible?

16   A.    No.  I would say I manage my day-to-day schedule myself

17   unless it's scheduling patients in clinic; and then the chronic

18   care nurse or the sick call nurse actually schedules those

19   encounters.  But that's not scheduling my calendar, per se.

20   Q.    I want to talk about clinic a little bit.

21         So you do daily rounds in the Infirmary; correct?

22   A.    Yes.

23   Q.    And you look at patients' charts daily in the Infirmary?

24   A.    Yes.

25   Q.    You do weekly rounds in the Long Term Care facility;

HAGGARD - Cross

1    correct?

2    A.   Correct.

3    Q.   You do not do daily rounds in any other housing unit in the

4    facility; right?

5    A.   So I don't think of the Infirmary and the Long Term Care

6    Unit as a housing unit, per se.  It's an Infirmary and a Long

7    Term Care unit.

8    Q.   Let me rephrase my question.

9         Do you do rounds in any other area at ISCI on a daily

10   basis where patients live?

11   A.   No.

12   Q.   On a typical work week, do you work most Saturdays and

13   Sundays?

14   A.   When you say "work," do you mean come into the facility?

15   Q.   Let me rephrase the question.

16        Do you bring work home with you on Saturdays and

17   Sundays?

18   A.   Yes.

19   Q.   And that's because you need to catch up on some of the work

20   that you were not able to do during the work week?

21   A.   Potentially catch up or keep up.

22   Q.   And you take work home with you every night as well?

23   A.   Yes.

24   Q.   And even when you're not at ISCI, you're potentially still

25   on call; correct?

HAGGARD - Cross

1    A.   Yes.

2    Q.   When Dr. Menard was the regional medical director, you

3    would go and do rounds as the site medical director in Long Term

4    Care; correct?

5    A.   Yes.

6    Q.   And Dr. Menard would also do rounds in Long Term Care;

7    right?

8    A.   Correct.

9    Q.   So there were two sets of doctors doing rounds in Long Term

10   Care?

11   A.   Correct.

12   Q.   When you were serving as both the site medical director and

13   the regional medical director, there was only one doctor doing

14   rounds in Long Term Care; correct?

15   A.   Yes.  I'm only one person.

16   Q.   And you can only do one job at a time; right?

17   A.   That's not entirely true.

18   Q.   You remember reviewing Exhibits 184, 185, 186; those were

19   the audit tools that Mr. Kronberg showed you?

20   A.   The peer review tools?

21   Q.   Yes, ma'am.

22   A.   Yes.

23   Q.   You would agree if the information on those peer review

24   tools is incorrect, then the tool would be incorrect; right?

25   A.   I'm not sure I understand the question.

HAGGARD - Cross

1    Q.   If somebody were to input inaccurate data onto those tools,

2    the tool would not be accurate; right?

3    A.   I'm trying to imagine a scenario where someone would input

4    incorrect data.  Because you're auditing a chart, and that chart

5    can be evaluated to see if the information is correct.

6    Q.   So my question was:  If somebody put incorrect data onto

7    those charts -- or strike that.

8              If someone put incorrect data onto those peer review

9    forms, the form would be wrong; right -- or inaccurate?

10   A.   Yes.

11   Q.   And if somebody based an audit on reviewing those charts,

12   that audit itself would be inaccurate; correct?

13   A.   Yes.

14   Q.   The contract between Corizon and IDOC relates only to

15   medical care; is that right?

16   A.   Medical, dental, I mean, the full scope of medical care.

17   So, yes.

18   Q.   You're familiar with that contract?

19   A.   Yes.

20   Q.   And so the services that were being contracted for were

21   medical services, be it dental or other sorts of medical

22   services?

23   A.   Yes.

24   Q.   And that's what IDOC -- or strike that.

25              That's what Corizon agreed to provide, were medical

HAGGARD — Cross

1    services; correct?

2    A.    Yes.

3    Q.    You're aware that one of the services that I -- that

4    Corizon agreed to provide to IDOC was to provide reasonable

5    accommodations for offenders with physical and/or developmental

6    disabilities, as required by the ADA, or the Americans with

7    Disabilities Act?

8    A.    Yes.

9    Q.    So you would agree that complying with that provision of

10   the contract is a medical requirement; right?

11   A.    All the provisions of the contract would be required, yes.

12   Q.    And it's required in order to give adequate medical care;

13   right?

14   A.    Yes.

15   Q.    If a patient in a wheelchair isn't able to access an area

16   where they would be getting medical services easily, then that

17   access to that medical care would be impeded; fair to say?

18            MR. KRONBERG:  Your Honor, I'm going to object to this

19   line of questioning.  The form of the question, there is nothing

20   in evidence.  It assumes facts not in evidence.

21            THE COURT:  I'm sorry.  The what?

22            MR. KRONBERG:  I'll object on the basis of the form of

23   the question.  It assumes facts not in evidence.

24            THE COURT:  All right.  Well, I think the way the

25   question is phrased, there is only some testimony with the

1        pictures that were shown that I think at least suggests that.

2               I'll allow counsel some leeway, as I have throughout

3        the hearing, to tie it in if they can through other witnesses.

4               So I'll overrule the objection and allow the witness

5        to testify.  It's pretty much a rhetorical question, anyway.

6               But go ahead and answer.

7               THE WITNESS:  Could you please state the question

8        again, then.

9               MR. WATKINS:  Madam Court Reporter, could you please

10       read the question back to the witness.

11              (Question read by the reporter.)

12              THE WITNESS:  I'm not sure that that's fair to say.

13       Because if patients are in a wheelchair, they would have access

14       to medical.  We don't have stairs in the medical building or

15       anything like that, and we also have wheelchair pushers

16       available to go get patients if they need assistance.

17       Q.   BY MR. WATKINS:  So my question -- strike that.

18              As the site medical director and 50 percent of the

19       regional medical director, do you see yourself as having any

20       responsibility to remove barriers to care?

21       A.   Certainly we don't want any barriers to care.  There have

22       not been any to my knowledge when I have been serving in those

23       roles.

24       Q.   And as the site medical director and 50 percent of the

25       regional medical director, you certainly don't want anything

HAGGARD - Cross

1    that would impede any patient from having access to medical

2    care; right?

3    A.   Correct.

4    Q.   You're aware, aren't you, that the Idaho Department of

5    Corrections filed to terminate the Balla injunctions in around

6    March of 2019?

7    A.   Yes.

8    Q.   Can the witness be shown Exhibit 270, please.

9         THE COURT:  I'm sorry.  What was the number?

10        MR. WATKINS:  270, Your Honor.

11   Q.   BY MR. WATKINS:  This is the March 2019 audit results.

12        Have you seen these documents before?

13   A.   I have not seen this specific one, no.

14   Q.   You're generally familiar, though, with these audit tools?

15   A.   Yes.

16   Q.   You provide information and data that creates the output of

17   these audit tools?

18   A.   I don't provide information regarding medical diets, but I

19   provide information regarding the other areas that have been

20   discussed, such as peer review and chart audits.

21   Q.   Perfect.  Go ahead and look at page 2 of the document.

22        MR. WATKINS:  Your Honor, at this time, we would move

23   to admit Exhibit 270.

24        THE COURT:  Any objection?

25        MR. KRONBERG:  No.

```
 1              THE COURT:  270 will be admitted.

 2          (Defendants' Exhibit 270 admitted.)

 3     Q.    BY MR. WATKINS:  Do you see in the bottom right-hand corner

 4     where it says, "Provider visits within 14 days"?

 5     A.    Yes.

 6     Q.    Could we blow that up, Ms. Franolich.

 7              In or around March of 2019, when the Idaho Department

 8     of Corrections filed for termination, they were -- patients were

 9     seeing providers within about 100 percent; is that correct?

10     A.    Yes.

11     Q.    Is it important for the provision of medical care to see

12     patients in a timely manner?

13     A.    Yes.

14     Q.    And why is that important?

15     A.    Because timeliness is one of the Institute of Medicine's

16     goals for quality health care.

17     Q.    What is the concern if a patient is not seen within a

18     timely manner?

19     A.    Timeliness is related to the condition.  If the patient has

20     something serious, you don't want to delay providing care for

21     them.

22     Q.    Why not?

23     A.    It could potentially progress and become worse.

24     Q.    The patient could gain more symptoms?

25     A.    Whatever the -- whatever the scenario is, yes.
```

HAGGARD - Cross

1    Q.    The patient could be in pain longer than they need to be?

2    A.    Potentially.  This is a hypothetical, so I'm having trouble

3    following your example.  But theoretically, they could be.

4    Q.    A patient could suffer for longer than necessary?

5    A.    Patients have access to emergency care if needed.  So if

6    they were getting worse and worse, they could always access care

7    through the urgent/emergent process.

8    Q.    That wasn't the question I asked.  Try to focus on the

9    question I'm asking.

10          The question I asked was that if a patient is seen in

11   an untimely manner, that patient may suffer longer than

12   necessary; correct?

13   A.    Not necessarily, because they do have access to care

14   through other mechanisms.

15   Q.    This March 2019 audit tool refers to the general

16   population; is that right?

17   A.    Yes.

18   Q.    And when we're talking about the general population, we are

19   not talking about the Infirmary or the Long Term Care facility;

20   correct?

21   A.    Yes.

22   Q.    Those patients have access to you in the Long Term Care

23   facility and in the Infirmary; right?

24   A.    They have access to the on-call provider at nights and

25   weekends, and they have to access to me during the day and

1       nurses around the clock.

2       Q.   So that's a yes?  The patients in the Long Term Care and

3       the Infirmary have access to you; correct?

4       A.   Yes.

5       Q.   The general population of patients, they get access to care

6       through contacting other providers other than yourself; right?

7       A.   Yes.

8       Q.   You don't do rounds in any other area where patients are

9       housed in the –– at ISCI?

10      A.   There would be no indication to conduct medical rounds in a

11      general housing unit.

12      Q.   For –– so for the general population, when we say "see a

13      provider within 14 days," that's referring to maybe an RN?

14      A.   This particular form does say "quality of nursing care," so

15      this may be the nurse triage tool.

16      Q.   Okay.  So it's not a physician's triage tool; correct?

17      A.   This does mention nursing protocol, so I think this

18      particular report is regarding nurse sick call.

19      Q.   So as a general matter, if a patient that is not living in

20      the Long Term Care Unit and is not living in the Infirmary seeks

21      medical care, that patient will see an RN or an LPN or a PA if

22      they go to say a provider; correct?

23      A.   Or a nurse practitioner, yes.

24      Q.   Or a nurse practitioner.

25            They will not go and see you; right?

HAGGARD - Cross                                                183

1    A.   Not necessarily directly.  They might.  If I'm on site and

2    available, I may see someone.

3    Q.   What percentage of your workday is consumed with seeing

4    patients that are not in the Long Term Care facility and not in

5    the Infirmary?

6    A.   That's really hard to judge.  I -- I can't give a

7    percentage.  I don't know.

8    Q.   As a general matter, the other 1400-plus inmates that are

9    housed at Idaho State Correctional Institute, they see somebody

10   other than a physician when they need to go see a provider;

11   right?

12   A.   Yes.  They are seen by the nurse first and then referred to

13   a provider.  In the case of chronic care, they see the provider

14   as scheduled.

15   Q.   When was the last time you saw a patient from the general

16   population that wasn't housed in the Infirmary or the Long Term

17   Care Unit?

18   A.   I had a patient referred to me just the other day, this

19   past week.

20   Q.   What was that patient's name?

21   A.   I don't remember his name, but I did admit him to the

22   Infirmary.  So he is in the Infirmary now in the room directly

23   across from the nurses' station.

24   Q.   So you saw a patient that was needing to be in the

25   Infirmary, and you confirmed that they did, in fact, need to be

HAGGARD - Cross

1    in the Infirmary?

2    A.   Yes.

3    Q.   When was the last time you saw a patient that was not being

4    admitted into the Infirmary or the Long Term Care Unit coming

5    out of the general population?

6    A.   I would have to search for encounters outside of the

7    Infirmary or the Long Term Care Unit to find those.  I don't

8    know off the top of my head.

9    Q.   None come to recent memory?

10   A.   I discuss cases with the other providers daily.

11   Q.   My question is:  When do you, as a physician, somebody with

12   a medical doctor's license, lay hands on a general population

13   patient?  And it sounds like none come to recent memory.

14   A.   I would have to search eOMIS.  I am sure there are

15   encounters that just don't come to mind.

16   Q.   Referring again to Exhibit 270.  So in March of 2019, when

17   IDOC sought for termination, patients were seen within 14 days

18   of a provider, correct, in the general population?

19   A.   Seen within 14 days of a provider?  I'm not sure I know

20   what --

21   Q.   Strike that question.  Let me rephrase it.

22        According to the March 2019 results, which is the same

23   month that IDOC sought termination, general population patients

24   were able to see a provider -- which would be an RN or an LPN,

25   PA, et cetera -- within 14 days of seeking that care; correct?

1      A.    Yes.

2      Q.    Could the witness be shown Exhibit 277.

3            This is the October 2019 results.  And you've

4      generally seen documents like this before; correct?

5      A.    I have not really looked at the medical diet log, no.

6      Q.    I'm just referring to the front page of the entire

7      document.  These are the audit documents that you said your

8      people provide information for.

9      A.    Generally speaking, yes.

10     Q.    Go ahead and look at page 2 --

11           MR. WATKINS:  Your Honor, move to admit Exhibit 277.

12           THE COURT:  Any objection?

13           MR. KRONBERG:  No.

14           THE COURT:  277 will be admitted.

15           (Defendants' Exhibit 277 admitted.)

16     Q.    BY MR. WATKINS:  Do you see the bottom right-hand corner

17     for general population provider visits within 14 days?

18     A.    Yes.

19     Q.    And in June of 2014 *[sic]* -- so just a few months after

20     IDOC filed for termination -- what percentage of general

21     population patients were seen by a provider within 14 days?

22     Strike that.

23           In June of 2019, what percentage of patients --

24     general population patients were seen by a provider within

25     14 days?

HAGGARD - Cross

1     A.   68 percent.

2     Q.   And how about in July of 2019?

3     A.   28 percent.

4     Q.   And in August of 2019?

5     A.   30 percent.

6     Q.   And in September of 2019?

7     A.   42 percent.

8     Q.   And in October of 2019?

9     A.   40 percent.

10    Q.   I'm sorry?

11    A.   40 percent.

12    Q.   Fair to say that IDOC's ability to see general population

13   patients within 14 days declined after they filed for

14   termination?

15    A.   Chronologically by month, yes.  That's not necessarily the

16   explanation.

17    Q.   Can you take off the blow-out so we can see the whole

18   document.

19         Do you see the section on there that says,

20   "Notes: Breakdown of line 24"?

21    A.   Yes.

22    Q.   And do you see in that box, there is an asterisk at the

23   bottom?  Do you see where I'm indicating?

24    A.   Yes.

25    Q.   It says, quote:

HAGGARD - Cross

1              "There was no indication of any adverse effects due to

2              the late appointments."

3              Did I read that correctly?

4    A.    That's what it says.

5    Q.    As the site medical director and half of the regional

6    medical director at ISCI, did you personally go out and ask any

7    of these inmates if they had any adverse effects due to the

8    delay?

9    A.    I did not; but I did not complete this report, either.

10   Q.    Did you -- did you advise anybody, as the site medical

11   director providing medical care to the patients at ISCI, to go

12   out and talk to any of these inmates to see if they had any

13   adverse effects as a result of the delay?

14   A.    I did not.

15   Q.    So do you know if any of these inmates suffered symptoms

16   from illnesses longer than necessary or if they had any adverse

17   effects?

18   A.    If there were any serious adverse affects, that would have

19   risen to me to take care of them in the Infirmary.

20   Q.    So the question [sic] is, no, you are not aware of any

21   patients that may have had adverse effects as a result of this?

22   A.    I am not aware.

23   Q.    The providers at ISCI are not equipped or -- strike that.

24              The providers at ISCI do not have all the equipment to

25   provide 100 percent of the medical care that a patient may

HAGGARD - Cross

1    require; right?

2    A.    We don't have unlimited equipment, no.

3    Q.    You don't have an MRI, for example?

4    A.    Correct.

5    Q.    In those instances, a patient might need to be sent off

6    site in order to get an MRI?

7    A.    Yes.

8    Q.    And the providers at ISCI are not specialized in every

9    field of medicine; correct?

10    A.    Correct.

11    Q.    There is not a brain surgeon at ISCI?

12    A.    Correct.

13    Q.    So if a patient was needing that sort of care, they would,

14    again, need to go off site to an off-site provider; right?

15    A.    Yes.

16    Q.    When that is needed, you send an electronic request to the

17    Utilization Management Team; is that right?

18    A.    Yes.

19    Q.    That's sometimes referred to as the "UM"?

20    A.    Yes.

21    Q.    And the UM is a team at Corizon corporate; is that right?

22    A.    I don't know if they are physically situated at corporate;

23    but it is a team of four physicians, yes.

24    Q.    They are not in Idaho?

25    A.    They are licensed in Idaho but not physically here.

HAGGARD - Cross

1    Q.    So first the request -- but the request doesn't go directly

2    to the UM team; right?

3    A.    The request in eOMIS has to be taken from the electronic

4    record and put into another system, yes.

5    Q.    So it's first seen by a case manager who reviews it?

6    A.    Yes.

7    Q.    And then if the plan is not approved by the case manager,

8    then it goes to the UM team at Corizon corporate?

9    A.    Well, the case manager doesn't necessarily approve them.

10   There are some scenarios where there is automatic approval, so

11   that that's not his or her decision; that's based on a protocol

12   that they follow.

13          If it doesn't meet automatic criteria, then it gets

14   referred to the team.

15   Q.    If it doesn't meet automatic criteria it goes to the

16   Utilization Management Team at Corizon corporate; correct?

17   A.    Correct.

18   Q.    As you already said, that's comprised of four physicians?

19   A.    Yes.

20   Q.    But only one of those out-of-state physicians decides

21   whether or not to allow the procedure after reviewing the

22   electronic request?

23   A.    They make an initial determination and either approve or

24   provide an alternative treatment.

25   Q.    Now, to be clear, that UM team member never actually lays

HAGGARD – Cross

1    eyes on the patient; right?

2    A.    Correct.

3    Q.    You don't send the patient from ISCI to Tennessee or

4    whenever that physician is located to give a second exam?

5    A.    The process would be similar to any insurance company.  So,

6    no, they don't.

7    Q.    Well, ISCI is a medical provider; correct?

8    A.    ISCI is a facility.

9    Q.    Strike that.

10            Corizon is a medical provider; correct?

11   A.    Corizon Health is a correctional health care company.

12   Q.    Okay.  And it provides medical care?

13   A.    It does.

14   Q.    And at the same time, it also acts almost like an insurance

15   company; right?

16   A.    Medical care includes cost efficiency and appropriateness

17   of care in the right place and the right time for the right

18   patient.  So, yes, that's a part of health care.

19   Q.    Okay.  So the same company, Corizon, is determining whether

20   or not to give care to the patient; right?

21   A.    Similar to at UnitedHealthcare or Blue Cross, yes.

22   Q.    And that same company is also determining whether or not to

23   give care to that patient; right?

24   A.    That is always up to the provider who is seeing the

25   patient.

1    Q.   And Corizon gets paid $18.02 per inmate per day; right?

2    A.   I'm not sure I know what the current rate and contract

3    calls for.

4    Q.   So the more care -- strike that.

5         Providing medical care costs money; correct?

6    A.   Yes.

7    Q.   So the more medical care Corizon provides to a patient, the

8    less money that Corizon is able to get from the contract; is

9    that fair to say?

10   A.   Theoretically, yes.

11   Q.   And the -- the same would be also true that the more care

12   Corizon provides to the patient, the -- strike that.

13        The more care Corizon provides to the patient, the

14   less money Corizon makes per diem; right?

15   A.   Theoretically, yes.

16   Q.   And the opposite would also be true?

17   A.   Yes.

18   Q.   So it goes to the UM team that acts like an insurance

19   company.  And one of those physicians, if they believe it's not

20   medically appropriate, they will send back the request with an

21   alternative treatment plan; is that right?

22   A.   Yes.

23   Q.   And an alternative treatment plan is something other than

24   what was recommended by maybe the off-site specialist?

25   A.   An ATP, alternative treatment plan, is a reasonable

HAGGARD - Cross

1    treatment plan within the range of medical care that would be

2    considered standard of care.

3    Q.    So --

4    A.    And then it's up to the provider seeing the patient to

5    determine if that's an appropriate path to take or not.

6    Q.    So that's a yes to my question?  The --

7    A.    No.

8    Q.    So my question was -- try to focus on the question I ask.

9          When the Utilization Management Team provides an

10   alternative treatment plan, that alternative treatment plan is

11   something different or alternative to the care that was ordered

12   by the off-site provider; right?

13   A.    The off-site provider or the provider at ISCI?

14   Q.    So when the Utilization Management Team gives an

15   alternative treatment plan, that alternative treatment plan is,

16   by definition, different than what the off-site provider or the

17   provider at ISCI has requested or sought?

18   A.    It's a recommendation for a different course of therapy

19   that the provider can accept or not.

20   Q.    Okay.  And so if the provider does not accept it, then it

21   can be appealed; correct?

22   A.    Correct.

23   Q.    And the appeal goes to a different doctor on that

24   four-person UM team?

25   A.    The appeal goes to the regional medical director first.

HAGGARD - Cross

1    Q.   All right.  And then regional medical director -- if the

2    regional medical director feels the appeal is valid, they can

3    pass it on to the UM team?

4    A.   Yes.

5    Q.   Part of your role as regional medical director was to

6    assist in these appeal processes?

7    A.   Yes.

8    Q.   So an off-site specialist may say that, based on their

9    expertise, a patient needs a certain treatment; the UM team,

10   without seeing that patient, would say no; and then you would

11   assist in appealing that decision?

12   A.   That's a different process than what you were describing

13   with the onsite provider requesting an MRI or a specialty visit.

14   You're talking about when the patient has already gone to a

15   specialist and they are requesting another test.

16   Q.   Well, let's -- let's maybe put some bones on this.

17          So if -- if a patient goes off site to a specialist in

18   the community --

19   A.   Yes.

20   Q.   -- and the specialist in the community -- strike that.

21          The patient has been sent off site to the specialist

22   in the community because Corizon at ISCI does not have the same

23   specialization as that outside specialist; correct?

24   A.   Correct.

25   Q.   And if that outside specialist orders a treatment -- say a

1      colonoscopy –– the colonoscopy order from that off-site provider

2      would come back to ISCI; right?

3      A.   Yes.

4      Q.   And ISCI would then pass that along to the UM team;

5      correct?

6      A.   The provider seeing the patient would then enter that as a

7      request from that provider, not from the off-site.

8            The UM doctors don't have the ability to ATP community

9      providers, is what I'm trying to say.

10     Q.   Oh.  And thank you for that clarification.

11           So the community provider who has the expertise will

12     say:  This patient needs a colonoscopy.

13           And then the ISCI provider will say:  I, the ISCI

14     provider, am ordering a colonoscopy for this patient.

15     A.   Correct.

16     Q.   And then that order will go to the UM team?

17     A.   Correct.

18     Q.   And the UM team will either decide to grant the colonoscopy

19     or deny the colonoscopy?

20     A.   Correct.

21     Q.   And then it goes back down to the ISCI provider; correct?

22     A.   Yes.

23     Q.   And the ISCI provider can then share it with you as the

24     regional medical director?

25     A.   Yes.

HAGGARD - Cross

1    Q.    And you as the regional medical director can say:  No, we

2    do want this patient to have a colonoscopy.  In which case, you

3    would then appeal it back up to the UM?

4    A.    Correct.

5    Q.    All right.  As an initial matter, do -- does the

6    four-person UM team cover the full breadth of possible medical

7    specialties that exist?

8    A.    I'm not sure I understand the question.

9    Q.    Well, we used the example earlier of a brain surgeon.

10            Does the UM team have a brain surgeon, to the extent

11   you know?

12   A.    No, not that I'm aware of.

13   Q.    If an off-site brain surgeon said a patient needed a brain

14   surgery based off that off-site brain surgeon's expertise, and

15   the recommendation came back to ISCI and made its way up to the

16   UM team, what basis would the UM team that doesn't have the same

17   expertise as a brain surgeon have to deny that treatment?

18   A.    We generally would approve a brain surgery if a brain

19   surgeon says that it has to be done.

20   Q.    Okay.  But you don't approve all of them; right?

21   A.    Once the patient has been off site to a see a specialist

22   and that recommendation comes back, we take a specialist's

23   recommendation pretty seriously.

24   Q.    So you don't approve all of them; correct?  All off-site

25   provider recommendations are not followed at ISCI?

HAGGARD - Cross

1    A.    Not 100 percent, if there's an alternative plan that hasn't

2    been tried yet.

3    Q.    You approximately -- you, as the regional medical director,

4    help fill out one to two appeals per day; is that correct?

5    A.    Roughly, on average.  It can be much more than that, or it

6    may be none for a day.

7    Q.    Okay.  So on average, it's one to two appeals per day from

8    a recommendation coming in on a treatment that should be given?

9    A.    And that's statewide, yes.

10    Q.    And it could be even more than that per day?

11    A.    Yes.

12    Q.    Now, you don't appeal 100 percent of the cases that come to

13    you to the UM team; correct?

14    A.    No.

15    Q.    So you're making a decision on some of them where you say

16    we're just not going to grant that care or we're going to go

17    with an alternative treatment plan?

18    A.    Right.

19    Q.    And so you are actually getting more appeals than the --

20    just the one to two that you're actually ultimately appealing

21    per day; correct?

22    A.    If you -- yes, including the ones that we uphold the

23    alternative treatment plan and the ones that we appeal.  So it

24    goes both directions, yes.

25    Q.    How many cases do you get back from the UM each day that

HAGGARD - Cross

1   you could appeal but do not?

2   A.   Not very many.

3   Q.   Would you --

4   A.   I mean -- I think I meant the opposite.  I appeal the

5   majority; I occasionally uphold the recommendation.

6   Q.   So the majority of the time, you are appealing up to the

7   UM?

8   A.   Yes.

9   Q.   And how many times that you appeal up to the UM are you

10  denied?

11  A.   Not very often.

12  Q.   Do you have a percentage?

13  A.   I don't.  It's really hard to -- to say.

14  Q.   And I think you already testified that cost is a factor in

15  deciding to take an alternative treatment plan; is that correct?

16  A.   Is or is not?

17  Q.   Is a factor.

18  A.   It is not from a provider's perspective, no.

19  Q.   Well, I think you already testified that cost efficiency is

20  part of quality of care.

21  A.   Yes, it is.

22  Q.   Okay.  So does Corizon make efficiency or cost

23  considerations on deciding whether or not to grant an

24  alternative treatment plan or go with an alternative treatment

25  plan?

**HAGGARD - Cross**

1    A.   Not when we're delivering care to the patient.  So if it

2    has to be done, it has to be done regardless of the cost.

3    Q.   You would agree that cost efficiency is part of quality of

4    care; right?

5    A.   That is one of many factors, yes.

6    Q.   And so at least with respect to the cost-efficiency factor,

7    that is a factor that goes into whether or not to give the care

8    that has been requested?

9    A.   It doesn't go into the decision to request care that's

10   needed.

11   Q.   Do you still have your deposition transcript in front of

12   you?

13   A.   Yes.

14   Q.   Go ahead and turn to page 130.  I'm going to read from line

15   12 down to line 25.

16        Do you see where that starts?

17   A.   Yes.

18   Q.        "Q.  Do you know or have you ever observed cost being

19             a factor in an alternative treatment plan?"

20             Two objections were interposed.  And then you said, in

21   line 18:

22             "Cost efficiency is part of quality of care.  So I

23             would echo the Institute of Medicine's goals for

24             quality of care, which are safety, efficiency, cost,

25             patient centered, and timeliness."

HAGGARD - Cross

1                    Did I read that correctly?

2    A.   Yes.

3                    THE COURT:  Counsel, actually, you didn't.  You said

4    "efficiency" when it actually -- the witness actually said

5    "efficacy," which I think are two different things.

6                    MR. WATKINS:  Thank you, Your Honor.  My apologies.

7    Q.   BY MR. WATKINS:  So for clarity of the record, on line 18,

8    you said:

9                    "Cost efficiency is part of quality of care, so I

10                   would echo the Institute of Medicine's goals for

11                   quality of care, which are safety, efficacy, cost,

12                   patient centered, and timeliness."

13                   Did I read that correctly?

14   A.   Yes.

15                   THE COURT:  Just to be clear, from a doctor's point of

16   view, efficacy has more to do with effectiveness than

17   efficiency.  And although those are related, they are really

18   different; correct?

19                   THE WITNESS:  I would agree.

20                   THE COURT:  All right.  Go ahead.

21   Q.   BY MR. WATKINS:  Do you know a patient by the name of Troy

22   Wolf?

23   A.   I know the name.  I don't know the case well.

24   Q.   Do you recall a patient that you worked with who had a

25   pilonidal cyst?

HAGGARD - Cross

1    A.   I don't off the top of my head.

2    Q.   This was a patient that had the pilonidal cyst, and it

3    progressed into a fistula?

4    A.   I don't have the records in front of me to verify that.  So

5    I'm sorry.

6    Q.   Do you know if you ever ordered or tried to get the

7    Utilization Management Team to give a patient with a fistula a

8    colonoscopy?

9    A.   I don't remember off the top of my head.

10    Q.   Or if a multiple Corizon medical staff tried to get this

11    patient approved for a colonoscopy but was denied by the UM?

12    A.   Again, I would need to review the record.

13    Q.   You would at least agree that as a treating physician, you

14    have had Corizon deny the care you were seeking for the patient

15    before through the UM process; is that right?

16    A.   Only if there is an acceptable treatment plan in place.

17    Q.   So again, that's a yes to my question?  As the treating

18    physician, you have had the UM team deny care that you were

19    seeking for a patient before; right?

20    A.   I would not say it's denied.  I would say there is an

21    alternative treatment plan recommended that is then carried out

22    that's still appropriate.

23    Q.   As a treating physician, you have had the -- the UM team

24    provide an alternative treatment than the treatment that you, as

25    the provider, initially thought was appropriate for the patient?

HAGGARD - Cross

1    A.    Yes.

2    Q.    And in the patient's best interests?

3    A.    That I initially thought was appropriate for the patient

4    and then, upon considering the alternative treatment, that's a

5    reasonable course of action.

6    Q.    I don't think you answered my question, ma'am.

7          My question was:  You've had the UM team give an

8    alternative treatment to treatment that you originally believed

9    was in the patient's best interest; right?

10   A.    Correct.

11   Q.    You're familiar with the Medical Annex?

12   A.    Yes.

13   Q.    Generally speaking, the Medical Annex is comprised of

14   patients with higher medical needs than the general housing?

15   A.    Generally speaking, yes, but not necessarily 100 percent of

16   the time.

17   Q.    The only medical staff inside the Medical Annex is an LPN;

18   right?

19   A.    Yes.

20   Q.    But the LPN is not there around the clock?

21   A.    Correct.

22   Q.    So there is no other medical staff stationed in the Medical

23   Annex other than an LPN who is there only during the daytime;

24   correct?

25   A.    That's true of any general population unit, yes.

HAGGARD - Cross

1    Q.    Do you know of any other general population unit where

2    there is an LPN stationed there during the daytime hours?

3    A.    I believe there is one out in the Behavioral Health Unit

4    and in RDU.

5    Q.    The Behavioral Health Unit, that's where inmates suffering

6    from mental health concerns reside?

7    A.    Yes.

8    Q.    Would you agree that mental health is part of an inmate's

9    medical health?

10   A.    Sometimes there is a connection.  Sometimes there is a

11   pretty distinct division.

12   Q.    And where was the other place that you believe there is an

13   LPN stationed?

14   A.    RDU.

15   Q.    And RDU, that's the Receiving and Diagnostics Unit?

16   A.    Yes.

17   Q.    And that's where patients might come in from the county

18   jails to be integrated into the IDOC system?

19   A.    Correct.

20   Q.    And at that time, a medical provider like the LPN will see

21   if that inmate is coming in with any sort of medications or

22   anything like that?

23   A.    Correct.

24   Q.    Are you aware of any general housing unit, other than the

25   Receiving and Diagnostic Unit or the Behavioral Health Unit

HAGGARD - Cross

1    where an LPN is stationed?

2    A.    I'm not aware of any, no.

3    Q.    Now, a previous witness has testified that an RN was later

4    added to be housed in the Medical -- to be stationed in the

5    Medical Annex.

6              Are you aware of that?

7    A.    I'm not, but that's -- I'll take your word.

8    Q.    So as the site medical director, you're not aware of where

9    RNs are always stationed inside of ISCI?

10   A.    Always stationed in ISCI?

11   Q.    As the site medical director, you are not aware where RNs

12   are stationed within ISCI?

13   A.    I'm generally aware of where the RNs are stationed.

14   Q.    Just not aware of whether or not there is an RN stationed

15   in the Medical Annex?

16   A.    Correct.

17   Q.    When was the last time you've been in the Medical Annex?

18   A.    It's been a little bit of a while.  I don't remember the

19   exact date.

20   Q.    A year ago?

21   A.    Possibly.

22   Q.    More than a year ago?

23   A.    Possibly a year ago.

24   Q.    But during the nighttime, there is no medical -- there is

25   no medical staff stationed in the Medical Annex; correct?

HAGGARD - Cross

1    A.    Correct.

2    Q.    And you do rounds in Long Term Care?

3    A.    Yes.

4    Q.    And you do rounds in the Infirmary?

5    A.    Yes.

6    Q.    But you don't do any rounds in the Medical Annex; right?

7    A.    Because it's not a medical building.

8    Q.    Okay.  But it's called the "Medical Annex"; correct?

9    A.    That's the name because it's situated close to the medical

10   building.

11   Q.    Do you know if what you just said comports with what the

12   Idaho Department of Corrections represented to the Court in its

13   filings in 2005?

14   A.    I don't.  I'm not familiar with 2005 filings.

15   Q.    Okay.  And whether or not you do rounds in the Medical

16   Annex, no one else does rounds in the Medical Annex, either;

17   right?

18   A.    None of the providers do rounds in any of the general

19   population housing units.

20   Q.    So, again, my question was:  No other medical providers do

21   rounds in the Medical Annex; correct?

22   A.    Correct.

23   Q.    There are patients in the Medical Annex with dementia?

24   A.    Yes.

25   Q.    Chronic diseases?

HAGGARD — Cross

```
 1      A.    Yes.

 2      Q.    COPD?

 3      A.    Yes.

 4      Q.    Diabetes?

 5      A.    Yes.

 6      Q.    Peripheral vascular disease?

 7      A.    Yes.

 8      Q.    There is elderly patients in the Medical Annex?

 9      A.    Yes.

10      Q.    Patients with comorbidities?

11      A.    Yes.

12      Q.    Are there amputees in the Medical Annex?

13      A.    Yes.

14      Q.    The Medical Annex has a -- has wound care supplies; right?

15      A.    I have not physically seen them, but I would assume the

16      nurse down there would have those so she could provide that care

17      in the annex.

18      Q.    There is prosthetics in the Medical Annex?

19      A.    Yes.

20      Q.    And there is wheelchairs?

21      A.    Yes.

22      Q.    Corizon, as a medical provider, will sometimes request IDOC

23      to move inmates from the general population into the Medical

24      Annex?

25      A.    Yes.
```

HAGGARD - Cross

1    Q.   And that's because those patients may have worsening

2    medical conditions that need to be closer to medical?

3    A.   They generally have mobility issues and need to be closer

4    to medical.

5    Q.   My question was:  That's because they have worsening

6    conditions?

7    A.   If they have worsening conditions, we are going to consider

8    them for admission into the Infirmary or the Long Term Care

9    Unit.

10   Q.   Can the witness be shown Exhibit 1039.  Exhibit 1039 is a

11   document that was previously admitted.  I would like you to look

12   at the second page of this email.  This is a July 16th, 2018,

13   email from Gentilia Brewer to yourself and others.

14           Do you see that?

15   A.   Yes.

16   Q.   Who is Gentilia Brewer?

17   A.   She is one of the DONs at ISCI.

18   Q.   Ms. Brewer says, quote:

19           "Would you move" -- the inmate with the No. ███████ --

20           "to the Medical Annex as soon as possible?  His

21           medical concerns have increased and the doctor would

22           like him closer to medical."

23           Do you see that?

24   A.   Yes.

25   Q.   Did you respond to Ms. Brewer's email saying that if an

HAGGARD - Cross

1    inmates's medical concerns were increasing, that he needs to be

2    considered to be in Long Term Care or the Infirmary?

3    A.   I don't recall if I responded to this email or not.  You

4    would have to show me.

5    Q.   But you were certainly aware, in or around July of 2018,

6    that at least some inmates were being moved to the Medical Annex

7    because they had increased medical concerns and needed to be

8    closer to medical; right?

9    A.   That's what this email says.

10   Q.   Other times, Corizon will move patients from Long Term Care

11   into the Medical Annex; right?

12   A.   Occasionally.  Not typically.

13   Q.   How occasionally is "occasionally"?

14   A.   Not very often.  Usually it's the other way.

15   Q.   Can the witness be shown Exhibit 1052.

16         Dr. Haggard, Exhibit 1052 is an October 2018 email

17   with -- that was sent to you.

18         Do you see that?

19   A.   Sent to me or included in the copy?

20   Q.   You're included in the copy.  My apologies.

21   A.   Okay.

22   Q.   Do you see that?

23   A.   The top one or the bottom one?

24   Q.   Both.

25   A.   Okay.

HAGGARD - Cross

1    Q.    Are you included in this email?

2    A.    Yes.

3    Q.    So you received this email?

4    A.    Yes.

5           MR. WATKINS:  Your Honor, move to admit Exhibit 1052.

6    Oh, I believe it's already in, Your Honor.  My apologies.

7           THE COURT:  I'm sorry?

8           MR. WATKINS:  Is it already in?

9           THE COURT:  No, I don't believe so.

10          MR. WATKINS:  We move to admit Exhibit 1052.

11          THE COURT:  Any -- I assume there is no objection.

12          MR. KRONBERG:  No objection.

13          THE COURT:  1052 is admitted.

14       (Plaintiffs' Exhibit 1052 admitted.)

15          THE COURT:  1039, which you referred to earlier, was

16   previously admitted according to my notes.

17          MR. WATKINS:  Okay.

18   Q.    BY MR. WATKINS:  In this Exhibit, Veronica Evancho says to

19   you and others:

20          "So sorry for the short notice, Davina, but" -- an

21          inmate with the number ▇▇▇▇ -- "has been D/C'd from

22          LTC..."

23          Is "LTC" Long Term Care?

24   A.    Yes.

25   Q.    Do you understand "D/C'd" to mean discharged?

HAGGARD — Cross

1    A.    Yes.

2    Q.        "...and will need to be housed in the Medical Annex.

3              Please move patient as soon as you can."

4              Do you see that?

5    A.    Yes.

6    Q.    Do you know why, if the Medical Annex is a general

7    population unit, an inmate would need to go from Long Term Care

8    directly into the Medical Annex as opposed to some other housing

9    facility at ISCI?

10   A.    Again, for proximity to medical, to be close.

11   Theoretically, would have a lot of appointments with Chronic

12   Care, with sick call or need to come to Wound Care and/or have

13   mobility issues.  So to keep them close by.

14   Q.    Because they are receiving medical treatment?

15   A.    Because they may have higher needs for medical care.

16   Q.    Can the witness be shown Exhibit 290, please.

17             You said the last time you were in the Medical Annex

18   might have been about a year ago; is that right?

19   A.    Roughly.

20   Q.    This is an image that was previously entered into evidence.

21             Have you seen this image before?

22   A.    I have not.

23   Q.    Do you know who took this image?

24   A.    No.

25   Q.    Do you know when this image was taken?

HAGGARD - Cross

1    A.    No.

2    Q.    Do you know if there was any orders prior to this image

3    being taken to clear out aisleways or walkways in the Medical

4    Annex?

5    A.    I don't.

6    Q.    Are you familiar with an inmate by the name of ████

7    ████████?

8    A.    Yes.

9    Q.    ████████████ was a Medical Annex patient; correct?

10   A.    I actually am not sure what housing unit he was in.

11   Q.    Do you know where ████████████ is housed today?

12   A.    I believe he is at ISCC.

13   Q.    Do you know when he was moved to ISCC?

14   A.    Within the last week or two.  I don't know the exact date.

15   Q.    Do you know if that was before or after plaintiff submitted

16   their exhibit list?

17   A.    I don't know.

18   Q.    I think you've testified earlier that if a patient in the

19   Medical Annex needs to be somewhere with a higher level of care,

20   they will be moved to Long Term Care; correct?

21   A.    Yes.

22   Q.    And that's once that patient is brought to your attention;

23   is that right?

24   A.    Yes.

25   Q.    Do you -- do you know if Mr. ████████ was ever housed in

**HAGGARD - Cross**

1    the Long Term Care Unit or the Infirmary?

2    A.    Yes.

3    Q.    Do you know how long Mr. ███████ lived in the Medical

4    Annex prior to him being moved to Long Term Care or the

5    Infirmary?

6    A.    I believe I testified that I didn't know what unit he was

7    in prior to admission to the Long Term Care Unit.

8    Q.    Do you know an inmate by the name of ███████████████?

9    A.    Yes.

10   Q.    Did you provide any care to Mr. ██████████?

11   A.    Yes, in the Long Term Care Unit.

12   Q.    Do you know where Mr. █████████ was housed immediately prior

13   to going to the Long Term Care Unit?

14   A.    I believe he was in the Medical Annex.

15   Q.    Do you know how long Mr. ███████ lived in the Medical

16   Annex before being moved to Long Term Care?

17   A.    I do not.

18   Q.    You would agree that someone like Mr. ███████ needed to be

19   in Long Term Care?

20   A.    At the time that he came to us, yes.

21   Q.    Do you know how long Mr. ███████ had the symptoms that

22   made him sufficiently needing to be in the Infirmary prior to

23   being in Long Term Care -- prior to being in the Medical Annex?

24   A.    My review of the records show that he had been refusing

25   care since 2017.

HAGGARD - Cross

1    Q.   So he was in the Medical Annex since 2017?

2    A.   I don't know if that was the date he was in the Medical

3    Annex.

4    Q.   Do you know a patient by the name of ███████████?

5    A.   I do.

6    Q.   ████████████ is in Long Term Care?

7    A.   He is as of this week.  I just admitted him last week.

8    Q.   Do you know if that was before or after plaintiffs

9    submitted their witness list?

10   A.   I don't.  I do know that he -- we received a call that he

11   had had a fall.

12   Q.   And where did he have that fall at?

13   A.   In the annex.

14   Q.   Do you know how long Mr. ████████ was having falls in the

15   Medical Annex?

16   A.   I don't.  But I talked to him when I admitted him, of

17   course.  And he said he wants to be as independent as he could.

18   Q.   And you don't know how long Mr. ████████ was housed in the

19   Medical Annex prior to moving to Long Term Care?

20   A.   I don't.

21   Q.   How many beds -- you testified earlier that Long Term Care

22   has 16 beds; right?

23   A.   15 or 16.  I -- I would have to count them.

24   Q.   And the Infirmary has 12?

25   A.   Or 13 if you count the mental health seg cell.

**HAGGARD - Cross**

1    Q.   So somewhere between -- approximately 28 beds between the

2    Infirmary and Long Term Care?

3    A.   Roughly.

4    Q.   If there is roughly 28 beds between the Infirmary and Long

5    Term Care, what happens when there is a 29th or 30th patient at

6    ISCI that needs a bed in Long Term Care or the Infirmary?

7    A.   That doesn't happen very often; but when it does, there is

8    usually a patient who is ready for discharge and stable, so we

9    can make room for that patient by discharging one and bringing

10   another one in.

11   Q.   You need to remove a patient from Long Term Care and swap

12   them out with the -- the needful patient?

13   A.   Typically it would be the Infirmary where we've been

14   providing more acute care for patients who are ready for

15   discharge.

16   Q.   Is Long Term Care almost always full?

17   A.   Almost always.

18   Q.   Inmate ███████ passed away; correct?

19   A.   Yes.

20   Q.   He was in the Long Term Care Unit?

21   A.   He was in the hospital when he passed away.

22   Q.   He was in the Long Term Care Unit immediately --

23   immediately prior to going to the hospital where he passed away?

24   A.   He had been in the Long Term Care Unit for several months

25   prior to that, yes.

HAGGARD — Cross

1    Q.    After Inmate ████████ passed away, Inmate ████████ was later

2    moved into the Long Term Care Unit?

3    A.    Not -- not immediately, no.  I mean, there were several

4    patients who came to Long Term Care in between.

5    Q.    Okay.  So -- so once Mr. ████████ passed away and there was

6    that extra spot, other inmates were put into that position?

7    A.    Yes.

8    Q.    And is it your testimony that those patients' needs that

9    required them to be in the Long Term Care Unit arose at the

10   exact time that the bed opened up for them to be in the Long

11   Term Care?

12   A.    No, that would not be my testimony.

13   Q.    So prior to being in the Long Term Care Unit, they had

14   needs that justified them being there, but there wasn't space

15   for them?

16   A.    Right now, we have several patients in the Infirmary proper

17   who are on long-term care status because we don't have enough

18   beds.

19   Q.    And you also have patients in the Medical Annex who could

20   justify being in Long Term Care, but there is not enough beds?

21   A.    That's not what I testified.

22   Q.    That's the question I'm asking you.

23   A.    No.

24   Q.    Do you also have patients in the Medical Annex who could

25   qualify for housing in the Long Term Care Unit, but there's not

HAGGARD - Cross

1      currently beds?

2      A.    No.

3      Q.    How do you know that?

4      A.    Because I testified earlier that when patients come to our

5      attention that need additional care, we do admit them to the

6      Infirmary or the Long Term Care Unit.

7      Q.    But the last time you were in the Medical Annex was about a

8      year ago; right?

9      A.    Physically walking there and walking in the unit, yes.

10     Q.    And you don't do rounds in the Medical Annex?

11     A.    Correct.

12     Q.    And no other medical provider does rounds in the Medical

13     Annex?

14     A.    But the patients are seen on a regular basis through

15     Chronic Care, and they have access to let us know that they're

16     having problems through the sick call or HSR process.

17     Q.    Try and focus on the question I asked.

18          The question I asked was:  No other medical providers

19     do rounds in the Medical Annex; right?

20     A.    We don't round in general population units.

21     Q.    So if you don't round in the Medical Annex and no other

22     providers round in the Medical Annex, how is it that you're able

23     to become aware of a patient that needs to be in the Long Term

24     Care Unit but is actually housed in the Medical Annex?

25     A.    When they are seen in clinic.

HAGGARD - Cross

1    Q.    And your testimony is that every inmate in the Medical

2    Annex is seen in clinic?

3    A.    Every patient who has a chronic condition.  So,

4    theoretically, yes, any of those who have chronic diseases are

5    seen regularly in clinic.

6    Q.    Because there's patients in the Medical Annex that have

7    chronic diseases?

8    A.    Yes.

9    Q.    As the regional medical director, you are aware that there

10   have been instances in the Medical Annex where other inmates

11   have helped inmates use the restroom?

12   A.    I am aware of that.  And as soon as that comes to our

13   attention, those patients are provided the help that they need.

14   Q.    Now, I think you testified earlier that there is no medical

15   providers in the Medical Annex at nighttime; right?

16   A.    Correct.

17   Q.    So if a patient needs help with using the restroom in the

18   Medical Annex and it's at night and the inmates can't help them

19   use the restroom, who helps them use the restroom?

20   A.    I would hope that the officers would call medical and send

21   the patient over to medical to be evaluated.

22   Q.    Do you know whether or not the officers do rounds in the

23   Medical Annex?

24   A.    I don't know how the officers conduct business there.

25   Q.    You don't know if the officers walk down the aisles in the

1    evening in the Medical Annex to see if there is a patient there

2    that needs help using the restroom?

3    A.    I would assume they walk up and down the aisles but not

4    necessarily to see if they need to use the restroom.

5    Q.    But you don't know whether or not the officers in the

6    Medical Annex walk up and down the aisles?

7    A.    I don't -- I -- no, I have not sat there to watch them.

8    Q.    But at least in some instances, the reason why LPNs

9    assigned to the Medical Annex are not taking patients to the

10   toilet was because the LPN isn't there 24 hours a day; is that

11   right?

12   A.    You'll have to say the question again.

13   Q.    Sure.  The reason that a medical provider is not

14   taking -- strike that.

15         The reason why an LPN doesn't take a patient in the

16   Medical Annex to the toilet 24 hours a day is because there is

17   not an LPN there 24 hours a day; right?

18   A.    If a patient needed that kind of care, they should be

19   admitted to the Long Term Care Unit.

20   Q.    Again, try to focus on the question I asked.

21   A.    The question doesn't make any sense, frankly.

22   Q.    You would agree that the -- an LPN does not take a patient

23   in the Medical Annex to the toilet 24 hours a day because there

24   is not an LPN in the Medical Annex 24 hours a day; right?

25   A.    I would not agree to that statement.

HAGGARD - Cross

1    Q.    Which part of my statement did you not agree with?

2    A.    That the reason that the LPN doesn't take the patient to

3    the restroom is that they are not there.

4    Q.    Well, could an LPN take a patient to the restroom when the

5    LPN is not -- isn't there?

6    A.    No, but they could when they are there.  But the whole

7    point is that when the patients need that level of care, they

8    should no longer be in the annex.

9    Q.    Do you know what a gait belt is?

10   A.    Yes.

11   Q.    You have and use gait belts in Long Term Care?

12   A.    I don't use them.  Our physical therapists use them, and

13   the nurses may use them.

14   Q.    And they are in Long Term Care?

15   A.    They are with physical therapy, anywhere the nurses may

16   need to help support a patient.

17   Q.    Do you know if there is gait belts in the Medical Annex?

18   A.    I don't know.

19   Q.    As the regional medical director or the site medical

20   director, you have never asked anyone to staff or assign an LPN

21   in the Medical Annex at night to assist with patients?

22   A.    No.

23   Q.    And as the regional medical director or the site medical

24   director, you have never asked anyone to assign an RN to the

25   Medical Annex at night to assist with patients?

1    A.   I have not asked for anyone to be assigned to any general

2    population unit.

3    Q.   You're aware that in the Medical Annex, there are stalls

4    where soiled clothing is kept in soiled bins?

5    A.   I'm not sure where they keep the soiled linen, but I assume

6    there is an area designated for that.

7    Q.   Can the witness be shown Exhibit 1162.

8         Exhibit 1162 is an image of a stall in the Medical

9    Annex.  Have you seen this stall before?

10   A.   No.

11        MR. WATKINS:  Move to admit Exhibit 1162.

12        THE COURT:  Any objection?

13        MR. KRONBERG:  No.

14        THE COURT:  1162 will be admitted.

15   (Plaintiffs' Exhibit 1162 admitted.)

16   Q.   BY MR. WATKINS:  If inmates in the Medical Annex don't need

17   assistance with toileting, do you know why the Medical Annex

18   would need a stall with the words "urine enclosed" on it?

19   A.   There are patients there who wear adult Depend-type

20   diapers, and they may occasionally soil themselves and have to

21   have a change of clothes.

22   Q.   Who changes these patients when they need help?

23   A.   They are independent of their ADL, so the patient would

24   change themselves.

25   Q.   Could the witness be shown Exhibit 1164.

1          1164 is another image of a stall in the Medical Annex.

2     Have you seen this image before?

3     A.   I have not.

4          MR. WATKINS:  Move to admit 1164.

5          THE COURT:  Any objection?

6          MR. KRONBERG:  No, Your Honor.

7          THE COURT:  1164 will be admitted.

8          (Plaintiffs' Exhibit 1164 admitted.)

9     Q.   BY MR. WATKINS:  If inmates in the Medical Annex don't need

10    assistance with toileting, do you know why the Medical Annex

11    would need a stall with the words "fecal enclosed" on it?

12    A.   For the same reason I explained a moment ago.

13    Q.   So those inmates with -- who have adult Depends, your

14    testimony is that they are always self-sufficient such that they

15    could change themselves, and they would move their soiled linens

16    into one of these stalls?

17    A.   My testimony was that they are functionally independent

18    with their ADLs.

19    Q.   And when they're not, that's brought to your attention?

20    A.   Yes.

21    Q.   And then they move into medical -- into the Long Term Care

22    or the Infirmary?

23    A.   Yes.

24          MR. WATKINS:  That's all the questions I have.

25          THE COURT:  Redirect.

1          MR. KRONBERG:  Thanks, Your Honor.

2                      REDIRECT EXAMINATION

3   BY MR. KRONBERG:

4   Q.   Dr. Haggard, you were asked about your work as an RMD when

5   you were doing both the RMD and the site MD duties earlier this

6   year.  And you were asked to read a portion -- read along a

7   portion of your deposition where it said that being an RMD took

8   away from your clinic time.

9              Do you recall that?

10  A.   Yes.

11  Q.   What's the date of your deposition?

12  A.   April 11th, 2019.

13  Q.   What changed after April 11th, 2019, in relation to your

14  RMD?

15  A.   Dr. Dawson started in May.

16  Q.   And does she share the RMD duties with you that you had all

17  by yourself when your deposition was taken?

18  A.   Yes.

19  Q.   So your answer you gave on April 11th is no longer

20  reflective of the conditions of your job; correct?

21  A.   Correct.

22  Q.   Now, you were asked a lot of questions about how sick folks

23  show up at ISCI.

24              When sick folks show up, do you take care of them?

25  A.   Yes.

HAGGARD - Redirect

1    Q.   Provide medical care to those sick folks?

2    A.   Yes.

3    Q.   Do you have any examples you could share with us about how

4    you do that?

5    A.   We get sick patients from multiple sources.  They might be

6    coming back from the hospital in need of additional acute care,

7    or they might be transferred from one of the county jails.  We

8    receive reports from the jails -- hopefully, with some of their

9    medical records attached -- that we can provide some continuity

10   of care.

11   Q.   So what happens when they show up at ISCI?  Are they

12   screened?  Give us -- give me an example of what happens.

13   A.   So when they show up, they go to the reception and

14   diagnostic intake unit, and they are screened for medical

15   conditions and problems.  And if there is an issue, they -- they

16   are either set up for sick call or chronic care, as appropriate,

17   or sent over to the Infirmary.

18   Q.   And so they -- they're provided medical care by you in the

19   Infirmary if necessary?

20   A.   Yes.

21   Q.   In the Long Term Care if necessary?

22   A.   Yes.

23   Q.   And you manage their chronic conditions if necessary?

24   A.   Yes.

25   Q.   Now, you're a full-time physician out at ISCI.

HAGGARD - Redirect

1          Once Dr. Dawson came on board, did she also spend time

2     as a physician at ISCI?

3     A.   She comes for the Long Term Care rounds.

4     Q.   So there is actually more than one full-time physician at

5     ISCI now; correct?

6     A.   Yes.

7     Q.   Are there folks in wheelchairs spread out throughout the

8     housing units at ISCI?

9     A.   Yes.  There are some in other units.

10    Q.   Does the fact that someone is in a wheelchair mean they

11    can't get medical care?

12    A.   Absolutely not.

13    Q.   Are you aware of anybody that's in the Medical Annex that

14    has a wheelchair that has been denied medical care because they

15    can't get down an aisle in the building?

16    A.   No.

17    Q.   While we're talking about this 14-day issue in terms of

18    seeing a provider, first of all, is there a medical basis for

19    that 14-day period that you're aware of?

20    A.   No.

21    Q.   So you started to talk about this on cross.  If someone has

22    an issue they want to see a provider for, they hand in -- they

23    hand in a Health Service Request?

24    A.   Yes.

25    Q.   And if they have a problem they need to see somebody right

1       away with, what happens?

2       A.   The nurse will triage that, and they will be seen urgently

3       or emergently, as the case may be.

4       Q.   So it's -- the nurse is triaging these during the day; is

5       that right?

6       A.   They'll review those requests and make a triage decision,

7       yes.

8       Q.   And are there providers available during the day if that

9       inmate needs to see somebody right away?

10      A.   Yes.

11      Q.   So this -- is this a situation where there is a requirement

12      they have to be seen within 14 days if they need to be seen

13      sooner?

14      A.   Say that again.

15      Q.   So if they needed to be seen sooner than the 14-day period,

16      is that what happens?

17      A.   Yes, absolutely.

18      Q.   Sorry.  That was a bad question.

19              Let's talk about that utilization management process.

20      Who has the final say as to whether a treatment is going to be

21      provided or not?

22      A.   The regional medical director has the ability to override

23      any decision by the UM team.  Whether it's appealed or not

24      accepted by the other providers, there is always an override.

25      Q.   Can you give us an example of what a provider may recommend

HAGGARD - Redirect

1    as a treatment and what would be an alternative or an alternate

2    treatment plan?

3    A.   An example might be, like, a lumbar MRI, for example, is

4    the request; and the alternative treatment might be to try a

5    six-week course of physical therapy along with some medications

6    and activity modification, for example.

7    Q.   So where would the initial request for an MRI come from?

8    A.   From the provider in the clinic seeing the patient.

9    Q.   And where might the alternative treatment plan come from?

10   A.   From the UM team.

11   Q.   And so regardless of whether it's recommended by the

12   provider or an -- an alternative treatment plan, the inmate is

13   getting medical care, is he not?

14   A.   Yes.

15   Q.   And if they're -- are you monitoring these folks to

16   determine, if things get worse, that you may need to switch plan

17   to something else?

18   A.   Yes.  So with the alternative treatment plan, that patient

19   would be brought in and have the plan explained, and then they

20   would be followed to see if that works; and if it doesn't, there

21   is always the ability to resubmit the same request.

22   Q.   Is there a medical reason to be doing rounds as a doctor in

23   the Medical Annex?

24   A.   Not that I'm aware of.

25   Q.   Now, the folks in the Medical Annex, if they get a --

HAGGARD - Redirect

1    submit an HSR and they get an appointment to see a provider,

2    where do they have to go to see that provider?

3    A.    To the medical building.

4    Q.    They have to leave to the Medical Annex and get to the

5    medical building?

6    A.    Yes.

7    Q.    If they are incapable of doing that on their own, what

8    happens?

9    A.    We would either have one of the nurses go get them and

10   bring them, or they could have a wheelchair pusher bring them.

11   Or if they are that unable to come to medical, perhaps they need

12   admitted to the Infirmary or Long Term Care Unit.  They would

13   need to be evaluated.

14   Q.    So there is a nurse, whether it's an LPN or RN, stationed

15   during the day in the Medical Annex; is that true?

16   A.    Yes.

17   Q.    And does that nurse do pill call?

18   A.    Yes.

19   Q.    Does that nurse do sick call?

20   A.    Yes.

21   Q.    Does that nurse do wound care?

22   A.    Yes.

23   Q.    So if that nurse notices a problem with anybody being able

24   to come up to pill call or sick call or wound care, what might

25   happen?

1    A.    She will pick up the phone and call in.

2    Q.    And then what happens?

3    A.    We either go down and get the patient or have the patient

4    brought up.

5    Q.    Is there a need perhaps to further assess whether that

6    patient needs to have Long Term Care?

7    A.    Say that again.  Is there a need to...

8    Q.    Would one of the options be to assess that patient to

9    determine whether they might be better off in Long Term Care?

10   A.    Yes.

11            MR. KRONBERG:  I have nothing further.  Thank you.

12            THE COURT:  Anything else, Mr. Watkins?

13            MR. WATKINS:  Briefly, Your Honor.

14                      RECROSS-EXAMINATION

15   BY MR. WATKINS:

16   Q.    Do you agree that the Medical Annex is a semipermanent

17   structure?

18   A.    I'm not sure what you'd call a Sprung structure, whether

19   it's semipermanent.  But it's a different sort of building, for

20   sure.

21   Q.    Is it a self-contained rehabilitation unit for medically

22   infirm offenders who have long-term medical issues?

23   A.    I wouldn't say that.

24   Q.    Is it a -- is it a unit that houses offenders who don't

25   need to be in the hospital but who are too infirm to be in

HAGGARD – Recross

1    Unit 14, where such offenders are housed?

2    A.   I don't think I would say that, either.

3    Q.   Do you know if more infirm offenders in Unit 14 were moved

4    into the Medical Annex to free up space in Unit 14?

5    A.   I don't know for sure.  But if the patient were moved from

6    14 to the annex, it would presumably be to be closer to medical.

7    Unit 14 is really far away.

8    Q.   Dr. Dawson is not a full-time employee at ISCI; correct?

9    A.   Correct.

10   Q.   She is stationed at IMSI?

11   A.   Not currently.

12   Q.   Where is she currently stationed?

13   A.   ISCC.

14   Q.   You are the only physician stationed at ISCI?

15   A.   I'm the full-time site medical director.

16   Q.   You testified that sometimes patients in the Medical Annex

17   need to leave the Medical Annex in order to get medical care, to

18   go to the medical building?

19   A.   Yes.

20   Q.   And you would agree that ambulation is an activity of daily

21   living?

22   A.   Yes.

23   Q.   The ability to move about, whether using a walker or

24   wheelchair, is an activity of daily living?

25   A.   Yes.

HAGGARD - Recross

1    Q.   But I think you also testified that some patients in the

2    Medical Annex might need a wheelchair pusher or someone from

3    medical to come and get them because they are not capable of

4    getting themselves to medical on their own power?

5    A.   If they are in need of medical care that they requested,

6    yes.  I mean on an acute basis; I didn't mean on a regular

7    basis.

8    Q.   So at least some patients in the Medical Annex aren't able

9    to get to the medical building on their own; they need

10   assistance?

11   A.   If they are sick and needing help, yes, they may need

12   assistance.  We may actually send medical down to go get them.

13   Q.   So at least with respect to those patients, those patients

14   wouldn't be able to be performing the activities of daily living

15   at least with respect to ambulation?

16   A.   Any patient we call a medical emergency on wouldn't be able

17   to necessarily ambulate.  So we would have to send a cart out to

18   go get a patient from any unit, theoretically.

19   Q.   But you would agree that there's patients in the Medical

20   Annex that if you, as the site medical director, call up to see

21   a patient to the Medical Annex, may need a wheelchair pusher to

22   come push them to the Medical Annex; right?

23   A.   There are patients all over the yard who may need a

24   wheelchair pusher, depending on where they are housed and what

25   their condition is.

**HAGGARD — Recross**

1    Q.   But with respect to the Medical Annex, there is patients in

2    the Medical Annex who can't, on their own power, get to the

3    medical building without assistance; right?

4    A.   There may be some who have a wheelchair pusher.

5    Q.   Pill call in the Medical Annex is not bed to bed; correct?

6    A.   I don't think so.  I don't know for a fact.  I have never

7    witnessed pill call in the annex.

8    Q.   You have never witnessed pill call in the Medical Annex?

9    A.   No.

10   Q.   Have you ever witnessed wound care in the Medical Annex?

11   A.   No.

12   Q.   Have you ever witnessed sick call in the Medical Annex?

13   A.   As I testified earlier, I don't go out there regularly

14   because it's not a medical unit.

15   Q.   So you have no basis of which to testify as to what happens

16   with respect to pill call in the Medical Annex or sick call in

17   the Medical Annex or -- or wound care in the Medical Annex?

18   A.   I know that it's conducted there.

19   Q.   But you don't know how?

20   A.   Procedural and processwise, I don't, because I have not

21   actually watched it.

22           MR. WATKINS:  Thank you.  No further questions.

23           THE COURT:  Anything else?

24           MR. KRONBERG:  No, Your Honor.

25           THE COURT:  All right.  You may step down, Doctor.

```
 1        Thank you.
 2                    THE WITNESS:  Should I just leave this here?
 3                    THE COURT:  Is that the deposition?
 4                    THE WITNESS:  Yes.
 5                    THE COURT:  Leave it with Mr. Metcalf.  Thank you very
 6        much.
 7                    THE WITNESS:  Thank you.
 8                    THE COURT:  Call your next witness.
 9                    MR. KRONBERG:  Rona Siegert.
10                    THE COURT:  Counsel, we will probably go until about
11        2:40.
12                    MR. KRONBERG:  So if I may, I have a witness video
13        conference -- by video conference first thing in the morning at
14        8:30.  So we will probably interrupt the testimony of this
15        witness, if that's okay.
16                    MS. OLSON:  That's fine.
17                    THE COURT:  Yes.
18                    Ms. Siegert, would you come before the clerk and be
19        sworn.  Ms. Gearhart will place you under oath and then direct
20        you from there.
21                     RONA SIEGERT, DEFENDANTS' WITNESS, SWORN
22                    THE CLERK:  Please take a seat in the witness stand.
23                    Please state your complete name for the record.
24                    THE WITNESS:  Rona Siegert.  R-O-N-A, S-I-E-G-E-R-T.
25                    THE COURT:  You may inquire.
```

```
 1              MR. KRONBERG:  Thank you.
 2                    DIRECT EXAMINATION
 3   BY MR. KRONBERG:
 4   Q.   Ms. Siegert, do you work for the Idaho Department of
 5   Correction?
 6   A.   Yes.
 7   Q.   What's your current position?
 8   A.   Health services director.
 9   Q.   And I want to go back over your employment background just
10   briefly.
11              Are you a registered nurse?
12   A.   Yes.
13   Q.   When did you first become a registered nurse?
14   A.   1975.
15   Q.   And I take it you went to school for that?
16   A.   Yes.
17   Q.   How long?
18   A.   Three years.
19   Q.   And where did you work after you became an RN?
20   A.   I worked in different places, hospitals, went overseas for
21   a while, doctor's office.
22              THE COURT:  Could you bring the mic just a little
23   closer.
24              THE WITNESS:  And also in corrections.
25   Q.   BY MR. KRONBERG:  When did you first start working in
```

1    correctional health care or corrections?

2    A.    About 2001.

3    Q.    What were you doing then?

4    A.    I worked for a medical contractor at one of the state

5    facilities.

6    Q.    Which one?

7    A.    ISCI.

8    Q.    How long did you have that job?

9    A.    I had that job until 2005.

10   Q.    What did you do after that?

11   A.    I started working for the Department of Correction in 2006.

12   Q.    What were you doing for the Department of Correction in

13   2006?

14   A.    I was the nurse manager.

15   Q.    What were your duties?

16   A.    At the time, it was to start developing audit tools for

17   state audits.

18   Q.    Would that be for the contract for medical care?

19   A.    Yes.

20   Q.    How long did you have that job?

21   A.    Until 2008.

22   Q.    What did you start doing in 2008?

23   A.    I became a health services director.

24   Q.    What were your duties at that time as health services

25   director?

SIEGERT - Direct

1     A.   Pretty much the same.  I was able to hire some more staff,

2     so -- but mainly, it's just oversight of the medical contract

3     through audits and monitoring.

4     Q.   Do you have any licenses or certifications other than as a

5     registered nurse?

6     A.   I am NCCHC certified as a CCHP-RN.

7     Q.   Okay.  What does that mean?

8     A.   It's just a correctional certification.

9     Q.   So does that stand for Certified Correctional Healthcare

10    Provider-Registered Nurse?

11    A.   Yes.

12    Q.   So tell us about your duties and responsibilities as health

13    services director.

14    A.   Well, I have a staff of four nurses who -- you know, we

15    just divide up all the facilities in the state.  They are

16    responsible for conducting biannual audits and also monitoring

17    their facilities.

18    Q.   When you say "biannual audits," is that in relation to the

19    contract audit that you perform?

20    A.   They are.  They are the contract's performance indicator

21    audits.

22    Q.   And do you have audit tools you use for that?

23    A.   Yes.

24    Q.   Were you involved in developing those audit tools?

25    A.   Yes.

1    Q.   Do you also perform the -- what I'll refer to as the "Balla

2    audits"?

3    A.   Yes, some of them.

4    Q.   And you oversee a staff that performs those audits?

5    A.   Yeah, two of the nurses perform the Balla audits.

6    Q.   And who are they?

7    A.   Joni Lemons and Zarah Martin.

8    Q.   And were you involved with developing the audit tools used

9    for the Balla audits?

10   A.   Yes.

11   Q.   And what was your understanding of the purpose of those

12   audit tools?

13   A.   The purpose of them was to measure the elements in the MCP.

14   Q.   The Modified Compliance Plan?

15   A.   Yes.

16   Q.   And let's, hopefully -- are we up on the screen?  Sorry.  I

17   don't think we have ever gotten this into evidence.

18        But I'm showing you what's been marked Exhibit 1,

19   Ms. Siegert.  Do you recognize that?

20   A.   I do.

21   Q.   What is it?

22   A.   That is a portion of Addendum A.

23   Q.   So I think we have 30 pages here.  You can -- I can flip

24   through it if you want or whatever you would like to do.

25        But does that appear to be a copy of Addendum A?

1    A.    Yes.

2    Q.    Does that contain the Modified Compliance Plans?

3    A.    Yes.

4          MR. KRONBERG:  Move to admit Exhibit 1.

5          THE COURT:  No objection?

6          MR. WATKINS:  No.  I would only object, Your Honor, to

7    counsel's statement that this includes the Modified Compliance

8    Plan.  I think the Modified Compliance Plans grew out of

9    Addendum A, but that's it.  No objection to this document.

10         THE COURT:  Exhibit 1 will be admitted.

11         (Defendants' Exhibit 1 admitted.)

12   Q.    BY MR. KRONBERG:  So I just want to get some background

13   information before we start talking about the audit

14   specifically.

15         What's the process with performing these audits?  Just

16   in general terms, what do folks do?  Do you have weekly

17   meetings?  Review the audits?  How does that work?

18   A.    Well, the audits are weekly or monthly, and so the -- there

19   is real specific timelines that the audits are gathered.

20         So the nurses gather up the information.  Most -- most

21   of the audits are weekly, and then they are reported out

22   monthly.

23         We do have meetings.  We have a meeting every

24   Wednesday morning with a larger group.  After that meeting, a

25   smaller group -- the nurses, myself -- meet to discuss the week

SIEGERT – Direct

1    previous' audits.

2    Q.    So that smaller meeting is you and the folks that you

3    supervise that do these audits?

4    A.    Yes.

5    Q.    And how are these results put together?

6    A.    They are all entered into what's called the Health Service

7    Report.

8    Q.    Is that Health Service Report shared with the plaintiffs?

9    A.    Yes.

10   Q.    Is that at a monthly meeting?

11   A.    Yes.

12   Q.    What's that monthly meeting referred to as?  What's that

13   monthly meeting called?

14   A.    "The monthly meeting."

15   Q.    Okay.  And it's called the "MM meeting" or "MM" at times?

16   A.    Yes.

17   Q.    Now, you're aware of how each of these audits are

18   performed; is that correct?

19   A.    Yes.

20   Q.    And you -- so these -- are these audits reviewed at your

21   weekly meetings?

22   A.    Yes, they are.

23   Q.    Let's take a look at Exhibit 86.  It should be up there on

24   the screen.

25           THE COURT:  Counsel, could I -- the word "Health

1        Service Reports," could you clarify?  It's been used, I think,

2        in the context of a request or someone presenting and needing

3        medical care.  And then the way you have just used the term

4        seems to suggest that it's more of a aggregation of health care

5        provided.

6                Can you just clarify what it is?

7                THE WITNESS:  Yes.  The HSR, where it's a request for

8        medical care, is called a Health Service Request.

9                THE COURT:  Okay.  So there is Health Service Request

10       and Health Service Reports?

11               THE WITNESS:  Correct.

12               THE COURT:  Are they both referred to as HSRs?

13               THE WITNESS:  Yes.

14               THE COURT:  That's a bad idea.  Okay.  So can we be

15       very clear when you use one as compared to the other?

16               THE WITNESS:  Yes.

17               THE COURT:  And not use the acronym, Counsel; because

18       otherwise, the record is going to be very confusing.

19               MR. KRONBERG:  Sure.

20               THE COURT:  All right.  Thank you.  I'm glad we

21       clarified that.

22       Q.   BY MR. KRONBERG:  So Exhibit 86, Ms. Siegert, what's that?

23       A.   That's a list -- that's a list of the audits -- of the

24       Balla audits.

25       Q.   And there are two pages in that exhibit?

SIEGERT - Direct

1    A.    Yes.

2    Q.    It looks like 39 tools all together?

3    A.    Yes.

4          MR. KRONBERG:  I'm going to move to admit Exhibit 86.

5          MR. WATKINS:  No objection.

6          THE COURT:  All right.  Exhibit -- what's the number

7    again, Counsel?

8          MR. KRONBERG:  86.

9          THE COURT:  Exhibit 86 will be admitted.

10   (Defendants' Exhibit 86 admitted.)

11   Q.    BY MR. KRONBERG:  If I were to ask you which of these audit

12   tools related to which of the -- what I will refer to in the

13   Addendum A, the plaintiffs' concerns, would you be able to tell

14   us?

15   A.    Yes.

16   Q.    So see if I can get this to work here.  So the first one I

17   want to start with in terms of the plaintiffs' concerns in

18   Exhibit 1 is the No. 2:  "Address delays/lack of response (time

19   delays/referrals) to HSRs."

20         MR. KRONBERG:  And that would be "Health Service

21   Requests," Your Honor.

22   Q.    BY MR. KRONBERG:  Can you tell us which of these audit

23   tools refer to that plaintiffs' concern?

24   A.    It would be Audit 02, 03, and 21.

25   Q.    Thank you.

1               And the next plaintiffs' concern in Addendum A:

2       "Address poor quality of nursing care when delivered; also look

3       to issues at RDU."

4               Which Balla audit tools would relate to that?

5       A.   Audit No. 03.

6       Q.   Next plaintiffs' concern in Exhibit 1 is No. 5:  "Address

7       concerns related to staff competency and that certain systems

8       for selecting and training qualified staff/detect and respond to

9       incompetent staff."

10              Which Balla audit tools off of Exhibit 86 would apply

11      to that concern?

12      A.   04 and 05.

13      Q.   The next plaintiffs' concern in Exhibit 1:  "Address lack

14      of confidentiality during care at sick call/pill call."

15              Which audit tools would relate to that concern?

16      A.   We don't have an audit tool for that, but I believe that

17      was addressed with the addition of the pill call area.

18              THE COURT:  Now, Counsel, I think it's clear, but the

19      audit tool number that you're referring to actually is the

20      order -- or is it the order that I have been referring to in

21      *Balla I*, *II* and *III*?  Or are they distinct from that?

22              MR. KRONBERG:  I'm sorry.  I'm not following.

23              THE COURT:  Well, for example, in *Balla I* -- well, you

24      referred to, I think, 04 and 05 having to do with incompetent

25      staff.

1          The *Balla I* order required that you create a properly

2     staffed and organized medical delivery system.

3          Is that what we're referring to?

4          MR. KRONBERG:  I believe so.

5          THE COURT:  And 05 has to do with creating a

6     psychiatric care program.  Is that what you understood?

7          I just want to -- see, it's the same problem as

8     before.  I want to make sure that I understand that we're using

9     the same acronyms and buzzwords.

10          I mean, in the long term, I'll figure this out by

11     reviewing proposed findings and conclusions.  But from my

12     understanding of what we're actually talking about here, I need

13     to make sure we are all talking about the same thing.

14          And I apologize.  You folks have been dealing with

15     this for years.  I'm up here conducting trials on everything

16     under the sun, and so I need to play a little catch-up here.

17          MR. KRONBERG:  Right.

18          THE COURT:  So can you -- so when we're referring to

19     the audits, do those refer to what I refer to as the

20     Balla -- and I get a number assigned, and I think that's what we

21     have been referring to them consistently in our prior orders.

22          MR. KRONBERG:  Well, Your Honor, I think I have been

23     on a steep learning curve here, too.  But, you know, what I'm

24     looking at, as I said in my short opening statement, is tying in

25     these audits to the Modified Compliance Plans which were

```
 1      originally --

 2              THE COURT:  Well, the Modified Compliance Plans are

 3      not directly at issue.  And my understanding is we are only

 4      using those as kind of a surrogate for overall compliance with

 5      the original Balla orders.

 6              MR. KRONBERG:  Correct.

 7              THE COURT:  So apparently --

 8              MR. KRONBERG:  I'll let Mr. --

 9              MR. KUBINSKI:  Your Honor, I might be able to shed

10      some light on this, if that's all right.

11              So on Exhibit 1, that Addendum A document, those

12      headings that I think you're asking about where they are

13      numerically on the left-hand column --

14              THE COURT:  Right.  Correct.

15              MR. KUBINSKI:  -- so on that page, it's 5.  Those are

16      headings, I believe, that were borrowed from Dr. Stern's report.

17      And plaintiffs can tell me whether they agree with that or not.

18              THE COURT:  Is that --

19              MR. WATKINS:  That's accurate, Your Honor.  These do

20      not coincide with the Balla orders.

21              THE COURT:  That's very helpful to know that.

22              Could counsel provide me -- I'll call it a -- it

23      probably exists somewhere in one of the exhibits, but a very

24      summary description of what each of those audit numbers

25      reference and which, if any, of the Balla orders are affected by
```

1      that part of the audit findings?

2            MR. WATKINS:  Your Honor, we prepared a history of

3      *Ballas I, II*, and *III* about findings of fact and conclusions of

4      law that the Court reached.  That goes through the chronology

5      and history of what the Court found in what order.  We'd be

6      happy to provide it to --

7            THE COURT:  Well, that's helpful.  But that needs to

8      then be translated into this reference, the audit numbers.

9      Because, apparently, they are not --

10           MR. WATKINS:  This is their document, Your Honor.  We

11     don't know what they did to create their audit tools, Your

12     Honor.

13           THE COURT:  That's why, Mr. Kronberg, I need that.  In

14     order for me to make sense of this as we go, I need to be able

15     to -- could you see if you could put something like that

16     together?

17           MR. KRONBERG:  I certainly will make an effort to do

18     that after the day is over.  I'm not --

19           MR. CHURCH:  One more clarification, Your Honor, if I

20     may.

21           THE COURT:  Yes.

22           MR. CHURCH:  The Balla audit tools that are being

23     referenced on the right side of the screen --

24           THE COURT:  Actually, the left side, I think.

25           MR. CHURCH:  Well, the left side is -- at least on my

1        side, the left side is the Modified Compliance Plan addenda.

2                The right side of the screen, as I see it, lists a

3        series of Balla audit tools.  Those Balla audit tools

4        correspond --

5                THE COURT:  Oh, I see what you mean.  We have got a

6        split screen here.

7                MR. CHURCH:  Exactly.

8                THE COURT:  All right.

9                MR. CHURCH:  On the split screen, on the right side of

10       it, there is a list of Balla audit tools.

11               THE COURT:  Correct.

12               MR. CHURCH:  Those correspond to certain tasks that

13       were part of the addenda in the Modified Compliance Plans

14       themselves.  So they are numbered -- well, that's what

15       Mr. Kronberg is walking through is the numbering and trying to

16       tie it into each area of the Modified Compliance Plans.

17               THE COURT:  All right.  Well, at least I understand

18       that the audit number on the right-hand side of the split

19       screen, the reference in the left-hand column on the right-hand

20       document is the audit numbers from the Modified Compliance Plan

21       and do not tie directly to any of the original orders in

22       *Balla I*, *II*, or *III*.  That's what I understand at this point.

23               And if you want to clarify how those audit numbers or

24       audit findings from the Modified Compliance Plan correlate to

25       specific orders from any of the *Balla I*, *II*, or *III* orders, that

1      would be most helpful.  But if you can't, at least I've

2      clarified -- and I won't be making the mistake I think I've

3      made, which is to conflate that numbering sequence.

4            So go ahead.

5            MR. KRONBERG:  Thank you.

6            THE COURT:  And if I've got it really bolloxed up, you

7      can try to unbollox it at some point, if there is such a thing.

8      I suspect there isn't, but go ahead.

9            MR. KRONBERG:  Okay.

10     Q.   BY MR. KRONBERG:  Ms. Siegert, I don't remember where we

11     were, so I'll just ask you -- Addendum A, Exhibit 1, we were

12     talking about -- I think we -- I don't remember if we went

13     through the staff competency one or not, but tell us which audit

14     tools relate to that plaintiffs' concern, if you can, please.

15     A.   04 and 05.

16     Q.   I think we went through the confidentiality, No. 6,

17     already.  It's coming back to me now.

18           So let's look at No. 7.  It starts at the bottom of

19     page 8 of Exhibit 1:  "Address the poor quality of medical care

20     when it is delivered -- Increase the availability of RNs to

21     respond during emergency responses."

22           Do you know which Balla audit tools relate to that

23     concern?

24     A.   I'm sorry.  That is audit -- I'm sorry.  I am not seeing

25     that audit now.  I'm kind of -- I'm not remembering which audit

1    tool.  Oh, 29.  I'm sorry.  Yeah, audit tool 29.

2    Q.   Okay.  So the next plaintiffs' concern is No. 8:

3    "Address/confirm the continuity of care upon return from

4    hospital, ER, or pharmacy visits," and then brackets, "Off-Site

5    care."

6         Do you know which Balla audit tools relate to that

7    concern?

8    A.   Audit tools 06 and 07.

9    Q.   Concern No. 9 in Exhibit A, page 10:  "Address the issue of

10   emergency response equipment not being kept in order or not

11   being carefully tracked/confirm that emergency cart being used

12   in the way described."

13   A.   I believe that's audit No. 30.

14   Q.   And then the next one that we're going to be concerned

15   about is No. 12, "Long Term Care."

16        Which tools relate to that concern?

17   A.   Those are 10 and 11.

18   Q.   Are there any ones that are internal that relate to that?

19   A.   There are.  And I'm not -- I don't know the numbers of

20   those --

21   Q.   Well, you can take a look --

22   A.   -- without seeing the chart.

23   Q.   I think I have the chart up there on the right side.

24        Does that help?

25   A.   On the chart, it's 31 and 32.

**SIEGERT – Direct**

1    Q.    Thank you.

2            The next concern identified in Addendum A, Exhibit 1:

3    "Address poor documentation of medication delivery or

4    administration."

5            Do you know which Balla audit tools relate to that

6    issue?

7    A.    I believe it's 09 through 15.

8    Q.    The next concern in Exhibit 1 is segregation -- it's

9    No. 14:  "Segregation/welfare check concerns."

10            Do you know which Balla audit tools relate to that

11    concern?

12    A.    Can I -- could you put the other list up, the 01 through

13    24.

14            I believe it's Balla No. 20.

15    Q.    The next concern we're going to look at is No. 15:  "Assure

16    access to offender medical records/mental health records."

17            Which Balla audit tools relate to that concern?

18    A.    It was No. 22.

19    Q.    Back to Exhibit 1, concern 16:  "Address issues surrounding

20    review of complaints from IDOC grievance system -- complaints

21    not timely reviewed by Corizon's regional manager as required

22    per policy."

23            Which Balla audit tools relate to that issue?

24    A.    No. 23.

25    Q.    Okay.  We're going to stop with that one because the rest

**SIEGERT - Direct**

1    of them relate to mental health, and we're going to have other

2    folks deal with that.

3              So let's start going through some of these audits, and

4    you can --

5              THE COURT:  Counsel, could I just ask a couple --

6    again, I apologize.  You know, I just made the comment one of

7    the advantages -- well, in a message to Mr. Metcalf and

8    Ms. Davis, one of the advantages of having been around the block

9    a few times is I can ask really dumb questions, and you are just

10   going to attribute it to old age and senility or something.

11             Let me make sure I do understand what this all is.

12             The left-hand document, is that like an agenda of one

13   of these meetings in which you have -- these are items that you

14   are discussing?  Or is this a broader kind of organic document

15   that drives what the institution does?

16             THE WITNESS:  The left-hand document?

17             THE COURT:  Yes, the left-hand document.

18             THE WITNESS:  That is what we refer to as Addenda A,

19   which came from the MCPs.

20             THE COURT:  So that very document came from the MCP?

21             THE WITNESS:  Yes.

22             THE COURT:  And the right-hand document?

23             THE WITNESS:  Is the audit tools that were developed

24   to monitor those items.

25             THE COURT:  Okay.

1              THE WITNESS:  -- on the left.

2              THE COURT:  So, Mr. Kronberg, you are just trying --

3    you're having the witness correlate between, I guess, the MCP

4    and the audit tools developed to enforce or implement the MCPs.

5              MR. KRONBERG:  Yes.

6              THE COURT:  Correct?

7              MR. KRONBERG:  Yes.  So --

8              THE COURT:  But this -- these were always discussed in

9    these weekly compliance meetings that you were having at the

10   facility; correct?  Or does it have -- are you just -- have you

11   stepped back away from those monthly meetings or weekly meetings

12   and actually just talking -- trying to set the stage for what

13   the tasks were that you were trying to perform by way of

14   compliance?

15             THE WITNESS:  Yes.  The document on the right, all

16   those audit results are what we talk about at our weekly

17   meetings and then are presented at the monthly meetings.

18             THE COURT:  All right.  Go ahead, Mr. Kronberg.  And

19   we'll go for another five minutes.

20             MR. KRONBERG:  Maybe this -- we'll get into one -- how

21   one of these audits are done.  Maybe that will hopefully help.

22   Q.  BY MR. KRONBERG:  So take a look at Exhibit 88,

23   Ms. Siegert.

24             Do you recognize that?

25   A.  Yes.

1    Q.    What is it?

2    A.    That's a Balla Audit Tool No. 4 and --

3    Q.    What's it -- I'm sorry.  Go ahead.

4    A.    And it measures the licensure and training for health care

5    staff.

6              MR. KRONBERG:  I'm going to move to admit Exhibit 88.

7              THE COURT:  Any objection?

8              MR. WATKINS:  No objection, Your Honor.

9              THE COURT:  That's 88?

10             MR. KRONBERG:  Yes.

11             THE COURT:  Exhibit 88 will be admitted.

12         (Defendants' Exhibit 88 admitted.)

13   Q.   BY MR. KRONBERG:  So how does this audit get done?  What's

14   the process?

15   A.    The process is we get from Corizon a list of the current

16   medical staff at ISCI, and then we just simply go through and

17   verify each of the questions.

18             The first one is that CPR is current; if they are a

19   licensed staff, that their license is current; that they receive

20   competency training; and that they have had their annual

21   performance evaluation.

22   Q.    How often does this audit tool get reported out?

23   A.    Twice a year.

24   Q.    So it wouldn't necessarily show up on a monthly Health

25   Services Report?

1    A.    Not on a monthly, no.

2    Q.    For example, if you look at Exhibit 3, what's Exhibit 3?

3    A.    That is the medical diet results.

4    Q.    Well, here is what -- it's an entire document.  What is it?

5    A.    Oh, it's the Health Service Report.

6    Q.    For?

7    A.    February 2019.

8              MR. KRONBERG:  And I might as well move to admit that

9    exhibit, Exhibit 3, at this time.

10             MR. WATKINS:  No objection.

11             THE COURT:  Exhibit 3 will be admitted.

12         (Defendants' Exhibit 3 admitted.)

13   Q.    BY MR. KRONBERG:  So if we want to find where in this

14   Health Service Report Balla Audit Tool 04 is reported, could we

15   look in the upper left-hand corner of each page?

16   A.    Yes.

17   Q.    So this would be the page of the report that reports out

18   Balla Audit Tool 04 results; is that right?

19   A.    Yes.

20   Q.    So this page has a lot of N/As on it.

21             Does that mean it wasn't the time to report on the

22   semiannual results?

23   A.    That's correct.

24   Q.    Let's take a look at Exhibit 89.

25             What is that?

1    A.   That's Balla Audit Tool No. 05.  And it is a measurement of

2    the similar licensure for -- and for reviews for medical

3    provider staff.

4              MR. KRONBERG:  Move to admit Exhibit 89.

5              MR. WATKINS:  No objection, Your Honor.

6              THE COURT:  All right.  Exhibit 89 will be admitted.

7         (Defendants' Exhibit 89 admitted.)

8              THE COURT:  When we use the word "audit," this is not

9    like an external audit?  It's an internal review of compliance;

10   is that correct?

11             THE WITNESS:  Correct.

12             THE COURT:  When I think of audits, typically I think

13   of an outside group coming in.  And that's not what is going on

14   here, although there may be some involvement of the plaintiffs

15   in this -- or not.  I guess we'll find out.

16             Go ahead.  Mr. Kronberg, go ahead.

17             And these are prepared monthly?

18             MR. KRONBERG:  Correct.  So --

19             THE COURT:  So there is a weekly meeting in which you

20   are discussing generally; then a monthly Health Services Report

21   is prepared, and that is the subject of a monthly meeting in

22   which you review this as part of an internal audit process; is

23   that accurate?

24             THE WITNESS:  It is.  And it's presented to the

25   plaintiffs.

1          THE COURT:  Okay.  Go ahead, Mr. Kronberg.

2          MR. KRONBERG:  Let's back up.

3          THE COURT:  It's slowly sinking in.  So I don't want

4    you to think you've wasted the whole day.

5          MR. KRONBERG:  You don't know how long I spent trying

6    to figure this out.

7    Q.   BY MR. KRONBERG:  So let's go back.  You and your monitors

8    work for IDOC; correct?

9    A.   Correct.

10   Q.   So -- and you perform these audits that we're talking

11   about, and that's an internal function; correct?

12   A.   Correct.

13   Q.   And you meet weekly internally to discuss the results of

14   the audits for that week?

15   A.   Yes.

16   Q.   So that's a meeting with you -- and Joni Lemons and Zarah

17   Martin and yourself?

18   A.   And Kerrie Hightower.

19   Q.   Kerrie Hightower.  Kerrie Hightower is with Corizon?

20         THE COURT:  Are those exclusively IDOC

21   representatives, or is Corizon involved?

22         THE WITNESS:  Yes.  Kerrie Hightower works for

23   Corizon.

24         THE COURT:  All right.  Thank you.

25   Q.   BY MR. KRONBERG:  And at the end of the month, the Health

1    Services Report is put together for that month?

2    A.   Yes.

3    Q.   And do you, Ms. Martin, Ms. Lemons, and Kerrie Hightower

4    sit down and review that report?

5    A.   Yes, we do.

6    Q.   And then at a meeting subsequently or shortly thereafter,

7    you go to this monthly meeting and provide that report to the

8    plaintiffs?

9    A.   Well, after we review the report, then we meet with a

10   different group.  It's called an ICS meeting that we have every

11   Wednesday morning, and it's with more the attorneys and more

12   people; and we review that report, and it's approved to be then

13   released.

14          THE COURT:  Okay.  You said you meet weekly, but the

15   report is only prepared monthly; is that correct?

16          THE WITNESS:  Yes.

17          THE COURT:  All right.  Counsel, I have another matter

18   at 3:30, so I'm getting a little tight on time.  I think we have

19   pretty much caught up from today.  If you have one or two more

20   questions, I'll allow it, but I think we need to take a break

21   because I've got -- I have to turn my attention to some other

22   matters.

23          MR. KRONBERG:  Well, we might as well break here.  We

24   are going to slog through these for --

25          THE COURT:  Well, actually, the last 15 minutes has

1    actually been time not wasted because I think it has given me a

2    better understanding of kind of the mechanism that you have gone

3    through, and that's most helpful.

4            And I apologize for my not already understanding all

5    that.  Hopefully, within the next day or two, I'll have a better

6    foundation that you can all build on.

7            All right.  So we'll be in recess until 8:30 tomorrow

8    morning.

9            Did I understand you have a witness appearing by video

10   tomorrow morning?

11           MR. KRONBERG:  Correct.  It's all set up.

12           THE COURT:  All right.  Famous last words.

13           I would suggest that you be very careful and maybe

14   check it again in the morning before we start, because

15   technology has a nasty way of not working as well as we had

16   hoped when we start.  All right?

17           So we will be in recess until 8:30 tomorrow morning.

18       (Court recessed at 2:47 p.m.)

19

20

21

22

23

24

25

```
 1                        REPORTER'S CERTIFICATE

 2

 3

 4

 5          I, TAMARA I. HOHENLEITNER, CSR, RPR, CRR, certify that

 6     the foregoing is a correct transcript of proceedings in the

 7     above-entitled matter.

 8

 9

10

11

12

13

14

15     /s/  Tamara I. Hohenleitner          04/22/2020
       _____      _____
16     TAMARA I. HOHENLEITNER, CSR, RPR, CRR    Date

17

18

19

20

21

22

23

24

25
```