IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WALTER D. BALLA, et al. | |
| Plaintiffs, | Case No.  1:81-CV-1165-BLW |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| IDAHO STATE BOARD OF CORRECTION, et al. | |
| Defendants. | |

## INTRODUCTION

The Court has before it defendants' motion to terminate prospective relief.  The Court held an eleven-day trial on the motion that was completed on February 21, 2020.  The parties then filed additional briefing that was completed on April 6, 2020.  The motion is now at issue.  For the reasons explained below, the Court will grant the motion and order that the case be dismissed.

## SUMMARY

This class action lawsuit was filed in 1981 by inmates at the Idaho State Correctional Institution (ISCI) alleging that their conditions of confinement violated the Eighth Amendment.  Following a trial in 1984, Judge Harold R. Ryan required ISCI to make changes in the areas of food preparation; medical facilities; places for eating; safety; clothing; nutrition; medical, dental and mental health care; certain rehabilitative programming; and staffing.  In the following years, there was lengthy litigation over

ISCI's compliance with the Court's orders and an increased focus on medical care and overcrowding.

Eventually the parties agreed to a set of Modified Compliance Plans (MCP), as to medical and mental health treatment, that established standards for various jail conditions along with regular monitoring to evaluate whether ISCI was complying with those standards. Their agreement contemplated a two-year monitoring period, after which ISCI would apply for certification from the National Commission on Correctional Health Care ("NCCHC"), a nationally recognized organization with the mission of improving the quality of health care in prisons. Following certification that the medical and mental health treatment at ISCI complied with the NCCHC standards for institutional health care, the parties would voluntarily terminate the existing Court orders.

ISCI received full accreditation by the NCCHC in 2017 and again in 2019. The monitoring of the MCP has shown that ISCI is complying with the standards agreed upon by the parties.

Despite this apparent compliance with the MCPs and the parties' agreement, the inmates claim that ISCI was continuing to violate the Eighth Amendment by, among other things, providing inadequate medical care. In February 2020, this Court held a two-week trial to determine whether there are any current and ongoing violations of the Eighth Amendment.

The Eighth Amendment guarantees inmates the right to adequate medical treatment in prison. Prison officials violate that Amendment when they fail to provide

adequate medical care and do so with deliberate indifference – that is, they know their failure causes an excessive risk to inmate health and safety and they disregard that risk.

In the decision below, the Court finds that the ISCI is not violating the Eighth Amendment. The NCCHC accreditation and the MCP compliance, while not determinative, constitute substantial evidence of adequate medical care. ISCI has put in place policies, training programs, and monitoring systems that will foster good care. The physicians, nurses, and other staff professionals are highly qualified and dedicated to providing quality medical care to the inmates. When errors or shortcomings occur, they are identified and addressed with corrections and training. Although there have been failures in the provision of medical care, they are isolated instances and not evidence of a systemic failure. For these reasons, the Court will grant the defendants' motion to terminate relief.

The Court would note, however, that there are three areas where ISCI is compliant with its Eighth Amendment obligations, but barely so. The first area is suicide prevention, the most important component of any mental health program. In the past, ISCI has been plagued by falsified records and general incompetence. Only recently has ISCI corrected these problems and improved its suicide prevention program to meet Eighth Amendment standards. But given this history, ISCI must be vigilant in training and in monitoring for the falsification of records. This is a weak link in ISCI's provision of medical care and could easily be the basis for a new lawsuit if ISCI ignores problems.

A second area where ISCI is marginally compliant is emergency response staffing during the evening hours for the Medical Annex. For five nights a week the only

emergency responder is a single Certified Medical Specialist (CMS) – trained as an EMT – who covers all of ISCI and its 1,400 inmates. The 78 inmates in the Medical Annex often have chronic medical conditions that put them at higher risk for emergencies than inmates in the general population. While there are nurses on the night shift in the Infirmary and Long Term Care, those units are locked down at night and the nurses are not available to assist Medical Annex inmates during evening hours. Correctional Officers have some basic training and can assist the CMS, and this staffing level has not caused any injuries or harm to this point. But once again ISCI is doing the bare minimum under the Eighth Amendment and would be wise to increase its staffing to avoid future litigation.

The third area concerns the Medical Annex itself. It houses inmates who have chronic health conditions or disabilities that warrant exclusion from the general population but who can do the activities of daily living and do not need the greater care provided in the Infirmary or the Long Term Care unit. The concept behind the Medical Annex – operating as an independent living center to allow inmates to care for themselves – is beneficial but it requires constant monitoring because these inmates can experience a quick deterioration in their health. The current monitoring is provided by a board-certified physician who examines inmates on an outpatient basis in the Chronic Care Clinic and by a nurse who staffs pill call and sick call and can check on inmates who do not attend when they should. Correctional Officers who staff the Medical Annex are also trained to recognize certain serious health problems. This is adequate to meet

Eighth Amendment standards, but barely.  It would be wise for ISCI to increase its staffing in the Medical Annex to avoid future litigation.

In the final result, ISCI is the prevailing party.  After decades of litigation they have taken substantial steps to improve conditions at ISCI.  But in the three areas identified above, there are potential weaknesses that could easily backslide into an Eighth Amendment violation.  That is why the Court has offered this serious warning.

## LITIGATION BACKGROUND

The long history of this case has been detailed in several past decisions by this Court and will not be repeated here but merely summarized to provide a context for the Court's decision.

### *Balla I*

In 1984, Judge Harold R. Ryan found that inmates at ISCI were subjected to unconstitutionally inadequate medical treatment and that certain other conditions of confinement resulted in constitutional violations.  *Balla v. Idaho State Bd. of Corr.*, 595 F. Supp. 1558, 1583 (D. Idaho 1984) (*Balla I*) (also available at Dkt. 585). Though ISCI also appeared to be overcrowded, the Court declined to address the issue at that time because "a real effort [wa]s being made to alleviate the overcrowding." *Id*. at 1573. The Court recognized, however, that "overcrowding may well reach a level at which the shelter of the inmates is unfit for human habitation." *Id*. at 1574.

The Court entered nine injunctive relief orders, referred to as the *Balla I* Orders. *Balla I* Orders 1, 2, 7, 8, and 9 – which related to medical diets, inmate clothing, a reporting obligation, sexual assault precautions, and disciplinary offense procedures –

have been voluntarily terminated by stipulation. *See* Dkt. 1282. As a result, the only *Balla I* Orders that remain in effect today are the following:

| *Balla I*, Order 3 | <ul><li>Create a 24-hour emergency medical care system</li><li>Develop a system which allows unimpeded access to medical care</li><li>Hire a full-time physician</li></ul> |
| --- | --- |
| *Balla I*, Order 4 | Create a properly staffed and organized medical delivery system to allow for effective utilization of the infirmary |
| *Balla I*, Order 5 | Create a psychiatric care program |
| *Balla I*, Order 6 | Double the security staffing in any double-celled, medium-custody tiers |

*Balla I*, F. Supp. at 1583. Decades later, the parties attempted to settle Orders 3, 4, and 5 of *Balla I*. Those efforts will be discussed in more detail below.

The original *Balla I* compliance plans were adopted by the Court on July 11, 1985. *See* Dkt. 150. The Ninth Circuit affirmed this Court's measure of Defendants' compliance with the *Balla I* Orders against the 1985 compliance plans, rather than against the insufficiently specific *Balla I* opinion. *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989). On May 28, 2009, this Court determined that the *Balla I* compliance plans remained enforceable via contempt proceedings. *See* Dkt. 768.

Unfortunately, some of the original *Balla I* compliance plans have been lost to the vicissitudes of time.[1] However, for purposes of this decision the Court agrees with the

---

[1] As relevant here, the Court has located the *Balla I* compliance plans for Order 6 and part of the *Balla I* compliance plans for Order 5. The record does not contain any part of the *Balla I* compliance plans for Orders 3 and 4. Notes in the paper record indicate that these plans were contained in a separate expando folder that the Court no longer possesses.

(Continued)

**Findings of Fact & Conclusions of Law – page 6**

parties that the closest full set of the *Balla I* compliance plans is that compiled and submitted by Plaintiff on April 14, 2009, at Docket No. 764-2.[2]

*Balla I* was issued, and the compliance plans adopted, long before the passage of the Prison Litigation Reform Act of of 1996 ("PLRA"). Thus, the Court, in issuing the *Balla I* Orders and the later-adopted compliance plans, did not find that they were narrowly drawn, extended no further than necessary to correct the constitutional violation, or were the least intrusive means to correct the constitutional violation, as required by the PLRA.[3]

### *Balla II*

As noted above, *Balla I* did not find a constitutional violation arising from overcrowding. The Court went on to address that issue in *Balla v. Idaho State Board of Corrections*, 656 F. Supp. 1108 (D. Idaho 1987) (*Balla II*). Finding that overcrowding had resulted in Eighth Amendment violations at ISCI, the Court imposed population caps, as well as certain restrictions on double-celling, in Units 1, 2, 3, 7, 8, 9, 10, 11, and 13 of the prison. *Id*. at 1119–20. The Court also ordered that no more than two inmates could

---

[2] The Court rejects Plaintiff's contention that Defendants' Motion must be denied solely on the basis that neither the parties nor the Court has a complete set of *Balla I* compliance plans. *See* Dkt. 1286 at 35. One of the questions the Court must answer is whether, under 18 U.S.C. § 3626(b), present conditions at ISCI have improved, over the last thirty-five years, to the point that there is no longer a *current and ongoing* systemic Eighth Amendment violation based on medical treatment and overcrowding. The Court does not need the *Balla I* compliance plans to make that determination.

[3] The Court rejects Plaintiffs' contention that the required need-narrowness-intrusiveness findings were implicit in *Balla I. See* Dkt. 1286 at 35. Section 3626 was specifically intended to restrict the availability and scope of prospective relief ordered in prison conditions cases.

be housed in any cell, that no inmates could be housed in day rooms or other non-designed cell areas, and that no inmates could be forced to sleep on mattresses on the floor. *Id.* at 1120. Finally, the Court ordered that all plumbing problems in the prison must be attended to within 24 hours and fixed within three days. *Id.* These ten injunctive relief orders have been referred to as the *Balla II* Orders.

The IDOC later constructed the Idaho Maximum Security Institution, which received many inmates as transfers from ISCI. As a result, the Court modified *Balla II*, Order 6, which addressed Unit 9 of ISCI. The Court raised the population cap in that unit and ordered that, if IDOC double-celled medium custody inmates in Unit 9, it would be required to increase security staff and access to other areas. Dkt. 317 at 4–5 (Aug. 23, 1990). The Court later modified the Unit 9 injunction yet again, to correct an error in the population cap and to impose a staffing pattern for medium-custody tiers in that unit. Dkt. 325 at 2–3 (March 5, 1991). That staffing pattern required Defendants to "utilize[e] the services of two officers during the day shift, two officers during the swing shift, and one officer during the graveyard shift." *Id.* at 3.

Because the PLRA had not yet been enacted, the Court in *Balla II* did not make any findings as to the necessity, narrowness, or intrusiveness of the *Balla II* Orders.

### ***Balla III***

In 2003, Defendants filed a motion to terminate the *Balla II* Orders pursuant to the provisions of the intervening PLRA. Judge Fitzgerald found that the overcrowded conditions at ISCI had not improved in certain units and, therefore, preserved some of the *Balla II* Orders. *Balla v. Idaho State Bd. of Corr.*, 2005 WL 2403817, *12 (D. Idaho Sept.

26, 2005) (*Balla III*), *clarified on denial of reconsideration by* Dkt. 600 (Dec. 9, 2005). Specifically, the Court incorporated its findings and conclusions with respect to overcrowding in Units 9, 10, 11, and 13 and reissued the *Balla II* injunctions governing those units, with a modification to the Unit 9 order. The Court refers to these orders as the *Balla III* Orders. The Court also found that these *Balla III* Orders met the need-narrowness-intrusive standard of § 3626(a)(1)(A).

The Court in *Balla III* expressly declined to incorporate its previous findings and conclusions with respect to *Balla II*, Orders 1 through 5, which pertained to Units 1, 2, 3, 7, and 8, as well as to close custody inmates. *Id.* at *9 n.1. The Court found that those orders were "no longer at issue in this action" and that only the Orders pertaining to Units 9, 10, 11, and 13 "of the permanent injunction in *Balla II* remain in effect."[4] *Id.* at *12. Because those *Balla II* Orders were incorporated into *Balla III*, the only *Balla II* or *Balla III* Orders that remain in effect today are the following:

| *Balla III*, Order 1 (corresponding, with modification, to *Balla II*, Order 6) | Unit 9:<br>• 117-inmate population cap<br>• Double-celling allowed in only half of the 78 cells<br>• If double-celled, must have the greater of (1) twice the security staff, or (2) security staff comparable to other medium-custody units<br>• Staffing pattern of two officers during day shift, two officers during swing shift, and one officer during graveyard shift |
| --- | --- |

---

[4] The Court finds that the omission of the other *Balla II* Orders—those pertaining to Units 1, 2, 3, 7, and 8 and close custody inmates—from the list of orders that would "remain in effect" constituted a termination of those other *Balla II* Orders.

| *Balla III*, Orders 2 and 3 (corresponding to *Balla II*, Order 7) | Units 10 and 11: 108-inmate population cap, no double-celling |
| *Balla III*, Order 4 (corresponding to *Balla II*, Order 8 | Unit 13 (formerly known as A-Block): 144-inmate population cap |
| *Balla III* Housing Order (corresponding to *Balla II* Housing Order) | • No more than two inmates in any cell<br>• No inmates housed in dayrooms or other non-designed cell areas<br>• No inmates sleeping on mattresses on the floor |
| *Balla III* Plumbing Order (corresponding to *Balla II* Plumbing Order) | Plumbing problems must be attended to within 24 hours and fixed within 3 days |

*Id*.; Dkt. 325 at 3 (March 5, 1991); Dkt 600 at 5–6 (Dec. 9, 2005).

## Modification of *Balla I*, Orders 3, 4, and 5: Modified Compliance Plans and Stipulated Motion[5]

Following the Court's appointment of a special master and the submission of the special master's report, the parties began settlement negotiations with respect to *Balla I* Orders 3, 4, and 5, which are the Orders relating to medical and mental health treatment ("*Balla I* Medical Orders").[6] The parties eventually agreed to a set of plans, the MCP,

---

[5] Because the MCP discussed in this section have expired, Defendants' compliance with those plans does not necessarily directly answer the questions posed in this proceeding: (1) whether there is a current and ongoing constitutional violation, and (2) if so, whether the prospective relief previously ordered in this case meets the need-narrowness-intrusiveness standard of § 3626. However, the Court agrees with Defendants' position at the evidentiary hearing that compliance with these plans remains relevant to these questions, as it is some evidence that Defendants have cured the constitutional violations previously found by the Court with respect to the *Balla I* Medical Orders.

[6] The parties also negotiated *Balla I*, Order 1 in the MCP, which pertained to medical diets and which has since been terminated.

**Findings of Fact & Conclusions of Law – page 10**

which were most recently admitted as Defendants' Exhibits 1 and 2 at the February 2020 evidentiary hearing and which have frequently been referred to Addenda A and B.

The MCP provided for specific monitoring procedures that IDOC would use to ensure compliance with the MCP. These monitoring procedures were referred to as "*Balla* audit tools" at the February 2020 evidentiary hearing.

The MCP contemplated a two-year monitoring period, after which IDOC would apply for certification from the National Commission on Correctional Health Care ("NCCHC"), a nationally recognized organization with the mission of improving the quality of health care in prisons, jails, and juvenile confinement facilities. Following certification that the medical and mental health treatment at ISCI complied with the NCCHC standards for institutional health care, the parties would voluntary terminate the *Balla I* Medical Orders. Dkt. 842 at § 6.7.

The parties filed a stipulated motion to modify the *Balla I* Medical Orders, incorporating the MCP. *See* Dkt. 842. On June 11, 2012, the Court approved the Stipulated Motion to modify the *Balla I* Medical Orders and adopted the MCP. At that time, the Court stated that the terms of the stipulated motion "extend no further than necessary to satisfy the requirements of 18 U.S.C. § 3626(a)(1)." Dkt. 849.

In retrospect, the Court should not have approved the MCP without making additional findings pursuant to 18 U.S.C. § 3626. *See* Dkt. 1262 at 7 ("[T]he Court should not have adopted the parties' plan simply because it was wrought by compromise and settlement."). Specifically, in approving the modification of the *Balla I* Medical Orders, the Court did *not* consider whether there was a current and ongoing constitutional

violation at ISCI—a statutory requirement for prospective relief that cannot be waived by the parties or excused by the Court.[7] *Cf. Hernandez v. Holland*, 750 F.3d 843, 856 (9th Cir. 2014) (holding that the standard of review under the Anti-Terrorism and Effective Death Penalty Act "cannot be waived" because it "'is not a procedural defense, but a standard of general applicability for all petitions … adjudicated on the merits by a state court'") (quoting *Eze v. Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003)).

Notwithstanding that the Court should have first determined whether a current and ongoing violation existed, the MCP is what defined compliance with the *Balla I* Medical Orders during the MCP's term of applicability. That is, with respect to the *Balla I* Medical Orders, compliance with the MCP would remedy any such current and ongoing violation.

The monitoring period was initially set to end in June 2016. However, in 2015, Judge Carter extended the monitoring period set forth in the MCP—for an additional two years—as a sanction for the misconduct of certain IDOC employees that occurred in 2011 and 2012. *See* Dkt. 983. Judge Carter also amended the portion of the Stipulated Motion that provided for termination of the *Balla I* Medical Orders, by (1) requiring Defendants to file a motion to terminate after the conclusion of the monitoring period, (2) placing the burden on Defendants "to prove that there are no ongoing constitutional

---

[7] The statutory requirements of § 3626(a) apply to the Court's order approving the Stipulated Motion and adopting the MCP. *See* 18 U.S.C. § 3626(c)(1) ("[T]he court shall not enter or approve a consent decree unless it complies with the limitations on relief set forth in subsection (a)"), and § 3626(g) ("[T]he term 'consent decree' means any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlements[.]").

violations, that the relief ordered exceeds what is necessary to correct an ongoing

constitutional violation, or both," and (3) providing that termination of the *Balla I*

Medical Orders would occur "only with the Court's approval." *Id*. at 18 (internal

quotation marks omitted).

For years, both before and after Judge Carter's extension of the monitoring period,

Plaintiffs—through the class representatives and counsel—monitored Defendants' use of

what everyone believed at the time to be the *Balla* audit tools required by the MCP. This

included attending monthly monitoring meetings with IDOC officials.

Alas, all was not as it seemed. In October 2015, Defendants disclosed that they

had been using audit tools identified in the wrong version of the MCP and, therefore,

were not in compliance with the MCP actually in effect. Dkt. 1202 at 16–18; Dkt 1205 at

9.[8] Despite the fact that Plaintiffs themselves were monitoring the Defendants'

monitoring, Plaintiffs did not raise an issue of noncompliance until after Defendants'

disclosure.

The Court need not recount the contempt proceedings that arose from that

noncompliance, which are detailed in previous orders, other than to recount Judge

Carter's factual finding that, as of July 2016, Defendants had brought themselves into

compliance with the MCP. Dkt. 1202 at 3, 29. As explained more fully below in the

---

[8] Defendants' noncompliance with the MCP was discovered by then-Deputy Chief of Prisons Ashley Dowell, who, "[u]nlike the IDOC officials previously in charge of *Balla*, … took swift and effective action to identify and rectify the areas of noncompliance." Dkt. 1202 at 16.

Court's Findings of Fact, Defendants have established that, from July 2016 to the present, they have remained in compliance with the MCP.

The monitoring period in the MCP expired on September 1, 2017. On March 1, 2019, Defendants filed the instant Motion to Terminate Prospective Relief.

## LEGAL STANDARDS

### Termination of Injunctive Relief

The Prison Litigation Reform Act of of 1996 ("PLRA") was enacted "to stop federal courts from micromanaging our Nation's prisons" and "from providing more than the constitutional minimum necessary to remedy the proven violation of federal rights." Shima Baradaran-Robison, *Kaleidoscopic Consent Decrees: School Desegregation and Prison Reform Consent Decrees After the Prison Litigation Reform Act and Freeman-Dowell*, 2003 B.Y.U. L. Rev. 1333, 1351 (2003) (internal quotation marks omitted). The PLRA imposes numerous restrictions on actions challenging the constitutionality of prison conditions.

These include restrictions on prospective injunctive relief, which are codified at 18 U.S.C. § 3626. The PLRA restricts "courts' authority to issue and enforce prospective relief concerning prison conditions" and requires "that such relief be supported by findings and precisely tailored to what is needed to remedy the violation of a federal right." *Miller v. French*, 530 U.S. 327, 347 (2000).

Under the PLRA, a federal court may not grant or approve prospective relief "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means

necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). The Court will refer to these required findings as "need-narrowness-intrusiveness" findings. *See Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010). In considering prospective relief, a court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1)(A).

Section 3626 limits not only the circumstances in which prospective relief may be granted, but it also governs the termination of such relief. Prospective relief is terminable upon motion of a party, at the latest, two years after the relief was granted. If the relief was granted before the enactment of the PLRA, it is terminable no later than two years after the date of enactment. 18 U.S.C. § 3626(b)(1)(A).

Further, prospective relief is subject to *immediate* termination if the court granted the relief without making the required need-narrowness-intrusiveness findings. *Id.* § 3626(b)(2) ("[A] defendant … shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."). This plain language appears to require immediate termination of any relief that was not accompanied by need-narrowness-intrusiveness findings at the time the relief was granted.

However, the Ninth Circuit has interpreted § 3626(b)(2) as requiring a district court to examine present conditions of confinement to determine if the need-narrowness-

intrusiveness standard is currently satisfied, rather than requiring the district court to immediately terminate any relief that was granted in the absence of need-narrowness-intrusiveness findings. *Gilmore v. People of the State of California*, 220 F.3d 987, 1008 (9th Cir. 2000) ("We conclude that the court erred in its ... exclusive focus on express findings rather than on whether, in fact, the remedy exceeded the constitutional minimum according to the record and the relevant caselaw."). Essentially, it seems that the court in *Gilmore* equated § 3626(b)(2)'s language that a defendant is "entitled to immediate termination" of relief with § 3626(b)(1)'s language that relief is "terminable."

In addition to *Gilmore*'s limitation on immediate termination, the statutory language itself also limits termination of prospective relief, with the savings provision of § 3626(b)(3). Even if relief is terminable under § 3626(b)(1) or (2), a court may not terminate the prospective relief if the relief "remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and ... is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3).

If a court finds no current and ongoing violation of "the Federal right," the inquiry ends. The court must terminate all prospective relief.

If a court does find a current and ongoing violation of "the Federal right," it must undertake an additional analysis. Even if such a violation exists, prison officials are entitled to *modification* of the prospective relief—rather than maintenance of the prospective relief in its present form—if the court finds that the existing relief does not meet the need-narrowness-intrusiveness standard. *See Gilmore*, 220 F.3d at 1008 ("If the

**Findings of Fact & Conclusions of Law – page 16**

existing relief qualifies for termination … but there is a current and ongoing violation, the district court will have to modify the relief to meet the [PLRA's] standards."); *Pierce v. Orange County*, 526 F.3d 1190, 1204 n.13 (9th Cir. 2008) (describing the district court's "authority under § 3626 to modify (and thereby expand or diminish)" the existing prospective relief). This is true even if the relief did, at one point, meet that standard, because the analysis under the PLRA's termination provisions must focus on "the *current* circumstances at the prison," rather than the conditions that existed at the time the relief was granted. *Gilmore*, 220 F.3d at 1009 (emphasis added). Determining whether prospective relief meets § 3626(b)(3)'s need-narrowness-intrusiveness standard "will obviously rest upon case-specific factors—namely, the extent of the current and ongoing constitutional violations." *Pierce*, 526 F.3d at 1206.

In the Ninth Circuit, the party moving for termination has the burden "to prove its compliance" with the federal right at issue in the case. *Gilmore*, 220 F.3d at 1008; *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (per curiam) ("When a party moves to terminate prospective relief under § 3626(b), the burden is on the movant to demonstrate that there are no ongoing constitutional violations, that the relief ordered exceeds what is necessary to correct an ongoing constitutional violation, or both."). This Court has previously expressed its belief that the plain language of the statute "requires a different approach":

> As the moving party, Defendants should have the initial burden to show that they are entitled to termination under § 3626(b)(1) or (2). *See* § 3626(b)(1)(A) and (A)(iii) (prospective relief granted before the PLRA was enacted is "terminable upon the motion of any party" two years after enactment). The burden should then shift to Plaintiffs to

show that the "limitation" on entitlement to termination in § 3626(b)(3) applies—that the "prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and … is narrowly drawn and the least intrusive means to correct the violation." *See, e.g., Guajardo v. Texas Dep't of Criminal Justice*, 363 F.3d 392, 395 (5th Cir. 2004) ("TDCJ, in seeking termination, must initially establish the requisite passage of time. As held by most courts, the burden of proof then shifts to the prisoners to demonstrate ongoing violations and that the relief is narrowly drawn.") (internal citation and parenthetical omitted).

Dkt. 1357 at 7 n.1.  Nonetheless, the Court is bound by the Ninth Circuit's statement in *Gilmore*.

Thus, Defendants hold the burden of proof not merely to show that two years have passed since the relief was granted, or that the relief was granted in the absence of the required need-narrowness-intrusiveness findings. Defendants must also show that they are not presently committing a current and ongoing constitutional violation of the federal right at issue or that, if they are, the prospective relief exceeds the constitutional minimum. However, not just any constitutional violation can justify the maintenance or modification of the remaining *Balla* Orders. The scope of permissible injunctive relief "is dictated by the extent of the violation established." *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 963 (E.D. Cal. and N.D. Cal. 2009). A systemwide injunction "is appropriate only if plaintiffs have established systemwide injury and impact." *Id*. As this case exemplifies, class actions may result in such a remedy. *See also Parsons v. Ryan*, 754 F.3d 657, 680 (9th Cir. 2014) ("Claims … involving detailed factual and legal allegations of specified systemic deficiencies in prison conditions giving rise to a

substantial risk of serious harm, have long been brought in the form

of class actions lawsuits.").

A court should grant or maintain systemwide relief only where the violations "are

attributable to policies or practices pervading the whole system," or where "the unlawful

policies or practices affect such a broad range of plaintiffs that an overhaul of the system

is the only feasible manner in which to address the class's injury." *Armstrong v. Davis*,

275 F.3d 849, 870 (9th Cir. 2001), *abrogated on other grounds by Johnson v.*

*California*, 543 U.S. 499, 507 (2005). By contrast, "isolated violations affecting a

narrow range of plaintiffs" cannot justify systemwide relief. *Id.*; *see also Lewis v. Casey*,

518 U.S. 343, 359 (1996) (holding that two instances of access-to-courts violations

"were a patently inadequate basis for a conclusion of systemwide violation and

imposition of systemwide relief"). Such claims are better addressed in an individual

lawsuit by an individual plaintiff.

This 39-year-old case, filed on May 15, 1981, "has always been about systemic

failures amounting to constitutional violations. Proof of some individual failures does

not establish systemic constitutional failures." *Graves v. Penzone*, No. CV-77-00479-

PHX-NVW, 2019 WL 4535543, at *3 (D. Ariz. Sept. 19, 2019). Therefore, the mere

existence of instances of, for example, constitutionally deficient medical treatment at

ISCI would not establish a systemic Eighth Amendment violation precluding

termination of prospective relief under § 3626(b). On the other hand, if enough of those

instances have occurred such that a causal link is established between the class

members' injuries and a systemwide policy or practice, then a systemwide remedy may remain appropriate.

### Definition of "the Federal Right" Referenced in § 3626(b)(3)

The savings provision requires that the Court maintain or modify the *Balla* Orders if it finds a current and ongoing violation of "the Federal right" at issue in these proceedings, which—as the Court has previously explained—is the constitutional right that was previously litigated and found to have been violated. *See* Dkt. 1357. "The use of the definite article [in § 3626(b)(3)] must mean that violations of federal rights other than those previously litigated—and found to have been violated—may not be dealt with in termination proceedings in the existing case. Instead, any such new violations must be brought, if at all, in a new lawsuit." *Id*. at 2. Because the nature and scope of "the Federal right" is informed by, but not defined by, the scope of the prospective relief, a court considering a § 3626(b) motion to terminate must focus on "the federal right which the prospective relief was intended to protect." *Id*. at 3.

As a result, the only types of constitutional violations that are relevant at this stage of the proceedings are those that were fully adjudicated in the 1980s, 1990s, and 2000s. The rights that the *Balla* Orders were intended to protect are (1) the right of ISCI inmates to adequate medical and mental treatment, with respect to the types of violations that were previously established or that can otherwise be linked to a specific *Balla* Order, and (2) the right to conditions of confinement that do not constitute cruel and unusual punishment as a result of overcrowding, in those areas of the prison that were previously litigated or that can otherwise be linked to a specific *Balla* Order.

Findings of Fact & Conclusions of Law – page 20

**Eighth Amendment Standard**

Prison officials violate the Eighth Amendment when they are deliberately indifferent to inadequate medical care being provided to inmates.  Inadequate medical care is a failure to treat a serious medical need – that is, a failure to treat an inmate's condition that could result in further significant injury or the unnecessary and wanton infliction of pain.  *Edmo v. Corizon Inc.,* 935 F.3d 757, 785 (9th Cir. 2019).  The failure must be the result of deliberate indifference on the part of prison officials.  *Id.*  An inadvertent or negligent failure to provide adequate medical care – and even medical malpractice – is insufficient to establish deliberate indifference.  *Id.*  To constitute deliberate indifference, the course of treatment the official chose must have been medically unacceptable under the circumstances and chosen by that official in conscious disregard of an excessive risk to the plaintiff's health.  *Id.*  Under this standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, but that person must also draw the inference."  *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004).  Typically, a difference of opinion between a physician and the prisoner – or between medical professionals – concerning what medical care is appropriate does not amount to deliberate indifference.  *See Edmo,* 935 F.3d at 786.  But that is true "only if the dueling opinions are [both] medically acceptable under the circumstances."  *Id.*

Overcrowding rises to the level of an Eighth Amendment violation only when it is combined with other factors, such as violence or inadequate staffing.  *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 471 (9th Cir. 1989).  A small cell, or housing two inmates in

a single cell, raises constitutional concerns only if it results in "genuine privations and hardship over an extended period of time." *Bell v. Wolfish*, 441 U.S. 520, 542 (1979) (pretrial detainees, due process context).

The opinions of experts and national organizations—such as the NCCHC—can also be relevant as to whether conditions of confinement violate the Eighth Amendment. *Balla I*, 595 F. Supp. at 1563. However, "these opinions will not ordinarily establish constitutional minima." *Id.*; *see also Bell*, 441 U.S. at 543 n.27 ("[W]hile the recommendations of [such] various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question.").

For example, the NCCHC standards are designed to ensure that systems, policies, and procedures of correctional institutions are "in keeping with nationally recognized best practices" in correctional medical care. *Graves v. Arpaio*, 48 F. Supp. 3d 1318, 1338 (D. Ariz. 2014), *amended*, No. CV-77-00479-PHX-NVW, 2014 WL 6983316 (D. Ariz. Dec. 10, 2014), *and judgment terminated sub nom., Graves v. Penzone*, 2019 WL 4535543. But best practices are not necessarily the constitutional floor. Systems, policies and procedures that fall short of best practices may still comply with the Eighth Amendment; conversely, compliance with best practices would seem to be important, but not conclusive, evidence of compliance with the Eighth Amendment.  Thus, although the Court will consider the NCCHC's opinions as to the medical treatment provided at ISCI, as it will consider all the evidence in this matter, those opinions do not compel the Court's decision.

**Findings of Fact & Conclusions of Law – page 22**

## FINDINGS OF FACT & CONCLUSIONS OF LAW

**NCCHC Compliance**

The NCCHC was established in the early 1970s by the American Medical Association to improve the quality of health care in jails, prisons and juvenile confinement facilities. NCCHC establishes standards for health services in correctional facilities and operates a voluntary accreditation program for institutions that meet those standards.

As part of the accreditation process, NCCHC staff visit a prison, review inmates' medical records, and interview prison staff and inmates concerning the provision of medical services.  In this case, the NCCHC staff reviewed 71 health records of inmates and interviewed ISCI's deputy warden, responsible physician, health services administrator, other health, mental health, dental, and pharmacy staff, sergeant, three Correctional Officers, and 16 inmates selected at random.  *See* Exh. 189.

The NCCHC investigators were looking for compliance with 39 "essential" standards and 21 "important" standards.  *See* Exh. 189.  For example, essential standards include (1) no unreasonable barriers to care; (2) qualified health care professionals make clinical decisions; (3) proper identification and treatment of chronic disease such as diabetes, hypertension, and psychotic disorders; (4) proper infectious disease prevention and control; (5) proper suicide prevention and intervention program; (6) training for all qualified medical staff, correctional officers, and inmates who work with them; (7) compliance with all state and federal laws governing dispensing pharmaceuticals; and (8) identification and treatment of mental health needs, including individual and group

**Findings of Fact & Conclusions of Law – page 23**

counseling, crisis intervention, and psychotropic medication management. *Id.* In order to receive full accreditation, the facility must comply with 100% of the essential standards. *Id.*

The "important" standards include (1) full and timely reviews of all inmate deaths; (2) timely and effective grievance process for health care complaints; (3) healthy lifestyle promotion; (4) patient safety and confidentiality; (5) proper staffing; (6) sufficient clinical space and equipment; and (7) timely and safe inmate escort to off-site appointments. In order to receive full accreditation, the facility must comply with 85% of the 21 important standards. *Id.*

Based on its investigation, the NCCHC concluded that 38 of the 39 essential standards applied to ISCI and that the facility satisfied 34 of those 38 essential standards. *Id.* In addition, the NCCHC found that ISCI complied with all 21 of the important standards. *Id.*

Because the facility did not comply with 100% of the essential standards, it was given a "continued accreditation with verification," meaning that the lack of compliance with the 4 standards must be corrected before a full accreditation could be awarded. *Id.* Later, ISCI verified that it had corrected those shortcomings and NCCHC issued a second report dated January 14, 2020, concluding that ISCI had met 100% of all the essential and important standards, and issued a Certificate of Accreditation to ISCI. *See* Ex. 305 at 2; Ex. 313.

## Modified Compliance Plans & Audit Tools

In May of 2012, the plaintiffs and ISCI entered into a Stipulation agreeing that ISCI would implement the MCP to address challenges made by plaintiffs to ISCI's provision of medical and mental health services.  *See Stipulation (Dkt. No. 842).*  The Court approved that Stipulation shortly thereafter.  *See Order (Dkt. No. 849).*  The specifics of the MCP were then negotiated by the parties, finalized, and adopted by the Court.  *See Order (Dkt. No. 930).*

The MCP were tied to the NCCHC standards.  Under the MCP, ISCI would use audit tools to monitor (on a monthly basis) compliance with the NCCHC standards with the overarching goal to ensure compliance with *Balla I* orders 1, 3, 4 and 5.  *See Plaintiffs' Brief (Dkt. No. 1286)* at p. 6.

The NCCHC standards identified 38 "essential" standards that applied to ISCI and must be met for accreditation, as discussed above.  Correspondingly, there are 37 audit tools used by ISCI to monitor its compliance on a monthly basis with all but one of those NCCHC standards.  *See Exhibit 86.*

To take one example, audit tool 02 looks at how responsive ISCI is to Health Service Requests (HSRs).  *Id.*  These are inmate requests for some type of medical service.  For the month of December 2019, inmates filed 91 HSRs and 90 of those inmates were evaluated within the required time frames for an initial screening.  *See Exhibit 306.*  Of those 91 inmates, 68 were referred to a medical provider, and 67 of those inmates saw a medical provider within 14 days.  *Id.*  The parties had earlier agreed that a 90% compliance rate was the minimum required, and Exhibit 306 shows that ISCI easily satisfied that rate for each of the audit tools for the month of December 2019.  The Court

**Findings of Fact & Conclusions of Law – page 25**

will discuss later in this decision a time when ISCI's compliance was much lower but was later corrected.

To take another example, audit tools 04 & 05 look at whether the medical providers at ISCI have the necessary licensure and training.  For the month of December of 2019, 50 staff members required some type of licensure and training, and the review showed that all 50 had the necessary licensure and training.  *See Exhibit 306.*

Jeremy Clark, a Clinical Supervisor, testified that it was his responsibility to monitor the audit tools dealing with mental health.  For example, audit tool 03 examines whether inmates in the Behavioral Health Unit (BHU) have appropriate treatment plans and whether those plans "appear to reflect appropriate clinical judgment" among other things.  *See Exhibit 306.*  To perform his review of audit tool 03, Clark picks a random sample of 10% of the inmates in the BHU, pulls their medical records, and examines whether they have up to date assessments, treatment plans and psychiatric care.  He also examines whether those plans reflect appropriate clinical judgment.

For the month of December 2019, he pulled the records of 25 inmates in the BHU. Each of those inmates had a treatment plan that reflected appropriate clinical judgment. He concluded that ISCI had a 100% compliance rate for audit tool 03.  *See Exhibit 306.* Indeed, for the years 2018 and 2019, Clark's review showed that for each audit tool dealing with mental health treatment, ISCI was complying with the standards at or above the 90% rate.  *Id.*

Plaintiffs agreed to the audit tools and the MCP to ensure compliance with *Balla I* orders 3, 4 and 5.  On the basis of the evidence discussed above, the Court finds that for

the years 2018 and 2019, ISCI satisfied the 90% threshold requirement for each audit tool every month with few exceptions.  *See* Tr., vol. 1, 36-37, 122-126.  The one glaring exception was those months when ISCI failed to arrange for provider visits within 14 days of an HSR being filed, an exception that was corrected as the Court will discuss further below.

**<u>Medical Annex</u>**

Much of the evidence at trial focused on the Medical Annex.  It is a tent-like structure housing 78 inmates.  *See* Tr. vol. 1 at 140 (Dr. Haggard); Ex. 301 at 41-42. Adjacent to the Medical Annex is the Medical Building, which houses the prison's Infirmary, Chronic Care Clinic, and Long Term Care (LTC) unit. *See* Tr. vol 1 at 140; vol. 10 at 2154 (Dr. Haggard).  Any discussion of the Medical Annex must include a summary of the services available in the Medical Building because inmates are often placed in the Medical Annex because it is close to these other services.

The Medical Building houses the Infirmary with capacity for 13 patients. It serves as an on-site, acute care facility, where skilled care is provided for patients with serious illnesses and infectious diseases. *See* Tr. vol. 1 at 141 & 144; vol. 10 at 2161 (Dr. Haggard).  For example, the Infirmary would treat inmates (1) with infectious diseases like the flu or tuberculosis; (2) who need intravenous long-term antibiotics or wound care with wound vacs and (3) who are not ambulatory after surgery.  *See* Tr. Vol. 10 at 2161-65 (Dr. Haggard).

The LTC unit is essentially the equivalent of a nursing home.  *See* Tr., vol. 1, 144:17-145:5 (Dr. Haggard).  It has 16 beds and houses patients with dementia and

chronic conditions who cannot independently accomplish the acts of daily living, such as toileting, transferring between bed and wheelchair, bathing, feeding, taking medications, and wound care. *See* Tr. vol. 5 at 1069-70 (Dr. Menard); Tr. vol. 1 at 80 (Hofer).

Dr. Haggard is in charge of admitting and discharging inmates from LTC, and she performs working rounds there every Tuesday, meeting with the nursing staff to discuss the status of each patient. *Id.* at 144-45. She examines each LTC patient, makes sure needed medications and lab tests are ordered, and addresses any problems the nurses bring to her attention. *Id.* The treatment plans for each LTC patient are maintained in the electronic record (known as "eOMIS"). *Id.* at 145. A second physician, Dr. Dawson, the RMD for Corizon, also performs rounds in LTC with Dr. Haggard on Tuesdays. *Id.* Dr. Dawson's duties are to ensure that LTC patients are receiving appropriate care. *Id.*

Inmates in the Infirmary or LTC have serious disabilities and illnesses that prevent them from doing daily activities. These intensive services are not the best fit for inmates who can function independently despite their disability or chronic illness; yet those inmates capable of independent functioning need more than the basic services offered to the general population. To bridge this gap ISCI built the Medical Annex – it operates like an independent living center serving as a link between the general population and the Infirmary/LTC unit. The Court will explore this concept of the Medical Annex further below.

The Medical Annex is staffed with a full-time Registered Nurse (RN), a position currently filled by Hannah Taff who works three days a week, from 5:00 a.m. to 5:00 p.m. *See* Tr. vol. 1 at 48, 65 (Hofer); Tr. vol. 9 at 1855-56 (Taff). Taff engages with

Annex inmates during two pill calls, a diabetic insulin call, sick call and wound care.  *See* Tr., vol. 9, 2131.  If she learns that for any of those activities an inmate is not able to come up to the nurses' window, she would alert a provider and management.  *Id.*  If an inmate is found to be incapable of getting to the window on their own, they would be moved to LTC or the Infirmary.  *See* Tr., vol. 9, 2131:13-19 (Taff).

During the day-time hours when an RN is not working in the Medical Annex, an LPN is on duty there.  *See* Tr. 67:13-20 (Hofer).  In the evenings, if there is an emergency in the Medical Annex, there is a Correctional Medical Specialist (CMS) – akin to an EMT or Army medic – in the Medical Building next door to the Medical Annex who can respond to emergencies.  *See* Tr. vol. 6 at 1388, 1394 (Young).  On Tuesdays and Thursdays there were two CMSs on the night shift.  The CMS can also call on Correctional Officers who are trained in CPR and in recognizing responders are on call and will respond in four minutes.  *Id.*

Inmates placed in the Medical Annex generally have higher medical needs than the general population.  *See* Tr. 201:13-16 (Dr. Haggard).  For some of those inmates, their medical conditions include diabetes, high blood pressure, incontinence, cancer, and infections, among other chronic conditions.  *Id.* at 204-205 (Dr. Haggard); Tr. vol. 1 at 49:8-25 (Hofer).  Others have disabilities and amputations and must use wheelchairs, walkers, and canes.  *Id.* at 205 (Dr. Haggard); Tr. at 49:8-25 (Hofer).

These inmates with chronic conditions and mobility problems are often placed in the Medical Annex because they will be close to facilities which they need to access on a regular basis – the cafeteria, the pharmacy dispensary, and the Chronic Care Clinic in the

**Findings of Fact & Conclusions of Law – page 29**

Medical Building.  Testimony demonstrated that even with limited mobility they have enough mobility to access those services.  *See* Tr., vol. 9 at 2138 (Taff); Tr. vols. 10 at 2268 (Tillemans).

While in the Medical Annex, those inmates with chronic conditions are treated in the Chronic Care Clinic on an outpatient basis by a board-certified physician, Dr. Haggard.  *See* Tr. vol. 10 at 2153-54 (Dr. Haggard).  If Dr. Haggard sees that an inmate's condition is deteriorating, she will move that inmate into the Infirmary or to the LTC unit.  *Id.* at 2159-61 (Dr. Haggard).

Inmates are only placed in the Medical Annex if they can do all the activities of daily living.  *See* Tr. Vol. 10, 2157-58 (Dr. Haggard).  There are exceptions, however. Some inmates are incontinent, wear adult diapers, and at times are unable to clean themselves after soiling themselves.  *See* Tr. vol. 6 at 1460 (Young).  But this is a rare occurrence, and when it happens, a janitor or CMS can help with the cleaning.  *Id.* at 1453.  There are also inmates in the Medical Annex who are confined to a wheelchair and might need help showering – they are scheduled to shower in the LTC, which has seats and a shower hose.  *See* Tr. vol. 10 at 2158 (Dr. Haggard).  Of these inmates, Dr. Haggard testified that "they are functionally able to take care of themselves."  *Id*.  Dr. Menard, the former Regional Medical Director, agreed with Dr. Haggard's conclusion that inmates in the Medical Annex could perform the activities of daily living.  *See* Tr. vol. 5 at 1160 (Dr. Menard).

As will be discussed further below, there are instances where the capacity of an inmate to do the activities of daily living deteriorates or is temporarily limited.  When

that happens, in most cases, the inmate is either given assistance or transferred to the

Infirmary or the LTC unit, as will be discussed further below.  While there have been

instances where there were delays in transferring an inmate – or failures to assist an

inmate – those incidents are isolated in nature and not the result of a systemic failure.

**Challenge to the Medical Annex – Dr. Williams & Dr. Menard**

Plaintiffs challenge this portrayal of the Medical Annex as a well-run facility by

introducing, among other evidence, the testimony of Dr. Ryan Williams and Dr. Steven

Menard.  Dr. Williams is a board-certified internal medicine specialist who holds a

license to practice in Idaho and is the Medical Director for four skilled nursing facilities

located in Idaho.  To render his opinion about the Medical Annex he reviewed deposition

testimony along with videos of the Annex, and visited the site on one occasion for about

an hour-and-a-half.  *See* Tr. vol. 9 at 2050 (Dr. Williams).  He concluded that 20% of the

inmates he observed there had such serious medical conditions that they belonged instead

in a skilled nursing facility.  *Id.* at 2072; *see also* at 2057 ("you can tell a lot by just

observing a patient. And there are several signs that are evident that tell you what level of

– what acuity the patient may be at and what the patient's needs may be").  Because there

are 78 inmates in the Medical Annex, that means that in his opinion about 15 to 16 of

those inmates should be in the LTC unit.  He testified that (1) the Medical Annex does

not function as a skilled nursing facility and fails to meet the standards set for those

facilities by the Idaho Administrative Procedures Act (IDAPA); and (2) that this failure is

causing harm to the inmates.  *Id.* at 2054.

**Findings of Fact & Conclusions of Law – page 31**

A similar challenge to the Medical Annex came from Dr. Steven Menard, a board-certified family practice physician who was Regional Medical Director (RMD) at ISCI from January of 2018 to January of 2019. He testified that during his tenure, there were inmates in the Medical Annex that belonged instead in the LTC unit but could not be moved there because of a lack of beds in LTC. *See* Tr. vol. 5 at 1060 (Dr. Menard); *see also* Exh. 1085 (minutes of an ISCI meeting held May 10, 2018, recounting Dr. Menard's statements that "patients who really should be in long term care are being placed in the Medical Annex because Long Term Care is full. Extra staffing was discussed due to the Annex being more like a skilled nursing facility"). He was critical of the narrow aisles between beds and the way the beds were all abutted up against each other, leaving only one side of the bed accessible because the head, foot, and other side of the bed were abutted up against other beds with only short half-walls separating the beds. *Id.* at 1064-1065. Having the beds so close together would, in his opinion, allow infectious diseases like the flu to spread quickly and block easy access for emergency responders to inmates in their beds. *Id.* at 1077.

Dr. Menard testified that he was constantly asking for additional staff but his demands were always rejected. *Id.* at 1090. This was especially true during a time when the Health Service Requests (HSRs) filed by inmates increased so quickly that it overwhelmed the staff. The Court will discuss this incident in more detail below. To provide for inmates in the Medical Annex, Dr. Menard often had to pull an LPN out of LTC. *Id.* at 1068. In meetings with staff they discussed inmates helping with toileting for incontinent inmates in the Medical Annex. *Id.* at 1089.

**Findings of Fact & Conclusions of Law – page 32**

When Dr. Menard was asked if the lack of staff led to any patient harm, he recalled a case where an inmate in the Medical Annex was sitting in his chair for two weeks until his skin rotted and turned black. *Id.* at 1091-95. The inmate had significant health problems, was not compliant with the treatments set up by medical providers, and eventually passed away. *Id.* He should not have been in the Medical Annex with such serious health concerns but should have been moved to the Infirmary or LTC, according to Dr. Menard. *Id.*

### Analysis of Testimony of Dr. Williams and Dr. Menard.

The testimony of Dr. Williams and Dr. Menard was troubling because of their impressive expertise. Dr. Menard ultimately resigned because he no longer felt he could practice ethically given the level of care he was providing. *Id.* at 1145. Both Dr. Williams and Dr. Menard have high professional standards and testified convincingly that the Medical Annex violated those standards.

However, the testimony at trial also included contrary opinions. For example, Drs. Williams and Menard testified that there were inmates languishing in the Medical Annex who obviously belonged in LTC or the Infirmary and were not getting proper care for their serious medical needs. A contrary opinion was offered by Dr. Haggard who testified that she was not aware of any inmate currently housed in the Medical Annex who needs to be in the LTC, or any inmate that was discharged from LTC to the Medical Annex that still belonged in LTC. *See* Tr. Vol. 10 at 2163. She further testified that although the LTC is often full, *id.* at vol. 1, 213, she was not aware of any inmate who was not able to be admitted to the LTC due to a lack of capacity in the LTC. *See* Tr. Vol.

**Findings of Fact & Conclusions of Law – page 33**

10 at 2163.  In response to the Court's inquiry, she testified that she has never been required to provide care below her own perception of the community standard of care because of budget restraints or administrative directive.  *Id.* at 2261.

Hannah Taff, the RN who works in the Medical Annex, testified similarly that she was not aware of any inmate in the Medical Annex that was blocked from transferring to the LTC unit because it was full.  *See* Tr., vol. 9, at 2138-39.  She also testified that no inmate in the Medical Annex was not getting access to care because of being physically unable to access that care.  *Id.*

Dr. Williams testified that he would defer to the treating physician's opinion as to whether the inmates in the Annex should be in LTC.  *Id.* at 2106.  That treating physician is Dr. Haggard who, as discussed above, regularly sees inmates from the Medical Annex in the Chronic Care Clinic on an outpatient basis.  Referring to Dr. Williams' testimony that 20% of inmates in the Medical Annex belonged in LTC, Dr. Haggard responded that "I don't know how he came to that conclusion."  *Id.* at 2258.

Dr. Menard similarly deferred to Dr. Haggard when he (as RMD) was her supervisor – she made the decisions on admitting inmates to LTC, and Dr. Menard never once overrode her decisions.  *See* Tr. vol. 5 at 1165 (Dr. Menard).  He deferred to Dr. Haggard because "[s]he has more insight because she's there five days a week, 10 hours a day or plus."  *Id.* at 1166.  He agreed with Dr. Haggard's conclusion that inmates in the Medical Annex could perform the activities of daily living.  *Id.* at 1160.  He did not regularly review medical records of inmates in the Medical Annex and had no knowledge

of any communicable diseases or skin infections being transmitted in the Medical Annex. *Id.* at 1169-70.

Dr. Menard is correct that aisles in the Medical Annex are narrow and at times passage is hindered by wheelchairs, oxygen tanks, and various items. But the Correctional Officers are trained to direct inmates to clear any obstacles and they take that responsibility seriously. *See* Tr. vol. 10 at 2314 (Ellington). Correctional Officer Ellington testified that the Unit Sergeant "consistently walks the unit and reminds them." *Id.* He also testified that emergency responders could wheel a gurney down the aisles to get access to an inmate. *Id.*

Further testimony on aisle access was given by nurse Tillemans, an RN who was Director of Nursing and then Health Services Administrator at ISCI. She narrated a video of the emergency response to an unresponsive inmate lying in his bed in the Medical Annex. *See* Exh. Exh. 1245 (starting at 10:31:00); Tr., vol. 10, 2270-73 (Tillemans). The video shows a Correctional Officer calling an emergency for an unresponsive inmate in his bed on an inside aisle, a location that Dr. Menard was especially concerned about. In the incident recorded on the video, Tillemans was one of at least five emergency responders who responded within just minutes to that bed. The video and Tillemans' testimony were consistent – the emergency responders had no difficulty accessing the unresponsive inmate and providing appropriate medical aid. *Id.* at 2274-82 (Tillemans); Exh 1245 (video).

Similar testimony was given by Hannah Taff, who, as a nurse staffing the Medical Annex on a fulltime basis, has personally responded to medical emergencies about ten

times.  *See* Tr., vol. 9 at 2133. (Taff).  She testified that she "never had issues" gaining access to inmates needing emergency treatment in their bunks.  *Id.* at 2134 (Taff).

 It is difficult to reconcile the testimony of Dr. Haggard, Dr. Williams, Dr. Menard, and nurses Hannah Taft RN and Amanda Tillemans RN.  Each has impressive credentials and each testified credibly, but at first glance, it appears they were practicing in two different Medical Annexes; Dr. Haggard and nurses Taff and Tillemans saw satisfactory care where Drs. Williams and Menard saw substandard care.  How can that be?

The answer lies in the standards applied by Drs. Williams and Menard.  They have long experience practicing outside of a prison setting.  While they do not advocate gold-plated health care for the prison, they do want the prison to comply with the standards applicable to their practice outside the prison system:  Dr. Williams abides by IDAPA standards, and Dr. Menard by his high ethical and malpractice standards.  Indeed, when Dr. Menard was asked by the Court whether medical care (or its lack) in the Medical Annex resulted in significant injury or the unnecessary and wanton infliction of pain – the Eighth Amendment standard – he answered, "I don't know if I can answer that."  *See* Tr. vol. 5 at 1188 (Dr. Menard).

The standards applied by Drs. Williams and Menard are not the Eighth Amendment standards.  An inadvertent or negligent failure to provide adequate medical care is insufficient to establish a claim under the Eighth Amendment.  *Edmo,* 935 F.3d at 786.  Even medical malpractice does not violate the Eighth Amendment.  *Id.*  What is required is deliberate indifference – the plaintiffs must show that "the course of treatment

the [official] chose was medically unacceptable under the circumstances and that the [official] chose this course in conscious disregard of an excessive risk to the plaintiff's health." *Id.*

The opinions of Drs. Williams and Menard are "highly relevant" in determining what care is medically acceptable, but they are not determinative. *Id.* However, there were other opinions – contrary opinions – offered by Dr. Haggard and nurses Tillemans and Taff. Typically, "[a] difference of opinion between medical professionals … concerning what medical care is appropriate does not amount to deliberate indifference." *Id.* But that is true only if the dueling opinions are medically acceptable under the circumstances. *Id.*

The Court cannot find that the opinions of Dr. Haggard and nurses Tillemans and Taff were "medically unacceptable under the circumstances" demonstrating that they "chose this course in conscious disregard of an excessive risk to the plaintiff's health." *Id.* Instead, the Court finds their opinions medically acceptable. If medical personnel have been "consistently responsive to [the inmate's] medical needs," and medical personnel did not have both a "subjective knowledge and conscious disregard of a substantial risk of serious injury," there has been no Eighth Amendment violation. *Toguchi*, 391 F.3d at 1061. That describes the work of Dr. Haggard and nurses Tillemans and Taff, among others.

Though there is a difference in medical opinions, the Court cannot find that the opinions of Dr. Williams and Dr. Menard establish that ISCI is providing constitutionally

inadequate medical care in the Medical Annex and further finds that the medical providers and officials of ISCI are not acting with deliberate indifference.

## Challenge to the Medical Annex – Testimony of Individual Inmates

### Joshua McGiboney

Inmate Joshua McGiboney suffers from a rare condition known as arteriovenous malformation ("AVM"), which is essentially a condition where the blood vessels in his spine are tangled and subject to hemorrhaging. *See* Tr., vol. 7 at 1569 (McGiboney); Tr. vol. 10 at 2249 (Dr. Haggard). He entered the ISCI in March of 2016 with this condition and was treated by Dr. Haggard. *Id.* Late in 2017 he received an MRI indicating he needed a complicated type of neurological surgery, and it was approved by ISCI. *See* Tr. vol. 7 at 1561, 1564 (McGiboney). During that surgery a team of surgeons drained fluid from his spine, stopped the hemorrhaging, and opened up pathways for his nerves and circulatory system to prevent further damage. *Id.* at 1564-65. After the surgery he was returned to ISCI where there was a mix-up with his medication although the record does not reveal whether the error was with the physician's prescription or ISCI interpretation of the prescription.

Once back at ISCI, he was to receive physical therapy. The staff at St. Al's Hospital recommended that he receive three-hour-a-day therapy sessions but the sessions he received at ISCI were limited to 20-minute sessions. *Id.* at 1566.

However, within a few months ISCI sent him off-site to a physical therapy clinic run by St. Al's Hospital known as Liberty Stars. *Id.* at 1572-73. From April to November of 2018, he was transported from ISCI to Liberty Stars once or twice a week

for physical therapy.  *See* Tr. vol.10 at 2206 (Dr. Haggard).  That therapy was later

stopped but then started again when ordered by the Court in a separate case.  Tr. vol.7 at

1576-78.  That therapy continues and includes pool therapy.  *See Exhibit 318;* Tr. vol.10

at 2205-10 (Dr. Haggard)*.*  In 2018, McGiboney suffered from additional bleeding in his

spine and pain from degenerative discs in his back.  He received additional visits to

outside specialists and further treatment.  *Id.*

McGiboney also complains that he had to re-use catheters because there were none

in stock.  *See* Tr. vol. 7 at 1569 (McGiboney).  At most this appears to be an isolated

incident – Dr. Haggard testified credibly that inmates could "obtain as many catheters as

they need" and that she was not "aware of us running out of catheters."  *See* Tr. vol. 10 at

2253 (Dr. Haggard).

These facts show that McGiboney had a rare and complicated medical condition

that required multiple surgeries and extensive treatment by medical specialists.  ISCI

provided those surgeries and treatments, and while his post-operative physical therapy

may not have always been precisely in the amounts recommended, it was nevertheless

extensive, requiring ISCI to transport him off-site for therapy that included pool

treatment.  There is no evidence that any problems he suffered post-operatively were

caused by insufficient time in therapy.  With regard to catheter use, his experience is an

isolated one as Dr. Haggard convincingly refuted any inference of a systemic shortage of

catheters.

If anything, McGiboney's testimony demonstrates that ISCI provides access to

complex neurological surgery and extensive off-site physical therapy, including pool

therapy.  Nothing here even hints at an Eighth Amendment violation. Further, even if McGiboney's care had been substandard, there is no evidence that could support a conclusion that such care was the result of a systemwide problem.

_Keith Dickson_

Inmate Keith Dickson suffers from "moyamoya", a disease that creates an abnormal tangle of blood vessels in the brain.  *See* Tr. Vol. 10 at 2188 (Dr. Haggard).  He had suffered a rupture of one of those vessels in his brain before came into the ISCI and was monitored regularly for this condition by Dr. Haggard.  *Id.*  His symptoms included headaches and seizures.  *Id.*

Dickson fell on December 24, 2018 and was having neck pain, so he was placed in a cervical collar to protect his neck.  *See* Tr., vol. 10 at 2191 (Dr. Haggard).  The next day he was examined in the Infirmary, and his medical notes say nothing about any sores on his neck and do not indicate that he was complaining about sores.  *Id.* at 2192. Eventually he was discharged by Dr. Haggard who decided to keep the cervical collar on until x-rays could be taken.  *Id.* at 2196.  The x-rays were taken on January 2, 2019, and the cervical collar removed on that day.  *Id.*

When testifying, Dickson claimed the cervical collar was "rubbing on [his] neck where [he] had scars from it."  *See* Tr., vol. 7, 1603:13-21 (Dickson).  Certified Medical Specialist (CMS) Donald Young testified during his direct examination that he observed sores on Dickson's neck and chin from the cervical collar but then on cross examination testified that he did not personally observe the sores.  *Compare* Tr. vol. 6, at p. 1412 *with* p. 1450 (Young).  When asked to reconcile this contradictory testimony, Young testified

that he had helped a nurse who was taking care of Dickson's sores and that although he never took the cervical collar off to observe the sores, he "did get glimpses of the sores." *Id.* at 1462.

This testimony was directly contradicted by Dr. Haggard and the medical record. Dr. Haggard testified that it was medically appropriate for Dickson to wear the cervical collar from December 24, 2018 until January 2, 2019, and that she had no concerns with him developing sores from the cervical collar because such collars "can be worn for weeks to months." *See* Tr., vol. 10, 2203:8-23 (Dr. Haggard). During her testimony, Dr. Haggard reviewed a lengthy medical record entitled "Health Services Encounter" that documented Dickson's encounters with medical providers – including Dr. Haggard – in the infirmary during the period he was wearing the cervical collar. *See Exhibit 326.* He fell several times and so was in the Infirmary several times for monitoring. Dr. Haggard testified that if there were sores on Dickson's neck, they would have been noted on the records, but there were no observations of sores noted. *See, e.g.,* Tr., vol. 10, 2192-95 (Dr. Haggard).

The Court finds Dr. Haggard's testimony credible and rejects the testimony of CMS Young due to the inconsistencies discussed above. Dickson was treated promptly for his neck injury, was able to see medical providers regularly thereafter, and had x-rays taken in a timely manner. If Dickson suffered some soreness from the cervical collar it was at most an isolated experience and does not represent a systemic failure. The Court can find no evidence of an Eighth Amendment violation in the incident with Dickson.

*Robroy Wall*

**Findings of Fact & Conclusions of Law – page 41**

Inmate Robroy Wall suffers from a rare auto-immune disease and suffers allergic reactions, including a reaction to nitrile which is used in the protective gloves often used by ISCI staff and medical providers. *See* Tr., vol. 7, 1608:4-1610:2. While at ISCI, Wall suffered various allegoric reactions, several of which affected his airway and ability to breathe. The medical providers at ISCI tried various drugs that, as Wall testified, worked for a time but then stopped working. At the same time, he was treated for high blood pressure with the drug Lisinopril. Wall testified that after being put on Lisinopril, his adverse allergic reactions increased substantially. For example, there were three incidents between April and July 2019, where his allergic reaction made it difficult for him to breath, and he had to have an injection from an EpiPen to recover. He complained of delays because in one instance the responder did not know how to use the EpiPen, although a second responder was able to give him an injection. In another incident there was a delay while the responders got permission to use the EpiPen. In each incident he recovered without any evidence of injury.

In August of 2019, ISCI sent him to an offsite physician – a Dr. Fritz – who specialized in allergies and immunology. Dr. Fritz took him off Lisinopril and made other recommendations that were reviewed by Dr. Haggard and turned into a treatment plan that was discussed with Wall. *See* Tr., vol. 10, 2215:18-2218:5. The medical notes state that Wall reports a dramatic improvement in symptoms since he quit taking the Lisinopril and wanted to return to work. *See* Exh. 327; *see also* Tr., vol. 10, 2218:6-2219:4. However, he continues to have emergency allergic reactions since he quit taking Lisinopril, so that drug does not appear to be the sole cause of his reactions. *Id.* at 2227.

In summary, Wall suffered from a rare form of immune disorder and allergies that were successfully treated by ISCI's medical providers with various drugs that eventually lost their effectiveness. His allergic reactions may have been exacerbated by his high blood pressure medication, although that is not altogether clear from the record, and there were delays in treating him with the EpiPen on at least two occasions, but those delays did not result in any injury or long-term consequence. He eventually received off-site treatment from a medical specialist that led to a dramatic improvement in his condition.

Once again, this anecdotal evidence does not support plaintiffs' claim of an Eighth Amendment violation.

*Ronald Coleman*

Inmate Ronald Coleman had a long history of serious medical problems. *See* Tr. vol. 6 at 1303 ("I've had brain surgeries. I've had bones sticking out of my legs. I've had, like, eight broken ribs before. I've had an aneurysm rupture"); 1316 (kidney transplant). On July 25, 2019, he hurt his knee, and the next day (July 26, 2019) reported it as an injury needing treatment. That was a Thursday – by the following Monday he was seen by Nurse Practitioner Rogers who drained fluid from the knee and gave him a cortisone shot. *See* Tr. vol. 6 at 1299-1300; 1313. His knee was fine on July 30, 2019, but by July 31, 2019, it "went completely wild and . . . started hurting just beyond belief and swelled up really big." *Id.* at 1301. Coleman claims that his repeated pleas for medical treatment at sick call were denied. *Id.* at 1303. Eight days later – on August 8, 2019 – Coleman was transported to an off-site hospital where he remained for a month, undergoing 14 surgeries to remove infections throughout this body, including in his heart and brain. *Id.*

at 1317.  He returned to the Infirmary where he was seen by medical providers once a day, but they once again ignored his complaints of pain and swelling in the knee.  *Id.* at 1306.  The infection returned and he was transported back to the hospital September 25, 2019.  *Id.* at 1308; 1318.  He returned to ISCI in October but was hospitalized again in December of 2019.  He has since returned to ISCI but the knee continues to give him problems.  *Id.* at 1309.

Coleman complains that his knee infection resulted from the shot given to him by Nurse Practitioner Rogers.  But other than his own speculation there is no evidence to support that claim and, in any event, it does not establish an Eighth Amendment violation.  *Broughton,* 622 F.2d at 460 (holding that medical malpractice or negligence does not support a cause of action under the Eighth Amendment).

Coleman's central complaint is that the eight days of delay between the day his knee started hurting so bad after the shot (July 31, 2019), and the day he was taken to the hospital (August 8, 2019) allowed infection to spread throughout his body eventually threatening this life and requiring three separate long hospitalizations.  Yet the Court has no evidence that the 8-day delay led to the multiple hospitalizations other than Coleman's own speculation.  A delay in medical treatment does not violate the Eighth Amendment unless that delay causes further harm. *McGuckin,* 974 F.2d at 1060.

During those eight days, he was seen on three separate occasions by ISCI medical providers:  (1) RN Amanda Johnson on August 1, 2019; (2) Nurse Jamie Blackburn on August 4th; and (3)  Nurse Practitioner Rogers on August 5, 2019.  *Id.* at 1314-17.  He claims his knee had swelled to the size of a "volleyball" and that the area from his knee to

his ankle had swelled up to the size of a "basketball."  Yet according to him, all three nurses "refused treatment."  *Id.* at 1324.  He admitted getting angry with these nurses because, he claimed, they refused to treat him.  *Id.* at 1326.

Refusing to treat a knee and lower leg swelled up to that extent would be evidence of deliberate indifference – indeed it would be cruel.  But it is hard to find this testimony credible.  Throughout the entire trial there was no other evidence that the nursing staff were cruel; in fact the evidence was just the opposite:  The nursing staff were well-trained and highly professional in their care.  The Court simply cannot believe that three different nurses on three separate occasions all ignored a knee swelled up like a volleyball and a lower leg swelled up like a basketball.  Even if they did, "proof of some individual failures does not establish systemic constitutional failures." *Graves v. Penzone,* 2019 WL 4535543, at *3 (D. Ariz. Sept. 19, 2019).  "[I]solated violations affecting a narrow range of plaintiffs" cannot justify systemwide relief.  *Armstrong,* 275 F.3d at 870; *see also Lewis v. Casey*, 518 U.S. 343, 359 (1996) (holding that two instances of access-to-courts violations, "were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief").  If there was a nursing failure here, which the Court does not find, it was an isolated case.  The Court can find no systemic failure of the nursing staff to ignore obvious signs of serious medical needs.

<u>James Hydle</u>

James Hydle was an inmate in the Medical Annex who, prior to being incarcerated, had been shot in the head and confined to a wheelchair.  Tr. vol. 6 at 1471

(Hydle).  Before arriving at ISCI he developed an infection in his foot and later developed infections in his leg.  *Id.* at 1473-74.  To treat the infections, he was transferred from the Medical Annex to the LTC unit two different times, residing in LTC for three months each time.  *Id.* at 1491.  ISCI also transported him off-site to the St. Luke's Hospital Wound Center for treatment three different times.  *Id.* at 1491.

When he was not in LTC or in the Wound Center he was housed in the Medical Annex, where (1) a nurse regularly changed his bandages, (2) he obtained five different prescription medications during pill call, and (3) he received outpatient treatment in the Chronic Care Clinic.  *Id.* at 1489-90.  He could call on the services of a "wheelchair pusher" to help him get to pill call (in the Medical Annex) and the Chronic Care Clinic (next door in the Medical Building).  *Id.*  His infections have largely healed.  *Id.* at 1476.  Because of his disability he fell several times but was seen by a nurse after his falls.  *Id.* at 1491.  He only submitted one HSR while at ISCI.  *Id.* at 1494.

At one point in his testimony Hydle inferred that the close spacing of the beds in the Medical Annex could have facilitated the spread of infection to his legs while at the same time could have exposed other inmates to his infection.  *Id.* at 1476.  This is sheer speculation; there is no evidence to support that conclusion.  Indeed, Dr. Menard testified that he was not aware of any skin infections being spread in the Medical Annex.  *See* Tr. vol. 5 at 1169-70 (Dr. Menard).

Hydle also complains that his access to the Medical Building was impeded by a door in the Medical Annex that was difficult to maneuver through.  But he also testified

that he had a "wheelchair pusher" to help him, so that was not much of a barrier to medical care.

In fact, Hydle received extensive care while at ISCI. For his infections he received three off-site treatments at St. Luke's Wound Center and six months of care in the LTC unit, and all of that care was ultimately successful. While in the Medical Annex he received regular care from a nurse, all his prescription medications, and regular outpatient care in the Chronic Care Clinic. The Court can find no evidence here to support an Eighth Amendment claim.

### *Jack Swisher*

Inmate Swisher came into the ISCI as a paraplegic suffering from intermittent incontinence. *See* Tr. vol. 6 at 1378 (Swisher). He was housed in the Medical Annex from March of 2019 to February of 2020, and then moved into the LTC unit where he currently resides. *Id.* at 1379. During those eleven months in the Medical Annex, he fell three times while transferring from his wheelchair to his bed, and five or six times while transferring from his wheelchair to the toilet. *Id.* at 1380. While the Correctional Officers or other inmates were not allowed to help him when he fell, the Officers would alert a nurse who would help him. *Id.* at 1380. He wore an adult diaper for his incontinence and had to change it himself, which was a difficult task, taking him 10 to 15 minutes. *Id.* at 1382. Though Swisher undoubtedly has a difficult time in custody because of his medical condition, his testimony does not establish an Eighth Amendment violation.

### **Challenge to Medical Annex – Conclusions re Inmate Testimony**

**Findings of Fact & Conclusions of Law – page 47**

The testimony of the individual inmates showed that despite their disabilities and chronic conditions they were largely able to do the activities of daily life.  In addition to care at the prison, ISCI provided them access to off-site hospitals and medical specialists.  There they received complicated surgeries along with treatment from highly specialized medical professionals.  If there were delays in treatment, or an inmate was kept too long in the Medical Annex before being transferred to the Infirmary or the LTC unit, those incidents were isolated in nature and did not rise to the level of a systemic failure.

The Medical Annex operates essentially as an independent living facility, serving as a bridge between the general population and the Infirmary/LTC.  It allows inmates whose chronic conditions keep them out of the general population to continue living independently.  Even Dr. Menard thought this *concept* of the Medical Annex was a good idea, even if *in practice* it was not meeting Dr. Menard's standards.  *See* Tr. vol. 5 at 1179 (Dr. Menard).  The inmates in the Medical Annex can perform the activities of daily living even with their chronic medical conditions.  So, they typically do not need the level of care provided in the Infirmary or the LTC unit.  By being housed in the Medical Annex, those inmates can remain independent while at the same time be close to important services like the pharmacy, cafeteria, and Chronic Care Clinic for outpatient care.  If their condition deteriorates or if they can no longer do the activities of daily living, they can be moved into LTC or the Infirmary.

That line – that is, the line between independence and deterioration – is often difficult to discern.  Because many of the inmates in the Medical Annex have chronic health problems, they are closer to that line than the general population inmates.  This

requires the medical providers to be especially alert to signs of deterioration.  Dr.
Haggard monitors those conditions by seeing inmates from the Medical Annex in the
Chronic Care Clinic, and the nurses who staff sick call and pill call provide further
monitoring.  While the evidence shows that there were instances where the line may have
been crossed – where some inmates should have been transferred out sooner – those were
isolated instances and did not rise to the level of a systemic failure.

As discussed above, a systemwide injunction "is appropriate only if plaintiffs have
established systemwide injury and impact." *Coleman*, 922 F. Supp. at 963.  Proof of
some individual failures does not establish systemic constitutional failures." *Graves,*
2019 WL 4535543, at *3.

The Court concludes that the testimony from the individual inmates does not rise
to the level of establishing that the ISCI is systematically providing inadequate medical
care in the Medical Annex.  In addition, the Court cannot find that the medical providers
and prison officials are acting with deliberate indifference in the Medical Annex.  To
close this issue, the Court refers to the warning in the Summary portion of this decision
regarding the staffing in the Medical Annex.

### Health Service Requests – *Balla I* Orders 3 & 4

*Balla I* Orders 3 & 4 relate to proper staffing and medical care.  A specific issue
raised by plaintiffs concerned a period of time when the inmates' Health Services
Requests (HSAs) overwhelmed the system.  An HSA is an inmate's request for medical
assistance.  A triaging nurse screens the HSRs and determines whether further treatment

is necessary – if so, the inmate must have a visit with a medical provider within 14 days of the inmate submitting an HSR.  *See* Tr. vol 1 at 35 (Hofer).

A survey conducted in 2017 by NCCHC found a potential barrier to care in ISCI's requirement for a $5 co-pay per visit for medical services, a $3 co-pay for medications, and a limit of one HSR per day.  To correct that potential barrier to care, ISCI changed its policy to reduce the co-pay to $2 and raise the limit on HSRs to three per day.[9]

Predictably, this dramatically increased the number of HSRs filed by inmates, causing a backlog of HSRs and delays in the time an inmate could see a medical provider.  *See* Tr. vol 1 at 34-35, 76-77 (Hofer); Ex. 1085 at 1; Tr. 1108-11 (Dr. Menard).  In ISCI meeting minutes dated December 6, 2018, medical providers are described as "struggling to stay afloat," and "drowning with the number of inmates seen in the morning."  *See* Exh. 1088 at 2; Tr. vol 1 at 106-08 (Hofer).  Dr. Menard testified there was not enough medical staff at ISCI to timely and adequately address and document the medical concerns raised.  *See* Tr. vol. 5 at 1115 (Dr. Menard).  So ISCI pulled providers from other IDOC facilities to clear the temporary backlog.  *See* Tr. vol. 1 at 86-87 (Hofer); Tr. vol. 2 at 421 (Siegert).

For example, In the Receiving and Diagnostics Unit, only 24% of the inmates who were referred to providers were seen within 14 days in July 2019; 22% in August; 41%

---

[9] The Court notes that requiring inmates who have money in their accounts to pay co-payments for health care or prescriptions does not violate the Eighth Amendment, so long as the inmate was not denied care because of an inability to pay. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 408 (9th Cir. 1985) (holding that a $3.00 copay fee for prisoners cannot be construed as deliberate indifference to inmates' medical needs); *Reynolds v. Wagner*, 128 F.3d 166, 174 (3rd Cir. 1997) (holding that a $3.00 co-pay did not violate inmates' Eighth Amendment and due process rights).

percent in September; 33% in October; and 71% in November.  *See* Ex. 306 at 14; Tr.

vol. 1 at 84-85 (Hofer).  With regard to the general inmate population, only 28% of the

inmates who were referred to providers were seen within 14 days in July 2019; 30% in

August; 42% in September; 40% in October; and 88% in November.  *See* Ex. 306 at 2;

Tr. vol. 1 at 85-86 (Hofer).  But by December of 2019, ISCI caught up with the HSR

backlog and returned to 100% compliance.  *See* Tr. vol. 1 at 35-37; 77-78 (Hofer); Ex.

301 at 2, 14.

It is important to note that the 14-day requirement to see a provider was an internal

standard, not a standard set by NCCHC.  *See* Tr. Vol. 1 at 118-20 (Hofer).  Thus, this

incident with ISCI being overwhelmed with HSRs did not affect the NCCHC

accreditation.

To summarize this evidence, the HSR system was overwhelmed for a time due to

the good faith attempt of ISCI to correct the potential barrier to care identified by the

2017 NCCHC audit.  ISCI took several months to process these piles of HSRs, and

plaintiffs complain that the delays could have been avoided if ISCI had immediately

hired additional staff.  But there is no evidence that even with immediate hiring (and its

related expense) the new staff would have been trained and fully operational so quickly

that the delays would have been reduced in any significant manner.  The delays were

cleared quickly enough by pulling in additional providers, and no evidence was presented

that any inmate was harmed by the delay.  Dr. Haggard testified that she would have

treated any such injuries in the infirmary and she saw none there.  *See* Tr., vol. 1 at 187

(Dr. Haggard).  The Court finds no Eighth Amendment violation here.

**Findings of Fact & Conclusions of Law – page 51**

**Mental Health Services – *Balla I* Order 5**

*Balla I* required, in Order No. 5, that ISCI establish a psychiatric care program that contained the following essential elements:  (1) A system for screening and evaluating inmates to identify those who need mental health treatment; (2) Mental health treatment beyond segregation and close supervision of inmates; (3) Trained mental health professionals in sufficient numbers; (4) Records of mental health treatment that are accurate, complete, and confidential; (5) Preventing the prescription and administration of behavior-altering medications in dangerous amounts, by dangerous methods, or without appropriate supervision and periodic evaluation; and (6) Establishing a basic program for the identification, treatment and supervision of inmates with suicidal tendencies.  *Balla I*, 595 F. Supp. at 1577.

Some evidence that ISCI has put in place a mental health program that satisfies these elements is contained in the 2019 NCCHC survey discussed above.  It found that ISCI satisfied all "essential" standards governing mental health treatment by, among other things, (1) staffing the facility adequately; (2) providing a comprehensive suicide prevention and intervention program, (3) timely screening inmates by qualified mental health professionals; (4) providing individual and group counseling, and (5) properly managing psychotropic medication.  *See* Exh 189.

Moreover, as discussed above, the audit tools concerning mental health that were agreed upon by the parties demonstrate that ISCI has better than a 90% compliance rate for almost every month in 2018 and 2019.  While ISCI's compliance with the audit tools and its 2019 accreditation by NCCHC are not determinative, they are powerful evidence

of compliance with Eighth Amendment standards.  The Court will turn next to the evidence adduced at trial.

Mental health services are largely rendered in the Behavioral Health Unit ("BHU"), also known as Unit 16, that has 227 beds.  *See* Tr., vol. 3 at 687 (Watson).  The NCCHC describes the BHU as a subacute mental health unit, meaning that inmates housed there have mental health problems but not as acute as those with the most serious problems – acute patients are housed at a facility other than ISCI.  *Id.* at 594.  As compared to the general population unit, the BHU provides a higher ratio of mental health staff to inmates; delivery of in-house medications; a psychiatrist who visits the unit; and mental health groups.  *See* Tr., vol. 3 at 687-88 (Watson).

The provision of mental health services is overseen by the Chief Psychologist Dr. Walter Campbell, who has a Ph.D. in psychological counseling.  *See* Tr., vol. 3, 567 (Dr. Campbell).  He is assisted in this work by two Clinical Supervisors, Jeremy Clark and Laura Watson.  Watson supervises the BHU and has a master's degree in social work. *See* Tr., vol. 3, 653-55 (Watson).  Clark supervises the general population units and has a master's degree in counseling.  *See* Tr. vol. 3 at 743 (Clark).

As Clinical Supervisors, Watson and Clark assist Dr. Campbell in overseeing mental health treatment, as well as staff, in their area of responsibility.  *See* Tr., vol. 3, 654 (Watson).  They also supervise eleven licensed, masters-level clinicians who provide mental health care to inmates.  *See* Tr., vol. 3 at 733 (Watson).  These eleven clinicians are either licensed clinical social workers, licensed counselors, or licensed marriage and family counselors.  *Id.* at 654.  Six of the eleven are assigned to the BHU and the

**Findings of Fact & Conclusions of Law – page 53**

remaining five are assigned to the general population units.  *Id.*  The clinicians provide coverage to ISCI seven days a week, and generally one or more clinicians is on-site from 6:30 a.m. until 6:00 p.m., (Monday – Friday), and 7:30 a.m. until 5:00 p.m., (Saturday and Sunday).  *Id.* at 655.  There is also holiday coverage.  *Id.*  The clinician with the "primary clinician designation" for that day is responsible for reviewing completed mental health screens and meeting with inmates on suicide watch.  *Id.* at 656-57.

In addition to the clinicians, ISCI also has a psychiatric treatment coordinator supervised by Watson.  *Id.*  The psychiatric treatment coordinator oversees some of the supportive services at ISCI, and supervises four psychiatric technicians.  *Id.* at 654-55. The psychiatric technicians triage the mental health HSRs and meet with inmates within 24 hours if an HSR indicates clinical symptoms.  *Id.* at 698-70.  They also operate some of the mental health groups.  *Id.* at 684.

Each week about 100 new inmates are brought into IDOC and each is screened in the Receiving and Diagnostic Unit (RDU).  This mental health screening is completed by a medical staff member who documents responses to a series of questions on a form.  *Id.* at 659; Exh. 143; Exh. 30.  For example, some of the questions seek information that must be acted upon immediately, such as whether the inmate plans to hurt himself.  Such an answer would trigger an immediate suicide protocol.  *See* Ex. 30; Tr., vol. 3, 662-63 (Watson).  Other questions seek information about mental health that do not require such an immediate response.

The completed screening form becomes part of the inmate's electronic file and is reviewed by one of the master's level mental health clinicians within 24 hours.  *Id.* at

660.  The clinician will then meet with the inmate if that is indicated from the clinician's review of the inmate's answers on the form.  *Id.* at 667-68.

Once past the screening and now part of the population of ISCI, inmates can request mental health care at any time by filing an HSR.  *See* Exh. 139 at 7.  The HSRs are reviewed by the nursing staff to see whether there are any indications the inmate intends to harm himself.  If so, the nursing staff contacts a primarily clinician to assess the inmate for placement on suicide watch.  *See* Tr., vol. 3 at 698-99 (Watson).  If the HSR does not reveal an intent to harm, the staff person provides the form to the psychiatric technicians.  *Id.*  If the HSR reflects a clinical symptom, then the psychiatric technician meets with the inmate within 24 hours.  *Id.* at 699.  If the psychiatric technician believes that the inmate's complaint needs to be addressed by a clinician, an appointment with a clinician is made.  *Id.* at 699-70.

Inmates are referred to the BHU by a referral document maintained in the electronic records (eOMIS).  *Id.;* Exh. 151. The referral document records the mental health status, diagnosis, reason for referral, and course of treatment, as well as the signature of the clinician making the referral.  *Id.*  This referral document is reviewed by Clinical Supervisor Watson who makes the decision whether that inmate will move into, or out of, the BHU.  *Id.* at 688-90.

 Once in the BHU, an inmate can request or seek mental health services by submitting an HSR, by attending open clinic, or by talking to mental health staff in the unit.  *See* Tr., vol. 3 at 690 (Watson). The BHU walk-in open clinic has a clinician

available to address inmates' mental health concerns. *Id.* In addition, there are approximately 30 hours per week of group services offered in the BHU. *Id.* at 691.

**Mental Health Treatment – Suicide Prevention**

IDOC's chief psychologist, Dr. Campbell, testified that "suicide risk management, in many ways, can be considered the primary job of mental health in the correctional environment." *See* Tr. vol. 3 at 584 (Dr. Campbell). In *Balla I* (Order 5), the Court ordered IDOC to establish a psychiatric care program to address, among other violations, the failure to provide treatment to inmates who contemplate suicide. *Balla I*, 595 F. Supp. at 1569, 1577, 1583. The Court observed that "it is critical that a program for the identification, treatment, and supervision of inmates with suicidal tendencies and who have previously attempted suicide is essential." *Id.* at 1577. With this background, the Court will review ISCI's suicide prevention program.

ISCI's Standard Procedures "recognize that any inmate, simply by virtue of being placed in a correctional facility, is at increased risk of suicide or self-harm." *See* Tr. vol. 3 at 617 (Dr. Campbell). Because of that, compliance with the Procedures "is not just a responsibility of mental health staff strictly, but is the responsibility of all staff …." *Id.*

As part of those Procedures, inmates with indications of self-harm are placed on suicide watch in special isolation cells in the BHU (Unit 16), each cell door having a window to allow visual monitoring by Correctional Officers. If the inmate is on acute suicide watch, the inmate is subject to constant visual supervision; if the inmate is on non-acute suicide watch, the Correctional Officers must visually check on the inmate at staggered intervals no more than every 15 minutes. *See* Tr. vol. 10 at 1968-69 (Watson).

**Findings of Fact & Conclusions of Law – page 56**

Trained inmates are used as "watch companions" to assist Correctional Officers in visually monitoring inmates on non-acute suicide watch. *Id.* A watch companion will sit outside the cell for an inmate on nonacute suicide watch and check him every 5 minutes, while a Correctional Officer would walk by to make a visual check every 15 minutes. *See* Tr. vol. 9 at 1981 (Watson). Each time the Correctional Officer makes a cell check, the Officer must sign a logbook (located at the cell door) noting his initials and the time of the check. *Id.*

ISCI was only partially compliant with this standard for non-acute suicide watch inmates according to the NCCHC report in September of 2019. More specifically, ISCI was not complying with the requirement that inmate's on non-acute suicide watch be checked every 15 minutes. *See* Exh 189. Confirming this NCCHC finding – and going further to identify misconduct – was inmate Omar Escobedo, an ISCI suicide watch companion up until December of 2017. As a watch companion, Escobedo could see if the Correctional Officers were following the 15-minute visual check requirement. He testified that those Officers, on a regular basis, made false entries in the suicide log that they had checked on an inmate when in fact they had not done so. *See* Tr. vol. 9 at 1918-19 (Escobedo).

On October 8, 2019, Escobedo himself was put on non-acute suicide watch in the BHU because he wanted to kill himself. *See* Tr. vol. 9 at 1922 (Escobedo). On that date, a video of the unit shows that at 9:16 a.m., Escobedo put a covering (a mattress) over the only window in his cell door blocking all view of what was going on inside his cell. *See* Exh. 1256. The video shows that about 12 minutes later – while Escobedo's window is

still covered – a Correctional Officer approached Escobedo's window but did nothing. *Id.* Escobedo kept the window covered for 26 minutes until 9:42 a.m. *Id.* During the time between 9:16 a.m. and 9:42 a.m. while his window was covered, Escobedo testified that he was sharpening a button, fashioning a tourniquet to enlarge a vein, and using the sharpened button to slice his vein in a suicide attempt. During those 26 minutes that his window was covered nobody attempted to enter his cell to find out what was happening. Escobedo testified that he was bleeding from roughly 9:40 am to 11:29 am when he was finally taken from his cell.

Escobedo's testimony is contradicted by Correctional Officer Cheever who testified that he monitored Escobedo at 10:30 a.m., 11:00 a.m., and 11:15 a.m. Cheever testified that during these three times he saw no injuries on Escobedo. It was not until 11:21 a.m. (when Cheever was alerted by an inmate) that he first saw injuries on Escobedo. Cheever's testimony raises the possibility that Escobedo cut himself between 11:15 a.m. and 11:21 a.m. instead of two hours earlier as he testified.

It is difficult to reconcile these contradictory accounts as both Escobedo and Cheever appeared credible, yet at the same time both accounts have their weaknesses. If Cheever is to be believed, Escobedo did nothing to himself during the 26 minutes his cell window was covered; if Escobedo is to be believed, he was bleeding for about 2 hours yet was still strong enough to resist the four Officers who eventually entered his cell to remove him. The most likely explanation is that Escobedo did in fact cut himself during the 26 minutes his window was covered, but not deep enough to cause extensive bleeding for the next two hours.

**Findings of Fact & Conclusions of Law – page 58**

But regardless of how the testimony of Cheever and Escobedo is reconciled, it remains undisputed that Escobedo – while in an isolation cell on nonacute suicide watch – was able to cover up the window to his cell for 26 minutes without anyone from ISCI taking any action.  That is a serious violation of any suicide prevention standard.

Recall that about four months prior to Escobedo's incident – in June of 2019 – the NCCHC staff had visited ISCI and observed a lack of compliance with the interval monitoring of inmates on non-acute suicide watch.  That was part of the reason ISCI received only a partial accreditation in the NCCHC's initial report dated September 13, 2019.  *See* Exh. 189.  A similar finding had been made by the NCCHC in its 2016 survey.  *See* Exh. 314.  In addition, in September of 2019, an inmate with suicidal tendencies who was being held in an observation cell awaiting further evaluation was able to commit suicide when the staff member who was supposed to be monitoring him was called away on an emergency.  *See* Tr. vol. 3 at 641-44 (Dr. Campbell).  Moreover, in 2011, an IDOC staff member falsified logbooks showing suicide prevention training that had not in fact occurred.  *See* Exhs. 1327 & 1328.

 ISCI's own random audits showed 28% compliance with the interval monitoring requirement in September of 2019 and 33% in October of 2019 (the month of Escobedo's incident).  *See* Exh 305 at p. 4.  These audit results – when considered with Escobedo's testimony about falsified log entries – are especially concerning to the Court.

ISCI's Clinical Supervisor Watson was also concerned.  She reviewed the logs and saw the lack of compliance with the staggered 15-minute interval monitoring requirement.  *See* Tr. vol. 9 at 1978-80; vol. 10 at 2351-53 (Watson).  To correct this,

Watson started in November of 2019 an education and training program for Correctional Officers stressing the NCCHC essential standard regarding suicides and especially the requirement of random checks every 15 minutes for non-acute inmates on suicide watch. *Id.* at 1979 ("[w]e did face-to-face training. We reprinted the policy, had all of them review it with the sergeant and the housing unit. We had them sign that they have reviewed it. We reviewed every log and provided direction to any of those officers that were not doing random checks"). Following this training, the logs showed improvement in compliance to 73% in November, and 97% in December 2019. *See* Exh. 305 at p. 4.

At the trial, Watson testified that she was not aware of any further incidents of lack of compliance with the 15-minute interval monitoring requirement. *See* Tr. vol. 10 at 2354. Confirming her testimony was an inmate, Halton Flowers, who testified that although he had difficulty in the past when acting as a watch companion to get an officer's attention, he had no further incidents in the six months leading up to the trial. *See* Tr. vol. 9 at 1961-63 (Flowers).

Thus, by January of 2020, ISCI was in compliance with the NCCHC standards. Watson testified that following the training, there were no further issues with noncompliance of this requirement. *Id.* at 2354. On January 15, 2020, the NCCHC granted ISCI full accreditation after finding that all shortcomings – including those related to the suicide standards – had been cured. *See* Exh. 190.[10]

---

[10] That finding of full compliance was not based on a visit to the facility but rather based on emails sent by ISCI to the NCCHC that were taken at face value. *See* Tr. vol 2 at 301(Martin). Those email representations from ISCI were received on January 14, 2020. *Id.* at 302 (Martin).

**Conclusions on ISCI's Mental Health Program**

It is worth repeating the testimony of IDOC's chief psychologist, Walter Campbell, that "suicide risk management, in many ways, can be considered the primary job of mental health in the correctional environment." *See* Tr. 584:13-15 (Campbell).  In the past, suicide prevention has been a particular weak link in ISCI's provision of medical services.  As discussed above, the facility has had a history of noncompliance caused by incompetence and fraud that resulted in injury and death.

But to its credit, ISCI has identified the weaknesses and taken corrective action by alerting and training the staff.  Compliance with the monitoring requirements has markedly improved.  More generally, ISCI has put comprehensive protocols in place to identify and treat those with suicidal tendencies, and ISCI is monitoring compliance with those protocols through the audit tools.  The NCCHC recognized this when it accredited ISCI's suicide prevention measures.

Turning more broadly to the provision of mental health services, ISCI has hired competent staff and established comprehensive policies.  As discussed, Clinical Supervisor Watson assists Dr. Campbell in overseeing mental health treatment, and they supervise six licensed, masters-level clinicians in the BHU who provide mental health care to inmates.  These clinicians are either licensed clinical social workers, licensed counselors, or licensed marriage and family counselors.  They provide coverage to ISCI seven days a week.  Moreover, as discussed above, the mental health audit tools concerning mental health that were agreed upon by the parties demonstrate that ISCI has

better than a 90% compliance rate for almost every month in 2018 and 2019.  Finally, ISCI received full accreditation from NCCHC for its mental health services.

ISCI's comprehensive program for mental health treatment, in combination with the audit tool results for 2018-2019 and the NCCHC accreditation for 2019, demonstrates that all six of the essential elements identified in *Balla I* have been satisfied by ISCI.  It is true that in the past, ISCI has failed to provide adequate mental health services to certain individuals, and its own staff members have committed fraud and been incompetent.  But ISCI has now hired competent and qualified professional staff, set in place detailed protocols, trained the staff to avoid past errors, and provided ongoing monitoring through the mental health audit tools.  Thus, the Court can find no ongoing and current violation of any federal right. In addition, the Court cannot find that ISCI has been deliberately indifferent to the past problems given the institution's commitment to train and monitor staff to prevent future problems.   For all of these reasons, the Court finds that *Balla I* Order 5 shall be terminated.

Nevertheless, ISCI's history should be a sobering warning that backsliding could lead to injury and death, and will almost certainly result in a new round of litigation before this Court, which is well-familiar with that history.

## Emergency Medical Care – *Balla* Order No. 3

In *Balla I,* the Court found that the provision of emergency medical care at ISCI was inadequate:

> This court concludes that the evolving standards of decency require that
> 24-hour emergency medical care be available. The prison population is
> presently well over a thousand and increasing. The likelihood of the need

for emergency care on a 24-hour basis has passed from the stage of a remote possibility to that of a strong probability. Consequently, 24-hour emergency medical care is not only needed, but constitutionally required.

*Balla I,* 595 F. Supp. at 1576.  Order No. 3 from *Balla* requires that 24-hour emergency medical care be available.  The NCCHC essential standard P-D-07 likewise requires that inmates have access to emergency medical services 24 hours a day, and that facility staff are able to provide emergency services until qualified health care providers arrive.  *See* Exh. 189.  Another NCCHC essential condition – P-C-04 – requires that correctional officers who work with inmates have training at least every two years in, among other things, (1) CPR, including the use of a defibrillator, (2) administration of first aid; and (3) acute manifestations of serious illnesses.  *Id.*

The NCCHC survey of ISCI in 2019 concluded that ISCI had 100% compliance with these two essential standards.  *Id.* The testimony at the evidentiary hearing confirmed the NCCHC conclusions.

At least one emergency responder is on-site at all times.  *See* Tr., vol. 4 at 878 (Tillemans).  The emergency responder is either a Correctional Medical Specialist ("CMS"), RN, or LPN.  *Id.* at 879.  At night, there are the following medical providers available for emergency response:  (1) an LPN in the LTC, (2) an RN in the Infirmary, and (3) a CMS in the Medical Building next door to the Medical Annex.  *Id.* at 880; *see also* Tr. vol 10 at 2291 (Tillemans).  On Tuesdays and Thursdays there were two CMSs on the night shift; the other nights just one.  *Id.* In addition, Correctional Officers are trained in CPR and trained to recognize life threatening situations and alert medical professionals.  *Id.*

**Findings of Fact & Conclusions of Law – page 63**

Emergency response time is to be within four minutes.  *Id.*  The responders bring an emergency cart, including oxygen, and life-saving drugs such as an Epi Pen, nitroglycerine, Glucagon and Narcan.  *See* Exh. 49; Exh. 97 at 3; *Id.* at 2183-84.  A responder is authorized to use those items in a life-threatening situation without calling a provider for authorization.  *See* Tr., vol. 10, 2263-65 (Tillemans).  A telephone landline is available to call 911, and although cell-phone coverage is blocked, responders had radios and could use them to request a 911 call.  *Id.*  Additionally, a psychiatrist, medical provider, and dentist are always on-call.  *Id.*

Each emergency response is logged and reviewed by the Regional Medical Director (RMD).  *See* Tr. vol. 4 at 882 (Tillemans).  For example, Dr. Menard testified that while he was RMD, he reviewed every emergency response each month.  *See* Tr. vol. 5 at 1151 (Dr. Menard).  Health Service Administrator Tillemans could recall one incident (during the time she was in that position from November of 2018 to July of 2019) where two emergencies were called in at once during the night.  *See* Tr. vol. 4 at 882-83; 897 (Tillemans).  The review of that single incident showed that it was handled appropriately.  *Id.*  The Court will later discuss the testimony of Donald Young, who worked at ISCI as an emergency responder and recalls responding to "dozens" of simultaneous emergencies.

This emergency response capability of the ISCI was demonstrated in a video dated October 24, 2017, taken in the Medical Annex.  *See* Exh. 1245 (starting at 10:31:00).  The video shows a Correctional Officer calling an emergency for an unresponsive inmate in his bunk, and within a minute two nurses respond; within about two minutes, another

**Findings of Fact & Conclusions of Law – page 64**

two nurses respond; and within about four and a half minutes, two CMSs join them.  *See* Tr., vol. 10, 2270-73 (Tillemans). Within less than three more minutes, another two nurses have joined the six responders already on the scene.  *Id.*  In just under 20 minutes from the emergency being called, an ambulance has arrived and the EMTs are at the side of the unresponsive inmate.  *Id.* at 2281.

The unresponsive inmate was in his bunk on an inside aisle in the Medical Annex, a location that plaintiffs had argued was difficult to reach.  But in the incident recorded on the video, Tillemans was one of the emergency responders, and she testified credibly that they had no difficulty accessing the patient and providing appropriate medical aid.  *Id.* at 2274-82.

Similar testimony was given by Hannah Taff, who, as a nurse staffing the Medical Annex on a fulltime basis, has personally responded to medical emergencies about ten times.  *See* Tr., vol. 9 at 2133. (Taff).  She testified that she "never had issues" gaining access to inmates needing emergency treatment in their bunks.  *Id.* at 2134 (Taff).

This is substantial evidence that ISCI has satisfied *Balla* Order No. 3 and the Eighth Amendment.  But plaintiffs offered the testimony of Donald Young to show that that this apparent capacity did not translate into an actual capacity to respond to emergencies.

Young was a CMS working the night shift (7am to 7pm) at ISCI from October of 2017 to January of 2019.  He had been an Army medic and was a trained Emergency Medical Technician (EMT).  *See* Tr. vol. 6 at 1386 ("I can intubate, do emergency

cricothyrotomies, place tourniquets, control bleeding, manage airways, as well as a whole list of other invasive and advanced procedures").

During his tenure as CMS he was allowed to administer oxygen, NARCAN, or other medications if the patient's life was threatened without first seeking to get permission from a medical provider. *See* Tr. vol. 6 at 1428. But he testified that on January 16, 2019, ISCI changed its policy and restricted the care that CMSs could provide: No longer could they complete invasive procedures, do sutures, or provide IV push medications without permission. *See* Exh. 1066. In addition, the new policy stated that, "[i]t is required that you function strictly within an LPN scope of practice as medical responders and contract – and contact a provider before any medication that is not NET [Nursing Encounter Tool] protocol is administered." *Id.* Young testified that by restricting CMSs to an LPN's scope of practice, CMSs could no longer give aspirin, oxygen, or NARCAN (among other life-saving medications) even if the patient's life was threatened, without permission from a medical provider. *See* Tr. vol. 6 at 1435-37. With these changes, he testified that undue delays might cause harm because it could take ten minutes to get ahold of a medical provider for permission and another twenty minutes for an ambulance to arrive. *Id.* at 1437-38.

But his prediction of future harm was based on what appears to be a misunderstanding. Both Dr. Haggard and Health Services Administrator Tillemans testified that the current policy allows a CMS to administer oxygen and life-saving medications like NARCAN and albuterol when the patient's life is threatened without first seeking approval from a medical provider. *See* Tr. vol. 10 at 2264 (Tillemans); Tr.

**Findings of Fact & Conclusions of Law – page 66**

vol. 10 at 2185, 2187, 2256 (Dr. Haggard).  Young had been fired the day before the new

policy was issued and so his interpretation of the policy is irrelevant, now that Dr.

Haggard and Administrator Tillemans have clarified the current policy of ISCI.[11]

Young raised a second challenge that is more serious.  Specifically, he highlighted

a weakness in the capacity to respond to emergencies at night.  While two nights a week

there was a second CMS on duty, the other five nights there was only a lone CMS for the

whole of ISCI, which housed an average of about 1,424 inmates at any given time.  *Id.* at

1390.  As discussed, the CMS on duty could not call on the nurses in the Infirmary or the

LTC unit because they were not allowed to leave their units at night, and he could not

bring an inmate there because those units were locked down at night.  *Id.* at 1391-92 (he

needed orders from a medical provider and a security escort to bring an inmate into the

Infirmary or LTC unit at night).

Young testified that during the 15 months he worked at ISCI, there were "more

than a dozen" occasions when he was the only CMS on duty and multiple emergencies

were called in simultaneously.  *Id.* at 1392-93.  He would attend one and then use the

radio to attempt to walk a Correctional Officer through the other until he could arrive.  *Id.*

He complained about the lack of emergency responders at night to the Director of

Nursing but nothing was changed.  *Id.* at 1403.

---

[11] Young was fired for giving an injection of Benadryl to a patient without first seeking approval from a medical provider.  The next day the new policy was issued restricting a CMS to the scope of practice of an LPN.  That appeared to restrict CMSs in the manner described by Young.  But Dr. Haggard and nurse Tillemans testified otherwise, as set forth above, and there is nothing in the record that rebuts their description of the current policy of ISCI.  Thus, the Court accepts the testimony of Dr. Haggard and nurse Tillemans.

Having just one emergency responder at night to cover so many inmates puts the ISCI close to the line for an Eighth Amendment violation. Ultimately, the Court finds no such violation based largely on the lack of any evidence of harm and on the NCCHC accreditation. Young testified that during the 15 months he worked there, he never experienced any delays in getting medical provider approval or ambulance service. *Id.* at 1428. When he had three simultaneous emergencies, he was able to eventually handle all three and he did not identify any harm that resulted from his delays. *See* Tr. vol. 6 at 1393-94. Moreover, as discussed above, the Correctional Officers are trained to some degree and can assist the CMS.

This is enough along with the NCCHC accreditation, MCP compliance, and evidence set forth above to satisfy the Eighth Amendment. Because the Court can find no current and ongoing violation of the Eighth Amendment, *Balla* Order No. 3 must be terminated.

## Overcrowding

The prospective relief ordered by this Court prohibits IDOC from housing more than 117 inmates in Unit 9, 108 inmates in Unit 10, 108 inmates in Unit 11, and 144 inmates in Unit 13 (or A-Block as it is referred to in *Balla III*). *See Memorandum Decision (Dkt. No. 585)* at p. 25. Additionally, the Court kept in place its previous injunction "that no more than two (2) inmates be housed in any cell for any period of time at any time and that no inmates be housed at any time in day rooms or other non-designed cell areas or forced to sleep on mattresses on the floor." *Id.* These injunctions were subsequently incorporated into a Judgment. *See Judgment (Dkt. No. 601)*.

**Findings of Fact & Conclusions of Law – page 68**

Sgt. Christopher Rufe is responsible for ensuring compliance with the population caps. *See* Tr., vol. 4, 972-74 (Rufe). Under his computer program, if a staff member attempts to assign an inmate to a bed in one of those units that would result in exceeding that unit's population cap, a warning is issued. *Id.* at 977. In addition to this warning, the prison's daily count process – that is, the physical count of inmates – is "the safety net that prevents IDOC from exceeding those population caps." *Id.* at 977-78. Since October 2017, ISCI has never exceeded the population caps in Units 9, 10, 11, and 13. *Id.* at 980. Likewise, since October 2017, no more than two inmates have been assigned to the same cell. *Id.* at 980-81. Nor have any inmates been required to sleep on the floor or assigned to sleep in non-designed cell areas. *Id.*

Thus, the population caps and housing restrictions carried through in the *Balla III* Orders must be terminated.

**Security Staffing Levels – *Balla* Order No. 6**

In *Balla I,* the Court ordered "[t]hat if the prison administration determines to double-cell inmates in medium custody, the administration shall then be required to employ twice the security personnel on those medium security tiers where the double-celling takes place." *Balla I,* 595 F. Supp. at 1583. Subsequently, the Court ordered for Unit 9 that the staffing pattern shall consist of two officers during the day shift, two officers during the swing shift, and one officer during the graveyard shift. *See* Tr. vol. 4 at 1002 (Richardson).

The evidence showed that this staffing level for Unit 9 is being followed. *Id.* at 1003. The same staffing pattern is also in effect for Units 10, 11, and 13. *Id.* at 1000-01;

1014.  Plaintiffs complain that there should be two officers at all times for Units 10, 11 and 13 pursuant to the Order in *Balla I*.  That decision, however, never made a need-narrowness-intrusiveness finding, and there is no evidence that the current security staffing is leading to any security related problems.  Thus, requiring a second security officer during the graveyard shift cannot satisfy the need-narrowness-intrusiveness standard.  *Gilmore* 220 F.3d at 1008.  The Court finds that the security staffing does not constitute a current and ongoing violation of a federal right.  Accordingly, *Balla I*, Order 6 will be terminated.

## Plumbing Repairs

In *Balla II*, the Court ordered IDOC to "attend to all plumbing disorders in the housing units within twenty-four (24) hours of oral or written report to the Idaho State Correctional Institution (ISCI) staff and that those plumbing disorders be remedied within three (3) working days from such report."  *Balla II*, 656 F. Supp. at 1120.  This part of *Balla II* was reaffirmed by the Court in *Balla III*.  *See Memorandum Decision (Dkt. No. 585)* at p. 25.

Chuck Kinkead is IDOC's support manager for its prisons division. Tr., vol. 4 at 1016 (Kinkead).  Kinkead described in detail how his maintenance staff receive, respond to, and complete plumbing repairs.  *Id.*  IDOC has used since 2016 a web-based software program called Micromain that allows all staff at ISCI, including Correctional Officers, to submit work orders for plumbing repairs.  *Id.* at 1017-18.  The Micromain system automatically date stamps work orders when they are submitted, assigned, and

completed.  *Id.* at 1017.  Each morning Kinkead reviews all of the submitted work orders in Micromain and assigns them to the maintenance staff.  *Id.* at 1021-22.

Micromain contains a priority field for repair times. Specifically, priority level 3 requires repairs to be made within 72 hours in compliance with the Court's plumbing repair orders.  *Id.* at 1032-33.  Kinkead ensures that his staff are aware of the time requirements for completing plumbing repairs by making it part of the discussion at the morning maintenance meetings.  *Id.* at 1033-34.

Despite this system, there was evidence that plumbing problems persist long past 72 hours.  Class Representative Barry Searcy was housed in Unit 13 and personally experienced issues with a sink on the tier during this time frame.  *See* Tr. vol. at 1999-2000 (Searcy). He testified that it took multiple complaints made over multiple months before the issue was finally resolved.  *Id.* at 1998-2002.

But overall, for 2018, ninety-eight per cent (98%) of plumbing repairs at ISCI were completed within three days.  *See* Tr., vol. 5, 1036 (Kinkead); Exh. 302.  In 2019, the percentage was the same.  *Id.*; Exh. 303.

Thus, while there may have been instances of noncompliance, they are isolated in nature and not evidence of a systemic failure.  Moreover, Kinkead's testimony and the system he uses to flag plumbing problems demonstrates that the prison is not acting with deliberate indifference.  This *Balla II and III* Order must be terminated.

## Conclusion

For the reasons expressed above, the Court can find no current and ongoing constitutional violation.  In addition, with respect to the security staffing issue, the Court

**Findings of Fact & Conclusions of Law – page 71**

finds that the *Balla I* order does not satisfy the need-narrowness-intrusiveness standard of § 3626 of the PLRA.  For these reasons, the Court will grant the motion to terminate prospective relief and order that this case be dismissed.  The Court will issue a separate Judgment as required by Rule 58(a).

## ORDER

In accordance with the Findings of Fact and Conclusions of Law above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for termination of prospective relief (docket no. 1257) is GRANTED.

IT IS FURTHER ORDERED, that this action be DISMISSED.  The Clerk is directed to close this case.

DATED: May 30, 2020

B. Lynn Winmill
U.S. District Court Judge