IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WALTER D. BALLA, et al. | |
| Plaintiffs, | Case No.  1:81-CV-1165-BLW |
| v. | **MEMORANDUM DECISION AND ORDER** |
| IDAHO STATE BOARD OF CORRECTION, et al. | |
| Defendants. | |

## INTRODUCTION

The Court has before it a motion for attorney fees and costs filed by plaintiffs.  The motion is fully briefed and at issue.  For the reasons expressed below, the Court will grant the motion in part, awarding plaintiffs the sum of $265,607.63 in attorney fees (representing 25% of the total fees requested of $1,062,430.50) and $10,989.84 in costs (representing 25% of the total costs requested of $43,959.37) for a total award of $276,597.47.

## LITIGATION BACKGROUND

Plaintiffs, represented by the law firm of Stoel Rives LLP, seek an award of $1,062,430.50 in attorney fees and $43,959.37 in costs arising from their work opposing defendants' motion to terminate.  The Court granted that motion following an eleven-day trial.  The Court's analysis is set forth in its Findings of

Fact and Conclusions of Law and will not be repeated here. *See Findings of Fact & Conclusions of Law (Dkt. No. 1419).*

The plaintiffs argue that their fees and costs are warranted under 42 U.S.C. § 1988(b) and the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e. The award sought by plaintiffs does not include fees related to counsel's regular day-to-day monitoring and enforcement efforts, such as attending monthly monitoring meetings and conducting normal communications with class members and defense counsel. Those fees were subject to a separate negotiation that led to a stipulation awarding plaintiffs $49,439.70 in fees and $2,247.83 in costs for a total of $51,687.53 incurred between August 1, 2018, to May 30, 2020. *See Stipulation (Dkt. No. 1441).* The Court adopted that Stipulation by Order filed October 26, 2020. *See Order (Dkt. No. 1442).* The pending motion seeks fees and costs incurred in opposing the motion for termination granted by the Court in the decision referenced above.

## LEGAL STANDARDS

Section 1988 provides that a court may, "in its discretion," award a "reasonable attorney's fee" to a "prevailing party" in a suit brought under various federal statutes, including 42 U.S.C. § 1983. *See* 42 U.S.C. § 1988(b). "[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the

benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424,

433 (1983).  The amount of a reasonable fee award under § 1988 must be

determined on a case-by-case basis in light of several factors, the "most critical" of

which "is the degree of success obtained."  *Id.* at 436. "The purpose of § 1988 is to

ensure 'effective access to the judicial process' for persons with civil rights

grievances," and thus to "deter civil rights violations and encourage access to the

courts to redress often economically unviable injuries to fundamental rights,"

*Bravo v. City of Santa Maria*, 810 F.3d 659, 668 (9th Cir. 2016).

To determine the amount of a reasonable fee, district courts typically

proceed in two steps: first, courts generally apply the lodestar method to determine

what constitutes a reasonable attorney fee; and second, the district court may then

adjust the lodestar upward or downward based on a variety of factors, including the

degree of success obtained by the plaintiffs."  *Id.* at 665–66.  However, the PLRA

alters the lodestar method in prisoner civil rights cases in three fundamental ways.

First, rather than hours reasonably expended in the litigation, the hours used to

determine the fee award are limited to those that are (1) directly and reasonably

incurred in proving an actual violation of the plaintiff's rights, and (2) either

proportionately related to court-ordered relief or directly and reasonably incurred

in enforcing such relief.  *See* 42 U.S.C. § 1997e(d)(1).  Second, the total amount of

the attorneys' fees award associated with the monetary judgment is limited to 150

percent of the judgment. *Id*. § 1997e(d)(2); see *Jimenez v. Franklin*, 680 F.3d 1096,

1100 (9th Cir. 2012).  Third, the hourly rate used as the basis for a fee award is

limited to 150 percent of the hourly rate used for paying appointed counsel under

the Criminal Justice Act, 18 U.S.C. § 3006A (the "CJA rate"). *See* 42 U.S.C.

§ 1997e(d)(3).

## ANALYSIS

Stoel Rives has represented plaintiffs for most of the period between 2004

and the present.  Over this time, their zealous advocacy on behalf of the inmate

class has resulted in improved prison conditions.  For their work in the past – not

including their work on the motion to terminate – they have been awarded over

$1.65 million in attorney fees and costs.

There is no dispute that the firm spent substantial time and expense in

opposing the defendants' motion to terminate.  They called numerous witnesses,

including experts, during the eleven-day trial.  Ultimately, the Court rejected all of

their contentions and granted the defendants' motion to terminate.  This does not

necessarily mean, however, that plaintiffs are not entitled to fees and costs.  In

*Balla v. Idaho,* 677 F.3d 910 (9th Cir. 2012), the Ninth Circuit affirmed an award

of fees to the plaintiffs for their work on their motion for contempt that was

ultimately denied.  The Circuit held that although the plaintiffs lost the motion,

their filing of the motion was the catalyst for the defendants to come into

compliance with the Court's prior orders. *Id.* at 920. Cases from outside the Ninth Circuit reach a similar result, awarding fees and costs to plaintiffs in prison conditions litigation because their advocacy prompted improvements in prison conditions, even though the motions they opposed were ultimately granted. *See Cody v. Hillard*, 304 F.3d 767 (8th Cir. 2002); *Graves v. Penzone*, 2020 WL 1984022, at *4 (D. Ariz. Apr. 27, 2020). These two cases are obviously not binding on the Court, but they are persuasive because their reasoning aligns with *Balla*.

This case law counsels the Court to look beyond the plaintiffs' failure to prevail on the motion to terminate and ask whether their opposition to the motion gained anything of significance for their clients. Plaintiffs argue that it did, and the Court will examine each benefit the plaintiffs claim was conferred on the inmate class due to their opposition to the motion to terminate.

Plaintiffs argue first that their opposition to the motion forced defendants to improve suicide protocols. The defendants filed their motion to terminate in March of 2019. *See Motion (Dkt. No. 1257).* About six months later, NCCHC filed its report finding that ISCI was not complying with interval monitoring of inmates on suicide watch. *See Findings of Fact & Conclusions of Law, supra,* at p. 59. This negative report, if not corrected, would be a substantial blow to defendants' motion to terminate. ISCI's Clinical Supervisor testified that

**Memorandum Decision & Order – page 5**

NCCHC's negative report along with her own observations of the monitoring logs prompted her to set up a training program that ultimately corrected the problem and led to NCCHC's approval in January of 2020. *Id.* at pp. 59-60. This correction was not due solely to plaintiffs' opposition to the motion to terminate. The correction, more accurately, could be attributed to several factors, including the negative NCCHC report. Even if plaintiffs had not opposed the motion, a clean NCCHC report was absolutely critical for defendants to get approval of their motion to terminate and would have provided sufficient incentive to correct the negative report by itself. Plaintiffs' advocacy on this issue contributed to the correction but only at the margins.

Plaintiffs argue next that their advocacy prompted defendants to hire Hannah Taff, a Registered Nurse (RN) in June of 2019 to work a day-shift in the Medical Annex. She worked three 12-hour shifts dispensing medications, caring for wounds, and generally being on sick call. *Id.* at pp. 28-29. She was hired about three months after the defendants' filed their motion for termination and prior to the trial on the motion. Previously – before the motion to terminate was filed – a Licensed Practical Nurse (LPN) was stationed in the Medical Annex during the daytime. *See Transcript* at pp. 418-19. LPNs are not able to perform the same duties as an RN such as starting an IV or giving IV medication. *Id.* While there was no direct proof that RN Taff was hired due to plaintiffs' advocacy, the timing

of the hire supports plaintiffs' position here.  The benefit gained was that an RN

replaced an LPN on the day-shift in the Medical Annex.

Plaintiffs describe the third benefit they obtained for the inmates with their

advocacy as follows:

> Despite Dr. Menard's warnings that ISCI's medical care system was
> understaffed following a change in the HSR policy in 2017, IDOC did
> not agree to increased medical staffing until after it filed for
> termination and after the deficiencies began to have impacts on the
> medical audits that tracked its compliance with the MCPs.  *See* Tr.
> 1112:15-22, 1184:17-1186:25, 1188:10-1190:1 (Menard); Tr.
> 387:17-388:4 (Siegert); Tr. 35:13-25 (Hofer).

*See Plaintiffs' Brief (Dkt. No. 1421-1)* at p. 11.  These citations include several

references to defendants' denial of Dr. Menard's demands for more medical staff at

a time when the staff was overwhelmed by inmates' Health Service Requests

(HSRs).  ISCI had made it easier for inmates to file HSRs in response to a NCCHC

report critical of barriers to filing HSRs.  This created a backlog of unaddressed

HSRs.  The Court found that the backlog was temporary and that defendants

corrected it by bringing in staff from other areas.  *See Findings & Conclusions,* at

pp. 50-51.  The Court rejected plaintiffs' allegation that defendants violated the

Eighth Amendment by refusing to hire more staff.  *Id.*  Reducing the backlog of

HSRs may have been prompted in part by plaintiffs' advocacy as this incident

occurred after the motion to terminate was filed.  But it is equally true that

(1) defendants would have to eliminate the backlog to have any hope of prevailing

on their motion regardless of plaintiffs' advocacy; (2) the defendants rejected the plaintiffs' demand for more staff and the Court upheld that action under the Eighth Amendment; and (3) the backlog was eliminated without adopting plaintiffs' advocated solution.  Thus, the benefit achieved was slight.

In one of the citations referenced by plaintiffs above, Rona Siegert – the ISCI Health Services Director – is asked to confirm that "IDOC hasn't authorized an across-the-board increase in medical staffing."  *See Transcript at p. 387-88 (Siegert).*  She disagrees and responds that "IDOC has."  *Id.*  She was then asked if that authorization came after the motion to terminate was filed in March of 2019, and she responded, "I believe it was after March, yes."  *Id.*  Plaintiffs' counsel did not ask her any follow-up questions to identify the specifics of the "across-the-board" hiring and whether it was actually prompted by the motion or was just a coincidence of timing.  The reference to "across-the-board" hiring may refer to increases in staffing for facilities other than those involved in this litigation.  It may also refer to the hiring of Hannah Taff, described above.  This is, at best, ambiguous evidence that shows a slight benefit.[1]

---

[1] Finally, plaintiffs did persuade the Court to identify three areas – suicide monitoring, emergency response staffing, and Medical Annex staffing – that although compliant with the Eighth Amendment were barely so.  That is, however, mere dicta that did not create any actual changes in operations or confer any actual benefit on plaintiffs.  As such, it fails the *Hensley* requirement that it be a significant  benefit.

Thus far, all the benefits discussed were obtained by plaintiffs' advocacy *prior to trial.* Additionally, the plaintiffs' pretrial advocacy prompted improvements in certain areas that allowed plaintiffs to agree to the voluntary termination and compromise of *Balla I* Orders 1 (special medical diets), 2 (clothing for protective custody inmates), 7 (protective custody conditions), 8 (protection of younger offenders), and 9 (due process at disciplinary hearings). That stipulation, and the Order approving it, were filed about a month after the motion to terminate was filed. *See Order Approving Stipulation* (Dkt. No. 1282).

In summary, the plaintiffs' opposition to the motion to terminate was the catalyst for some benefits being extended to the inmate class. But those benefits were all extended prior to the trial on the motion. At the trial itself, plaintiffs' contentions were all rejected by the Court. For example, several days of trial were devoted to Eighth Amendment challenges brought by individual inmates – McGiboney, Dickson, Wall, Coleman, Hydle, and Swisher – regarding their medical care and yet each of those was rejected by the Court. Additional trial time was used by plaintiffs to challenge defendants' emergency medical care, psychiatric care (outside of suicide monitoring), audit tools, overcrowding, security staffing, and plumbing repairs. All of those challenges were rejected by the Court. The majority of plaintiffs' trial time was spent presenting testimony alleging that defendants were deliberately indifferent to proper medical care in the Medical

Annex, an allegation ultimately rejected by the Court.

Recalling the legal standard to be applied here, fees are justified if plaintiffs "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley,* 461 U.S. at 433.  The most critical factor is "the degree of success obtained." *Id.* at 436.

Plaintiffs' did not succeed on any significant issue at trial and gained no benefits from the time they spent in trial, which is the vast majority of the fees they seek.  They did obtain some benefits *prior to trial* because defendants knew plaintiffs would be opposing the motion and knew that the motion had to be fully supported.  But those benefits were not substantial, as discussed above.  Moreover, they were partially prompted by the simple fact that defendants had the burden of proof on their motion to terminate and had to correct past weaknesses in prison conditions regardless of plaintiffs' advocacy to have any hope of getting their motion granted.

It is impossible to precisely separate out the fees incurred in the trial litigation with the fees incurred in obtaining the benefits prior to trial – the fee schedule submitted by Stoel Rives does not break down the fees in this manner and probably could not do so. *See Exh. A (Dkt. No. 1421-3).*

Consequently, the Court is left to make a decision that will be imprecise by necessity.  The Court estimates that about 75% of the fees sought relate to the trial

and the issues on which plaintiffs were not successful.  That means that about 25% of the fees relate to benefits that the plaintiffs' advocacy obtained for the inmate class prior to trial.  The Court will therefore award plaintiffs the sum of $265,607.63 in attorney fees (representing 25% of the total fees requested of $1,062,430.50) and $10,989.84 in costs (representing 25% of the total costs requested of $43,959.37) for a total award of $276,597.47.[2]  The Court will enter a separate Judgment.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for fees and costs (docket no. 1421) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks $265,607.63 in attorney fees and $10,989.84 in costs for a total award of fees and costs in the sum of $276,597.47.  It is denied in all other respects.

DATED: March 9, 2021

B. Lynn Winmill
U.S. District Court Judge

---

[2] The Court finds that the hourly rates and time spent are reasonable and satisfy the standards set forth in the PLRA and 42 U.S.C. §1988(b).

**Memorandum Decision & Order – page 11**